### IN THE UNITED STATES DISTRICT COURT FOR
### THE NORTHERN DISTRICT OF WEST VIRGINIA
### WHEELING DIVISION

MARK MCEVOY, JAMES
TAWNEY, and SUSAN
TAWNEY, individually and
on behalf of a proposed class,

> ELECTRONICALLY
> FILED
> **07/08/2022**
> U.S. DISTRICT COURT
> Northern District of WV

Plaintiffs,

v.                                                           CIVIL ACTION NO. **5:22-CV-171 (Bailey)**
                                                                            _____

DIVERSIFIED ENERGY COMPANY PLC,
DIVERSIFIED GAS & OIL, PLC,
DIVERSIFIED PRODUCTION, LLC,
DIVERSIFIED GAS & OIL CORPORATION,
DIVERSIFIED OIL AND GAS LLC,
ALLIANCE PETROLEUM CORPORATION
EQT PRODUCTION COMPANY,
EQT PRODUCTION HTW, LLC,
EQT ENERGY LLC,
EQT INVESTMENT HOLDINGS, LLC,
EQT GATHERING, LLC,
EQT MIDSTREAM PARTNERS LP,
EQT GP HOLDINGS, LP,
and
EQT CORPORATION,

Defendants.


### CLASS ACTION COMPLAINT

Plaintiffs Mark McEvoy as well as James and Susan Tawney, individually and on behalf

of a proposed class, bring this action against Defendants Diversified Energy Company Plc,

Diversified Gas & Oil, Plc, Diversified Oil and Gas LLC, Diversified Production, LLC,

Diversified Gas & Oil Corporation, and Alliance Petroleum Corporation  (collectively,

"Diversified"), as well Defendants EQT Production Company, EQT Production HTW, EQT

Energy LLC, EQT Investment Holdings, LLC, EQT Gathering LLC, EQT Midstream Partners,

LP, EQT GP Holdings LP and EQT Corporation (together "EQT," and with Diversified, the "Defendants"). In support, Plaintiffs respectfully state as follows:

## STATEMENT OF THE CASE

1.     This case centers on thousands of abandoned gas wells in West Virginia that Diversified has a duty to plug and decommission. In West Virginia, a gas well that has not produced for twelve consecutive months is "abandoned" under state law and must be "promptly" plugged by the owner to reduce methane emissions, restore damaged properties, conserve the State's oil and gas resources, and maintain safety. *See* W. Va. Code § 22-6-19.

2.     Plaintiffs are members of a proposed class of West Virginia landowners whose properties are burdened with abandoned gas wells, who hereby assert common law claims for trespass, nuisance, and negligence against Diversified. Overall, Diversified owns 23,309 wells in West Virginia, at least 2,168 of which are abandoned — including the more than 700 ***already*** abandoned or nonproducing wells in West Virginia transferred by EQT to Diversified in or around July 2018 and additional wells transferred from EQT to Diversified in or around May 2020. This lawsuit aims in the first instance to enforce the Plaintiffs' common private right to have those abandoned wells plugged and decommissioned by Diversified on a prompt basis. Every landowner with a nonproducing Diversified well was defrauded and harmed by the July 2018 Fraudulent Transfers and May 2020 Transfers whether or not those wells were previously owned by EQT.

3.     Landowners such as the Plaintiffs here are left with unplugged, inoperative, and abandoned wells that are hazardous to health, damage the environment and harm property values.  The unlawful presence of these abandoned wells interferes with Plaintiffs' use and enjoyment of their properties, lowers their property values, and poses health and environmental

hazards. The wells also leak significant amounts of methane—a potent greenhouse gas—into the atmosphere and contribute to climate change. These actions constitute trespass, nuisance, and negligence.

4.    The case also concerns fraudulent transfers made between Diversified and EQT. During two such transfers, that occurred in July 2018 and on or about May 2020 (the "July 2018 Fraudulent Transfers" and the "May 2020 Fraudulent Transfers," respectively) Diversified paid more than $600 million to EQT.  Those transfers should be avoided up to the amount necessary to satisfy Plaintiffs' claims.

5.    In the July 2018 Fraudulent Transfers and May 2020 Fraudulent Transfers, Diversified also incurred hundreds of millions of dollars in liabilities in connection with plugging and decommissioning approximately 12,000 wells.  Those obligations should be avoided and placed back on EQT.

6.    Both the transfer of more than $600 million in assets and the incurrence of more than hundreds of millions of dollars in liability were the product of an actual fraudulent transfer under the West Virginia Uniform Fraudulent Transfer Act.  W.Va. Code § 40-1A-1 et seq.  The transfers should be avoided because they were done with actual intent to hinder, delay, and/or defraud creditors such as Plaintiffs.  As explained more fully below, by concealing plugging and decommissioning liabilities and exaggerating their revenue streams, Diversified created a veneer of profitability that allegedly allowed it to push off their well decommissioning liabilities decades into the future.

7.    In fact, those transfers rendered Diversified insolvent and undercapitalized in comparison with its current and future plugging and decommissioning obligations.[1]  As such, the

---

[1] More specifically, Diversified paid approximately $642 million to EQT for "assets"

July 2018 Fraudulent Transfers and the May 2020 Fraudulent Transfers were constructive fraudulent transfers as well.  Diversified failed to receive reasonably equivalent value in connection with the fraudulent transfers and Diversified (a) was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction and/or (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. *See* W.Va. Code §40-1A-4(a)(2)(i)-(ii).  Moreover, as a result of the transactions, Diversified was insolvent for purposes of the UFTA.  *See* 40-1A-5.

8.      As one expert has explained in detail, following the July 2018 Fraudulent Transfers and May 2020 Fraudulent Transfers, if Diversified had used industry norms to calculate its plugging and decommissioning obligations then those liabilities would have jumped from its self-reported range of $525 million to a more realistic range of $2 billion to $3 billion, thereby rendering Diversified insolvent for purposes of the UFTA claim.[2]

9.      As a recent article in Bloomberg observed, Diversified has acquired (partly from EQT) an "empire of dying wells."[3] Diversified has grown mainly through acquisition of older gas wells.[4] Overall, Defendant Diversified owns 23,309 wells in West Virginia, at least 2,168 of which are non-producing and legally abandoned — far more than it could afford to plug and

---

including approximately 12,000 gas wells in the Huron Play, about 37% of which were in West Virginia.

[2] *See* Ted Boettner, et al., *Diversified Energy: A Business Model Built to Fail Appalachia*, Ohio River Valley Institute (April 2022) (hereinafter, "Boettner Report") (attached as Exhibit A), at note 45 and accompanying text, full report and appendices available at https://ohiorivervalleyinstitute.org/diversified-energy-a-business-model-built-to-fail-appalachia/.

[3] Zachary R. Mider and Rachel Adams-Heard, *An Empire of Dying Wells*, Bloomberg, October 12, 2021, *available at*: https://www.bloomberg.com/features/diversified-energy-natural-gas-wells-methane-leaks-2021/.

[4] Boettner Report at 10 (finding that more than half of Diversified's wells are more than 20 years old and more than a third are more than 30 years old.)

decommission.    Diversified also owns thousands of non-producing and tens of thousands of marginal wells in neighboring states that it is obligated to decommission now or in the near-future.

10.      Diversified is, in essence, a company that was "built to fail."[5]  It has overstated its solvency and will eventually dump its liabilities on landowners like these Plaintiffs or taxpayers that will be forced to fund cleanup.

11.      Diversified's "best" wells are mainly low-operating, or "stripper,"[6] wells which generate some cash for Diversified, while Diversified grossly minimizes its future costs to plug and decommission wells. For perspective, a properly plugged well generally costs on average $75,000 to decommission, a number that far exceeds the income Diversified earns on a typical well.

12.      Diversified is engaged in a fraudulent roll up, seeking to increase income however incrementally while at the same time "disappearing" liabilities and hoping-against-hope to outrun its ever-growing mountain of financial problems. Thus, for instance, in connection with the July 2018 transaction, Diversified booked a plugging liability of only $26 million for the exact wells for which EQT had booked a plugging liability of $200 million immediately prior to the transaction.[7] As a result approximately $174 million plugging liability just vanished overnight in 2018 — or so Diversified has claimed. Diversified makes money by producing from a large number of marginal wells and grossly minimizing its plugging and decommissioning

---

[5] *See generally,* Beottner report.

[6] A stripper well is an oil or gas well producing less than 125 Barrels of Oil Equivalent per day (BOE/D) (60 MCFe/day), as defined by Interstate Oil and Gas Compact Commission (IOGCC). In ordinary parlance, these are loser wells.

[7] Boettner Report at notes 99-101.

costs, while landowners such as the Plaintiffs here are left with unplugged, inoperative, and abandoned wells that are hazardous to health and harmful to property values.

13.    Diversified's intent to hinder and delay is obvious, given that (i) beginning in 2018, Diversified creatively and baselessly estimated that the economic lives of most of its wells would extend through 2095 — an unexplained 50-year increase from its own prior estimates— allowing it to delay its cleanup costs for decades; and that (ii) Diversified continues to estimate that production from its wells will decline at only 5 percent per year, compared with other natural gas producers' decline rates that are two to three times as high.[8] An analysis of Diversified's financials reveals that the company is, quite *intentionally*, playing a high-stakes shell game designed to hinder and delay its creditors by decades upon decades.

14.    Under the scheme, a company such as EQT makes money by shedding liabilities, and Diversified would make money by producing from a small number of wells for a short time and minimizing estimates for its future plugging and abandonment costs.  Creditors such as Plaintiffs are left bearing the burden of abandoned and non-producing wells on their property.

15.    The fraudulent transfers alleged in this action are based on a fraudulent scheme to avoid hundreds of millions of dollars of liability under West Virginia laws that require operators such as EQT and Diversified to plug the wells. This action is brought to stop the shell game and to assure that the wells are plugged, despite the best efforts of both companies to slip their obligations.  The fraudulent scheme to transfer the wells from a rich company with the money to plug the wells to an undercapitalized one that will never have the resources to do so. These facts have created a significant problem for West Virginia and its citizens. Approximately 37% of Diversified's wells, most of them marginally productive at best, are located in this State.

---

[8] *Id.* at notes 15-19 and accompanying text.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).

17.    Plaintiff Mark McEvoy is an individual who owns property in Wetzel County in West Virginia.

18.    Plaintiffs James and Susan Tawney, husband and wife, are individuals who are full-time residents of Nicholas County, West Virginia.

19.    As set forth in more detail below, Defendants are corporate entities and/or partnerships that are not citizens of West Virginia.

20.    Plaintiffs bring this case as members of a class who are residents of a State different from that of either of the Defendants. Plaintiffs seek an amount sufficient to carry out Defendants' duty to plug and decommission the abandoned wells and associated infrastructure on their property.  Because the class members include individuals with more than 2,000 abandoned and non-producing wells on their property and plugging and abandonment costs will be approximately $75,000 per well, the amount in controversy exceeds $5,000,000.

21.    Defendants are subject to this Court's personal jurisdiction because the actions and inactions that caused the harm complained of occurred in this District.

22.    Venue is proper in this District and Division under 28 U.S.C. § 1391(b)-(d) because Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction when the action is commenced, and the Defendants' contacts with this District are sufficient to subject them to personal jurisdiction. Venue is also proper because Plaintiff McEvoy's property at issue in this action is within this District.

## PARTIES

23.     Plaintiff Mark McEvoy is an individual who owns property in Wetzel County, West Virginia.  He owns approximately 74 acres of real property on which an abandoned Diversified well is located.

24.     Plaintiffs James and Susan Tawney are a husband and wife who jointly own property in Nicholas County, West Virginia. They own approximately 93 acres on which an abandoned Diversified well is located.

25.     Defendant Diversified Energy Company, Plc is a public limited corporation headquartered in Alabama.  Upon information and belief it does business in West Virginia including through its wholly owned subsidiaries Diversified Production, LLC and Diversified Gas & Oil Corporation and holds ownership and financial interests in oil and gas wells in West Virginia.

26.     Upon information and belief, Defendant Diversified Gas & Oil Plc is a predecessor of Diversified Energy Company, Plc and was the operating name of that entity at the time of the July 2018 Fraudulent Transfers. Like Diversified Energy Company, Plc, Diversified Gas & Oil was headquartered in Alabama and held ownership and financial interests in oil and gas wells in West Virginia.

27.     Defendant Diversified Production, LLC is a Pennsylvania limited liability company with a principal office in Birmingham, Alabama and authorized to do business in West Virginia. Its manager is Diversified Gas & Oil Corporation. It has no other members or managers.

28.     Defendant Diversified Oil and Gas, LLC is an Alabama corporation headquartered in Birmingham, Alabama that is authorized to do business in West Virginia.

29.    Defendant Diversified Gas & Oil Corporation is a Delaware corporation with a principal office in Birmingham, Alabama and authorized to do business in West Virginia.

30.    Defendant Alliance Petroleum Company, which has merged into Diversified Production, LLC was at the time of the July 2018 Fraudulent Transfers, a Pennsylvania company with headquarters in Birmingham Alabama authorized to do business in West Virginia.

31.    Defendant EQT Production Company is a Pennsylvania corporation with principal offices in Pittsburgh Pennsylvania that is authorized to do business in West Virginia.

32.    Defendant EQT Production Company HTW, LLC is a Pennsylvania limited liability corporation with principal offices in Pittsburgh Pennsylvania that is authorized to do business in West Virginia.

33.    Defendant EQT Energy, LLC is a Delaware limited liability company with principal offices in Pittsburgh, Pennsylvania that is authorized to do business in West Virginia.

34.    Defendant EQT Investment Holdings, LLC is a Delaware limited liability company. Upon information and belief EQT Investment Holdings, LLC holds an ownership and/or financial interest in oil and gas wells in West Virginia.

35.    Defendant EQT Gathering, LLC is a Pennsylvania limited liability company with principal offices in Pittsburgh, Pennsylvania that is authorized to do business in West Virginia.

36.    Defendant EQT Midstream Partners, LP is a Delaware limited partnership.  Upon information and belief EQT Midstream Partners LP holds an ownership and/or financial interest in oil and gas wells in West Virginia.

37.    Defendant EQT GP Holdings, LP is a Pennsylvania general partnership with principal offices in Pittsburgh, Pennsylvania. Upon information and belief EQT GP Holdings, LP holds an ownership interest in oil and gas wells in West Virginia.

38.     Defendant EQT Corporation is a Pennsylvania Corporation with a principal office in Pittsburgh, Pennsylvania and authorized to do business in West Virginia.

## FACTS

39.     Under West Virginia law, any oil or gas well that has not produced for a period of twelve consecutive months "shall be presumed to have been abandoned and shall promptly be plugged by the operator." W. Va. Code § 22-6-19.

40.     The West Virginia legislature has declared "that it is in the public interest and it is the public policy of this state, to foster, encourage and promote the proper plugging of all wells at the time of their abandonment to protect the environment and mineral resources of this state." *Id.* § 22-10-2(b).

41.     As the owners of wells, Defendants are responsible for plugging and abandoning (P&A), a practice also known as "decommissioning," which includes site remediation pursuant to State regulations.

42.     Diversified has developed a business model that depends on (1) its related companies' delaying and eventually minimizing their responsibilities to plug natural gas wells on landowners' properties when those wells are "abandoned" or marginally productive and, (2) inflating future revenue streams from the wells it acquired from EQT (and others).

43.     In the past several years, Diversified has become the largest owner of oil and gas wells in the country and almost all of those wells — more than 63,000 — are located in Appalachia, with 23,309 of them alone being located in West Virginia.[9]

---

[9] Boettner Report at note 4 and accompanying text.

44.     Diversified rarely drills new wells — in fact it has drilled only 150 of its own wells since 2012.[10]

45.     Instead, it elects to acquire existing wells from other entities: since 2018, Diversified has been on an acquisition spree, primarily adding aging, low-producing and "non-producing" conventional wells to its inventory.[11]

46.     More than half of its well inventory is uneconomic by industry standards.[12]

47.     Thus, although Diversified is the largest well owner, it is only the 15th largest oil and gas producer in Appalachia.[13]

48.     Diversified's ability to remain solvent also depends on its massive undercounting of decommissioning liabilities and inflating of future revenue streams through the use of unjustifiable accounting practices that deviate significantly from standard industry practices.

49.     A 2021 report on Diversified's business practices (the Boettner report)[14] on Page 17 offers a standard example of Diversified's practice. The well was owned by EQT from 2006 to 2017, when it was transferred to Alliance Petroleum, which was purchased by and became a subsidiary of Diversified in 2018. The 15-year-old vertical conventional natural gas well is located near Charleston, West Virginia in Kanawha State Forest.[15] It was drilled in December of 2006, and it began producing in January of 2007, according to state records. The well initially produced nearly 24,000 Mcf of natural gas, or 11 BOED, its first year of production but produced less than 6,000 Mcf in 2020. The average annual decline rate of the well is 9 percent.[16] Despite being a low-

---

[10] *Id.* at 11, Section 1.0.
[11] *Id.* at note 4 and accompanying text.
[12] *Id.* at note 60 and accompanying text.
[13] *Id.* at note 8 and accompanying text.
[14] *See* fn. 2 for citation.
[15] *Id.* at note 68 and accompany text.
[16] *Id.* at 17, Figure 7.

producing stripper well, the well's production rate in 2020 was higher than 80 percent of Diversified's producing well inventory. Despite being a stripper well, it is apparently at the high end of Diversified's portfolio.

50.     Diversified's strategy is "acquiring low-cost, long-life, low-decline" oil and gas wells as well as non-producing wells that previous owners wanted to shed.[17]

51.     After acquiring these wells, Diversified performs a number of accounting maneuvers, designed to significantly reduce and misrepresent the decommissioning liabilities on its balance sheet and delay those decommissioning obligations into the future.

52.     First, Diversified enters into plugging schedules with state agencies that purport to allow it to extend its decommissioning liabilities far into the future. For example, consent agreements entered in West Virginia and Pennsylvania only require Diversified to plug roughly 80 wells per year for the next 15 years, despite the fact that Diversified holds tens of thousands of abandoned and low producing wells in these states.[18]

53.     While those consent agreements may provide a smoke-screen and give Diversified some comfort in terms of enforcement of its decommissioning duties by state regulatory agencies, they in no way impact the private civil liabilities that Diversified (and EQT) have to private citizens over private property rights.[19] Plaintiffs retain the rights they are enforcing in this action against Diversified through common law doctrines of trespass, nuisance, and negligence.

---

[17] *Id.* at note 55 and accompanying text.

[18] *Id.* at notes 10 and 11 and accompanying text.

[19] For example, by the West Virginia agreement's express terms, Diversified's compliance with the agreement only protects the company from enforcement of its plugging and decommissioning obligations *by the state*. *See* West Virginia Department of Environmental Protection, Consent Order No. 2018-22 (November 19, 2022) at §IV.5.b ("Oil and gas wells identified [as abandoned] *shall not be subject to any further enforcement activities by the [Office of Oil and Gas ]* with regard to any requirement to close and plug such wells based upon the lack of production in the most previous twelve months so long as Diversified is compliant with the

54.    Diversified also estimates its costs to plug wells at values that are far below industry standards.[20]

55.    Moreover, Diversified estimates that the economic life of its wells will last far beyond standard industry timelines, in part by employing annual rates of production decline that are one-third to one-half of the decline rates of other natural gas producers.[21]

56.    Diversified's tactics lead it to revalue its decommissioning liabilities at a small fraction of the value used by the entities from which Diversified acquires its wells.[22]

57.    Moreover, Diversified's accounting practices are also partly based on a set of unjustifiable assumptions around the plugging and decommissioning costs that allow the company to account for future plugging and decommissioning costs on its books at an unsupportable low value.

58.    Diversified puts forth a schedule for plugging and decommissioning its wells based on estimates for costs and timeframes that are well outside industry norms.

59.    In 2020, it estimated its plugging and decommissioning would cost $25,000 per well on average, which is much lower than actual costs.

60.    To make matters worse, Diversified then lowered this per-well cost by roughly ten percent the following year.[23]

61.    Even if the $25,000 cost were accurate, the approximately 7000 already non-producing wells acquired by Diversified in West Virginia, Pennsylvania, Kentucky and Ohio would cost $175,000,000 to decommission.

---

terms and conditions of this Order ….") (emphasis added).
    [20] Boettner Report at note 15 and accompanying text.
    [21] *Id.* at notes 16 and 17 and accompanying text.
    [22] *Id.* at note 21 and accompanying text.
    [23] *Id.* at note 15 and accompanying text.

62.     Diversified estimates the economic lives of its wells will last through 2095, allowing it to delay its cleanup costs for decades.[24] That estimate is wrong and is not supported by standard industry geologic evaluation practices. The result is that decommissioning obligations that should be incurred in the immediate future are put off for decades.

63.     Similarly, in 2020, Diversified estimated that production from its wells will decline at only 5 percent per year.  That is a significant underestimate. Other natural gas producers' decline rates are two to three times as high.[25]

64.     In its full-year 2021 results, the company acknowledged its actual decline rate for the year was, in fact, 9 percent.[26]

65.     In 2021, Diversified estimated inflation rates on plugging and decommissioning would be only 2.5 percent per year and did not transparently break out its forecast for future plugging and decommissioning costs.[27]

66.     Diversified's plugging and decommissioning costs appear on the company's books as a liability, called an Asset Retirement Obligation (ARO).

67.     Diversified's accounting for its AROs is also based on assumptions that are outside industry norms.

68.     For example, after it acquires wells, Diversified often revalues these ARO liabilities at a small fraction of the liabilities the prior owners had assumed.

69.     Other problematic ARO practices used by Diversified include extending the weighted average timeframe to plug and decommission its wells to 50 years.[28]

---

[24] *Id.* at note 16 and accompanying text.
[25] *Id.* at note 17 and accompanying text.
[26] *Id.* at note 18 and accompanying text.
[27] *Id.* at note 19 and accompanying text.
[28] *Id.* at note 22 and accompanying text.

70. Diversified has benefited from these and other accounting practices that other oil and gas producers have not used.

71. These include the highly unusual Gain on Bargain Purchase (GoBP), which Diversified has used every year since 2014 to boost its profits without paying taxes.[29]

72. After most of its acquisitions, it recognizes a "gain," which is added, tax free, to its net income.[30]

73. It appears that no other companies in the sector, at least according to one commentator, use this practice.

74. Unlike other oil and gas producers, Diversified has not written off or impaired any of its assets over the past few years, even when gas prices were extremely low.[31]

75. The result of Diversified's business practices guarantees the revenues from its producing wells will not be sufficient to cover the decommissioning obligations associated with its abandoned wells in the long run.

76. Diversified now owns thousands of abandoned wells in West Virginia and surrounding states with associated plugging and decommissioning obligations that Diversified is not fulfilling.

77. As explained above, Diversified has specific plans to plug only a tiny fraction of those wells.

78. Further, EQT and Diversified each understood at the times of the transfers of EQT's wells to Diversified, that the wells at issue were subject to significant plugging and decommissioning liabilities.

---

[29] *Id.* at note 23 and accompanying text.
[30] *Id.* at note 24 and accompanying text.
[31] *Id.*

79.    A significant motivation of EQT in the transactions with Diversified was to avoid the plugging and decommissioning liabilities associated with the wells.

80.    Diversified's failure to plug its wells is causing real and present harm.  For example, Diversified has failed to report the extent methane emissions form its acquired wells (including those acquired from EQT).

81.    That methane leakage not only causes significant environmental harm, but is also a significant financial liability.

82.    For example, an analysis of more than 20,000 active wells in Pennsylvania acquired by Diversified reveals an unrealistic drop in company-reported methane emissions post-acquisition.[32]

83.    Reported leakage for the same wells in 2020 was about 140,000 cubic feet per day when 95% of these wells were owned by Diversified.[33]

84.    ***That is about a 93% reduction in reported leakage related to ownership change, with no apparent physical efforts by Diversified to slow the leaks.***

85.    While it appears that EQT and other companies that transferred wells to Diversified reduced their emissions substantially between 2014 and 2020, that reduction is a mirage: Diversified was acquiring many of the leaking wells and decreasing reported emissions.[34]

86.    Mark McEvoy has substantial leakage from the non-producing well on his property. He can both see and smell hydrocarbons escaping from the well head. From time to time the leakage is so bad that it gives him headaches and makes him feel ill.

---

[32] *Id.* at note 31 and accompanying text.
[33] *Id.* at note 33 and accompanying text.
[34] *Id.* at note 34 and accompanying text.

87.     The high concentration of low-producing wells in one company's portfolio—along with more than 100,000 additional stripper wells in the region—presents a risk that even more wells could become orphaned or wards of the state.

88.     If Diversified were to go out of business, states could be on the hook for billions in clean-up costs for those wells since operators are not required to set aside sufficient plugging and decommissioning costs upfront.[35]

## EQT'S ROLE

89.     Diversified's overall business scheme is made possible only through the cooperation of entities such as Defendant EQT, which offloaded wells that it knew or should have known would become decommissioning liabilities—liabilities that it knew or should have known Diversified would not be able to satisfy.[36]

90.     EQT is a sophisticated industry player. It is the largest producer in the United States and second largest well owner in Appalachia, behind only Diversified.

91.     Although Diversified owns 3.4 times as many wells as EQT,[37] EQT produces 8.7 times more oil and gas than Diversified.[38]

92.     On average, Diversified's producing wells in the region produce 2 BOED compared to the four-state average of 25 BOED.

93.     EQT was aware of and understood the limited profitability of Diversified's well portfolio, including the liabilities associated with thousands of wells it sold to Diversified.

---

[35] *Id.* at note 35 and accompanying text.
[36] *See id.* at note 71 and accompanying text.
[37] *Id.* at 15, Figure 4.
[38] *Id*. at 15, Figure 5.

94.     Note Q from EQT Corporation's Form 10-Q filing with the United States Securities and Exchange Commission for the Quarterly Period Ending September 30, 2018, reflects the high level of detail that EQT had about the transaction at issue. Note Q of EQT Corporation and Subsidiaries Notes to Condensed Consolidated Financial Statements (Unaudited) — entitled "Divestitures" —details with particularity the issues and potential fraud of the parties:

> ***On July 18, 2018, the Company sold approximately 2.5 million non-core, net acres in the Huron Play for net proceeds of $523.6 million, subject to final purchase price adjustments (the Huron Divestiture). The assets sold in the Huron Divestiture included approximately 12,000 productive wells with current net production of approximately 200 MMcfe per day, approximately 6,400 miles of low-pressure gathering lines and 59 compressor stations. The Company retained the deep drilling rights across the divested acreage***

> ***During the first quarter of 2018, the Company recorded an impairment of $2.3 billion associated with the production and related midstream assets in the Huron and Permian Plays.***

*Id.* at Page 43, Note Q (emphasis added).   This was not a one-time deal between Diversified and EQT. In addition to the 2018 and 2020 fraudulent transfers described above, an EQT subsidiary made a similar transaction with Diversified in or around 2012.

95.     An article by Hart Energy of May 26, 2020, pointed out:

> EQT Corp. said May 26 it closed a multimilllion-dollar transaction to sell certain non-strategic assets with proceeds used to pay down the U.S. shale gas producer's debt.

> [Diversified], which had disclosed the deal earlier this month, agreed to purchase the package of upstream and midstream Appalachia assets for initial consideration of $125 million. The deal includes contingency payments of up to $20 million ***plus relieves EQT of approximately $47 million in asset retirement obligations and other liabilities associated with the assets.***

> Proceeds from the sale have been used to pay down EQT's term loan due 2021, which CEO Toby Rice said demonstrates the company's commitment improving the balance sheet and reducing debt.

"These assets sit outside our core focus area and the divestment will enable a heightened focus on our core asset portfolio," Rice said in a statement. ***"Additionally, the transaction relieves EQT of the higher relative operating costs and substantial asset retirement obligations associated with these assets and will improve our financial standing."***

The EQT assets comprise about 8,500 net acres located in Pennsylvania and West Virginia with an estimated 48 million BOE of reserves and PV-10 value of $185 million, according to a Diversified company release.

Primarily a conventional asset operator, Diversified also noted about 10% of the wells included in the EQT deal are unconventional and prospective for the Marcellus and Utica shales.

*Id.*

96.     The foregoing demonstrates that EQT viewed the sale principally as a way to reduce liabilities associated with the wells.

97.     As EQT was aware, Diversified could only be profitable by largely ignoring the millions of dollars of asset retirement obligations—namely, plugging and decommissioning costs—that EQT bragged to its shareholders about shedding.

**PLAINTIFFS' PROPERTY RIGHTS**

98.     Diversified's failures to promptly plug and remediate the non-producing and abandoned wells on Plaintiffs' properties constitute violations of Plaintiffs' real property rights.

99.     Defendants have violated and will continue to violate Plaintiffs' property rights by failing to promptly plug their wells, remove derelict equipment, properly reclaim the land, vacate Plaintiffs' property and take all other steps legally necessary to properly close the well.

100.     The wells damage Plaintiffs' property values and environmental interests.

101.     The non-producing and abandoned wells are not reasonable and necessary for mineral extraction, evidenced by the fact that there is no current mineral production.

102.    The non-producing and abandoned wells have not been plugged promptly after abandonment as required by West Virginia law.

103.    The non-producing and abandoned wells are both a trespass and a nuisance under West Virginia law.

104.    Additionally, Defendants' failures to plug the wells constitute negligent acts under West Virginia law that have caused injuries to Plaintiffs. Plaintiffs seek to recover from Defendants the costs necessary to cure the illegal conduct, including those needed to properly and fully plug the wells, remove all natural gas drilling equipment, waste, and other trespassory objects and materials from the properties, and complete remediation of the well sites.

**Plaintiff Mark McEvoy's Property**

105.    Plaintiff Mark McEvoy is an individual and landowner in Wetzel County, West Virginia.  He owns approximately 74 acres in Wetzel County, West Virginia. McEvoy uses the property for customary uses, including for recreation, firewood, and as a personal investment.

106.    McEvoy owns the surface estate. He does not possess the right to produce oil or gas from the property because the mineral estate was severed from the surface estate prior to Mr. McEvoy's purchase of the property.  *See* Book 474 page 619 in Wetzel County, West Virginia.

107.    Diversified Production, LLC is listed by the West Virginia Office of Oil and Gas ("Office of Oil and Gas") as the operator of a gas well on Plaintiff's property.

108.    The conventional vertical gas well is known by a unique numerical identifier, called an API number, which is 4710300705 ("the well").

109.    Diversified acquired the well from EQT on or about May 2020 as part of a transaction involving more than 880 other wells.

110.    When McEvoy purchased the property, the well was, to the best of his knowledge, producing gas.

111.    As a surface owner, McEvoy is not entitled to royalties or other compensation for gas production by the mineral estate owner or its lessee.

112.    According to the Office of Oil and Gas, the well's operator has not reported natural gas production in any amount since 2018.

113.    According to the Office of Oil and Gas, the well has never produced oil.

114.    The Office of the Oil and Gas lists the status of the well as "abandoned."

115.    The sole purpose of the well was the extraction of oil and/or natural gas.

116.    Without any mineral production on the McEvoy's property, there is no purpose and no legal justification for the continued presence of the well or its associated equipment.

117.    The well has not been plugged or decommissioned.

118.    The well site includes derelict equipment owned by Diversified.

119.    Diversified performs no maintenance on the well.

120.    Diversified does not monitor the well for leakage of methane or other harmful gasses into the atmosphere.

121.    Diversified does not monitor the well for leakage from the well bore and/or well casing into Plaintiff's groundwater or surface water.

122.    Upon information and belief, pursuant to West Virginia law and the deed severing the mineral estate from the Plaintiff's surface estate, Diversified has, at most, a limited surface easement implied by law to do what is reasonable and necessary to extract oil and gas from the subsurface of Plaintiff's property.

123.    The abandoned well is not reasonable and necessary to extract oil or gas, because the well is abandoned and has not been used for that purpose for at least three years.

124.    Diversified has no right to leave the unplugged well or the unreclaimed well site on McEvoy's property.

125.    The continued presence of the unplugged well and unreclaimed well site substantially devalue McEvoy's real property.

126.    The well is a safety hazard and is an actual or potential environmental hazard.

127.    McEvoy suffers headaches and illness as a result of the emissions from the well on his property.

### Plaintiffs James and Susan Tawney's Property

128.    Plaintiffs James and Susan Tawney are husband and wife who own approximately 93 acres in Nicholas County, West Virginia. The Tawneys use the property for customary uses, including for their residence, recreation, gardening, firewood, and as a personal investment. They also operate, as a business, a campground on the site.

129.    The Tawneys own the land in fee simple. They have leased the oil and gas rights, which Diversified formerly used to produce at the property.

130.    They have not received royalties from Diversified for at least the last two years.

131.    Diversified Production, LLC is listed by the West Virginia Office of Oil and Gas ("Office of Oil and Gas") as the operator of a gas well on Plaintiffs' property.

132.    The conventional vertical gas well is known by a unique numerical identifier, called an API number, which is 4706700689 ("the well"). Diversified acquired the well from EQT on or about July 18, 2018 as part of a transaction involving more than 11,000 other wells.

133.    When the Tawneys purchased the property, the well was producing gas.

134.    According to the Office of Oil and Gas, the well's operator has not reported natural gas production in any amount since 2019.

135.    According to the Office of Oil and Gas, the well has never produced oil.

136.    The Office of the Oil and Gas lists the status of the well as "abandoned."

137.    The sole purpose of the well was the extraction of oil and/or natural gas.

138.    The Tawneys' mineral lease does not provide any justification for the remainder of equipment from abandoned wells that are no longer being used for oil and gas production or activities related to the production and sale of oil and gas.

139.    The well has not been plugged or decommissioned

140.    The well site includes derelict equipment owned by Diversified.

141.    Diversified performs little to no maintenance on the well.

142.    Diversified does not monitor the well for leakage of methane or other harmful gasses into the atmosphere.

143.    Diversified does not monitor the well for leakage from the well bore and/or well casing into Plaintiffs' groundwater or surface water.

144.    Upon information and belief, pursuant to West Virginia law and the Tawneys' gas lease, Diversified has, at most, a temporary lease to extract oil and gas from the subsurface of the Tawneys' property or to perform activities related to the production and sale of oil and gas on the property.

145.    The well is not extracting oil or gas, because the well is abandoned and has not been used for that purpose for at least two years.  In addition, it is no longer being used for any activities related to the production or sale of oil or gas.

- 23 -

146.    The Tawneys' mineral lease does not give the lessee the right to avoid "promptly" plugging the well upon abandonment.

147.    Diversified has no right to leave the unplugged well or the unreclaimed well site on the Tawneys' property.

148.    The continued presence of the unplugged well and unreclaimed well site devalues the Tawneys' real property.

149.    The well is a safety hazard and is an actual or potential environmental hazard.

150.    The well devalues the Tawneys' business.

**CLASS ACTION ALLEGATIONS**

151.    Plaintiffs bring this action under Rules 23(b)(2), (3), and (c)(4) of the Federal Rules of Civil Procedure on behalf of all other persons or entities similarly situated that own property on which Diversified operates non-producing and/or abandoned wells.

152.    In this action, the named Plaintiffs propose to represent a class constituting all persons who own land in West Virginia containing at least one well that (1) is not producing and/or has not produced oil or gas for 12 consecutive months, (2) is currently owned or operated by Diversified, and (3) has not been plugged or properly decommissioned. This class includes, but is not limited to, those who own land with wells that were transferred to Diversified from EQT within the four years prior to the commencement of this action.

153.    Excluded from the Class are Defendants; any entities in which they have a controlling interest; their agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

154.    The class members are ascertainable through evaluation of publicly available documents.  Records maintained by the West Virginia Office of Oil and Gas identify well

owners and operators and indicate whether such wells have or have not produced oil or gas during all relevant timeframes. Records from county assessors' offices can be used to identify landowners who own property where those wells are located.

155.    Numerosity is satisfied because there are at least 2,000 of class members in West Virginia such that joinder of all potential class members is impractical.

156.    There are questions of law and fact common to Plaintiffs and to the proposed class, particularly regarding the Defendants' liability for trespass, nuisance, and negligence as a result of their failure to promptly plug their abandoned wells on Plaintiffs' properties. Common questions include but are not limited to the following:

a.    Is the intentional ongoing presence of non-producing and abandoned wells (and associated equipment) a trespass under West Virginia law?

b.    Does the failure of Diversified to decommission its wells on Plaintiffs' property unreasonably interfere with the Plaintiffs' free use of their property and/or render ordinary use and physical occupation impossible or unsafe so as to constitute a nuisance under West Virginia law?

c.    Has Diversified breached its duty to Plaintiffs by failing to decommission their abandoned wells in accordance with their statutory obligations under W.Va. Code 22-6-19?

d.    Did Diversified make the July 2018 Fraudulent Transfers and/or the May 2020 Fraudulent Transfer with actual intent to hinder, delay or defraud its creditors?

e.    Did Diversified receive reasonably equivalent value for the obligations it incurred in the July 2018 Fraudulent Transfer?

f.  Did Diversified receive reasonably equivalent value for the obligations it incurred in the May 2020 Fraudulent Transfer?

g.  At the time of the July 2018 Fraudulent Transfer and again at the time of the May 2020 Fraudulent Transfer, was Diversified engaged in or about to engage in a business transaction for which its remaining assets were unreasonably small in relation to the business transaction?

h.  Did Diversified incur debts beyond its ability to pay as they became due?

i.   Did Diversified engage in transactions (namely the July 2018 Fraudulent Transfers and May 2020 Fraudulent Transfers for which its remaining assets were unreasonably small in relation to its business or those transactions?

j.  Was Diversified insolvent at the time of the July 2018 Fraudulent Transfers and/or May 2020 Fraudulent Transfers or as a result of those transfers as determined by a balance-sheet analysis?

157.    Plaintiffs' claims are typical of the claims of class members, who also have abandoned and/or non-producing wells owned or controlled by Defendants that have not been promptly plugged as required by law.

158.    Plaintiffs are adequate representatives of the class because their interests do not conflict with the interests of the class members, they will fairly and adequately protect the interests of the class members, and they are represented by counsel skilled and experienced in class actions.

159.    Common questions of law and fact regarding Defendants' liability, including EQT's liability pursuant to West Virginia's Uniform Fraudulent Transfers Act, predominate over

questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the issues sought to be certified for class action.

160.    The likelihood that individual members of the classes will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

161.    Under Rule 23(b)(2), through its practices alleged, Diversified and EQT have acted on grounds that apply generally to the class, so that final injunctive or declarator relief is appropriate for the class as a whole.

## FIRST CAUSE OF ACTION
### Trespass by Diversified

162.    Plaintiffs hereby restate each and every preceding paragraph, as if specifically stated herein.

163.    Diversified has no right to physically occupy the Plaintiffs' properties for any reason other than oil and gas production.

164.    Diversified's wells physically occupy and will continue to physically occupy Plaintiffs' private properties. Such occupation prevents Plaintiffs' use and enjoyment of the occupied properties and contravenes the private property "right to exclude." Such physical occupation is itself actual harm, though other damage is also caused by Diversified's activities.

165.    Diversified has caused and continues to cause a wrongful interference with the Plaintiffs' possessory rights in their properties. Diversified has caused and will cause equipment, wastes, and other physical objects to leak into and/or remain upon the Plaintiff's property without lawful authority. The ongoing presence of equipment and material is direct, continuing, and physical and constitutes trespass.

166.    Diversified's acts and omissions were and are intentional.

167.    Plaintiffs are entitled to a declaration establishing Diversified's trespasses.

168.    Plaintiffs' injuries resulting from Defendants' trespass are "susceptible of complete pecuniary compensation" and can thus be remedied through money damages. *See Wiles v. Wiles,* 134 W.Va. 81, 58 S.E.2d 601 (1950).

169.    As a result of the trespasses, each Plaintiff is entitled to compensatory damages in an amount sufficient to (1) fully and properly plug the well in accordance with all statutory and regulatory requirements, (2) reclaim the well site, (3) remove all equipment and fixtures, and (4) perform any necessary remediation to land or water resources contaminated by the offending well.

170.    Plaintiffs are further entitled to damages sufficient to compensate for their lost use of the property and the annoyance, inconvenience, and aggravation associated with the presence of Diversified's abandoned wells, which damages began to accrue when Diversified first failed to carry out their obligations to promptly plug the wells. *See Moore v. Equitrans, L.P.,* 27 F.4th 211 (4th Cir. 2022).

## SECOND CAUSE OF ACTION
### Nuisance by Diversified

171.    Plaintiffs hereby restate each and every preceding paragraph, as if specifically stated herein.

172.    The acts and omissions of Diversified on Plaintiffs' properties unreasonably interfere with Plaintiffs' use and enjoyment of their private properties; such acts and omissions disturb the Plaintiffs' free use of their properties and render ordinary use and physical occupation impossible and unsafe.

173.    Diversified's acts and omissions injure and will continue to injure the Plaintiffs. Such acts and omissions occur on the Plaintiffs' private real properties and therefore injure the

Plaintiffs directly, uniquely and specially.  The substantial and unreasonable interferences constitute a nuisance.

174.    Plaintiffs are entitled to a declaration that Diversified's wells constitute a nuisance, and to compensatory damages in an amount sufficient to remedy the nuisance.

### THIRD CAUSE OF ACTION
### Negligence by Diversified

175.    Plaintiffs hereby restate each and every preceding paragraph, as if specifically stated herein.

176.    West Virginia Code § 22-6-19 establishes that Diversified owes Plaintiffs a duty to "promptly" plug any wells on Plaintiffs' property once those wells are abandoned, *i.e.*, have not produced oil or gas for twelve consecutive months.

177.    By failing to promptly plug their abandoned wells in accordance with their statutory obligations, Diversified has breached the duty owed to Plaintiffs. *See* Syl. pt. 1, in part, *Anderson v. Moulder,* 183 W. Va. 77, 394 S.E.2d 61 (1990).

178.    Diversified's breach of duty has caused harm to Plaintiffs by interfering with their exclusive use and enjoyment of their properties, lowering the value of their properties, and otherwise causing Plaintiffs annoyance, inconvenience, and aggravation in the use of their properties.

179.    The harm to Plaintiffs and their properties associated with Defendant's breach of its duty was entirely foreseeable.

180.    Plaintiffs are entitled to a declaration that Diversified's failure to promptly plug their wells upon abandonment constitutes negligent action that is the proximate cause of Plaintiffs' injuries, and to compensatory damages in an amount sufficient to remedy those injuries.

## COUNT IV
## (AVOIDANCE AND RECOVERY OF FRADULENT TRANSFER AS THE RESULT OF AN ACTUAL FRAUDULENT TRANSFER)

181.    Plaintiffs hereby restate each and every preceding paragraph, as if specifically stated herein.

182.    Plaintiffs are properly creditors of Diversified because they hold claims against the defendant for damages resulting from trespass, nuisance, and negligence.

183.    The July 2018 Fraudulent Transfers and May 2020 Fraudulent Transfers were fraudulent under Section §§ 40-1A-4 and 40-1A-5 et seq. of the West Virginia Code or under otherwise applicable state fraudulent transfer laws.

184.    Diversified made the July 2018 Fraudulent Transfers and May 2020 Fraudulent Transfers with actual intent to hinder, delay, or defraud its creditors, including Plaintiffs for instance, as described above, in 2018 Diversified inexplicably discounted $174 million from its liabilities and extended its plugging and decommissioning obligations 50 years from its own prior estimates

185.    Diversified made both the July 2018 Fraudulent Transfers and May 2020 Fraudulent Transfers with knowledge that the natural consequence of its actions would be that Diversified would not have sufficient funding to satisfy its plugging and decommissioning obligations to its creditors, including Plaintiffs as exemplified by its unjustified extension of plugging and decommissioning liabilities and use of an unrealistic decline curve.

186.    The July 2018 Fraudulent Transfers and May 2020 Fraudulent Transfers bear several of the "badges of fraud" recognized under the West Virginia Fraudulent Transfer Act, W. Va. Code 40-1A-4.

187.    In assessing the value of the transferred assets Diversified concealed the value of the obligations it incurred by unjustifiably underestimating the plugging and decommissioning costs of the wells in the transactions.

188.    The value of the consideration received by Diversified was not reasonably equivalent to the amount of the obligations Diversified incurred, if standard and appropriate accounting practices are used to value the wells involved in the transfer.

189.    The transfers resulted in the insolvency of Diversified, if proper accounting practices are used to evaluate its liabilities and income as a result of the July 2018 Fraudulent Transfers and/or the May 2020 Fraudulent Transfers.

190.    Because the July 2018 Fraudulent Transfers and May 2020 Fraudulent Transfers are voidable under Section 40-1A-4 and 40-1A-5 et seq. of the West Virginia Code or under otherwise applicable state fraudulent transfer laws, Plaintiffs are entitled to recover value necessary to satisfy their claims from Diversified's transfers under Section 40-1A-7 of the West Virginia Code or under otherwise applicable fraudulent transfer laws and to place obligations back to the transferee—EQT.

191.    Alternatively, Plaintiffs are entitled to recover judgment for the value of the asset transferred against the first transferee and any subsequent transferee, including the Defendant EQT, under Section 40-1A-8 of the West Virginia Code or under otherwise applicable state fraudulent transfer laws.

## COUNT V
## (AVOIDANCE AND RECOVERY OF FRADULENT TRANSFER AS THE RESULT OF A CONSTRUCTIVE FRAUDULENT TRANSFER)

192.    Diversified did not receive reasonably equivalent value in exchange for the $523.4 million and other consideration it transferred to EQT in connection the July 2018 Fraudulent Transfers.

193.    Diversified did not receive reasonably equivalent value in exchange for the $114.5 million and other consideration it transferred to EQT in connection with the May 2020 Fraudulent Transfers.

194.    Plaintiffs are properly creditors of Diversified because they hold claims against the defendant for damages resulting from trespass, nuisance, and negligence.

195.    At the time of the July 2018 Fraudulent Transfers, Diversified (a) was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction and/or (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

196.    Because the July 2018 Fraudulent Transfers are voidable under Section 40-1A-4 and 40-1A-5 et seq. of the West Virginia Code or under otherwise applicable state fraudulent transfer laws, Plaintiffs are entitled to avoidance of Diversified's transfers under Section 40-1A-7 of the West Virginia Code or under otherwise applicable state fraudulent transfer laws or recover judgment for the value of the asset transferred against the first transferee and any subsequent transferee, including the Defendant EQT, under Section 40-1A-8 of the West Virginia Code or under otherwise applicable state fraudulent transfer laws.

197.    At the time of the May 2020 Fraudulent Transfers, Diversified (a) was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction and/or (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

198.    As the May 2020 Fraudulent Transfers are voidable under Section 40-1A-4 et seq. of the West Virginia Code or under otherwise applicable state fraudulent transfer laws, Plaintiffs are entitled to avoidance of Diversified's transfers under Section 40-1A-7 of the West Virginia Code or under otherwise applicable state fraudulent transfer laws and for a judgment equivalent to the value of their claims.

199.    Alternatively, Plaintiffs are entitled to avoid the transferred obligations and place liability for plugging and decommissioning back on the transferee —EQT—under Section 40-1A-8 of the West Virginia Code or under otherwise applicable state fraudulent transfer laws.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court:

1.    Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), certify the proposed class for the purpose of determining Defendants' liability to Plaintiffs;

2.    Enforce the Plaintiffs' and class members' private property rights by declaring that Diversified's failure to promptly plug its abandoned wells on Plaintiffs' and class members' properties constitutes trespass, nuisance, and negligence such that Plaintiffs and class members are entitled to appropriate damages necessary to remedy their injuries;

3.      Award Plaintiffs and class members damages from Diversified to compensate them for trespass (calculated at the cost of plugging, remediation, and demolition of the abandoned wells), nuisance, and negligence.

4.      Declare that Diversified's July 2018 Fraudulent Transfer of nearly $523.4 million to EQT in exchange for approximately 11,0000 wells is avoided as a fraudulent transfer as defined by West Virginia Code § 40-1A-1 et seq.;

5.      Declare that Diversified's May 2020 Fraudulent Transfer of nearly $114.5 million to EQT in exchange for approximately 900 wells is avoided as fraudulent transfer as defined by West Virginia Code § 40-1A-1 et seq.;

6.      In accordance with West Virginia Code § 40-1A-7, enter Judgment for the value of the property transferred up to the amount necessary to satisfy Plaintiffs' claims;

7.      Declare that Diversified's incurrence of liability is avoided and EQT is liable for the liabilities associated with plugging and decommissioning of the wells transferred in the July 2018 Fraudulent Transfers and May 2020 Fraudulent Transfers;

8.      Create a fund from the damages awarded from EQT to be used to plug and otherwise decommission class members' wells in West Virginia.

9.      Create a separate fund from damages awarded from Diversified to be used to plug and otherwise decommission class members' wells.

10.      Appoint a receiver pursuant to WV Code 40-1A-7(a)(3)(ii) to take charge of and administer both of those funds.

11.      Award attorney's fees as appropriate.

12.      Grant Plaintiffs and all class members such other and further relief as is just and equitable under the circumstances.

Trial by jury is demanded for all causes of action so triable.

Dated: July 8, 2022                              Respectfully submitted,

                                                 Brian Glasser

                                                 _____
                                                 Brian A. Glasser, Esq. (WVSB #6597)
                                                 John W. Barrett, Esq. (WVSB #7289)
                                                 BAILEY & GLASSER, LLP
                                                 209 Capitol Street
                                                 Charleston, West Virginia 25301
                                                 (304) 345-6555 (phone)
                                                 (304) 342-1110 (fax)
                                                 bglasser@baileyglasser.com
                                                 jbarrett@baileyglasser.com


                                                 Joseph M. Lovett, Esq. (WVSB #6926)
                                                 Benjamin A. Luckett, Esq. (WVSB #11463)
                                                 J. Michael Becher, Esq. (WVSB #10588)
                                                 Appalachian Mountain Advocates
                                                 P.O. Box 507
                                                 Lewisburg, WV 24901
                                                 (304) 645-9006
                                                 jlovett@appalmad.org
                                                 bluckett@appalmad.org
                                                 mbecher@appalmad.org

                                                 *Attorneys for Plaintiffs and Proposed Class*