**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING DIVISION**

| | |
|---|---|
| MARK MCEVOY, *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>DIVERSIFIED ENERGY COMPANY PLC,<br>*et al.*,<br><br>     Defendants. | Civil Action No. 5:22-cv-00171-JPB<br>Judge John P. Bailey |

## DIVERSIFIED DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Diversified Defendants request that the Court enter an order dismissing each of Plaintiffs' claims.[1]  Plaintiffs fail to state claims for which relief can be granted because settled legal principles conclusively bar each of Plaintiffs' claims.  In further support of Diversified Defendants' Motion to Dismiss (the "Motion"), Diversified Defendants offer the accompanying memorandum of law.

The Court should dismiss each of the causes of action in Plaintiffs' First Amended Class Action Complaint (ECF No. 4) (the "Complaint").  Fundamental to all claims, Plaintiffs allege Diversified failed in its duty to properly plug and abandon certain natural gas wells pursuant to West Virginia Code Section 22-6-19.  This statutory duty, however, is subject to the discretion of the director of the West Virginia Department of Environmental Protection's Office of Oil and Gas—the regulatory agency tasked by West Virginia to supervise the drilling, plugging, and

---

[1] "Plaintiffs" are Mark McEvoy, James Tawney, Susan Tawney, Samuel Stark, Susan Dennison, Mark Goff, Carol DelRosso, and George DelRosso; "Diversified Defendants" or "Diversified" are Diversified Energy Company PLC, Diversified Gas & Oil, PLC, Diversified Production LLC, Diversified Gas & Oil Corporation, Diversified Oil and Gas LLC, and Alliance Petroleum Corporation.

reclamation of natural gas wells within the state.  Utilizing this discretion, the Office of Oil and Gas entered a consent decree with Diversified in which it found no current duty to plug and abandon these wells, but instead set a schedule by which Diversified would investigate the future uses of its wells and plug and abandon a set number each year.  As a result, Diversified has no current duty to plug the wells on Plaintiffs' property and thus could not have breached that duty as a matter of law.  Plaintiffs cannot maintain their tort claims based upon this alleged duty.  In turn, because Plaintiffs do not have valid tort claims against Diversified, they cannot maintain a claim for fraudulent transfer (actual or constructive) as a matter of law.

Moreover, in seeking a ruling from this Court that Diversified breached its statutory duty to plug and abandon these wells, Plaintiffs attempt an end run around West Virginia's administrative framework to collaterally attack the State of West Virginia's findings on this matter. If Plaintiffs disagree with the West Virginia Office of Oil and Gas's order here, they must raise their complaint with the director of the Office of Oil and Gas, as provided under West Virginia law.  Plaintiffs' theory that they can trump the West Virginia Office of Oil and Gas's judgment is both legally incorrect and problematic as a matter of public policy.  In bringing this lawsuit, Plaintiffs seek to obviate West Virginia's statutory scheme for weighing the costs and benefits of plugging wells on the one hand and the potential for bona fide future uses of these wells on the other, as well as undermine the effectiveness of the regulatory agency charged with determining this balance—all to the detriment of royalty owners in West Virginia.

Respectfully submitted:                          Dated: September 29, 2022

 _/s/ Howard Persinger, III_
Howard Persinger, III                            Daniel Donovan, P.C. (admitted *pro hac vice*)
**PERSINGER & PERSINGER, L.C.**                  Ragan Naresh, P.C. (admitted *pro hac vice*)
237 Capitol Street                               **KIRKLAND & ELLIS LLP**
Charleston, WV 25301                             1301 Pennsylvania Avenue, N.W.
Phone:   (304) 346-9333                          Washington, D.C. 20004
Fax:       (304) 346-9337                        Phone:   (202) 389-5267
Email:   hmp3@persingerlaw.com                   Fax:       (202) 389-5200
                                                 Email:   daniel.donovan@kirkland.com
                                                         ragan.naresh@kirkland.com


                                                 Kenneth Young (*pro hac vice* forthcoming)
                                                 Dustin Womack (*pro hac vice* forthcoming)
                                                 **KIRKLAND & ELLIS LLP**
                                                 609 Main Street
                                                 Houston, TX 77002
                                                 Phone:   (713) 836-3600
                                                 Fax:       (713) 836-3601
                                                 Email:   kenneth.young@kirkland.com
                                                         dustin.womack@kirkland.com

*Counsel for Defendants Diversified Energy Company PLC, Diversified Gas & Oil, PLC,*
*Diversified Production LLC, Diversified Gas & Oil Corporation, Diversified Oil and Gas LLC,*
*and Alliance Petroleum Corporation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

MARK MCEVOY, *et al.*,

                Plaintiffs,

v.

DIVERSIFIED ENERGY COMPANY PLC, *et al.*,

                Defendants.

Civil Action No. 5:22-cv-00171-JPB
Judge John P. Bailey

## DIVERSIFIED DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

BACKGROUND ................................................................................................... 3

STANDARD OF REVIEW .................................................................................... 7

ARGUMENT ........................................................................................................ 8

I.   THE COURT SHOULD DISMISS THE TORT CLAIMS ............................ 8

A.   The Relevant Statutory Duty Was Not Breached as a Matter of Law ......... 8

B.   The Tort Claims Are Collateral Attacks on an Administrative Order ........ 11

1.   **The consent order governs the statutory duty to plug wells**......... 12

2.   **Plaintiffs collaterally attack the consent order when they demand that the wells be plugged immediately**................. 14

C.   The Tort Claims Are Barred by Their Two-Year Statute of Limitations .... 19

1.   **The trespass claims are untimely** ................. 19

2.   **The nuisance claims are untimely** ................. 21

3.   **The negligence claims are untimely** ................. 22

II.   THE COURT SHOULD DISMISS THE FRAUDULENT TRANSFER CLAIMS .... 22

A.   The Fraudulent Transfer Claims Should Be Dismissed with the Tort Claims .......... 22

B.   The Constructive Fraudulent Transfer Claim Is Barred by the One-Year Statute of Limitations.......... 23

CONCLUSION .................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

**Page(s)**

*Anheuser-Busch, Inc. v. Schmoke*,
    63 F.3d 1305 (4th Cir. 1995) ..................................................10

*Blake v. Columbia Gas Transmission, LLC*,
    2021 WL 951705 (S.D. W. Va. Mar. 12, 2021) ...............................15, 16

*Blake v. Columbia Gas Transmission, LLC*,
    2022 WL 866269 (S.D. W. Va. Mar. 22, 2022) ...............................15, 16

*Bordeaux Cap. Inc. v. U.S. Methanol Corp.*,
    2020 WL 2770418 (S.D. W. Va. May 28, 2020)..................................24

*Coleman v. Medi-Bill, Inc.*,
    2001 WL 1160566 (W.D.N.C. Sept. 21, 2001) ....................................7

*Collia v. Grubb*,
    2013 WL 3388294 (W. Va. July 8, 2013)......................................19, 21

*Confer v. EXCO Res., L.L.C.*,
    2013 WL 12203016 (M.D. Pa. Nov. 19, 2013) ...............................17, 18

*Confer v. EXCO Res., L.L.C.*,
    2014 WL 12704714 (M.D. Pa. Mar. 14, 2014)...............................17, 18

*Culley-Brown v. Am. Petrol. Partners, LLC*,
    2021 WL 6882398 (N.D. W. Va. Oct. 26, 2021)..................................19

*Durbin v. Nationwide Mut. Ins. Co.*,
    2019 WL 1545671 (N.D. W. Va. Apr. 9, 2019) ...................................19

*EQT Gathering Equity, LLC v. Fountain Place, LLC*,
    2011 WL 5419452 (S.D. W. Va. Nov. 9, 2011) ..............................20, 21

*Franks v. Ross*,
    313 F.3d 184 (4th Cir. 2002) ..................................................21

*Gibson v. Est. of Danilowicz*,
    2019 WL 637833 (Mich. Ct. App. Feb. 14, 2019)................................23

*Hartmann v. Cal. Dep't of Corr. & Rehab.*,
    707 F.3d 1114 (9th Cir. 2013) ..................................................7

*Iberiabank v. Polk*,
  2013 WL 5701084 (M.D. Ala. Oct. 18, 2013)........................................................................25

*McCaffrey v. Chapman*,
  921 F.3d 159 (4th Cir. 2019) .................................................................................................7

*Neitzke v. Williams*,
  490 U.S. 319 (1989).................................................................................................................8

*Richards v. Walker*,
  813 S.E.2d 923 (W. Va. 2018)..............................................................................................22

*Rogers v. Tug Hill Operating, LLC*,
  --- F. Supp. 3d ----, 2022 WL 1096620 (N.D. W. Va. Apr. 12, 2022) ...................................10

*Sherman v. Barnhart*,
  2008 WL 1994909 (N.D. W. Va. May 8, 2008) ....................................................................17

*Smith v. W. Reg'l Jail*,
  2017 WL 5329296 (S.D. W. Va. Nov. 13, 2017) ....................................................................7

*Smith v. W. Reg'l Jail*,
  2017 WL 5354201 (S.D. W. Va. Sept. 27, 2017) ...................................................................7

*Tabb v. Bd. of Educ. of Durham Pub. Schs.*,
  29 F.4th 148 (4th Cir. 2022) ..................................................................................................7

*Witthohn v. Fed. Ins. Co.*,
  164 F. App'x 395 (4th Cir. 2006)..........................................................................................10

**Statutes**

Ala. Code § 8-9A-4 .................................................................................................................23, 24

Ala. Code § 8-9A-5 .......................................................................................................................23

Ala. Code § 8-9A-9 .......................................................................................................................25

Ala. Code § 8-9B-5 .......................................................................................................................24

Ala. Code § 8-9B-10 .....................................................................................................................25

Ala. Code § 8-9B-16 .....................................................................................................................24

W. Va. Code § 22-1-1 ...............................................................................................................11, 18

W. Va. Code § 22-6-1 ....................................................................................................................11

W. Va. Code § 22-6-19 ........................................................................................................ *passim*

W. Va. Code § 22-6-23 ...................................................................................5, 13

W. Va. Code § 22-6-28 ................................................................................ *passim*

W. Va. Code § 22-6A-1 ......................................................................................11

W. Va. Code § 40-1A-4 ..........................................................................22, 23, 24

W. Va. Code § 40-1A-5 ................................................................................23, 24

W. Va. Code § 40-1A-11 ...................................................................................23

W. Va. Code § 40-1A-13 ...................................................................................24

W. Va. Code § 55-2-12 ........................................................................19, 20, 21, 22

**Rules**

Fed. R. Civ. P. 12............................................................................................7

**Other Authorities**

73A C.J.S. *Public Administrative Law and Procedure* § 349 .....................................14

## <u>INTRODUCTION</u>

The overarching legal problem presented by Plaintiffs' Complaint is that it directly misconstrues and conflicts with a West Virginia statute defining the duty to plug and providing a West Virginia administrative agency with exclusive authority to oversee the plugging of natural gas wells in West Virginia. And pursuant to that statute, that West Virginia agency—the Department of Environmental Protections' Office of Oil and Gas—exercised its authority and entered a consent decree with Diversified that is fundamentally at odds with, and cannot be reconciled with, the duties and claims alleged in the Complaint. Simply put, the statute and consent decree establish that Diversified is ***not*** obligated to plug the relevant wells, and Plaintiffs' claims depend on the contrary legal proposition that Diversified is obligated to plug the relevant wells. The Complaint fails as a matter of law, cannot be cured, and should therefore be dismissed.

West Virginia created a fulsome administrative system to oversee the drilling and plugging of natural gas and oil wells. This statutory scheme charges the West Virginia Department of Environmental Protection's Office of Oil and Gas with the exclusive authority to supervise the plugging, abandonment, and reclamation of natural gas and oil wells throughout the state. No person may plug a well in the state without first acquiring permission from this regulatory agency, which has the discretion not to require plugging of wells where it determines there to be a potential bona fide future use for the well. To the extent a person disagrees with actions taken (or not taken) by the Office of Oil and Gas, the West Virginia legislature has provided that person the ability to file a complaint with the director of the Office of Oil and Gas.

Here, the Office of Oil and Gas exercised its statutory authority to enter a consent order with Diversified finding that there were potential bona fide future uses for Diversified's non-producing wells and setting a schedule under which Diversified would investigate these uses and

plug a set number of wells each year.  Instead of filing a complaint with the director challenging its findings and/or seeking an order requiring these wells to be plugged immediately, however, Plaintiffs filed this lawsuit requesting the Court usurp the Office of Oil and Gas's authority and issue an order in contravention of its findings.  The Court should not entertain this request.

Numerous legal doctrines independently bar Plaintiffs' tort claims as a matter of law.  ***First***, the tort claims depend on Plaintiffs' misconstruction of West Virginia statutory law, which they contend imposes a duty on Diversified to plug the disputed wells.  But that gets it backwards: the Office of Oil and Gas is charged with establishing the scope of any duty to plug wells, and as the Complaint admits, that agency has already determined that Diversified has no current duty to plug these wells.  ***Second***, Plaintiffs' tort claims are an improper collateral attack on the Office of Oil and Gas's consent orders.  Plaintiffs must seek relief through prescribed administrative remedies with the Office of Oil and Gas, as provided by West Virginia law.  Plaintiffs demand that Diversified plug its wells, but the consent order states Diversified is not currently obligated to do so; Plaintiffs' claims are impermissibly contrary to the consent order.  ***Third***, even if the tort claims were not otherwise barred as a matter of law (they are), they are untimely under a two-year statute of limitations.  Plaintiffs contend Diversified failed promptly to plug abandoned wells on their properties, thereby tortiously invading Plaintiffs' property rights and violating duties owed to Plaintiffs.  If valid, however, these claims would have accrued more than two years ago when the wells were allegedly abandoned.

The actual and constructive fraudulent transfer claims also fail.  ***First***, these claims require Plaintiffs to be "creditors."  Plaintiffs are not creditors because their tort claims are the basis of their creditor status, the tort claims fail, and so the fraudulent transfer claims must fail with the tort

claims.  *Second*, the constructive fraudulent transfer claims are untimely under their governing one-year statute of limitations.

This case presents textbook examples of claims that require dismissal as a matter of law. Taking every word of the Complaint as true, and based only on its allegations and documents referenced therein, Plaintiffs fail to state claims for which relief may be granted.  Furthermore, dismissal is especially just because Plaintiffs' claims undermine West Virginia's ability to regulate the future beneficial use of wells for the benefit of its citizens.  The Court should dismiss Plaintiffs' claims.

## **BACKGROUND**

According to Plaintiffs, this case is based on allegedly abandoned natural gas wells in West Virginia that Diversified has a duty to plug and decommission.  Compl. (ECF No. 4) ¶ 1.  Plaintiffs assert that West Virginia Code Section 22-6-19 creates Diversified's duty to plug these wells.  *See id.*  Although their claims depend on that statute, Plaintiffs never recite in full the relevant text in the Complaint, so Diversified will do so, emphasizing the language that Plaintiffs selectively omit throughout the Complaint:

> Any well which is completed as a dry hole or which is not in use for a period of twelve consecutive months shall be presumed to have been abandoned and shall promptly be plugged by the operator in accordance with the provisions of this article, ***unless the operator furnishes satisfactory proof to the director that there is a bona fide future use for such well***.

W. Va. Code § 22-6-19 (emphasis added).  Based on this duty, Plaintiffs "assert common law claims for trespass, nuisance, and negligence against Diversified."  Compl. (ECF No. 4) ¶ 2.  In other words, each tort claim depends on Diversified having an obligation to plug its wells under this statute.

Based on their tort claims, Plaintiffs argue this "case also concerns fraudulent transfers made between Diversified and EQT." *Id.* ¶ 4. "During two such transfers, [sic] that occurred in July 2018 and on or about May 2020 . . . Diversified paid more than $600 million to EQT." *Id.* Plaintiffs ask the Court to undo both transactions "up to the amount necessary to satisfy Plaintiffs' [tort] claims." *Id.*

All of Plaintiffs' claims stem from well abandonment alleged to have happened years ago. Plaintiffs say, "The non-producing and abandoned wells are not reasonable and necessary for mineral extraction, evidenced by the fact that there is no current mineral production." *Id.* ¶ 110.[2] They claim the "wells have not been plugged promptly after abandonment as required by West Virginia law." *Id.* ¶ 111.[3] Thus, they allege the "wells are both a trespass and a nuisance under West Virginia law." *Id.* ¶ 112.[4] According to the Complaint, each well ceased production by 2019. *See id.* ¶ 121 (alleging the well on Mark McEvoy's property "has not reported natural gas production in any amount since 2018").[5]

---

[2]   *Accord* Compl. (ECF No. 4) ¶ 125 ("Without any mineral production on the McEvoy's property, there is no purpose and no legal justification for the continued presence of the well or its associated equipment."); *id.* ¶ 147 ("The Tawneys' mineral lease does not provide any justification for the remainder of equipment from abandoned wells that are no longer being used for oil and gas production or activities related to the production and sale of oil and gas."); *id.* ¶ 169 ("Without any mineral production on Mr. Stark's property there is no purpose and no legal justification for the continued presence of the well or its associated equipment."); *id.* ¶ 190 (same allegation for Dennison property); *id.* ¶ 211 (same allegation for Goff property); *id.* ¶ 232 ("The . . . mineral lease which governs the [DelRosso-related] mineral rights does not provide any justification for leaving equipment from abandoned wells that are no longer being used for oil and gas production or activities related to the production and sale of oil and gas.").

[3]   *Accord id.* ¶ 126 ("The well has not been plugged or decommissioned."); *id.* ¶ 148 (same allegation for Tawney well); *id.* ¶ 170 (same allegation for Stark well); *id.* ¶ 191 (same allegation for Dennison well); *id.* ¶ 212 (same allegation for Goff well); *id.* ¶ 233 (same allegation for DelRosso well).

[4]   *Accord id.* ¶ 133 ("Diversified has no right to leave the unplugged well or the unreclaimed well site on the McEvoy's property."); *id.* ¶ 156 (same allegation for Tawney property); *id.* ¶ 177 (same allegation for Stark property); *id.* ¶ 199 (same allegation for Dennison property); *id.* ¶ 219 (same allegation for Goff property); *id.* ¶ 241 (same allegation for DelRosso property).

[5]   *Accord id.* ¶ 165 (alleging the well on Samuel Stark's property "has not reported natural gas production in any amount since 2017"); *id.* ¶ 186 (alleging the well on Susan Dennison's property "has not reported natural gas production in any amount since 2018"); *id.* ¶ 143–44 (alleging the well on James and Susan

West Virginia has adopted a robust administrative scheme that oversees the drilling and plugging of natural gas wells, such as those at issue in Plaintiffs' claims.  Under this statutory scheme, West Virginia has appointed its Office of Oil and Gas to "exercise supervision over the drilling, casing, plugging, filling and reclamation of all wells and shall have such access to the plans, maps and other records and to the properties of the well operators as may be necessary or proper for this purpose . . . ."  W. Va. Code § 22-6-28(a).  A private party cannot plug a well in West Virginia without permission (and a permit) from the Office of Oil and Gas.  *See, e.g.*, W. Va. Code § 22-6-23.  West Virginia Code Section 22-6-19 gives the director of the Office of Oil and Gas discretion not to require the plugging of wells otherwise presumed abandoned under the statute based on a potential bona fide future use for such well.[6]

Pursuant to this provision, the Office of Oil and Gas entered a consent order with Diversified that covers the wells at issue in Plaintiffs' claims.  A true and correct copy of this consent order, which is referenced in the Complaint, is attached as **Exhibit A**.  The consent order includes findings of fact and conclusions of law.  *See* Ex. A §§ II–III.  In its factual findings, the Office of Oil and Gas determined "it is in the best interests of the state and its citizens that [Diversified's] wells be identified and that where a bona fide future use exists, wells should be placed back into production . . . ."  *Id.* § II ¶ 10.  The Office of Oil and Gas also found "that Diversified requires sufficient time to identify those wells . . . and [to] further assess the viability of those wells and identify those wells which have the capacity for a bona fide future use and bring

---

Tawney's property "has never produced oil" and "has not reported natural gas production in any amount since 2019"); *id.* ¶ 218 (alleging the well on Mark Goff's property "has not been used for [production] for at least three years"); *id.* ¶ 239 (alleging the well on the DelRosso property "has not been used for [production] for at least three years").

[6] "Any well . . . which is not in use for a period of twelve consecutive months shall be presumed to have been abandoned and shall promptly be plugged by the operator in accordance with the provisions of this article, unless the operator furnishes satisfactory proof to the director that there is a bona fide future use for such well."  W. Va. Code § 22-6-19.

such wells back into production or which require plugging . . . ." *Id.* § II ¶ 11.  Thus, the Office of Oil and Gas asked Diversified to begin a systematic review of its wells to identify bona fide future uses and to provide an annual report to the agency summarizing the wells that Diversified chooses to plug or to bring back into production.  *See id.* § IV ¶ 5.  For the duration of that process, Diversified has no duty to plug its wells unless it identifies them as a plugging candidate in its reports, and then only on a set schedule; Diversified has even submitted a $3 million bond to secure its obligations until the review process is complete.  *See id.* §§ II ¶¶ 10–12, IV ¶ 5.

Plaintiffs acknowledge the central role of the Office of Oil and Gas, and tacitly admit that the consent order it entered with Diversified foreclose any allegation that Diversified breached a duty owed to Plaintiffs.  For example, Plaintiffs note "Diversified enters into plugging schedules with state agencies that purport to allow it to extend its decommissioning liabilities far into the future."  Compl. (ECF No. 4) ¶ 61.  "For example, consent agreements entered in West Virginia and Pennsylvania only require Diversified to plug roughly 80 wells per year for the next 15 years, despite the fact that Diversified holds tens of thousands" of wells in those states.  *Id.*  While Plaintiffs characterize these consent orders as "a smoke-screen [sic]," their own Complaint admits the consent orders foreclose any allegation that Diversified breached its duty.  *See id.* ¶ 62 (noting the consent orders "give Diversified some comfort in terms of enforcement of its decommissioning duties by state regulatory agencies").

To the extent a person wishes to challenge an order or decision made by the Office of Oil and Gas, West Virginia's administrative scheme "permit[s] any aggrieved person to file before the director, a formal complaint charging any well operator with not drilling or casing, ***or not plugging or filling***, or reclaiming any well in accordance with the provisions of this article, or to the order of the director."  W. Va. Code § 22-6-28(a) (emphasis added).  "[A]fter a full hearing . . . the

6

director shall make findings of fact and enter such order as in the director's judgment is just and right and necessary to secure the proper administration of this article, and if the director deems necessary, restraining the well operator from continuing to drill or case any well or from further plugging, filling or reclaiming the same . . . ." *Id.*

Without seeking redress from the Office of Oil and Gas, Plaintiffs filed a putative class action case.  On July 8, 2022, Plaintiffs filed their original complaint.  *See* Original Compl. (ECF No. 1) at 1.  On July 15, 2022, Plaintiffs filed the First Amended Class Action Complaint.  *See* Compl. (ECF No. 4) at 1.

## STANDARD OF REVIEW

"[A] motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim and not the truth of the facts alleged to support it."  *Tabb v. Bd. of Educ. of Durham Pub. Schs.*, 29 F.4th 148, 155 (4th Cir. 2022).  "Thus, at this stage, the [alleged] facts must be taken as true.  But the test is not legally myopic."  *Id.*  "Rather, it must be applied with common sense to determine whether a complaint contains the 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face,' not merely conceivable."  *Id.* (emphasis & citation omitted).  If, after applying these principles, "the plaintiff cannot prove any set of facts in support of his claim entitling him to relief," the Court "should grant a Rule 12(b)(6) motion."  *McCaffrey v. Chapman*, 921 F.3d 159, 164 (4th Cir. 2019) (citation omitted).

At bottom, the Court should dismiss a complaint if it "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Smith v. W. Reg'l Jail*, 2017 WL 5354201, at *3 (S.D. W. Va. Sept. 27, 2017) (quoting *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013)), *adopted*, 2017 WL 5329296 (S.D. W. Va. Nov. 13, 2017); *accord Coleman v. Medi-Bill, Inc.*, 2001 WL 1160566, at *1 (W.D.N.C. Sept. 21, 2001) ("Rule 12(b)

authorizes dismissal based upon a dispositive issue of law." (citing, *inter alia*, *Neitzke v. Williams*, 490 U.S. 319, 326 (1989))).

**ARGUMENT**

**I.      THE COURT SHOULD DISMISS THE TORT CLAIMS**

The Court should dismiss Plaintiffs' first, second, and third causes of action—respectively, the trespass, nuisance, and negligence claims against Diversified—for any of three independent reasons.  ***First***, the alleged conduct underlying each claim was not tortious as a matter of law. ***Second***, the claims are improper collateral attacks on an Office of Oil and Gas consent order. ***Third***, each claim is time-barred under a two-year statute of limitations.

**A.      The Relevant Statutory Duty Was Not Breached as a Matter of Law**

Plaintiffs' tort claims depend on an unsupportable legal premise: that Diversified breached a statutory duty to plug wells on each of the Plaintiffs' properties.  Because that premise is legally incorrect, all three tort claims fail as a matter of law.

The linchpin of each tort claim is an alleged statutory duty to plug non-producing wells under West Virginia Code Section 22-6-19.  For negligence, Plaintiffs allege Diversified breached a duty to Plaintiffs by failing to comply with the statute.  Compl. (ECF No. 4) ¶¶ 270–71 (citing West Virginia Code § 22-6-19).  For trespass, Plaintiffs allege Diversified trespassed because it failed to plug abandoned wells, exceeding the permitted use of Plaintiffs' properties.  *See id.* ¶¶ 257–64.  For nuisance, Plaintiffs seek a declaration that unplugged and abandoned wells are a nuisance and seek damages equaling the (unincurred) costs to plug the wells.  *See id.* ¶ 268.

The dispositive problem for Plaintiffs is that Diversified has not breached the statute as a matter of law.  According to Plaintiffs, "West Virginia Code [Section] 22-6-19 establishes that Diversified owes Plaintiffs a duty to 'promptly' plug any wells on Plaintiffs' property once those wells are abandoned . . . ."  Compl. (ECF No. 4) ¶ 270.  However, the presumed duty to plug any

8

well is contingent on the discretion of an administrative agency—the West Virginia Department of Environmental Protection's Office of Oil and Gas:

> Any well . . . which is not in use for a period of twelve consecutive months shall be presumed to have been abandoned and shall promptly be plugged by the operator in accordance with the provisions of this article, ***unless the operator furnishes satisfactory proof to the director that there is a bona fide future use for such well***.

W. Va. Code § 22-6-19 (emphasis added).  Plaintiffs omit the bolded clause whenever they quote the statute in the Complaint.[7]  *See* Compl. (ECF No. 4) ¶ 48 ("[A]ny oil or gas well that has not produced for a period of twelve consecutive months 'shall be presumed to have been abandoned and shall promptly be plugged by the operator.'" (selectively quoting W. Va. Code § 22-6-19)). The omitted clause is lethal to the tort claims because it provides there is no well-plugging duty as a matter of law if the Office of Oil and Gas, in its discretion, finds a potential bona fide future use for a well—which is the case here.

There can be no legitimate dispute that West Virginia Code Section 22-6-19, ***read in its entirety***, does not impose a duty on Diversified to plug the wells in question ***as a matter of law***. In fact, the Complaint acknowledges the Office of Oil and Gas has determined Diversified has no current duty to plug its wells.  *See* Compl. (ECF No. 4) ¶ 61 ("Diversified enters into plugging schedules with state agencies that purport to allow it to extend its decommissioning liabilities far into the future.").  Although Plaintiffs imply something sinister about working with state agencies to address questions about plugging wells, the reality is that the very statute that Plaintiffs invoke

---

[7]   The Complaint depends on Plaintiffs' selective recitation of this statute.  *See, e.g.*, Compl. (ECF No. 4) ¶ 1 ("In West Virginia, a gas well that has not produced for twelve consecutive months is 'abandoned' under state law and must be 'promptly' plugged by the owner to reduce methane emissions, restore damaged properties, conserve the State's oil and gas resources, and maintain safety." (citing W. Va. Code § 22-6-19)); *id.* ¶ 48 ("Under West Virginia law, any oil or gas well that has not produced for a period of twelve consecutive months 'shall be presumed to have been abandoned and shall promptly be plugged by the operator.'" (selectively quoting W. Va. Code § 22-6-19)); *see also id.* ¶ 250(c) ("Has Diversified breached its duty to Plaintiffs by failing to decommission their abandoned wells in accordance with their statutory obligations under [West Virginia] Code [Section] 22-6-19?").

specifically contemplates that an operator can provide evidence to the Office of Oil and Gas that adjusts any statutory obligation.  Again, Plaintiffs implicitly concede the Office of Oil and Gas's consent order means Diversified has ***not*** breached the statutory well-plugging duty.  *See id.* ¶ 62 (stating "those consent agreements may provide a smoke-screen [sic] and give Diversified some comfort in terms of enforcement of its decommissioning duties by state regulatory agencies").  Thus, the Complaint itself demonstrates that Plaintiffs' tort claims fail as a matter of law.

In addition to the Complaint's concessions, the Court can examine the consent order to see that Diversified has not breached its statutory duty.  The Court can consider the government order for either of two reasons.  The first is that the Complaint references the consent order.  *See Rogers v. Tug Hill Operating, LLC*, --- F. Supp. 3d ----, 2022 WL 1096620, at *4–5 (N.D. W. Va. Apr. 12, 2022) (Bailey, J.) ("[T]he Court may rely on extrinsic evidence if the documents . . . are sufficiently referred to in the Complaint." (citing *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006) (per curiam))).  The second is that the consent order is a public record subject to judicial notice.  *See id.* ("[T]he Court should consider only the allegations contained in the Complaint, the exhibits to the Complaint, matters of public record, and other similar materials that are subject to judicial notice." (citing *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995))).

The consent order shows there has been no breach of the statute underlying each tort claim because the Office of Oil and Gas has determined otherwise.  The Office of Oil and Gas, through its Chief, entered the consent order under its statutory authority.  *See* Ex. A § I.  Under the consent order, Diversified reviews each of its wells over time to identify their capacity for a bona fide future use.  *See id.* § II ¶¶ 7, 11 (noting "[t]he parties agree that Diversified requires sufficient time to identify those wells referenced above and further assess the viability of those wells and identify

10

those wells which have the capacity for a bona fide future use"). As it completes its review, Diversified provides a list of wells that are not producing to the Office of Oil and Gas along with a report summarizing its efforts to plug the wells or bring them back into production; in other words, Diversified reviews the wells to notify the Office of Oil and Gas about potential future uses. *See id.* § IV ¶ 5. In agreeing to forego plugging while this list-review-decision process is ongoing, the Office of Oil and Gas found a potential bona fide future use for Diversified's wells and set schedule for the assessment, reworking, and/or plugging of wells. *See id.* § II ¶ 10 ("The parties agree . . . that where a bona fide future use exists, wells should be placed back into production and/or should be placed into such other use as identified and approved by [the Office of Oil and Gas], and that where no bona fide future use exists that such wells be plugged."); *id.* § IV ¶ 1 (Corrective Actions/Schedule).

Given that all the tort claims flow from Diversified's alleged breach of West Virginia Code Section 22-6-19 and given that West Virginia Code Section 22-6-19—***read in its entirety***—is not violated where, as here, the Office of Oil and Gas finds a potential bona fide future use, Plaintiffs' tort claims all fail as a matter of law.

### B.      The Tort Claims Are Collateral Attacks on an Administrative Order

The Office of Oil and Gas entered the consent order with Diversified under "the authority in [West Virginia] Code [Sections] 22-1-1, ***22-6-1*** and 22-6A-1 ***et seq.***," meaning the agency exercised its authority under the statute relied upon by Plaintiffs for each tort claim. Ex. A § I (emphasis added). The consent order exempts Diversified's wells from the presumption that wells that have not produced for 12 months are abandoned and must be plugged. Given that the consent order guts Plaintiffs' tort claims as a matter of law, Plaintiffs collaterally attack this order and the Office of Oil and Gas's authority by demanding that this Court order relief contrary to the findings of the duly authorized agency of West Virginia.

11

### 1.    The consent order governs the statutory duty to plug wells

Under the consent order, the Office of Oil and Gas made multiple findings of fact.  *See id.*
§ II.  Two such findings are especially important here:  *First*, "that it is in the best interests of the
state and its citizens that [Diversified's] wells be identified and that where a bona fide future use
exists, wells should be placed back into production and/or should be placed into such other use as
identified and approved" by the Office of Oil and Gas, "and that where no bona fide future use
exists that such wells be plugged." *Id.* § II ¶ 10.  *Second*, "that Diversified requires sufficient time
to identify those wells . . . and [to] further assess the viability of those wells and identify those
wells which have the capacity for a bona fide future use and bring such wells back into production
or which require plugging . . . ." *Id.* § II ¶ 11.

Given these facts, the consent order sets out a specific procedure.  First, Diversified
evaluates its wells and presents to the Office of Oil and Gas a list of non-producing wells.  *Id.* § IV
¶ 5.  "Oil and gas wells identified on this list shall not be subject to any further enforcement
activities by the [Office of Oil and Gas] with regard to any requirement to close and plug such
wells . . . so long as Diversified is compliant with the terms and conditions" of the consent order.
*Id.*  Additionally, for "each calendar year ended December 31, 2020 through December 31, 2034,
Diversified shall either place into production or plug at least fifty (50) oil and gas wells from the
list . . . , of which no less than twenty (20) of those oil and gas wells shall be plugged no later than
December 31 of the applicable year." *Id.*  This means the Office of Oil and Gas gave Diversified
substantial discretion to choose *which* wells are plugged in any given year, so long as a sufficient
number of those wells are plugged.  In turn, Diversified "agree[d] to voluntarily obtain and
maintain and submit to the [Office of Oil and Gas] . . . a bond valued at $3,000,000.00 to inure to
the benefit of the state of West Virginia . . . which bond shall be maintained until such time as the

12

tasks as set forth" in the consent order are complete "unless otherwise extended by agreement of the parties . . . ." *Id.*

The consent order is the final word on Diversified's duty to plug its wells—indeed, that is the specific issue the consent order addresses. *See id.* § IV ¶ 8 (noting the order is not "a bar to the enforcement of any other legal obligation of Diversified by [the Office of Oil and Gas], ***except with regard to the matters specifically addressed herein***." (emphasis added)).

The at-issue statute confirms the consent order's finality.  The Office of Oil and Gas is required to supervise the plugging of wells.  Section 22-6-28 of the West Virginia Code provides that the Office of Oil and Gas, via its director, "shall exercise supervision over the drilling, casing, plugging, filling and reclamation of all wells . . . ." W. Va. Code § 22-6-28.  A private party cannot unilaterally decide to plug a well without permission from the Office of Oil and Gas.  "All dry or abandoned wells or wells presumed to be abandoned under the provisions of section nineteen of this article shall be plugged and reclaimed in accordance with this section and the other provisions of this article and in accordance with the rules promulgated by the secretary." *Id.* § 22-6-23.  Among other things, one who wants to plug a well must notify the Office of Oil and Gas and provide a bond for the plugging operations.  *See id.*  One purpose of these provisions is to allow the Office of Oil and Gas to hold hearings that allow aggrieved persons to present complaints, and "if the director deems necessary, restraining the well operator from continuing to drill or case any well or from further plugging, filling or reclaiming the same . . . ." *Id.* § 22-6-28.  Put simply, Diversified cannot plug wells without the Office of Oil and Gas's approval.  In exercising its supervisory authority here, the Office of Oil and Gas has chosen a path that is the ***opposite*** of what Plaintiffs demand.  It has determined that Diversified is ***not*** currently obligated to plug any wells, and that the best approach for West Virginia is a methodical and orderly process of reviewing

13

Diversified's wells for bona fide future uses and plugging them or bringing them back into production. *See generally* Ex. A.

West Virginia's citizens, through their elected representatives, committed decisions about plugging wells to the Office of Oil and Gas. The Office of Oil and Gas has already decided how to address the plugging, if any, of Diversified's wells through the consent order, which states Diversified does not have any current obligation to plug any specific well. As discussed below, Plaintiffs' claims are an impermissible collateral attack on that consent order.

### 2. Plaintiffs collaterally attack the consent order when they demand that the wells be plugged immediately

Contrary to the consent order, Plaintiffs demand that Diversified plug its wells immediately (or pay Plaintiffs the unincurred costs to do so). This is a textbook collateral attack on an agency order, and it is hornbook law that such attacks are improper. 73A C.J.S. *Public Administrative Law and Procedure* § 349 ("The order or determination of an administrative body, acting within its jurisdiction and under authority of law, is not subject to collateral attack." (footnotes omitted)).

The consent order was issued pursuant to a comprehensive regulatory system that provides for administrative agency hearings for any alleged failure to plug wells. The Office of Oil and Gas "shall exercise supervision over the drilling, casing, plugging, filling and reclamation of all wells and shall have such access to the plans, maps and other records and to the properties of the well operators as may be necessary or proper for this purpose . . . ." W. Va. Code § 22-6-28(a). The Office of Oil and Gas "shall permit any aggrieved person to file before the director, a formal complaint charging any well operator with not drilling or casing, ***or not plugging or filling***, or reclaiming any well in accordance with the provision of this article, or to the order of the director." *Id.* (emphasis added). "At the time and place fixed for hearing, full opportunity shall be given any person so charged or complaining to be heard and to offer such evidence as desired . . . ." *Id.*

14

"[A]fter a full hearing . . . the director shall make findings of fact and enter such order as in the director's judgment is just and right and necessary to secure the proper administration of this article, and if the director deems necessary, restraining the well operator from continuing to drill or case any well or from further plugging, filling or reclaiming the same . . . ." *Id.*

This case's tort claims, consent order, and established administrative process are analogous to *Blake v. Columbia Gas Transmission, LLC*, 2021 WL 951705 (S.D. W. Va. Mar. 12, 2021) ("*Blake I*") and *Blake v. Columbia Gas Transmission, LLC*, 2022 WL 866269 (S.D. W. Va. Mar. 22, 2022) ("*Blake II*"). In *Blake*, the plaintiffs "own[ed] property situated near a natural gas facility referred to as the 'Ceredo Compressor Station,'" the defendants "made modifications and additions to the existing Compressor Station," and "these activities destroyed the barrier between [the plaintiffs'] property and the Compressor Station, which [allegedly] created a private nuisance." *Blake I*, 2021 WL 951705, at *1. The plaintiffs' nuisance claims were based on "noise, light, dust debris and odors" from the Compressor Station. *Id.* The court dismissed each type of nuisance claim in two opinions. *See id.* at *5 (dismissing noise claims); *Blake II*, 2022 WL 866269, at *3 (dismissing remaining claims).

In its first opinion,[8] the court dealt with the noise claims. The defendants argued dismissal was appropriate because the Federal Energy Regulatory Commission ("FERC") had issued two Certificates that "establish[ed] noise level limits for the Compression Station, and those levels are directly related to its operation." *Blake I*, 2021 WL 951705, at *3. "Although [p]laintiffs state[d] that they [we]re not challenging the Certificates, the [c]ourt disagree[d]." *Id.* The plaintiffs demanded "compensation for a noise level authorized by FERC," but they could not "demand

---

[8]   The court dismissed the remaining claims in its second opinion. *See generally Blake II*, 2022 WL 866269. The opinions issued at different times based on how the defendants presented their arguments, not because of any difference in the court's conclusions. *See id.* at *1 (discussing procedural posture).

15

through a collateral attack a lower noise level standard than what [d]efendants [could] lawfully do under their Certificates." *Id.* The court added that the correct way to challenge the noise level was to complain to FERC, not the district court. *See id.* Thus, the court dismissed the claims. *See id.*

In its second opinion, the defendants argued the "claims of 'light, dust, debris, and odors' [we]re covered with specificity by FERC's Order Issuing Certificates and Approving Abandonment (Certificate Order) and the Final Environmental Impact Statement (EIS)." *Blake II*, 2022 WL 866269, at *2. The court determined "it [wa]s clear that the EIS both contemplated and approved the removal and alterations of visual buffers." *Id.* Thus, the Court dismissed the claims because the plaintiffs did not avail themselves of the prescribed administrative remedy but instead sought to collaterally attack the administrative agency's orders. *See id.* at *3.[9]

Like in *Blake I* and *Blake II*, the consent order in this case addresses Diversified's duty to plug allegedly abandoned wells and sets out the procedure the Office of Oil and Gas determined will best balance the costs and benefits of plugging obligations. *See supra* Argument § I(B)(1). Plaintiffs cannot come to this Court to demand a more stringent plugging schedule than established by the Office of Oil and Gas in its consent order. Rather, under West Virginia law, Plaintiffs must seek administrative remedies from the Office of Oil and Gas. This Court lacks subject matter jurisdiction to address what amounts to a collateral attack that the plugging schedule established by the consent order constitutes common law torts. *See Blake II*, 2022 WL 866269, at *3 ("This Court simply lacks subject matter jurisdiction to address what amounts to be a collateral attack that the approved visual impacts constitute a common law nuisance.").

---

[9]   *Accord Blake I*, 2021 WL 951705, at *3 ("If Plaintiffs believe the noise level established by the Certificates is too high, then Plaintiffs' remedy lies with exercising their rights through the administrative process, not by bringing an action in the district court.").

This Court has similarly dismissed claims where plaintiffs failed to comply properly with prescribed administrative remedies. *See Sherman v. Barnhart*, 2008 WL 1994909 (N.D. W. Va. May 8, 2008) (Bailey, J.). In *Sherman*, the plaintiff asserted social security claims. *See id.* at *1–2. To assess the justiciability of these claims, the Court turned to the Social Security Act:

> Section 405(h) states: "The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or government agency except as herein provided."

*Id.* at *4. The Court held "[t]he first two sentences of section 405(h) assure that the 'administrative exhaustion will be required'" because "'they prevent review of decisions of the Secretary save as provided in the [Social Security] Act, which provision is made in § 405(g).'" *Id.* at *5 (second set of brackets in original) (citation omitted).

West Virginia's statute has the same type of language: "[T]he director shall make findings of fact and enter such order as in the director's judgment is just and right and necessary to secure the proper administration of this article . . . ." W. Va. Code § 22-6-28(a). If a complainant remains unsatisfied, West Virginia's statute also prescribes limited judicial review of the Office of Oil and Gas's decisions, which evinces the legislature circumscribed when—if at all—the judiciary may intervene. *See* W. Va. Code § 22-6-28(b)–(c). Under *Sherman*'s reasoning, the Court should dismiss the claims based on Plaintiffs' failure to avail themselves of their administrative remedies.

Indeed, based on similar reasoning, another federal court dismissed well-plugging claims because the plaintiffs failed to pursue the statutory remedies available under state law and seek relief through the state's administrative process. *See Confer v. EXCO Res., L.L.C.*, 2013 WL 12203016, at *7–8 (M.D. Pa. Nov. 19, 2013), *adopted as modified*, 2014 WL 12704714 (M.D. Pa. Mar. 14, 2014).[10] In *Confer*, the plaintiffs "allege[d] that EXCO failed to plug the three wells on

---

[10]   The district court adopted the Report and Recommendation, modifying only the magistrate's holding

their property which were abandoned as required by Pennsylvania law." *Id.* at *1. Pennsylvania law charged the Pennsylvania Department of Environmental Protection ("DEP") with authority over the plugging and abandoning of wells in the state and established an administrative process to challenge decisions of the DEP in the exercise of this authority. *Id.* at *7–8. The court held that plaintiffs' claims "implicate[d] technical and policy considerations . . . since such issues are clearly within the DEP's administrative decision making authority." *Id.* In fact, if the court had "ordered EXCO to plug and abandon wells on [the disputed property], this may [have] le[d] to inconsistent rulings with respect to DEP's decisions ordering gas companies to plug and abandon natural gas wells." *Id.* As a result, the court dismissed the claims because "DEP should [have] first be[en] afforded the opportunity to decide if EXCO should [have] be[en] ordered to plug and abandon natural gas wells on" the disputed property. *Id.* (citations omitted).

Here, Plaintiffs assert tort claims that demand the plugging of wells contrary to what Diversified may lawfully do under the ***West Virginia*** Department of Environmental Protection's consent order. Granting Plaintiffs' proposed relief would be tantamount to overturning an agency decision, upsetting the balance of social, economic, and policy considerations reflected in the consent order. Allowing the judiciary to second-guess an agency determination and impose its own course of action in lieu of the agency's procedure would upset the Legislature's purpose in consolidating these decisions in an administrative agency with expertise to address these issues, including "the coordination, consolidation and integration of state programs and agencies which are significantly concerned with the use, enhancement, preservation, protection and conservation of the environment." W. Va. Code § 22-1-1(a)(4); *see also id.* § 22-1-1(a)(5), (b)(2) (stating that "[t]hose functions of government which regulate the environment should be consolidated in order

on an irrelevant part of the case (that plaintiffs could not amend their pleading to allege continuous drilling). *See Confer*, 2014 WL 12704714, at *1.

to accomplish the purposes set forth in this article" and that "[t]he purposes of this chapter are: . . . [t]o consolidate environmental regulatory programs in a single state agency"); Ex. A § IV ¶ 1. This logic is at its apex here, where the relevant statute expressly empowers the administrative agency to determine whether "satisfactory proof" has been furnished "to the director" for the purpose of showing there may be "a bona fide future use" for the well.  W. Va. Code § 22-6-19. That Plaintiffs simply do not like how the Office of Oil and Gas decided this issue does not mean they can avoid the administrative review process West Virginia has established.  *See* Compl. (ECF No. 4) ¶ 62.

The Court should dismiss the claims because they are an impermissible collateral attack on an administrative order.  If Plaintiffs disagree with the Office of Oil and Gas's actions in this matter, they must raise such complaints with the director, as required under West Virginia law.

### C.      The Tort Claims Are Barred by Their Two-Year Statute of Limitations

Even if Plaintiffs' tort claims were cognizable (they are not), the Court should dismiss the trespass, nuisance, and negligence claims because they are untimely as alleged by Plaintiffs. Plaintiffs assert these claims after the expiration of the governing statute of limitations.  The Complaint shows the limitations period has run, so the Court may dismiss the claims as a matter of law.  *See Culley-Brown v. Am. Petrol. Partners, LLC*, 2021 WL 6882398, at *2 (N.D. W. Va. Oct. 26, 2021) (Bailey, J.) ("Courts may dismiss claims based on a statute of limitations defense when the face of the Complaint shows the limitations period has run." (quoting *Durbin v. Nationwide Mut. Ins. Co.*, 2019 WL 1545671, at *3 (N.D. W. Va. Apr. 9, 2019) (Bailey, J.))).

### 1.      The trespass claims are untimely

The trespass claims are untimely under the two-year statute of limitations in West Virginia Code Section 55-2-12(a).  *See Collia v. Grubb*, 2013 WL 3388294, at *2–3 (W. Va. July 8, 2013) (holding "unassailable" the conclusion that trespass claims were untimely under this provision).

Specifically, Plaintiffs needed to assert their claims "[w]ithin two years next after the right to bring the same shall have accrued, if it be for damage to property . . . ."  W. Va. Code § 55-2-12(a).  Because Plaintiffs' trespass claims accrued more than two years before they filed their original complaint on July 8, 2022, the claims are time-barred.

"It is generally the case that a tort claim accrues when the injury occurs."  *EQT Gathering Equity, LLC v. Fountain Place, LLC*, 2011 WL 5419452, at *2 (S.D. W. Va. Nov. 9, 2011).  Here, the alleged trespass is the occupation of Plaintiffs' property by abandoned wells without consent.  *See* Compl. (ECF No. 4) ¶¶ 258–59.  As pleaded, the alleged occupation-by-abandonment of each Plaintiff's property was complete—and any alleged injury sustained—more than two years before July 8, 2022:

- The Complaint alleges the well on Mark McEvoy's property "has not reported natural gas production in any amount since 2018."  *Id.* ¶ 121.  The Complaint itself explains that the basis of Mr. McEvoy's claim is that the well may not occupy the property because it "is not reasonable and necessary to extract oil or gas, because the well is abandoned and has not been used for that purpose for at least three years."  *Id.* ¶ 132.

- The Complaint alleges the well on James and Susan Tawney's property has existed since at least July 18, 2018.  *See id.* ¶ 141.  The Complaint alleges "the well has never produced oil," *id.* ¶ 144, and "has not reported natural gas production in any amount since 2019," *id.* ¶ 143.  Again, the face of the Complaint establishes that the claim is time-barred: it claims that this lack of production made the well an unlawful occupier of their property "for at least two years."  *See id.* ¶¶ 153–56.

- The Complaint alleges the well on Samuel Stark's property "has not reported natural gas production in any amount since 2017."  *Id.* ¶ 165.  Once again, the Complaint itself establishes that the claim is untimely: it alleges that the well may not occupy the property because it is "not reasonable and necessary to extract oil or gas, because the well is abandoned and has not been used for that purpose for at least three years."  *Id.* ¶ 176.

- The Complaint alleges the well on Susan Dennison's property "has not reported natural gas production in any amount since 2018."  *Id.* ¶ 186.  Yet again, the Complaint explains that the cause of action accrued more than two years ago: Plaintiffs claim that the well may not occupy the property because it is "not reasonable and necessary to extract oil or gas, because the well is abandoned and has not been used for that purpose for at least three years."  *Id.* ¶ 197.

- The same is true for the well on Mark Goff's property, which the Complaint alleges is "not reasonable and necessary to extract oil or gas, because the well is abandoned and has not been used for that purpose for at least three years." *Id.* ¶ 218.

- The Complaint alleges the well on Carol and George DelRosso's property has not produced oil since 2002 and has not produced natural gas since 2019. *See id.* ¶¶ 228, 229. Under either, however, the claim is untimely because the Complaint alleges this well trespasses on the DelRosso property because it has not produced oil and gas "for at least three years." *Id.* ¶ 239.

Each Plaintiff's alleged injury is interference with their right to possess their property free of abandoned wells. *See id.* ¶ 107 ("Diversified's failures to promptly plug and remediate the non-producing and abandoned wells on Plaintiffs' properties constitute violations of Plaintiffs' real property rights."). If this really were a cognizable legal theory, then the trespass would have occurred in 2019, as provided above. Because these claims were ripe, they had accrued. *See Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002) (noting "a cause of action accrues for purposes of the statute of limitations 'when it is sufficiently ripe that one can maintain suit on it'" (collecting cases)). Thus, Plaintiffs' trespass claims had accrued by 2019, became untimely in 2021, and were time-barred when originally filed on July 8, 2022.

## 2. The nuisance claims are untimely

The nuisance claims are similarly untimely under the two-year statute of limitations in West Virginia Code Section 55-2-12(a). *See Collia*, 2013 WL 3388294, at *2–3 (affirming nuisance claims were untimely under this provision). Plaintiffs needed to assert their nuisance claims "[w]ithin two years next after the right to bring the same shall have accrued, if it be for damage to property . . . ." W. Va. Code § 55-2-12(a).

The nuisance claims accrued two years before Plaintiffs filed the original complaint on July 8, 2022. Again, tort claims accrue when the underlying injury occurs. *See Fountain Place*, 2011 WL 5419452, at *2. The basis of Plaintiffs' nuisance claims is allegedly abandoned and unplugged wells. *See* Compl. (ECF No. 4) ¶ 268 ("Plaintiffs are entitled to a declaration that

21

Diversified's wells constitute a nuisance, and to compensatory damages in an amount sufficient to remedy the nuisance."). Plaintiffs could have asserted that the wells were a nuisance as of 2019, and the claims had accrued by that time. *See supra* Argument § I(C)(1). As a result, the nuisance claims were barred by the statute of limitations when Plaintiffs brought their case on July 8, 2022, more than two years after the claims had accrued.

### 3. The negligence claims are untimely

The same two-year statute of limitations discussed above bars the negligence claims. *Cf. Richards v. Walker*, 813 S.E.2d 923, 927 n.8 (W. Va. 2018) ("In West Virginia, negligence claims are governed by a two year statute of limitation under [West Virginia] Code, 55-2-12 . . . ." (citation omitted)). Plaintiffs allege Diversified had a statutory "duty to 'promptly' plug any wells on Plaintiffs' property once those wells [we]re abandoned, *i.e.*, ha[d] not produced oil or gas for twelve consecutive months." Compl. (ECF No. 4) ¶ 270. Plaintiffs allege negligence because Diversified "breached the [aforementioned] duty owed to Plaintiffs." *Id.* ¶ 271. Again, claims based on alleged failures to plug abandoned wells ripened in 2019 (at the latest), meaning such claims accrued more than two years before this case. *See supra* Argument § I(C)(1).

## II. THE COURT SHOULD DISMISS THE FRAUDULENT TRANSFER CLAIMS

The Court should dismiss the fourth and fifth causes of action—actual fraudulent transfer and constructive fraudulent transfer claims, respectively—because they depend on the viability of the tort claims. Moreover, the constructive fraudulent transfer claims are untimely under a one-year statute of limitations.

### A. The Fraudulent Transfer Claims Should Be Dismissed with the Tort Claims

Because the Court should dismiss Plaintiffs' tort claims, it should dismiss the derivative fraudulent transfer claims under the Uniform Voidable Transactions Act. Only a plaintiff who is the defendant's creditor can allege either actual or constructive fraudulent transfer. *See* W. Va.

Code § 40-1A-4(a) (noting a "transfer made or obligation incurred by a debtor is fraudulent as to

a creditor" in certain situations); *id.* § 40-1A-5(a), (b) (same).[11] Here, the basis for Plaintiffs' status

as Diversified's alleged creditors is their contingent, unliquidated tort claims. *See* Compl. (ECF

No. 4) ¶ 276 ("Plaintiffs are properly creditors of Diversified because they hold claims against the

defendant for damages resulting from trespass, nuisance, and negligence."); *id.* ¶ 288 (stating

same). As discussed above, however, Plaintiffs' tort claims are fatally deficient as a matter of law

for numerous reasons. And if the tort claims are dismissed—as they must be—then Plaintiffs

plainly have no standing as creditors, and they cannot prevail on their fraudulent transfer claims

as a matter of law. *See Gibson v. Est. of Danilowicz*, 2019 WL 637833, at *3 (Mich. Ct. App. Feb.

14, 2019) (per curiam) ("Any recovery under the [Uniform Voidable Transactions Act]

necessitated that plaintiff succeed on his claims at trial. Plaintiff did not succeed on his claims at

trial. Absent success on at least one of his underlying claims, plaintiff could not prove that he was

a creditor of the estate.").[12]

## B.     The Constructive Fraudulent Transfer Claim Is Barred by the One-Year Statute of Limitations

Even if Plaintiffs could properly allege a fraudulent transfer claim (and they cannot), their

constructive fraudulent transfer claim is time-barred. Plaintiffs allege that Diversified committed

a constructive fraudulent transfer in violation of the Uniform Voidable Transactions Act, codified

at West Virginia Code Section 40-1A-4(a)(2). *Compare* Compl. (ECF No. 4) ¶¶ 290, 292 (alleging

---

[11]   As noted *infra*, Argument § II(B), Alabama law governs, but there is no conflict between Alabama and West Virginia law on the creditor requirement. *See* Ala. Code § 8-9A-4(a), (c) (noting a "transfer made by a debtor is fraudulent as to a creditor" in certain situations); Ala. Code § 8-9A-5 (same).

[12]   *Gibson* concerned Michigan's Uniform Voidable Transactions Act, but the Court should reach the same result. One of the Uniform Voidable Transactions Act's purposes is to ensure uniformity in the law across states. *See* W. Va. Code § 40-1A-11 ("This article shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this article among states enacting it.").

two transactions are "voidable under Section 40-1A-4" of the West Virginia Code),[13] *with* W. Va. Code § 40-1A-4(a)(2) (defining constructive fraudulent transfer).

The constructive fraudulent transfer claim is untimely under the governing one-year statute of limitations, and the Court should dismiss the claim. Under the West Virginia statute's choice of law provision, Alabama's statute of limitations governs this claim. The statute says, "A claim for relief in the nature of a claim for relief under this article ***is governed by the local law of the jurisdiction in which the debtor is located when the transfer is made*** or the obligation is incurred." W. Va. Code § 40-1A-13(b) (emphasis added). As pleaded, Diversified is the alleged debtor. *See* Compl. (ECF No. 4) ¶ 276 ("Plaintiffs are properly creditors of Diversified . . . ."); *id.* ¶ 288 (same). Each Diversified entity's statutory "location"[14] is Alabama. *See id.* ¶¶ 33–38 (alleging Alabama is each entity's headquarters or main business place). Alabama law, therefore, sets the statute of limitations. *Cf. Bordeaux Cap. Inc. v. U.S. Methanol Corp.*, 2020 WL 2770418, at *8 (S.D. W. Va. May 28, 2020) (finding California law governed a fraudulent transfer claim because of the choice of law provision in West Virginia Code Section 40-1A-13(b)).

Alabama has constructive fraud provisions under its versions of the Uniform Voidable Transactions Act and the Uniform Fraudulent Transfer Act.[15] *See* Ala. Code § 8-9B-5(a)(2) (former statute); Ala. Code § 8-9A-4(c) (latter statute). A claim under either statute "is

---

[13]  Plaintiffs also reference a section of the West Virginia Code, which applies only to alleged creditors whose claims arose ***before*** the disputed transaction. *See* W. Va. Code § 40-1A-5 (discussing "a creditor whose claim arose before the transfer was made"). Plaintiffs claim to be Diversified's creditors because of their tort claims. *See* Compl. (ECF No. 4) ¶¶ 276, 288. The tort claims are based off wells transferred to Diversified as part of the disputed transactions. *See, e.g., id.* ¶¶ 118, 141, 284, 293. This means Plaintiffs' claims against Diversified arose, if at all, ***after*** the transfer. Consequently, Plaintiffs cannot assert claims against Diversified under West Virginia Code Section 40-1A-5.

[14]  "A debtor that is an organization and has more than one place of business is located at its chief executive office." W. Va. Code § 40-1A-13(a)(3).

[15]  Alabama's Uniform Fraudulent Transfer Act applies "to transfers made prior to January 1, 2019," and its Uniform Voidable Transactions Act applies to transfers on or after that date. Ala. Code § 8-9B-16.

extinguished unless action is brought . . . within one year after the transfer was made when the action is brought by a creditor whose claim arose after the transfer was made[.]"  Ala. Code § 8-9B-10(d); Ala. Code § 8-9A-9(4).  In other words, Alabama has a one-year statute of limitations for constructive fraudulent transfer claims asserted by after-the-transaction creditors (like Plaintiffs), and the statute begins to run when the transfer is complete.  *See Iberiabank v. Polk*, 2013 WL 5701084, at *3 (M.D. Ala. Oct. 18, 2013) (noting the statute of limitations is "one year after the transfer when the action is brought by a creditor whose claim arose after the transfer was made" (citing Ala. Code § 8-9A-9(4))).

The one-year statute of limitations bars Plaintiffs' constructive fraudulent transfer claim based on the Complaint.  The disputed transfers happened in July 2018 and May 2020.  *See, e.g.*, Compl. (ECF No. 4) ¶¶ 286–87 (discussing the "July 2018 Fraudulent Transfers" and the "May 2020 Fraudulent Transfers").  Even assuming the operative pleading relates back to the original complaint, Plaintiffs asserted their claim more than one year after the latest transfer.  *See* Original Compl. (ECF No. 1) at 1 (noting a July 8, 2022 filing date).  Thus, the constructive fraudulent transfer claim—Plaintiffs' fifth cause of action—is time-barred, and the Court should dismiss the claim with prejudice.

## CONCLUSION

Plaintiffs want to stop Diversified from operating its wells under its recognized rights.  To advance their goal, Plaintiffs brought this lawsuit in defiance of West Virginia's Office of Oil and Gas and numerous other statutory requirements.  The Court should dismiss this case.

Respectfully submitted:

  /s/ Howard Persinger, III
Howard Persinger, III
**PERSINGER & PERSINGER, L.C.**
237 Capitol Street
Charleston, WV 25301
Phone:  (304) 346-9333
Fax:      (304) 346-9337
Email:  hmp3@persingerlaw.com

Dated: September 29, 2022

Daniel Donovan, P.C. (admitted *pro hac vice*)
Ragan Naresh, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone:  (202) 389-5267
Fax:      (202) 389-5200
Email:  daniel.donovan@kirkland.com
         ragan.naresh@kirkland.com

Kenneth Young (*pro hac vice* forthcoming)
Dustin Womack (*pro hac vice* forthcoming)
**KIRKLAND & ELLIS LLP**
609 Main Street
Houston, TX 77002
Phone:  (713) 836-3600
Fax:      (713) 836-3601
Email:  kenneth.young@kirkland.com
         dustin.womack@kirkland.com

*Counsel for Defendants Diversified Energy Company PLC, Diversified Gas & Oil, PLC, Diversified Production LLC, Diversified Gas & Oil Corporation, Diversified Oil and Gas LLC, and Alliance Petroleum Corporation*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 29, 2022 a copy of the foregoing was served on all counsel of record via the Court's electronic filing system.

*/s/ Howard Persinger, III*

Howard Persinger, III