## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## WHEELING DIVISION

| | |
|---|---|
| MARK MCEVOY, *et al.*, <br>      Plaintiffs, <br><br> v. <br><br> DIVERSIFIED ENERGY COMPANY PLC, *et al.*, <br>      Defendants. | Civil Action No. 5:22-cv-00171-JPB <br> Judge John P. Bailey |

### DIVERSIFIED'S REPLY IN SUPPORT OF THE MOTION TO DISMISS

  Diversified's[1] Motion to Dismiss (ECF No. 44) (the "Motion") established as a matter of law that Diversified has not violated the well plugging duty in West Virginia Code section 22-6-19. This statutory duty is the same duty underlying Plaintiffs' tort claims. Consequently, Plaintiffs pivot to arguing that they assert claims based on the common law, not violations of the statute. There are several legal problems with this pivot. ***First***, the allegations in the Complaint about duty are expressly based on the statute; Plaintiffs identify no common law duty. ***Second***, West Virginia law does not allow Plaintiffs to convert a claim that Diversified breached the statute, which has no private cause of action, into a tort claim. *Cf. Magers v. Chesapeake Appalachia, LLC*, 2013 WL 4099925, at *7 (N.D.W. Va. Aug. 13, 2013) (holding one may not cast a statutory duty as the basis for a tort claim, and dismissing a negligence claim because it alleged "the defendants' duties arise from statutes" and "negligence is not based on statute").

  Even if Plaintiffs could assert a tort claim based on the statute, their claims would still fail because Diversified complied with its duty under the Consent Order with West Virginia's Office

---

[1]  "Diversified" and "Plaintiffs" have the meanings given in the Motion.

1

of Oil and Gas. To avoid this truth, Plaintiffs now ask the Court to second guess the Consent Order and to substitute its judgment for the agency's. This is a textbook impermissible collateral attack. In the Consent Order, the Office of Oil and Gas decreed that these wells are not "abandoned" under West Virginia law, just as the West Virginia statute provides. Plaintiffs cannot challenge that result in litigation without undermining the statute and the role of the Office of Oil and Gas. For these reasons, as well as independent legal bars (like the statute of limitations or lack of standing), the Court should dismiss Plaintiffs' claims.

## ARGUMENT

### I. THE COURT SHOULD DISMISS THE TORT CLAIMS

#### A. Diversified Has No Current Duty to Plug Plaintiffs' Wells

Diversified has no duty to plug the at-issue wells under the West Virginia statute. To avoid this result, Plaintiffs claim the Consent Order "merely exercises [the Office of Oil and Gas's] prosecutorial discretion" and makes no "determination that 'Diversified is *not* currently obligated to plug any wells.'" Resp. (ECF No. 66) at PageID 430. Plaintiffs are wrong. The Office of Oil and Gas has delegated enforcement authority for the relevant duty. *See* W.Va. Code §§ 22-1-1, 22-6-1, 22-6A-1. In the Consent Order, the Office of Oil and Gas exercised its authority and unambiguously declared Diversified is not currently obligated to plug any wells under the statute.

In the Consent Order's "Findings of Fact," the Office of Oil and Gas found "Diversified requires sufficient time to . . . identify those wells which have the capacity for a bona fide future use and bring such wells back into production or which require plugging and to further complete the plugging of those identified wells within a reasonable period of time." Consent Order (ECF No. 44-1) at PageID 313–14. It also found that "it is in the best interests of the state and its citizens that these wells be identified and that where a bona fide future use exists, wells should be placed back into production . . . and that where no bona fide future use exists that such wells be plugged."

*Id.* at PageID 313. After quoting the statutory duty Plaintiffs invoke as the basis for their claims, the Office of Oil and Gas set a schedule for well plugging. *See id.* at PageID 314–15. Ultimately, the agency decided Diversified's wells have a potential bona fide future use, so Diversified is not "require[d] to close and plug such wells" under the statute at this time. *Id.* at PageID 315. Throughout this process, the Office of Oil and Gas acted under its statutory authority. *See id.* at PageID 314 ("This Consent Order is an Order of the Office of Oil and Gas authorized and issued pursuant to [West Virginia Code sections] 22-1-1 and 22-6-1 *et seq*.").

In the face of the Consent Order's plain language, Plaintiffs first attack a strawman. They argue the Consent Order is "nothing more than an exercise of [the Office of Oil and Gas's] prosecutorial discretion and has no effect on Plaintiffs' property rights." Resp. (ECF No. 66) at PageID 431 (citation omitted).² Diversified did not claim the Consent Order abrogates Plaintiffs' property rights. *See* Mot. at PageID 294 ("West Virginia Code section 22-6-19 . . . is not violated where, as here, the Office of Oil and Gas finds a potential bona fide future use."). Plaintiffs misstate the relevant legal question. The question is whether the ***statutory duty*** has been violated, and the Office of Oil and Gas has determined the answer is "no." Plaintiffs' supposed preservation of unidentified common law rights is irrelevant.

Similarly, Plaintiffs argue the Consent Order does not defeat their claims because "they assert property rights claims that derive from the common law, not statutory, [sic] rights." Resp.

---

² In support of their prosecutorial discretion argument, Plaintiffs cite a Northern District of California case for the proposition that "extended compliance deadlines reflect prosecutorial discretion and do not necessarily bar actions separately authorized for private citizens." Resp. (ECF No. 66) at PageID 431 (citing *Citizens for a Better Env't-California v. Union Oil Co. of California*, 861 F. Supp. 889, 902 (N.D. Cal. 1994). That case is inapposite. Here, the agency found there is no duty to plug the relevant wells; it did not simply extend deadlines for compliance with a duty. *See Ohio Valley Env't Coal., Inc. v. Hobet Mining, LLC*, 2008 WL 5377799, at *9 (S.D. W. Va. Dec. 18, 2008) ("If citizens could sue for civil penalties that the government chose to forgo, they would usurp the primary enforcer role and undermine the state's discretion.") (citation omitted).

3

(ECF No. 66) at PageID 424.  That argument crumbles under the weight of Plaintiffs' own citations.  The Complaint undeniably and conclusively reveals that Plaintiffs' tort claims depend wholly on the statutory duty.  *See, e.g.*, Compl. (ECF No. 4) at PageID 89 ("By failing to promptly plug their abandoned wells in accordance ***with their statutory obligations***, Diversified has breached the duty owed to Plaintiffs.") (emphasis added); *id.* at PageID 53 ("This case centers on thousands of abandoned gas wells in West Virginia that Diversified has a duty to plug and decommission.  In West Virginia, a gas well that has not produced for twelve consecutive months is 'abandoned' under state law and must be 'promptly' plugged by the owner . . . .") (citing W. Va. Code § 22-6-19).  The Response continues to rely on the statute.  *See* Resp. (ECF No. 66) at PageID 422 (citing W. Va. Code § 22-6-19 as the basis of Diversified's duty); *id.* at 437 (same).  Plaintiffs have not identified a common law duty—or ***any*** basis other than West Virginia Code section 22-6-19—that supports their claims.  Regardless of their ostensibly common law nature, the tort claims depend on the ***statutory*** duty to plug abandoned wells; the Consent Order confirms Diversified has no such duty.  Thus, the tort claims must be dismissed.[3]

Finally, Plaintiffs argue the Consent Order "does not demonstrate that [Diversified's] wells have a bona fide future use."  *Id.* at PageID 431.  This is simply an attack on the Consent Order, and it again misses the point.  *See id.* at PageID 431–32 (critiquing Consent Order's factual basis and support).  The underlying support for the Office of Oil and Gas's discretion is not the issue.  The question is whether the agency is satisfied with the proof given to it.  *See* W. Va. Code § 22-6-19 (stating wells should be plugged "unless the operator furnishes ***satisfactory*** proof ***to the***

---

[3] *See Aikens v. Debow*, 541 S.E.2d 576, 580 (W. Va .2000) (citation omitted) ("[T]o establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff.  No action for negligence will lie without a duty broker.").  The determination of whether a defendant owes a duty to the plaintiff is not a factual question, rather "the determination of whether a plaintiff is owed a duty of care by the defendant must be rendered as a matter of law by the court." *Jack v. Fritts,* 457 S.E.2d at 435.

4

*director* that there is a bona fide future use for such well") (emphasis added).  At minimum, the Consent Order shows the Office of Oil and Gas is satisfied there is enough proof of a bona fide future use to suspend any statutory presumption of abandonment or well plugging requirement.  Thus, there was no abandonment under the statute's plain language.  In the Consent Order, the agency was acting under its statutory authority over the plugging of wells; it was applying the statute at issue; it made factual findings about the potential of Diversified's wells to have bona fide future uses; it determined it was in the best interest of West Virginia's citizens to evaluate that potential; it set forth the procedure for doing so; and it ordered that Diversified is not subject to enforcement of the statutory well plugging duty if it complies with the Consent Order.  *See* Consent Order (ECF No. 44-1) at PageID 312–16.

Plaintiffs' tort claims ask whether Diversified breached West Virginia Code section 22-6-19 by not plugging wells presumed abandoned under that provision.  In the Consent Order, the Office of Oil and Gas wielded its statutory authority and determined Diversified has not breached that duty.  As a result, the Complaint must be dismissed.

### B.     The Response Confirms Plaintiffs Collaterally Attack the Consent Order

Although Plaintiffs claim otherwise, the Response confirms that they collaterally attack the Consent Order.  For example, Plaintiffs argue "the Consent Order is woefully inadequate to address Diversified's problem."  Resp. (ECF No. 66) at PageID 424 (capitalization altered).  Plaintiffs also criticize the Office of Oil and Gas's judgment about when Diversified's wells should be plugged, complaining it "established a schedule . . . under which only fifty wells per year would be either plugged or returned to production.  At that rate, it would take Diversified 340 years to plug the approximately 17,000 wells it owned in 2018 . . . ."  *Id* (emphasis omitted).  In doing so, Plaintiffs concede two things: (1) the Office of Oil and Gas set the rate and timing of Diversified's

well plugging obligations, and (2) Plaintiffs demand that the Court enter judgment contrary to the Consent Order.  This is a textbook example of an impermissible collateral attack.

### 1. This is a textbook impermissible collateral attack.

Plaintiffs demand that the Court investigate, second-guess, and overrule the Office of Oil and Gas's commands about how best to protect West Virginia's interests and citizens.  The Office of Oil and Gas determined (1) "it is in the best interests of the state and its citizens" that Diversified's wells be put back into production or plugged and (2) the best way to accomplish this was an orderly review process.  *See* Consent Order (ECF No. 44-1) at PageID 313–15.  But Plaintiffs argue, "[E]ven if [the Office of Oil and Gas] intended the Consent [Order] to establish Diversified's compliance with [section] 22-6-19 in contravention of the statute's plain language, ***it lacked discretion to do so***."  Resp. (ECF No. 66) at PageID 434 (emphasis added).  Already, Plaintiffs demonstrate their case is a collateral attack on the Office of Oil and Gas's Consent Order.

Plaintiffs go further and directly challenge the Consent Order's foundation under various regulations.  *See id.* at PageID 432–33.  Those regulations, however, speak to the Office of Oil and Gas's decision-making process.  *See* W. Va. Code R. 35-5-3 (discussing materials operators submit to the Office of Oil and Gas for evaluation); W. Va. Code R. 35-5-5 (discussing the Office of Oil and Gas's designation of a well as inactive and noting "***[t]he chief shall determine whether sufficient data and information have been provided***") (emphasis added).  In asking the Court to reject the Consent Order's foundation and dive into the related regulations, Plaintiffs ask the Court to overthrow the Office of Oil and Gas's discretion and to micromanage the agency by checking its homework.  This is a classic collateral attack.

To mask this truth, Plaintiffs argue their "requested relief is not inconsistent with the Consent Order, which requires Diversified to address 'at least' 50 wells per year."  Resp. (ECF No. 66) at PageID 434 (citing Consent Order (ECF No. 44-1) at PageID 315).  The Consent Order

6

is not consistent with Plaintiffs' demands.  The Consent Order gives Diversified—not Plaintiffs—the choice of "plac[ing] into production or plug[ging] at least fifty (50) oil and gas wells from the list" compiled under the Consent Order's procedures.  Consent Order (ECF No. 44-1) at PageID 315.  To succeed on their claims, Plaintiffs *must* undo the Consent Order's procedure for assessing which, if any, of Diversified's wells should be plugged under the statute.

Multiple courts—including this Court—have held that cases like this one should be dismissed as impermissible collateral attacks.  *See, e.g.*, *Blake v. Columbia Gas Transmission, LLC* ("*Blake I*"), 2021 WL 951705, at *3 (S.D. W. Va. Mar. 12, 2021) ("Plaintiffs are seeking compensation for a noise level authorized by FERC.  However, Plaintiffs cannot demand through a collateral attack a lower noise level standard than what Defendants may lawfully do under their Certificates.").  Plaintiffs' attempts to distinguish these cases are unpersuasive.

Plaintiffs first argue this Court's decisions "are not on point because they involved the Natural Gas Act . . . which . . . expressly provides that its procedures for review of orders issued pursuant to its authority shall be exclusive."  Resp. (ECF No. 66) at PageID 428 (discussing *Blake I* and *Blake v. Columbia Gas Transmission, LLC*, 2022 WL 866269 (S.D. W. Va. Mar. 22, 2022) ("*Blake II*")).  The administrative review procedure for the Natural Gas Act did not motivate the *Blake* outcome; the Court mentioned the statute only to explain how the regulatory agency issued its Certificate.  *See generally Blake I*, 2021 WL 951705 (mentioning the Natural Gas Act twice to summarize the defendants' arguments and once to explain that compressor stations require issuance of a certificate); *Blake II*, 2021 WL 866269 (mentioning the Natural Gas Act twice to summarize *Blake I*).  Indeed, *Blake II* explained that the Natural Gas Act was an option for dismissal independent from the rationale the Court ultimately adopted.  *See Blake II*, 2021 WL

7

866269, at *1 (noting claims may "fall within [FERC's] Certificates' parameters **and/or** scope of preemption under [the Natural Gas Act]") (brackets in original) (emphasis added).

The Court's actual reasoning was straightforward. The plaintiffs' demand for relief contrary to the agency's Certificates was an impermissible collateral attack:

> Plaintiffs are seeking compensation for a noise level authorized by FERC. However, Plaintiffs cannot demand through a collateral attack a lower noise level standard than what Defendants may lawfully do under their Certificates. If Plaintiffs believe the noise level established by the Certificates is too high, then Plaintiffs' remedy lies with exercising their rights through the administrative process, not by bringing an action in the district court. Thus, as the permissible noise levels clearly were established by the Commission through the Certificate process, this Court lacks subject matter jurisdiction and **GRANTS** Defendants' motion as to Plaintiffs' allegations of noise.

*Blake I*, 2021 WL 951705, at *3. Although Plaintiffs argue "discussion of the *Blake* cases is a red herring," Resp. (ECF No. 66) at PageID 429, the only fishy thing is Plaintiffs' attempt to downplay those cases.

The Court should also reject Plaintiffs' attempt to distinguish *Confer v. EXCO Res., L.L.C.*, 2013 WL 12203016 (M.D. Pa. Nov. 19, 2013). Plaintiffs argue *Confer* is dissimilar because it dismissed tort claims under the "gist of the action" doctrine and concerned an "attempt to directly enforce statutory requirements regarding well plugging." Resp. (ECF No. 66) at PageID 427–28. In searching for dissimilarities, Plaintiffs find distinctions without difference. Whether brought as a claim for declaratory relief under a statute or as a tort, it is improper to demand—as the *Confer* plaintiffs did and Plaintiffs do—that a defendant plug a well based on a statutory duty when a regulatory agency with enforcement power has said otherwise. *Confer*'s logic is inescapable:

> We agree . . . that this Court should dismiss Plaintiffs' requests for declaratory relief seeking an order for EXCO to plug and abandon wells on their Property since the plugging and abandoning of wells implicates technical and policy considerations and, since such issues are clearly within the DEP's administrative decision making authority. Clearly, the decision whether EXCO should be ordered to plug and abandon natural gas wells on Plaintiffs' Property "involves technical or policy

8

considerations which are beyond the court's ordinary competence and within the agency's field of expertise." Also, if this federal Court ordered EXCO to plug and abandon wells on Plaintiffs' Property, this may lead to inconsistent rulings with respect to DEP's decisions ordering gas companies to plug and abandon natural gas wells. Moreover, Plaintiffs have not sought relief from the DEP and have not pursued their administrative remedies available under PA law. We find that DEP should first be afforded the opportunity to decide if EXCO should be ordered to plug and abandon natural gas wells on Plaintiffs' Property.

*Confer*, 2013 WL 12203016, at *7 (citations omitted). This Court should reach the same result.

### 2. The statute's absence of judicial review for Plaintiffs confirms that they cannot collaterally attack the Consent Order.

Plaintiffs' argument about the unavailability of judicial review[4] confirms that the Office of Oil and Gas's determination is final. Plaintiffs concede the statute "allows an aggrieved person to file a complaint with the director of [the Office of Oil and Gas] against a well operator, alleging non-compliance" with the statute, but Plaintiffs argue they need not follow that procedure. Resp. (ECF No. 66) at PageID 427 (citing W. Va. Code § 22-6-28(a)). The given basis for Plaintiffs' noncompliance is that "the statute provides that only a 'well operator or coal operator adversely affected by a final decision or order of the director'—not a surface owner—may appeal that decision." *Id.* (quoting W. Va. Code § 22-6-28(b)) (emphasis omitted).

Plaintiffs correctly observe that the statute allows Plaintiffs to file complaints with the Office of Oil and Gas but disallows them a right of judicial review. Plaintiffs fail to recognize that this is fatal to their claims under *Martin v. Hamblet*, 737 S.E.2d 80 (W. Va. 2012).

In *Martin*, the question was whether the law "permit[s] a surface owner to seek judicial review of the . . . Office of Oil and Gas's issuance of a well work permit for a horizontal Marcellus

---

[4] As a threshold matter, Plaintiffs reframe Diversified's collateral attack argument into one based on the doctrine of exhaustion of administrative remedies. These are distinct doctrines motivated by different concerns. Discussion of administrative exhaustion is not responsive to Diversified's arguments. So too, Plaintiffs' observation that the Office of Oil and Gas "is not authorized to award . . . monetary damages" is misplaced. Resp. (ECF No. 66) at PageID 429. The fundamental relief Plaintiffs seek is the plugging of wells, relief only the Office of Oil and Gas can approve. *See* W. Va. Code § 22-6-23.

9

well[.]" 737 S.E.2d at 82. To answer that question, the court had to examine two statutes. One statute stated, "[T]he coal seam owner or lessee . . . may . . . file objections in writing . . . to such proposed drilling or fracturing with the director . . . ." *Id.* at 86 (emphasis omitted). The other stated, "[T]he objecting coal seam owners present or represented [at a statutory meeting] shall hold a conference with the board to consider the objections." *Id.* (emphasis omitted). The court noted "[n]either statute mentions the owner of the surface rights of the subject property." *Id.* at 87. Thus, "the right of judicial review with regard to the issuance or refusal of a well work permit . . . d[id] not extend to owners of the surface rights of the property upon which the proposed well is to be drilled." *Id.* Undeterred, the surface owner argued this result did "not satisfy state and federal requirements of due process and equal protection" and "under the safeguards of due process, surface owners are entitled to an appeal that provides meaningful review of a government decision that affects their lands." *Id.* at 87–88. The West Virginia Supreme Court disagreed because, "[w]here the Legislature has prescribed limitations on the right to appeal, such limitations are exclusive, and cannot be enlarged by the court." *Id.* at 90 (collecting cases).

*Martin* disposes of this case. West Virginia's legislature permits "any aggrieved person to file before the director, a formal complaint charging any well operator with not drilling or casing, or not plugging or filling, or reclaiming any well . . . ." W. Va. Code § 22-6-28(a). The legislature considered the people who could complain to the Office of Oil and Gas, and it opened those doors wide. The legislature, however, decided to permit only certain people to seek judicial review of the Office of Oil and Gas's decisions. *See* W. Va. Code § 22-6-28(b) (noting "any **well operator or coal operator** adversely affected by a final decision or order of the director, may appeal" under judicial review provisions of the State Administrative Procedures Act) (emphasis added). Plaintiffs are not among those who can challenge the Office of Oil and Gas's determinations in

10

court.  As in *Martin*, the legislature "prescribed limitations on the right to appeal, [and] such limitations are exclusive . . . ." *Martin*, 737 S.E. 2d at 90.

From their conception to their procedural background, Plaintiffs' tort claims conflict with West Virginia law.  The Court, therefore, should dismiss those claims.

### C.     The Tort Claims Are Barred by the Statute of Limitations

The continuing tort doctrine does not breathe life into Plaintiffs' time-barred tort claims. Plaintiffs assert the continuing trespass doctrine because "Diversified continues to occupy Plaintiffs' property with gas wells and leaves derelict equipment on the land, [so] its trespass is ongoing and continuous."  Resp. (ECF No. 66) at PageID 436.  Plaintiffs assert the general continuing tort doctrine under the same rationale.  *See id.* at 437 (arguing the "doctrine also applies to Plaintiffs' nuisance and negligence claims" because "Diversified has an obligation under the law to plug wells promptly after it is no longer reporting production") (citing W. Va. Code §22-6-19).  Courts, applying West Virginia law, have rejected such arguments.  *See EQT Gathering Equity, LLC v. Fountain Place, LLC*, 2011 WL 5419452, at *3 (S.D. W. Va. Nov. 9, 2011).

In *Fountain Place*, the plaintiff brought negligence and trespass claims based on allegations that the defendant had a duty to remove fill dirt it allegedly left on the plaintiff's property after construction activity.  *See id.* at *1.  The defendant asserted the statute of limitations, and the plaintiff argued the limitations period had not accrued "based upon [their] theory that the failure to remove the trespass, presumably thousands of cubic yards of fill material, constitute[d] a continuing tort . . . ."  *Id.*  The court noted "[t]his carve out . . . is often misconstrued by injured parties as more broadly than intended."  *Id.* at *2.  It added that "a continuing tort requires a showing of repetitious, wrongful conduct" and "a wrongful act with consequential continuing damages is not a continuing tort."  *Id.* at *3 (quoting *Ricottilli v. Summersville Mem'l Hosp.*, 425 S.E.2d 629, 632 (W. Va. 1992)).  The court then held "[t]he breach occurred, and the injury was

11

complete, when the filling ceased. It was at that time that the wrongful act occurred and plaintiffs were charged with pursuing their rights within two years thereafter." *Id.* Thus, the continuing tort exception was inapplicable. *See id.*[5]

The same is true here. Plaintiffs assert tort claims based on Diversified's alleged duty to remedy infringing conditions left on their properties (*i.e.*, to plug wells and remove related equipment). *See, e.g.*, Resp. (ECF No. 66) at PageID 437 (arguing Diversified has an obligation to plug and reclaim nonproducing wells); *id.* at PageID 435 (arguing Diversified "breaches its affirmative duty to plug wells and remediate well sites"); *id.* at PageID 437 ("[The] Complaint repeatedly cites Diversified's continuing obligation to plug and reclaim nonproducing wells.").

In arguing that the non-removal of an undesirable thing on their property is a continuing trespass, Plaintiffs commit the same error as the *Fountain Place* plaintiff. Plaintiffs allege a single breach with continuing damages, but "a continuing tort requires a showing of repetitious, wrongful conduct" and "a wrongful act with consequential continuing damages is not a continuing tort." *See Fountain Place*, 2011 WL 5419452, at *3. Even assuming, *arguendo*, the statutory obligation to plug wells was breached, it was breached but once. For example, imagine a seller who contracts to deliver a package to a buyer but never does so. The seller breached his contract just once; the ongoing failure to deliver the package is not a continuing breach. Moreover, Plaintiffs' own argument reveals their error is the same as in *Fountain Place*. Plaintiffs' focus is on continuing damages. *See id.* at PageID 437 ("[The] Complaint describes injuries that affect Plaintiffs every

---

[5] "A continuing trespass must be distinguished from ***a trespass which permanently changes the physical condition of the land***. Thus, if one, without a privilege to do so, enters land of which another is in possession and destroys or removes a structure standing upon the land, or digs a well or makes some other excavation or removes earth or some other substance from the land, the fact that the harm thus occasioned on the land is a continuing harm does not subject the actor to liability for a continuing trespass. . . ." Restatement (Second) of Torts § 162 cmt e. (1965) (emphasis added); *see also Sustrik v. Johns & Laughlin Steel Corp.,* 413 Pa 324, 197 A.2d 44 (1964) (holding installation of a sewer pipe was not a continuing tort but "a permanent one").

day."); *id.* at PageID 435 (alleging "Plaintiffs' property damage [is] unabated"). Whether or not the damages are ongoing, Diversified could breach the well plugging duty just once, and the Court should reject Plaintiffs' argument.

## II. THE COURT SHOULD DISMISS THE FRAUDULENT TRANSFER CLAIMS

### A. The Fraudulent Transfer Claims Must be Dismissed with the Tort Claims

In its Motion, Diversified argues that if the tort claims are dismissed "Plaintiffs plainly have no standing as creditors, and they cannot prevail on their fraudulent transfer claims as a matter of law." Mot. at PageID 306. Plaintiffs' entire response is the following footnote: "Diversified argues that Plaintiffs' UVTA claims should be dismissed if their tort claims are dismissed. For the reasons explained below, those claims would still be 'contingent' and/or 'unmatured' claims providing Plaintiffs creditor status under the statutes." Resp. (ECF No. 66) at PageID 439, n. 7.

Plaintiffs' conclusory footnote ignores the law. Courts applying the Uniform Voidable Transactions Act have held that recovery under the act "necessitate[s] that plaintiff[s] succeed on [their] claims at trial" and "[a]bsent success on at least one of [the] underlying claims, plaintiff[s] [can] not prove that [they] [are] a creditor of the estate." *Gibson v. Est. of Danilowicz*, 2019 WL 637833, at *3 (Mich. Ct. App. Feb. 14, 2019). If Plaintiffs have no underlying claims upon which they may succeed (*i.e.*, if all tort claims are dismissed), they are not creditors as a matter of law.

Without addressing *Gibson*, Plaintiffs try to maneuver around this elementary principle by referencing the meaning of contingent and unmatured claims. Even without *Gibson*'s guidance, Plaintiffs' efforts must come to naught. ***Dismissed*** claims are not contingent or unmatured. Plaintiffs state a contingent claim is "[p]ossible, but not assured . . . ." Resp. (ECF No. 66) at PageID 440. Dismissal of the tort claims means any claim to relief is impossible. Plaintiffs also state an unmatured claim "is one that has yet 'to become due' or is not yet 'due for payment.'" *Id.* Dismissal of the tort claims means no payment can be due. The tort claims' viability is the stool

13

upon which the fraudulent transfer claims sit; if that stool vanishes, the fraudulent transfer claims necessarily fall.

Similarly, Plaintiffs do not have "contingent" or "unmatured" claims based on future costs *to Diversified* for plugging wells once so required by statute and the Office of Oil and Gas. *Id.* at PageID 441 ("All wells must eventually be plugged, and the operator is saddled with that obligation as soon as it drills a well."). Plaintiffs have no claim for these costs—and never will. Any "contingent and/or unmatured obligation[] for asset retirement" of Diversified is owed to the State—not Plaintiffs. *Id.* at PageID 442. Diversified will bear these costs when it plugs the wells. Such costs are not, and will never be, owed *to Plaintiffs* because they have not, and will never, incur them; Plaintiffs have not plugged—and will not plug—the wells themselves.

### B. The Constructive Fraudulent Transfer Claims Are Barred by the One-Year Statute of Limitations

Like their tort claims, Plaintiffs' constructive fraudulent transfer claims are untimely. Diversified moved to dismiss these claims because they arose after the disputed transfers and are therefore time-barred by a one-year statute of limitations. *See* Ala. Code § 8-9A-9; Ala. Code § 8-9B-10. Plaintiffs, however, argue that a four-year statute of limitations governs their claims because they supposedly arose before the disputed transfers.[6] To resolve this dispute, the Court must ascertain whether Plaintiffs assert constructive fraudulent transfer claims that arose before or after the transfers. Plaintiffs cite a plethora of cases from different contexts that discuss general principles about when fraudulent transfer claims arise under the Bankruptcy Code, but Plaintiffs

---

[6] If the Court accepts that the fraudulent transfer claims arose before the 2018 transaction, it should dismiss the underlying tort claims. Plaintiffs' fraudulent transfer claims depend on their status as Diversified's creditors and that status depends on the tort claims. *See* Compl. (ECF No. 4) at PageID 92 ("Plaintiffs are properly creditors of Diversified because they hold claims against the defendant for damages resulting from trespass, nuisance, and negligence."). If the fraudulent transfer claims arose before the 2018 transfer, so too did the torts. Thus, the torts would be untimely under their two-year statute of limitations.

14

neglect cases construing the statute at issue.  *See* Resp. (ECF No. 66) at PageID 443–46.  As a result, Plaintiffs miss the case with the answer to the question before the Court.

Specifically, in *In re Earle*, the court construed the fraudulent transfer provisions of the Alabama Code to determine the provision under which a creditor brought its claim.  *See* 307 B.R. 276, 290 (Bankr. S.D. Ala. 2002).  It was then faced with the same question presented here: whether a claim arose after a transfer and was time-barred by the one-year statute of limitations.  *See id.* ("[I]f PCF is a creditor whose claim arose after the transfer, [sections] 8-9A-4(c) and 5(a) are not available to PCF under the facts in this case because such claims are time barred.").  The court held the claims arose after the transfer because "there was no legally enforceable" obligation (in that case, a loan obligation) owed to the creditor by the debtor before the transfer.  *Id.*

Here, too, there was no legally enforceable obligation between Diversified and Plaintiffs before the transfers.  Recognizing this, Plaintiffs assert that the claims that arose pre-transfer are against EQT.  *See* Resp. (ECF No. 66) at PageID 442.  Plaintiffs' constructive fraudulent transfer claims, however, are not based on pre-transfer claims against EQT.  Plaintiffs pleaded they are "creditors of Diversified because they hold claims against the defendant for damages resulting from trespass, nuisance, and negligence."  Compl. (ECF No. 4) at PageID 92.  Indeed, the tort claims seek damages from Diversified based on its allegedly tortious conduct.  *See id.* at PageID 88, 89, 90 (discussing damages for each tort claim).  Thus, Plaintiffs are Diversified's alleged creditors based on their tort claims against Diversified, and those claims did not arise before the disputed transfers (*i.e.*, the earliest date Diversified could have a legally enforceable obligation to Plaintiffs).  Thus, the claims are time-barred.

## **CONCLUSION**

For the reasons given in the Motion and above, the Court should dismiss Plaintiffs' claims.

Respectfully submitted:                              Dated: October 20, 2022

 */s/ Howard Persinger, III*
Howard Persinger, III                                Daniel Donovan, P.C. (admitted *pro hac vice*)
**PERSINGER & PERSINGER, L.C.**                      Ragan Naresh, P.C. (admitted *pro hac vice*)
237 Capitol Street                                   **KIRKLAND & ELLIS LLP**
Charleston, WV 25301                                 1301 Pennsylvania Avenue, N.W.
Phone:   (304) 346-9333                              Washington, D.C. 20004
Fax:     (304) 346-9337                              Phone:   (202) 389-5267
Email:   hmp3@persingerlaw.com                       Fax:     (202) 389-5200
                                                     Email:   daniel.donovan@kirkland.com
                                                              ragan.naresh@kirkland.com

                                                     Kenneth Young (admitted *pro hac vice*)
                                                     Dustin Womack (admitted *pro hac vice*)
                                                     **KIRKLAND & ELLIS LLP**
                                                     609 Main Street
                                                     Houston, TX 77002
                                                     Phone:   (713) 836-3600
                                                     Fax:     (713) 836-3601
                                                     Email:   kenneth.young@kirkland.com
                                                              dustin.womack@kirkland.com

*Counsel for Defendants Diversified Energy Company PLC, Diversified Gas & Oil, PLC, Diversified Production LLC, Diversified Gas & Oil Corporation, Diversified Oil and Gas LLC, and Alliance Petroleum Corporation*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 20, 2022 a copy of the foregoing was served on all counsel of record via the Court's electronic filing system.

                                              */s/ Howard Persinger, III*
                                              Howard Persinger, III