**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING DIVISION**

|  |  |
|---|---|
| MARK MCEVOY, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>DIVERSIFIED ENERGY COMPANY PLC, *et al.*,<br><br>    Defendants. | Civil Action No. 5:22-cv-00171-JPB<br>Judge John P. Bailey |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

STANDARD OF REVIEW ............................................................................................... 5

ARGUMENT .................................................................................................................... 5

I.   THE COURT SHOULD DISMISS THE TORT CLAIMS ......................................... 5

   A.  The Relevant Statutory Duty Was Not Breached as a Matter of Law ........................... 6

   B.  The Tort Claims Are Collateral Attacks on an Administrative Order ........................... 7

      1.  The consent order governs the statutory duty to plug wells .................................. 8

      2.  Plaintiffs collaterally attack the consent order when they demand that the
         wells be plugged immediately ............................................................................ 10

   C.  The Tort Claims Are Barred by Their Two-Year Statute of Limitations ..................... 15

      1.  The trespass claims are untimely ....................................................................... 15

      2.  The nuisance claims are untimely ...................................................................... 18

      3.  The negligence claims are untimely ................................................................... 18

II.  THE COURT SHOULD DISMISS THE FRAUDULENT TRANSFER CLAIMS ........ 19

   A.  The Fraudulent Transfer Claims Should Be Dismissed with the Tort Claims .............. 19

   B.  Independently, the Constructive Fraudulent Transfer Claim Is Barred by the One-
      Year Statute of Limitations ....................................................................................... 24

CONCLUSION ............................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Blake v. Columbia Gas Transmission, LLC*,
   2021 WL 951705 (S.D. W. Va. Mar. 12, 2021) ...............................................................11, 12

*Blake v. Columbia Gas Transmission, LLC*,
   2022 WL 866269 (S.D. W. Va. Mar. 22, 2022) .......................................................11, 12, 13

*Collia v. Grubb*,
   2013 WL 3388294 (W. Va. July 8, 2013)........................................................................15, 18

*Confer v. EXCO Res., L.L.C.*,
   2013 WL 12203016 (M.D. Pa. Nov. 19, 2013) ......................................................................14

*Culley-Brown v. Am. Petrol. Partners, LLC*,
   2021 WL 6882398 (N.D. W. Va. Oct. 26, 2021)....................................................................15

*Durbin v. Nationwide Mut. Ins. Co.*,
   2019 WL 1545671 (N.D. W. Va. Apr. 9, 2019) .....................................................................15

*EQT Gathering Equity, LLC v. Fountain Place, LLC*,
   2011 WL 5419452 (S.D. W. Va. Nov. 9, 2011) ...............................................................16, 18

*Franks v. Ross*,
   313 F.3d 184 (4th Cir. 2002) .................................................................................................18

*Gibson v. Est. of Danilowicz*,
   2019 WL 637833 (Mich. Ct. App. Feb. 14, 2019).............................................................19, 21

*Grady v. A.H. Robins Co.*,
   839 F.2d 198 (4th Cir. 1988) .................................................................................................22

*Iberiabank v. Polk*,
   2013 WL 5701084 (M.D. Ala. Oct. 18, 2013).......................................................................24

*Int'l Mgmt. Grp., Inc. v. Bryant Bank*,
   274 So. 3d 1003 (Ala. Civ. App. 2018) .................................................................................25

*Martin v. Hamblet*,
   737 S.E.2d 80 (W. Va. 2012) ................................................................................................ 8

*McCaffrey v. Chapman*,
   921 F.3d 159 (4th Cir. 2019) .................................................................................................5

*In re Pettibone Corp.*,
   90 B.R. ...................................................................................................................................22

*Pettibone Corp. v. Ramirez* (*In re Pettibone Corp.*),
    90 B.R. 918 (Bankr. N.D. Ill. 1988) ...................................................22

*Richards v. Walker*,
    813 S.E.2d 923 (W. Va. 2018) .......................................................18

*Richardson v. Chambless*,
    266 So. 3d 684 (Ala. 2018) ...........................................................21

*Rogers v. Tug Hill Operating, LLC*,
    2022 WL 1096620 (N.D. W. Va. Apr. 12, 2022) .....................................7

*Sherman v. Barnhart*,
    2008 WL 1994909 (N.D. W. Va. May 8, 2008) ....................................13

*Smith v. W. Reg'l Jail*,
    2017 WL 5354201 (S.D. W. Va. Sept. 27, 2017) ....................................5

*Tabb v. Bd. of Educ. of Durham Pub. Schs.*,
    29 F.4th 148 (4th Cir. 2022) ..........................................................5

*Vu v. Ankoanda* (*In re Ankoanda*),
    495 B.R. 599 (Bankr. N.D. Ga. 2013) ..............................................20

*Zohar CDO 2003-1 v. Patriarch Partners, LLC* (*In re Zohar III, Corp.*),
    631 B.R. 133, 197 (Bankr. D. Del. 2021) ..........................................20

**Statutes**

Ala. Code § 8-9A-1 .......................................................................21

Ala. Code § 8-9A-4 ...................................................................19, 24

Ala. Code § 8-9A-5 .......................................................................19

Ala. Code § 8-9A-9 .......................................................................24

Ala. Code § 8-9B-2 .......................................................................21

Ala. Code § 8-9B-10 ......................................................................24

Ala. Code § 8-9B-16 ......................................................................24

W. Va. Code § 22-1-1 .....................................................................15

W. Va. Code § 22-6-19 .............................................................. *passim*

W. Va. Code § 22-6-23 ..................................................................3, 9

W. Va. Code § 22-6-28 ........................................................................................ *passim*

W. Va. Code § 40-1A-11 .................................................................................... 20

W. Va. Code § 55-2-12 .................................................................................... 15, 18

## INTRODUCTION

Plaintiffs' Complaint conflicts with the West Virginia statute that makes any duty to plug subject to the exclusive authority of the administrative agency that oversees the plugging of natural gas wells in West Virginia. Pursuant to that statute—the same one relied upon by Plaintiffs in this case—the Office of Oil and Gas entered a consent order establishing that Diversified is not currently obligated to plug the relevant wells. If Plaintiffs wanted to challenge that order, they had the right to complain to the Office of Oil and Gas's director. Having decided not to pursue that recourse, Plaintiffs cannot collaterally attack that agency's order for the first time in federal court.

Merely entertaining Plaintiffs' lawsuit threatens the carefully balanced administrative system that oversees the plugging of natural gas wells. In seeking to hold Diversified liable for conduct that the Office of Oil and Gas expressly authorized and found to be "in the best interests of the state and its citizens," Plaintiffs hope to craft a new layer of federal review, and thereby abolish the exclusive authority held by the Office of Oil and Gas to supervise the plugging, abandonment, and reclamation of natural gas wells in West Virginia.

Plaintiffs' tort claims fail as a matter of law. *First*, the tort claims depend on Plaintiffs' theory that Diversified must plug the disputed wells, but that gets it backwards: the Office of Oil and Gas is charged with establishing the scope of any duty to plug wells, and as the Complaint admits, that agency has already determined that Diversified has no current duty to plug these wells. *Second*, Plaintiffs' tort claims are an improper collateral attack on the Office of Oil and Gas's consent orders. Allowing claims predicated on the theory that Diversified has not currently plugged the wells would override the schedule promulgated by the Department of Oil and Gas providing that the wells do not currently need to be plugged. *Third*, the tort claims are untimely under a two-year statute of limitations, because even if cognizable, Plaintiffs' claims would have accrued more than two years ago when the wells were allegedly abandoned.

The actual and constructive fraudulent transfer claims also fail. ***First***, these claims require Plaintiffs to be creditors. Plaintiffs are not creditors because their tort claims are the basis of their creditor status, the tort claims fail, and so the fraudulent transfer claims must fail with the tort claims. The Second Amended Complaint's new claimants—which make up the majority of the putative Plaintiffs—also have no right to payment from Diversified and, therefore, no claim; they are not creditors and have no standing to bring claims for fraudulent or voidable transfer. ***Second***, the constructive fraudulent transfer claims are untimely under the one-year statute of limitations.

## BACKGROUND

According to Plaintiffs, this case is based on allegedly abandoned natural gas wells in West Virginia that Diversified has a duty to plug and decommission. *See, e.g.*, Compl. (ECF No. 96) ¶¶ 7, 104. Plaintiffs assert that West Virginia Code section 22-6-19 imposes a duty on Diversified to plug wells on their property. *See id.* at ¶ 78. Although their claims depend on that statute, Plaintiffs never recite its relevant text in full in the Complaint, selectively omitting the emphasized language:

> Any well which is completed as a dry hole or which is not in use for a period of twelve consecutive months shall be presumed to have been abandoned and shall promptly be plugged by the operator in accordance with the provisions of this article, ***unless the operator furnishes satisfactory proof to the director that there is a bona fide future use for such well***.

W. Va. Code § 22-6-19 (emphasis added). Based on this duty, Plaintiffs assert common law claims for trespass, nuisance, and negligence against Diversified. Compl. ¶¶ 108–110. In other words, each tort claim depends on Diversified having an obligation to plug its wells under this statute.

Plaintiffs also argue this case also concerns fraudulent transfers made between Diversified and EQT. *See id.* ¶ 5–6. Plaintiffs theory is that EQT's sales of thousands of wells to Diversified in 2018 and 2020 were efforts to avoid the associated plugging liability. *Id.* ¶¶ 6–11. Plaintiffs contend that Diversified is insolvent and seek to avoid the transfers under Alabama law. *Id.* ¶ 15.

2

West Virginia has adopted an administrative scheme to oversee drilling and plugging of natural gas wells, including those on Plaintiffs' land. Under this statutory scheme, West Virginia has appointed its Office of Oil and Gas to "exercise supervision over the drilling, casing, plugging, filling and reclamation of all wells and shall have such access to the plans, maps and other records and to the properties of the well operators as may be necessary or proper for this purpose . . . ." W. Va. Code § 22-6-28(a). A private party cannot plug a well in West Virginia without permission and a permit from the Office of Oil and Gas. *See, e.g.*, W. Va. Code § 22-6-23.

The Office of Oil and Gas entered a consent order with Diversified that covers the wells at issue in this case; the consent order is attached as **<u>Exhibit A</u>**. In its factual findings, the Office of Oil and Gas determined "it is in the best interests of the state and its citizens that [Diversified's] wells be identified and that where a bona fide future use exists, wells should be placed back into production . . . ." *Id.* § II ¶ 10. The Office of Oil and Gas also found "that Diversified requires sufficient time to identify those wells . . . and [to] further assess the viability of those wells and identify those wells which have the capacity for a bona fide future use and bring such wells back into production or which require plugging . . . ." *Id.* § II ¶ 11. Thus, the Office of Oil and Gas authorized Diversified to begin a systematic review of its wells to identify bona fide future uses and to provide an annual report to the agency summarizing the wells that Diversified chooses to plug or to bring back into production. *See id.* § IV ¶ 5. For the duration of that process, Diversified has no duty to plug its wells unless it identifies them as a plugging candidate in its reports, and then only on a set schedule; Diversified has even submitted a $3 million bond to secure its obligations until the review process is complete. *See id.* §§ II ¶¶ 10–12, IV ¶ 5.

Plaintiffs acknowledge the central role of the Office of Oil and Gas, and tacitly admit that the consent order it entered with Diversified foreclose any allegation that Diversified breached a

duty owed to Plaintiffs. For example, Plaintiffs note "Diversified enters into plugging schedules with state agencies that purport to allow it to extend its decommissioning liabilities far into the future." Compl. ¶ 56. "For example, consent agreements entered in West Virginia and Pennsylvania only require Diversified to plug roughly 80 wells per year for the next 15 years, despite the fact that Diversified holds tens of thousands" of wells in those states. *Id.* While Plaintiffs characterize these consent orders as "a smoke-screen [sic]," their own Complaint admits the consent orders foreclose any allegation that Diversified breached its duty. *See id.* ¶ 57 (noting the consent orders "give Diversified some comfort in terms of enforcement of its decommissioning duties by state regulatory agencies").

To the extent a person wishes to challenge an order or decision made by the Office of Oil and Gas, West Virginia's administrative scheme "permit[s] any aggrieved person to file before the director, a formal complaint charging any well operator with not drilling or casing, ***or not plugging or filling***, or reclaiming any well in accordance with the provisions of this article, or to the order of the director." W. Va. Code § 22-6-28(a) (emphasis added). "[A]fter a full hearing . . . the director shall make findings of fact and enter such order as in the director's judgment is just and right and necessary to secure the proper administration of this article, and if the director deems necessary, restraining the well operator from continuing to drill or case any well or from further plugging, filling or reclaiming the same . . . ." *Id.*

Finally, on January 5, 2023, Plaintiffs filed the Second Amended Class Action Complaint. Plaintiffs' Second Amended Complaint proposes to add a new voidable transfer class "consisting of all persons or entities that own property in West Virginia on which Diversified owns a well, regardless of whether the wells are currently abandoned or non-producing." *Id* ¶ 592. This proposed class simply underlines the fatal flaw with Plaintiffs' theory of the case: it is unbound

from any alleged injury and asserts purely speculative claims based on events that have not, and may never, happen. Plaintiffs' newly revised class includes individuals who do not even purport to have any existing tort, contract, or statutory claims against Defendants.

## STANDARD OF REVIEW

The Court should dismiss a complaint if it "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Smith v. W. Reg'l Jail*, 2017 WL 5354201, at *3 (S.D. W. Va. Sept. 27, 2017). "[A] motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim and not the truth of the facts alleged to support it." *Tabb v. Bd. of Educ. of Durham Pub. Schs.*, 29 F.4th 148, 155 (4th Cir. 2022). "Thus, at this stage, the [alleged] facts must be taken as true. But the test is not legally myopic." *Id.* "Rather, it must be applied with common sense to determine whether a complaint contains the 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face,' not merely conceivable." *Id.* (emphasis & citation omitted). If, after applying these principles, "the plaintiff cannot prove any set of facts in support of his claim entitling him to relief," the Court "should grant a Rule 12(b)(6) motion." *McCaffrey v. Chapman*, 921 F.3d 159, 164 (4th Cir. 2019) (citation omitted).

## ARGUMENT

### I.   THE COURT SHOULD DISMISS THE TORT CLAIMS

The Court should dismiss Plaintiffs' first, second, and third causes of action—respectively, the trespass, nuisance, and negligence claims against Diversified—for any of three independent reasons. ***First***, the alleged conduct underlying each claim was not tortious as a matter of law. ***Second***, the claims are improper collateral attacks on an Office of Oil and Gas consent order. ***Third***, each claim is time-barred under a two-year statute of limitations.

## A.    The Relevant Statutory Duty Was Not Breached as a Matter of Law

Plaintiffs' tort claims depend on an unsupportable legal premise: that Diversified breached a statutory duty to plug wells on each of the Plaintiffs' properties. Because that premise is legally incorrect, all three tort claims fail as a matter of law.

The linchpin of each tort claim is an alleged statutory duty to plug non-producing wells under West Virginia Code Section 22-6-19. For negligence, Plaintiffs allege Diversified breached a duty to Plaintiffs by failing to comply with the statute. Compl. ¶¶ 618–20 (relying on West Virginia Code § 22-6-19). For trespass, Plaintiffs allege Diversified trespassed because it failed to plug abandoned wells, exceeding the permitted use of Plaintiffs' properties. *See id.* ¶¶ 605–11. For nuisance, Plaintiffs seek a declaration that unplugged and abandoned wells are a nuisance and seek damages equaling the (unincurred) costs to plug the wells. *See id.* ¶¶ 614–16.

The Complaint fails because Diversified does not have an obligation to plug Plaintiffs' wells. According to the statute cited by Plaintiffs, no duty to plug exists if "the operator furnishes satisfactory proof to the director that there is a bona fide future use for such well," W. Va. Code § 22-6-19, which Plaintiffs acknowledge is the case here. *See* Compl. ¶ 56 ("Diversified enters into plugging schedules with state agencies that purport to allow it to extend its decommissioning liabilities far into the future."). Although Plaintiffs imply something sinister about working with state agencies to address questions about plugging wells, Plaintiffs implicitly concede the Office of Oil and Gas's consent order means Diversified has ***not*** breached the statutory well-plugging duty. *See id.* ¶ 57 (stating "those consent agreements . . . give Diversified some comfort in terms of enforcement of its decommissioning duties by state regulatory agencies").

The consent order,[2] which establishes a plugging schedule for Diversified, confirms that the Office of Oil and Gas has authorized Diversified's conduct under the "bona fide future use" provision of Section 22-6-19. *See* Ex. A § I (citing its statutory authority). Under the consent order, Diversified reviews each of its wells over time to identify their capacity for a bona fide future use. *Id.* § II ¶¶ 7, 11 (noting "[t]he parties agree that Diversified requires sufficient time to identify those wells referenced above and further assess the viability of those wells and identify those wells which have the capacity for a bona fide future use"). As it completes its review, Diversified identifies wells that are not producing to the Office of Oil and Gas along with a report summarizing its efforts to plug the wells or bring them back into production; in other words, Diversified reviews the wells to notify the Office of Oil and Gas about future uses. *Id.* § IV ¶ 5. In agreeing to forego plugging while this process is ongoing, the Office of Oil and Gas found satisfactory proof that a bona fide future exists for Diversified's wells such that they need not be shut-in during an orderly process of assessment and reworking or plugging of wells. *Id.* § II ¶ 10 ("[W]here a bona fide future use exists, wells should be placed back into production and/or should be placed into such other use as identified and approved by [the Office of Oil and Gas], and that where no bona fide future use exists that such wells be plugged."); *see also id.* § IV ¶ 1. Given that all the tort claims flow from the alleged breach of Section 22-6-19, but that section is not violated where, as here, the Office of Oil and Gas finds a bona fide future use, Plaintiffs' tort claims fail as a matter of law.

## B.     The Tort Claims Are Collateral Attacks on an Administrative Order

The Office of Oil and Gas rendered its order under "the authority in [West Virginia] Code [Sections] 22-1-1, *22-6-1* and 22-6A-1 *et seq.*," the statute relied upon by Plaintiffs for each tort

---

[2]   The Court can consider the consent order for either of two reasons: (1) the Complaint references the consent order and (2) it is a public record subject to judicial notice. *See Rogers v. Tug Hill Operating, LLC*, 2022 WL 1096620, at *4–5 (N.D. W. Va. Apr. 12, 2022) (Bailey, J.) (citations omitted).

claim. Ex. A § I (emphasis added). The Office of Oil and Gas's order exempts Diversified's wells from the presumption that wells that have not produced for 12 months are abandoned and must be plugged. Given that the order guts Plaintiffs' tort claims as a matter of law, Plaintiffs collaterally attack this order and the Office of Oil and Gas's authority by demanding that this Court order relief contrary to the findings of the duly authorized agency of West Virginia.[3]

### 1.   The consent order governs the statutory duty to plug wells

The Complaint cannot be reconciled with two findings from the Office of Oil and Gas's order: *First*, "that it is in the best interests of the state and its citizens that [Diversified's] wells be identified and that where a bona fide future use exists, wells should be placed back into production and/or should be placed into such other use as identified and approved" by the Office of Oil and Gas, "and that where no bona fide future use exists that such wells be plugged." *Id.* § II ¶ 10. *Second*, "that Diversified requires sufficient time to identify those wells . . . and [to] further assess the viability of those wells and identify those wells which have the capacity for a bona fide future use and bring such wells back into production or which require plugging . . . ." *Id.* § II ¶ 11.

Based on these findings of fact, the consent order sets out a specific plugging procedure. First, Diversified evaluates its wells and presents to the Office of Oil and Gas a list of non-producing wells. *Id.* § IV ¶ 5. "Oil and gas wells identified on this list shall not be subject to any further enforcement activities by the [Office of Oil and Gas] with regard to any requirement to close and plug such wells . . . so long as Diversified is compliant with the terms and conditions"

---

[3]   Moreover, because the statutory scheme allows Plaintiffs to file complaints with the Office of Oil and Gas, but disallows them a right of judicial review, the West Virginia Supreme Court of Appeals' holding in *Martin v. Hamblet*, 737 S.E.2d 80 (W. Va. 2012) is fatal to their claims. *Id.* at 87, 90 ("[T]he right of judicial review with regard to the issuance or refusal of a well work permit . . . d[id] not extend to owners of the surface rights of the property upon which the proposed well is to be drilled . . . . [w]here the Legislature has prescribed limitations on the right to appeal, such limitations are exclusive, and cannot be enlarged by the court."(collecting cases)).

of the order. *Id.* Additionally, for "each calendar year ended December 31, 2020 through December 31, 2034, Diversified shall either place into production or plug at least fifty (50) oil and gas wells from the list . . . , of which no less than twenty (20) of those oil and gas wells shall be plugged no later than December 31 of the applicable year." *Id.* This means the Office of Oil and Gas gave Diversified substantial discretion to choose ***which*** wells are plugged in any given year, so long as a sufficient number of those wells are plugged. In turn, Diversified "agree[d] to voluntarily obtain and maintain and submit to the [Office of Oil and Gas] . . . a bond valued at $3,000,000.00 to inure to the benefit of the state of West Virginia . . . which bond shall be maintained until such time as the tasks as set forth" in the consent order are complete "unless otherwise extended by agreement of the parties . . . ." *Id.*

The consent order is the final word on Diversified's duty to plug its wells—indeed, that is the specific issue the consent order addresses. *See id.* § IV ¶ 8 (noting the order is not "a bar to the enforcement of any other legal obligation of Diversified by [the Office of Oil and Gas], ***except with regard to the matters specifically addressed herein***." (emphasis added)).

The at-issue statute confirms the consent order's finality. The Office of Oil and Gas is required to supervise the plugging of wells. Section 22-6-28 of the West Virginia Code provides that the Office of Oil and Gas, via its director, "shall exercise supervision over the drilling, casing, plugging, filling and reclamation of all wells . . . ." W. Va. Code § 22-6-28. A private party cannot unilaterally decide to plug a well without permission from the Office of Oil and Gas. "All dry or abandoned wells or wells presumed to be abandoned under the provisions of section nineteen of this article shall be plugged and reclaimed in accordance with this section and the other provisions of this article and in accordance with the rules promulgated by the secretary." *Id.* § 22-6-23. Among other things, one who wants to plug a well must notify the Office of Oil and Gas and

9

provide a bond for the plugging operations. *See id.* One purpose of these provisions is to allow the Office of Oil and Gas to hold hearings that allow aggrieved persons to present complaints, and "if the director deems necessary, restraining the well operator from continuing to drill or case any well or from further plugging, filling or reclaiming the same . . . ." *Id.* § 22-6-28. Put simply, Diversified cannot plug wells without the Office of Oil and Gas's approval. In exercising its supervisory authority here, the Office of Oil and Gas has chosen a path that is the ***opposite*** of what Plaintiffs demand. It has determined that Diversified is ***not*** currently obligated to plug any wells, and that the best approach for West Virginia is a methodical and orderly process of reviewing Diversified's wells for bona fide future uses and plugging them or bringing them back into production. Plaintiffs' claims are an improper collateral attack on that consent order.

### 2. Plaintiffs collaterally attack the consent order when they demand that the wells be plugged immediately

Contrary to the consent order, Plaintiffs demand that Diversified plug its wells immediately or pay Plaintiffs the unincurred costs to do so. This is a textbook collateral attack on an agency order, and it is hornbook law that such attacks are improper. 73A C.J.S. *Public Administrative Law and Procedure* § 349 ("The order or determination of an administrative body, acting within its jurisdiction and under authority of law, is not subject to collateral attack." (footnotes omitted)). The Office of Oil and Gas's order was issued pursuant to a comprehensive regulatory scheme. *See* W. Va. Code § 22-6-28(a) (the Office of Oil and Gas "shall exercise supervision over the drilling, casing, plugging, filling and reclamation of all wells and shall have such access to the plans, maps and other records and to the properties of the well operators as may be necessary or proper for this purpose . . . ."). That scheme permits administrative hearings for any alleged failure to plug wells. *Id.* (the Office of Oil and Gas "shall permit any aggrieved person to file before the director, a formal complaint charging any well operator with. . . not plugging or filling, or reclaiming any

well in accordance with the provision of this article"). "At the time and place fixed for hearing, full opportunity shall be given any person so charged or complaining to be heard and to offer such evidence as desired . . . ." *Id.* "[A]fter a full hearing . . . the director shall make findings of fact and enter such order as in the director's judgment is just and right and necessary to secure the proper administration of this article . . . ." *Id.* Having failed to dispute the Office of Oil and Gas's jurisdiction to enter the order and declined to pursue their administrative remedies, Plaintiffs cannot now bring tort claims that would impose liability for conduct authorized by the agency.

Plaintiffs efforts to bring tort claims in the face of an agency order and established administrative process are analogous to *Blake v. Columbia Gas Transmission, LLC*, 2021 WL 951705 (S.D. W. Va. Mar. 12, 2021) ("*Blake I*") and *Blake v. Columbia Gas Transmission, LLC*, 2022 WL 866269 (S.D. W. Va. Mar. 22, 2022) ("*Blake II*"). In *Blake*, the plaintiffs "own[ed] property situated near a natural gas facility referred to as the 'Ceredo Compressor Station,'" the defendants "made modifications and additions to the existing Compressor Station," and "these activities destroyed the barrier between [the plaintiffs'] property and the Compressor Station, which [allegedly] created a private nuisance." *Blake I*, 2021 WL 951705, at *1. The plaintiffs' nuisance claims were based on "noise, light, dust debris and odors" from the Compressor Station. *Id.* The court dismissed each type of nuisance claim in two opinions. *See id.* at *5 (dismissing noise claims); *Blake II*, 2022 WL 866269, at *3 (dismissing remaining claims).

In its first opinion,[4] the court dealt with the noise claims. The defendants argued dismissal was appropriate because the Federal Energy Regulatory Commission ("FERC") had issued two Certificates that "establish[ed] noise level limits for the Compression Station, and those levels are

---

[4]   The court dismissed the remaining claims in its second opinion; the opinions issued at different times based on how the defendants presented their arguments, not because of any difference in the court's conclusions. *See Blake II*, 2022 WL 866269, at *1 (discussing procedural posture).

directly related to its operation." *Blake I*, 2021 WL 951705, at *3. "Although [p]laintiffs state[d] that they [we]re not challenging the Certificates, the [c]ourt disagree[d]." *Id.* The plaintiffs demanded "compensation for a noise level authorized by FERC," but they could not "demand through a collateral attack a lower noise level standard than what [d]efendants [could] lawfully do under their Certificates." *Id.* The court added that the correct way to challenge the noise level was to complain to FERC, not the district court. *See id.* Thus, the court dismissed the claims. *See id.*

In its second opinion, the defendants argued the "claims of 'light, dust, debris, and odors' [we]re covered with specificity by FERC's Order Issuing Certificates and Approving Abandonment (Certificate Order) and the Final Environmental Impact Statement (EIS)." *Blake II*, 2022 WL 866269, at *2. The court determined "it [wa]s clear that the EIS both contemplated and approved the removal and alterations of visual buffers." *Id.* Thus, the Court dismissed the claims because the plaintiffs did not avail themselves of the prescribed administrative remedy but instead sought to collaterally attack the administrative agency's orders. *See id.* at *3; *Blake I*, 2021 WL 951705, at *3 ("Plaintiffs' remedy lies with exercising their rights through the administrative process, not by bringing an action in the district court.").

Plaintiffs' demand for a more stringent plugging schedule than the one established by the Office of Oil and Gas is no different than the plaintiffs in *Blake* demanding more stringent noise and odor limits than those established by FERC. Like in *Blake I* and *Blake II*, the order in this case addresses Diversified's duty to plug allegedly abandoned wells and sets out the procedure the Office of Oil and Gas determined will best balance the costs and benefits of plugging obligations. *See* Ex. A. And, just like the plaintiffs in *Blake* had redress with FERC, West Virginia law requires Plaintiffs to seek administrative remedies from the Office of Oil and Gas. Accordingly, for the same reasons as in *Blake*, this Court lacks subject matter jurisdiction to address common law torts

that amount to collateral attacks on the plugging schedule established by the Office of Oil and Gas's order. *See Blake II*, 2022 WL 866269, at \*3 ("This Court simply lacks subject matter jurisdiction to address what amounts to be a collateral attack that the approved visual impacts constitute a common law nuisance.").

This Court has already considered and dismissed similar claims where plaintiffs failed to comply properly with prescribed administrative remedies. *See Sherman v. Barnhart*, 2008 WL 1994909 (N.D. W. Va. May 8, 2008) (Bailey, J.). In *Sherman*, the plaintiff asserted social security claims. *See id.* at \*1–2. To assess justiciability, the Court turned to the Social Security Act:

> Section 405(h) states: "The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or government agency except as herein provided."

*Id.* at \*4. The Court held "[t]he first two sentences of section 405(h) assure that the 'administrative exhaustion will be required'" because "'they prevent review of decisions of the Secretary save as provided in the [Social Security] Act, which provision is made in § 405(g).'" *Id.* at \*5 (second set of brackets in original) (citation omitted).

West Virginia's statute has the same type of language: "[T]he director shall make findings of fact and enter such order as in the director's judgment is just and right and necessary to secure the proper administration of this article . . . ." W. Va. Code § 22-6-28(a). If a complainant remains unsatisfied, West Virginia's statute also prescribes limited judicial review of the Office of Oil and Gas's decisions, which evinces the legislature circumscribed when—if at all—the judiciary may intervene. *See* W. Va. Code § 22-6-28(b)–(c). Under *Sherman*'s reasoning, the Court should dismiss the claims based on Plaintiffs' failure to avail themselves of their administrative remedies.

Based on similar reasoning, another federal court dismissed well-plugging claims because the plaintiffs failed to pursue the statutory remedies available under state law and seek relief

through the state's administrative process. *See Confer v. EXCO Res., L.L.C.*, 2013 WL 12203016, at *7–8 (M.D. Pa. Nov. 19, 2013), *adopted as modified*, 2014 WL 12704714 (M.D. Pa. Mar. 14, 2014).[5] In *Confer*, the plaintiffs "allege[d] that EXCO failed to plug the three wells on their property which were abandoned as required by Pennsylvania law." *Id.* at *1. Pennsylvania law charged the Pennsylvania Department of Environmental Protection ("DEP") with authority over the plugging and abandoning of wells in the state and established an administrative process to challenge decisions of the DEP in the exercise of this authority. *Id.* at *7–8. The court held that plaintiffs' claims "implicate[d] technical and policy considerations . . . since such issues are clearly within the DEP's administrative decision making authority." *Id.* In fact, if the court had "ordered EXCO to plug and abandon wells on [the disputed property], this may [have] le[d] to inconsistent rulings with respect to DEP's decisions ordering gas companies to plug and abandon natural gas wells." *Id.* As a result, the court dismissed the claims because "DEP should [have] first be[en] afforded the opportunity to decide if EXCO should [have] be[en] ordered to plug and abandon natural gas wells on" the disputed property. *Id.* (citations omitted).

Here, Plaintiffs assert tort claims that demand the plugging of wells contrary to what Diversified may lawfully do under the ***West Virginia*** Department of Environmental Protection's order. Granting Plaintiffs' proposed relief would be tantamount to overturning an agency decision, upsetting the balance of social, economic, and policy considerations reflected in the order. Allowing the judiciary to second-guess an agency determination and impose its own course of action in lieu of the agency's procedure would upset the Legislature's purpose in consolidating these decisions in an administrative agency with expertise to address these issues, including "the

---

[5]   The district court adopted the Report and Recommendation, modifying only the magistrate's holding on an irrelevant part of the case (that plaintiffs could not amend their pleading to allege continuous drilling). *See Confer*, 2014 WL 12704714, at *1.

coordination, consolidation and integration of state programs and agencies which are significantly concerned with the use, enhancement, preservation, protection and conservation of the environment." W. Va. Code § 22-1-1(a)(4); *see also id.* § 22-1-1(a)(5), (b)(2) (stating that "[t]hose functions of government which regulate the environment should be consolidated in order to accomplish the purposes set forth in this article" and that "[t]he purposes of this chapter are . . . [t]o consolidate environmental regulatory programs in a single state agency"); Ex. A § IV ¶ 1. This logic is at its apex here, where the relevant statute expressly empowers the administrative agency to determine whether "satisfactory proof" has been furnished "to the director" for the purpose of showing there may be "a bona fide future use" for the well. W. Va. Code § 22-6-19.

Plaintiffs' dislike of the Office of Oil and Gas's order does not allow them to skip the administrative review process West Virginia has established. The Court should dismiss the claims because they are an impermissible collateral attack on an administrative order.

### C.     The Tort Claims Are Barred by Their Two-Year Statute of Limitations

The Court should dismiss the trespass, nuisance, and negligence claims in the Complaint because the Complaint shows the limitations period has run, permitting dismissal as a matter of law. *See Culley-Brown v. Am. Petrol. Partners, LLC*, 2021 WL 6882398, at *2 (N.D. W. Va. Oct. 26, 2021) (Bailey, J.) ("Courts may dismiss claims based on a statute of limitations defense when the face of the Complaint shows the limitations period has run." (quoting *Durbin v. Nationwide Mut. Ins. Co.*, 2019 WL 1545671, at *3 (N.D. W. Va. Apr. 9, 2019) (Bailey, J.))).

#### 1.     The trespass claims are untimely

The trespass claims are untimely under the two-year statute of limitations in West Virginia Code Section 55-2-12(a). *See Collia v. Grubb*, 2013 WL 3388294, at *2–3 (W. Va. July 8, 2013) (holding "unassailable" the conclusion that trespass claims were untimely under this provision). Specifically, Plaintiffs needed to assert their claims "[w]ithin two years next after the right to bring

the same shall have accrued, if it be for damage to property . . . ." W. Va. Code § 55-2-12(a). Because Plaintiffs' trespass claims accrued more than two years before they filed even their original complaint on July 8, 2022, the claims are time-barred.

"It is generally the case that a tort claim accrues when the injury occurs." *EQT Gathering Equity, LLC v. Fountain Place, LLC*, 2011 WL 5419452, at *2 (S.D. W. Va. Nov. 9, 2011). Here, the alleged trespass is the occupation of Plaintiffs' property by abandoned wells without consent. *See* Compl. ¶¶ 605–07. The alleged occupation-by-abandonment of each Plaintiff's property was complete—and any alleged injury sustained—more than two years before July 8, 2022:

- The Complaint alleges the well on Mark McEvoy's property "has not reported natural gas production in any amount since 2018." *Id.* ¶ 120. The Complaint itself explains that the basis of Mr. McEvoy's claim is that the well may not occupy the property because it "is not reasonable and necessary to extract oil or gas, because the well is abandoned and has not been used for that purpose for at least three years." *Id.* ¶ 131.

- The Complaint alleges the well on James and Susan Tawney's property has existed since at least July 18, 2018. *See id.* ¶ 142. Again, the face of the Complaint establishes that the claim is time-barred: it claims that this lack of production made the well an unlawful occupier of their property "for at least two years." *See id.* ¶ 154.

- The Complaint alleges the well on Samuel Stark's property "has not reported natural gas production in any amount since 2017." *Id.* ¶ 167. Once again, the Complaint itself establishes that the claim is untimely: it alleges that the well may not occupy the property because it is "not reasonable and necessary to extract oil or gas because the well is abandoned and has not been used for that purpose for at least three years." *Id.* ¶ 178.

- Similarly, the well on Christine Cochran's property "has not reported natural gas production since 2019" and has never produced oil. *Id.* ¶ 576, 577.

- The Complaint also alleges the well on Susan Dennison's property "has not reported natural gas production in any amount since 2018." *Id.* ¶ 190. Yet again, the Complaint explains that the cause of action accrued more than two years ago: Plaintiffs claim that the well may not occupy the property because it is "not reasonable and necessary to extract oil or gas because the well is abandoned and has not been used for that purpose for at least three years." *Id.* ¶ 201.

- The Complaint alleges the well on Carol and George DelRosso's property has not produced oil since 2002 and has not produced natural gas since 2019. *See id.* ¶¶ 236, 237. The claim is untimely because the Complaint alleges this well trespasses on the DelRosso property because it has not produced oil and gas "for at least three years." *Id.* ¶ 247.

- The same is true for the well on Mark Goff's property, which the Complaint alleges is "not reasonable and necessary to extract oil or gas because the well is abandoned and has not been used for that purpose for at least three years." *Id.* ¶ 224.

- The same is also true for Chad and Michelle Silvester. *See id.* ¶ 300 (arguing a well may not occupy a property because it is "not reasonable and necessary to extract oil or gas because the well is abandoned and has not been used for that purpose for at least six years").

- So too for Eben Fritz and Eben Fritz III, Gary Wentz, Heidi Deem, Jeffrey and Kellie Saltis, Lane and Minerva Evans, Maynard and Jennifer Tanner, Joan Medley, Jacob and Regina Collette, and Kathy Johnson. *See id.* ¶ 357 (same untimely admission as to the Fritz Plaintiffs); *id.* ¶ 378 (same for Mr. Wentz); *id.* ¶ 399 (same as to Ms. Deem); *id.* ¶ 420 (same for Saltis Plaintiffs); *id.* at ¶ 437 (same for Evans Plaintiffs); *id.* ¶ 462 (same for Tanner Plaintiffs); *id.* ¶ 515 (same for Collette Plaintiffs); *id.* ¶ 567 (same for Ms. Johnson).

- The Complaint alleges a well on Benjamin Patterson's property "has not reported natural gas production in any amount since 2015" and has never produced oil. *Id.* ¶¶ 258, 259. Plaintiffs claim that the well may not occupy the property because it is "not reasonable and necessary to extract oil or gas because the well is abandoned and has not been used for that purpose for at least six years." *Id.* ¶ 271. For other wells, Plaintiffs candidly admit they lack standing because they have no injury. *See id.* ¶ 280 ("Diversified has reported production on those wells as recently as 2021. However, upon cessation of mineral production, each well will require plugging and full reclamation.").

- Similarly, the complaint alleges that there are several wells on the property of Joan Medley that constitute trespasses because they "are not reasonable and necessary to extract oil or gas because the wells are abandoned and have not been used for that purpose for at least four years." *Id.* ¶ 487. Like Mr. Patterson, however, Ms. Medley attempts to assert claims based on trespasses that have not yet occurred. *See id.* ¶ 495 ("Diversified has the responsibility to plug these wells once production ceases and/or it does not report production for any of these wells for a period of 12 months.").

- The same thing is true for Scott Corcoran. He has time-barred claims. *See id.* ¶¶ 523–55. He also asserts claims based on wells for which he has suffered no injury. *See id.* ¶¶ 534–35; *id.* ¶¶ 538–39.

- The Complaint alleges one well on Clinton and Candance Drainer Irrevocable Trust's property "has not reported natural gas production in any amount since 2019" and has never produced oil. *Id.* ¶¶ 311, 312. Yet again, the Complaint explains that the cause of action accrued more than two years ago: Plaintiffs claim that the well may not occupy the property because it is "not reasonable and necessary to extract oil or gas because the well is abandoned and has not been used for that purpose for at least six years." *Id.* ¶ 332. For other wells, Plaintiffs candidly admit they lack standing because they have no injury. *See id.* ¶ 328 ("Despite the production of some amount of gas . . . the wells nonetheless will require plugging and reclamation upon cessation of mineral production or if production reports are incorrect.").

Each Plaintiff's alleged injury is interference with their right to possess their property free of abandoned wells, which occurred in 2019. *See id.* ¶ 104 ("Diversified's failures to promptly plug and remediate the non-producing and abandoned wells on Plaintiffs' properties constitute violations of Plaintiffs' real property rights."). Thus, Plaintiffs' trespass claims had accrued by 2019, became untimely in 2021, and were time-barred when filed on July 8, 2022. *See Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002) ("a cause of action accrues for purposes of the statute of limitations 'when it is sufficiently ripe that one can maintain suit on it'" (collecting cases)).

### 2.      The nuisance claims are untimely

The nuisance claims are similarly untimely under the two-year statute of limitations in West Virginia Code Section 55-2-12(a). *See Collia*, 2013 WL 3388294, at *2–3 (affirming nuisance claims were untimely under this provision). Plaintiffs needed to assert their nuisance claims "[w]ithin two years next after the right to bring the same shall have accrued, if it be for damage to property . . . ." W. Va. Code § 55-2-12(a). Again, tort claims accrue when the underlying injury occurs. *See Fountain Place*, 2011 WL 5419452, at *2. The basis of Plaintiffs' nuisance claims is allegedly abandoned and unplugged wells. *See* Compl. ¶ 616 ("Plaintiffs are entitled to a declaration that Diversified's wells constitute a nuisance, and to compensatory damages in an amount sufficient to remedy the nuisance."). Just as with the trespass claims, Plaintiffs could have asserted that the wells were a nuisance as of 2019, and the claims had accrued by that time. As a result, the nuisance claims were barred by the statute of limitations when Plaintiffs brought their case on July 8, 2022, more than two years after the claims had accrued.

### 3.      The negligence claims are untimely

The same two-year statute of limitations discussed above bars the negligence claims. *Cf. Richards v. Walker*, 813 S.E.2d 923, 927 n.8 (W. Va. 2018) ("In West Virginia, negligence claims are governed by a two year statute of limitation under [West Virginia] Code, 55-2-12 . . . ."

18

(citation omitted)). Plaintiffs allege Diversified had a statutory "duty to 'promptly' plug any wells on Plaintiffs' property once those wells [we]re abandoned, *i.e.*, ha[d] not produced oil or gas for twelve consecutive months." Compl. ¶ 618. Plaintiffs allege negligence because Diversified "breached the [aforementioned] duty owed to Plaintiffs." *Id.* ¶ 619. For the same reasons as trespass and negligence, claims based on alleged failures to plug abandoned wells ripened in 2019 (at the latest), meaning such claims accrued more than two years before this case.

## II.     THE COURT SHOULD DISMISS THE FRAUDULENT TRANSFER CLAIMS

### A.     The Fraudulent Transfer Claims Should Be Dismissed with the Tort Claims

Because the Court should dismiss Plaintiffs' tort claims, it should dismiss the derivative fraudulent transfer claims under the Alabama Fraudulent Transfer Act ("AFTA") and Alabama Uniform Voidable Transactions Act ("AUTA"). Only a plaintiff who is the defendant's creditor can allege either actual or constructive fraudulent transfer. *See* Ala. Code § 8-9A-4(a), (c) (noting a "transfer made by a debtor is fraudulent as to a creditor" in certain situations); Ala. Code § 8-9A-5 (same). Here, the primary basis for Plaintiffs' status as Diversified's alleged creditors is their contingent, unliquidated tort claims. *See* Compl. ¶ 624 ("Plaintiffs are creditors of Diversified because they hold claims . . . against Diversified for [its] obligation to plug and remediate wells on their properties."); *id.* ¶ 637 (stating same). Because those tort claims are deficient, Plaintiffs are not creditors, and they cannot prevail on their fraudulent transfer claims as a matter of law. *See Gibson v. Est. of Danilowicz*, 2019 WL 637833, at *3 (Mich. Ct. App. Feb. 14, 2019) (per curiam) ("Any recovery under the [Uniform Voidable Transactions Act] necessitated that plaintiff succeed on his claims at trial. Plaintiff did not succeed on his claims at trial. Absent success on at least one of his underlying claims, plaintiff could not prove that he was a creditor of the estate.").[6]

---

[6]     *Gibson*, which concerned Michigan's Uniform Voidable Transactions Act, is persuasive authority because one of the Uniform Voidable Transactions Act's purposes is to ensure uniformity in the law.

The Second Amended Complaint tries to get around this problem by joining new Plaintiffs whose wells are concededly producing gas[7] and proposing a new class consisting of all owners of property with a Diversified well, "regardless of whether the wells are currently abandoned or non-producing." Compl. ¶ 592(a). Recognizing the fact that no obligation even arguably exists to plug producing wells, these Plaintiffs do not assert tort claims or any other claim based on alleged failure to plug the wells, but instead claim to be "creditors" because their wells might someday be abandoned and could hypothetically need to be plugged at an unspecified point in the future. *Id.* These Plaintiffs do not claim to be suffering any current damages. Dismissal is required.

First, these claims fail on Article III ripeness grounds. Federal courts are not in the business of resolving hypothetical claims based on hypothetical conduct that may be decades away. *Zohar CDO 2003-1 v. Patriarch Partners, LLC* (*In re Zohar III, Corp.*), 631 B.R. 133, 197 (Bankr. D. Del. 2021) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (citation omitted)); *Vu v. Ankoanda* (*In re Ankoanda*), 495 B.R. 599, 606 (Bankr. N.D. Ga. 2013) ("A 'substantial controversy which is definite and concrete' must exist for a court to consider the claim." (citation omitted)). These claims are wholly speculative: i) the wells may never be abandoned by Diversified; ii) the wells may not need to be plugged when they are abandoned, because the then-operator may submit proof of a bona fide future use under the same statute discussed *supra*; iii) if no bona fide use exists, and the wells do need to be plugged, the then-operator may plug them without accruing liability to Plaintiffs; and/or iv) if liability does exist, the existence and amount of damages is uncertain.

---

[7]   *See* W. Va. Code § 40-1A-11.

    The newly joined Plaintiffs who fit in this category of owners with producing wells appear to include Benjamin Patterson; the Clifton & Candace Drainer Irrevocable Trust; Eben Fritts & Eben Fritts, III; Joan Medley; Scott Corcoran; and Christine Cochran. *See* Compl. at 36; 39–40; 42; 55–56; 59–60; 63.

The lack of any existing obligation is thus fatal to the fraudulent transfer claims. To the extent any obligation exists under Section 22-6-19, it only arises *if and when* the time comes that the well has not produced for a year *and has no bona fide future use*. If and when these wells stop producing and whether or not they will have an alternative use remain a matter of speculation. Defendants do not and may never have an obligation to plug them (for example, they could be transferred or repurposed). Plaintiffs may not be the owners if and when the day ever comes that the wells do not produce for one year and have no bona fide future use. Even if that day comes, there is no non-speculative basis to allege that Diversified would violate any statutes or fail to plug the wells. Because Plaintiffs do not have any underlying claim, they cannot be creditors under AFTA or AUTA. *See Richardson v. Chambless*, 266 So. 3d 684, 688–90 (Ala. 2018) (holding that if plaintiff's tort claims are held to be without merit, he would "no longer have 'right to payment,'" "will no longer be a creditor," and "will cease to have a viable fraudulent-transfer claim"); *Gibson*, 2019 WL 637833, at *3 (rejecting a motion to amend a complaint to add a fraudulent transfer claim in the absence of an underlying claim).

Second, Plaintiffs' claims fail as a matter of law under the text of AFTA and AUTA because these new Plaintiffs are not "creditors" of Defendants under the statute. Under both the AFTA and the AUTA, "creditor" means "a person who has a claim." Ala. Code § 8-9A-1(4); *see also* Ala. Code § 8-9B-2(4). A "claim" is defined in pertinent part as a "*right to payment*, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, and specifically shall include the nonpayment of child support pursuant to a court order." Ala. Code § 8-9A-1(3) (emphasis added); Ala. Code § 8-9B-2(3) (emphasis added). In other words, if Plaintiffs do not have a "right to payment" from Defendants, they cannot bring these claims.

The first reason Plaintiffs are not "creditors" is for the same reason the claims are not ripe under Article III—there is no existing obligation to plug the well, and as such there cannot be liability for the alleged breach of that non-existent obligation. Plaintiffs attempt to avoid the speculative nature of their claims by relying on the part of the definition of "claim" including a "right to payment" that is "contingent" or "unmatured," but that does not change the analysis. Plaintiffs do not have *any* right to payment—even a contingent or unmatured one—because Plaintiffs cannot point to facts satisfying each element of an underlying cause of action.

Plaintiffs' position is inconsistent with the caselaw they cite. In *Grady v. A.H. Robins Co.*, 839 F.2d 198 (4th Cir. 1988),[8] the Fourth Circuit held that a contingent claim arises "when the acts constituting the tort or breach of warranty have occurred prior to the filing of the petition," even if there is "no right to the immediate payment of money." 839 F.2d at 203. Courts interpreting *Grady* have similarly held that a claim is "contingent" only if "all acts constituting the tort including impact on the victim had occurred prior to the . . . petition," and "[a]t the time of the petition, the plaintiff's right to payment depended solely on manifestation, a contingent event." *Pettibone Corp. v. Ramirez (In re Pettibone Corp.)*, 90 B.R. 918, 928 (Bankr. N.D. Ill. 1988) (citations omitted).[9] Even assuming Plaintiffs' common law theory of liability were valid (it is not), "all acts constituting the tort" (*i.e.*, cessation of production for a year and no finding of a potential bona fide future use) have not yet occurred because these wells are still producing. As such, even under the caselaw they cite, Plaintiffs do not hold "contingent" or "unmatured" claims as a matter of law.

---

[8] Plaintiffs previously relied on *Grady*. ECF No. 66 at 19–20.

[9] "[T]he products injury (or at least impact giving rise to future injury) had occurred pre-bankruptcy, with manifestation the sole event occurring post-petition." *In re Pettibone Corp.*, 90 B.R. at 930–31. "To say[Plaintiffs] had an unmatured pre-bankruptcy claim under the facts admitted here would be to adopt the perspective of the character in Alice in Wonderland who opined that words meant what he intended them to mean. The policy of relief to debtors and business reorganization cannot distort the broad but not unlimited Congressional definition of 'claim.'" *Id.* at 932.

The contrary result would be absurd. Plaintiffs' expansive definition of "contingent" or "unmatured" would stretch the definition of "creditors" to include everyone. If any tort that **could** be committed in the future is "contingent" for purposes of the statute, then everyone would be a creditor of everyone else because they **could** commit a tort against that person or company in the future. In other words, if what is "contingent" for a "contingent" tort claim to constitute a claim is the commission of the tort itself, this would render the definition of "creditors" unlimited and, therefore, superfluous. Because "creditors" must mean what its definition states, then Plaintiffs are not creditors and their claims must be dismissed.

The second reason Plaintiffs are not "creditors" under this statutory scheme is because they have not identified any law giving them a right to **payment**. The statute cited by Plaintiffs discusses a right of specific performance (plugging the wells) and it says that obligation is owed to the state (not Plaintiffs). W. Va. Code § 22-6-19. Nowhere is an obligation for the operator to make a payment to a surface owner mentioned in the statute's text (outside of obligations to post a bond **to the state**). Nor do Plaintiffs cite any West Virginia cases interpreting this statute as creating a right to payment, let alone creating a right to payment in favor of a surface owner.

Instead, the costs of incurring this obligation are borne by the operator at that time the Office of Oil and Gas requires the plugging. Plaintiffs and the putative class members have not borne plugging costs under this statute and **will never do so**. As such, even in the hypothetical world in which these producing wells are abandoned by these particular Defendants while the surface estate is still owned by these particular Plaintiffs, there are no circumstances in which members of the putative class have a "right to payment" for the plugging obligations. As such, they do not have a "claim" and cannot be "creditors" under AFTA or AUTA. Tellingly, Plaintiffs do not cite a single court anywhere that adopts or supports the expansive definition of "creditor" asserted by Plaintiffs.

**B.      Independently, the Constructive Fraudulent Transfer Claim Is Barred by the One-Year Statute of Limitations**

Plaintiffs' constructive fraudulent transfer claim is time-barred. Alabama has constructive fraud provisions under its versions of the Uniform Voidable Transactions Act and the Uniform Fraudulent Transfer Act.[10] *See* Ala. Code § 8-9B-5(a)(2) (former statute); Ala. Code § 8-9A-4(c) (latter statute). A claim under either statute "is extinguished unless action is brought . . . within one year after the transfer was made when the action is brought by a creditor whose claim arose after the transfer was made[.]" Ala. Code § 8-9B-10(d); Ala. Code § 8-9A-9(4). In other words, Alabama has a one-year statute of limitations for constructive fraudulent transfer claims asserted by after-the-transaction creditors (like Plaintiffs), and the statute begins to run when the transfer is complete. *See Iberiabank v. Polk*, 2013 WL 5701084, at *3 (M.D. Ala. Oct. 18, 2013) (noting the statute of limitations is "one year after the transfer when the action is brought by a creditor whose claim arose after the transfer was made" (citing Ala. Code § 8-9A-9(4))).

The one-year statute of limitations bars Plaintiffs' constructive fraudulent transfer claim based on the Complaint. The disputed transfers happened in July 2018 and May 2020. *See, e.g.*, Compl. ¶ 5. Plaintiffs asserted their claim more than one year after the latest transfer. *See* Original Comp. (ECF No. 1). Thus, the constructive fraudulent transfer should be dismissed with prejudice.

Furthermore, Plaintiffs cannot avoid the statute of limitations through what they have called the discovery rule. Plaintiffs have not pleaded the requirements to invoke this rule, and in any event, their claims are based on highly public conduct and cannot fall within this exception, which is based on concealing facts.

---

[10]   Alabama's Uniform Fraudulent Transfer Act applies "to transfers made prior to January 1, 2019," and its Uniform Voidable Transactions Act applies to transfers on or after that date. Ala. Code § 8-9B-16.

First, Plaintiffs have not pled the elements required by Alabama law to invoke the statute of limitations exception cited in the Complaint. "[A] party seeking to invoke § 6-2-3 must '(1) aver with precision the facts and circumstances which allegedly were not discovered and to which plaintiff allegedly was defrauded, (2) aver how or when these facts were discovered, (3) aver what prevented these facts from being discovered before the bar of the statute became complete and (4) aver facts acquitting the plaintiff of all knowledge of facts which ought to have put it on inquiry." *Int'l Mgmt. Grp., Inc. v. Bryant Bank*, 274 So. 3d 1003, 1014 (Ala. Civ. App. 2018) (internal alterations removed) (citation omitted). Plaintiffs' Second Amended Complaint does not "aver with precision the facts and circumstances . . . to which plaintiff allegedly was defrauded," "what prevented these facts from being discovered," or "facts acquitting the plaintiff of all knowledge of facts which ought to have put it on inquiry." *See id.* Plaintiffs have not satisfied each element.

Nor could Plaintiffs do so. Rather than being concealed, the transfers about which Plaintiffs complain were highly public and reported to federal and state regulators. Even Plaintiffs themselves allege that "EQT Corporation's Form 10-Q filing with the United States Securities and Exchange Commission for the Quarterly Period Ending September 30, 2018, ***reflects the high level of detail that EQT had about the transaction at issue***." Compl. ¶ 94 (emphasis added). Plaintiffs cite a public article from 2020 complaining that the transaction "relieves EQT of approximately $47 million in asset retirement obligations and other liabilities associated with the assets." *Id.* ¶ 95 (emphasis omitted). Plaintiffs cannot show, and did not plead, that Defendants concealed facts sufficient to put Plaintiffs on inquiry notice of claims based on these transfers.

## **CONCLUSION**

Plaintiffs want to stop Diversified from operating its wells under its recognized rights. To advance their goal, Plaintiffs brought this lawsuit in defiance of West Virginia's Office of Oil and Gas and numerous other statutory requirements. The Court should dismiss this case.

Respectfully submitted:

Dated: January 18, 2023

  /s/ Howard Persinger, III

Howard Persinger, III
**PERSINGER & PERSINGER, L.C.**
237 Capitol Street
Charleston, WV 25301
Phone:   (304) 346-9333
Fax:       (304) 346-9337
Email:   hmp3@persingerlaw.com

Daniel Donovan, P.C. (admitted *pro hac vice*)
Ragan Naresh, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone:   (202) 389-5267
Fax:       (202) 389-5200
Email:   daniel.donovan@kirkland.com
             ragan.naresh@kirkland.com

Kenneth Young (*pro hac vice*)
Dustin Womack (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
609 Main Street
Houston, TX 77002
Phone:   (713) 836-3600
Fax:       (713) 836-3601
Email:   kenneth.young@kirkland.com
             dustin.womack@kirkland.com

*Counsel for Defendants Diversified Energy Company PLC, Diversified Gas & Oil, PLC, Diversified Production LLC, Diversified Gas & Oil Corporation, Diversified Oil and Gas LLC, and Alliance Petroleum Corporation*

  /s/ Jennifer J. Hicks

Jennifer J. Hicks, Esquire (WVSB #11423)
Tiffany M. Arbaugh, Esquire (WVSB #9982)
**BABST, CALLAND, CLEMENTS AND ZOMNIR, P.C.**
300 Summers Street, Suite 1000
Charleston, WV 25301
Phone:   (681) 205-8888
Fax:       (681) 205-8814
Email:   jhicks@babstcalland.com
             tarbaugh@babstcalland.com

Anna Rotman, P.C. (*pro hac vice*)
Nick Brown (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
609 Main Street
Houston, TX 77002
Phone:   (713) 836-3600
Fax:       (713) 836-3601
Email:   anna.rotman@kirkland.com
             nick.brown@kirkland.com

Mark K. Dausch, Esquire (WVSB #11655)
**BABST, CALLAND, CLEMENTS AND ZOMNIR, P.C.**
603 Stanwix Street
Pittsburgh, PA 15222
Phone:   (412) 394-5655
Fax:       (412) 394-6579
Email:   mdausch@babst.calland.com

*Counsel for Defendants EQT Production Company, EQT Production HTW, LLC, EQT Energy LLC, EQT Investment Holdings, LLC, EQT Gathering, LLC, and EQT Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 18, 2023 a copy of the foregoing was served on all counsel of record via the Court's electronic filing system.

*/s/ Howard M. Persinger*
Howard M. Persinger, III