### IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA WHEELING DIVISION

MARK MCEVOY, et al., individually and
on behalf of a proposed class,

        Plaintiffs,

                              Civil Action No. 5:22-cv-171

v.                               The Honorable John P. Bailey

DIVERSIFIED ENERGY COMPANY PLC,
et al.,

        Defendants.

---

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

Brian A. Glasser, Esq. (WVSB No. 6597)
John W. Barrett, Esq. (WVSB No. 7289)
Brian R. Swiger (WVSB No. 5872)
Athanasios Basdekis (WVSB No. 9832)
William S. Flynn (WVSB No. 13947)
Panida Anderson (admitted *pro hac vice*)
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555 (phone)
(304) 342-1110 (fax)
bglasser@baileyglasser.com
jbarrett@baileyglasser.com
bswiger@baileyglasser.com
tbasdekis@baileyglasser.com
wflynn@baileyglasser.com
panderson@baileyglasser.com

Joseph M. Lovett (WVSB No. 6926)
J. Michael Becher (WVSB No. 10588)
Isak Howell (WVSB No.  11558)
Benjamin Luckett (WVSB No. 11463)
Amanda Demmerle (WVSB No. 13930)
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006
jlovett@appalmad.org
mbecher@appalmad.org
ihowell@appalmad.org
bluckett@appalmad.org
ademmerle@appalmad.org

## <u>TABLE OF CONTENTS</u>

I.    The Consent Order Does Not Deprive the Court of Jurisdiction ....................................... 2

   A.   The Consent Order Is Woefully Inadequate to Address Diversified's Problem ........ 3

   B.   Plaintiffs' Common Law Claims Are Expressly Preserved by the Oil and Gas Program ........................................................................................................... 4

   C.   Plaintiffs Were Not Required to File a Complaint with OOG ................................. 5

   D.   The Consent Order Does Not Establish Diversified's Compliance with § 22-6-19... 9

      1.   The Consent Order is merely an agreement by WVDEP not to exercise its enforcement authority over Diversified's violations of § 22-6-19 ................ 9

      2.   The Consent Order does not establish a bona fide future use as a matter of law ............................................................................................... 10

   E.   The Consent Order Does Not Provide Grounds for OOG to Deny Permits Needed by Diversified to Plug the Wells on Plaintiffs' Properties ............................................. 12

II.   Plaintiffs' Tort Claims Are Not Barred by a Statute of Limitations................................ 13

   A.   Diversified's Continued Failure to Plug Wells and Remediate Sites Creates a Continuing Trespass.................................................................................................. 13

   B.   The "Continuing Tort" Doctrine Also Applies to Nuisance and Negligence Claims ...................................................................................................................... 15

III.  Plaintiffs' AFTA/AVTA Claims Should Not Be Dismissed ........................................... 17

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atkinson v. Va. Oil & Gas Co.*,
 79 S.E. 647 (W. Va. 1913) ...................................................................................5

*Auber v. Jellen*,
 469 S.E.2d 104 (W. Va. 1996) .....................................................................16, 17

*State ex rel. Ball v. Cummings*,
 540 S.E.2d 917 (W. Va. 1999) .............................................................................8

*Balt. Neighborhoods, Inc. v. LOB, Inc.*,
 92 F. Supp. 2d 456 (D. Md. 2000) .....................................................................12

*Bank of Wheeling v. Morris Plan Bank & Tr. Co.*,
 183 S.E.2d 692 (W. Va. 1971) .............................................................................8

*Blake v. Columbia Gas Transmission, LLC*,
 No. 3:19-CV-0847, 2021 WL 951705 (S.D. W. Va. Mar. 12, 2021) ...................7, 8

*Burch v. Nedpower Mount Storm*,
 647 S.E.2d 879 (W. Va. 2007) ...........................................................................16

*Cent. Va. Obstetrics & Gynecology Assocs. v. Whitfield*,
 590 S.E.2d 631 (Va. Ct. App. 2004) ..................................................................12

*Citizens for a Better Env't-Cal. v. Union Oil Co. of Cal.*,
 861 F. Supp. 889 (N.D. Cal. 1994), *aff'd*, 83 F.3d 1111 (9th Cir. 1996) ...............10

*Cobb v. Collins*,
 No. 16-1212, 2018 WL 300990 (W. Va. Jan. 5, 2018) .........................................15

*Collins v. Elkay Min. Co.*,
 371 S.E.2d 46 (1988) ............................................................................................8

*Confer v. EXCO Res., L.L.C.*,
 No. 4:13-CV-2178, 2013 WL 12203016 (M.D. Pa. Nov. 19, 2013), *adopted as modified*, 2014 WL 12704714 (M.D. Pa. Mar. 14, 2014) .........................................6

*Cruden v. Bank of N.Y.*,
 957 F.2d 961 (2d Cir. 1992) ...............................................................................23

*Dominion Transmission, Inc. v. Summers*,
 723 F.3d 238 (D.C. Cir. 2013) .............................................................................7

*EQT Prod. Co. v. Wender*,
  870 F.3d 322 (4th Cir. 2017) ................................................................5

*In re Gaddy*,
  622 B.R. 440 (Bankr. S.D. Ala. 2020) ....................................................24

*Grady v. A.H. Robbins*,
  839 F.2d 198 (4th Cir. 1988) .........................................................18, 19

*Graham v. Beverage*,
  566 S.E.2d 603 (W. Va. 2002) ....................................................13, 14, 15

*Handley v. Town of Shinnston*,
  289 S.E.2d 201 (W. Va. 1982) .........................................................15, 17

*Hurry v. Gen. Motors LLC*,
  2022 WL 3587349 (M.D. Ala. Aug. 22, 2022) ........................................24

*Int'l Mgmt. Grp., Inc. v. Bryant Bank*,
  274 So. 3d 1003 (Ala. Civ. App. 2018) ....................................................25

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) ............................................................................14

*Lynch v. Merchs. Nat'l Bank*,
  22 W.Va. 554 (1883) ............................................................................6

*Moore v. Wilson*,
  No. 2:13-CV-14393, 2014 WL 1365967 (S.D. W. Va. Apr. 7, 2014) ........................13, 14, 16

*Mountain Valley Pipeline, LLC v. McCurdy*,
  793 S.E.2d 850 (W. Va. 2016) ................................................................4

*Ohio Valley Env't Coal., Inc. v. Maple Coal Co.*,
  808 F. Supp. 2d 868 (S.D. W. Va. 2011) ..............................................12

*Papastefan v. B&L Constr. Co. Inc. of Mobile*,
  385 So.2d 966 (Ala. 1980) ............................................................24, 25

*Potter v. First Real Estate Co.*,
  844 So.2d 540 (Ala. 2002) ....................................................................24

*Quarles v. United States*,
  139 S. Ct. 1872 (2019) ........................................................................14

*Reed v. Phillips*,
  452 S.E.2d 708 (W. Va. 1994) ...............................................................15

iii

*Reilley v. Bd. of Educ. of Cnty. of Marshall*,
    874 S.E.2d 333 (W. Va. 2022)................................................................16, 17

*Rhodes v. E.I. du Pont de Nemours & Co.*,
    657 F. Supp. 2d 751 (S.D. W. Va. 2009).................................................14

*Roberts v. W. Va. Am. Water Co.*,
    655 S.E.2d 119 (W. Va. 2007)................................................................15

*Rogers v. Tug Hill Operating, LLC*,
    No. 5:21-CV-199, 2022 WL 1096620 (N.D. W. Va. May 2, 2022) .........11

*S.J. Holding Co., Inc. v. Kadco, Inc.*,
    874 So.2d 1036 (Ala. 2003).....................................................................18

*Sherman v. Barnhart*,
    No. 3:03–MC–25, 2008 WL 1994909 (N.D. W. Va. May 8, 2008) (Bailey, J.) .....................7

*State v. McKinley*,
    764 S.E.2d 303 (W. Va. 2014)................................................................17

*Taylor v. Culloden Pub. Serv. Dist.*,
    591 S.E.2d 197 (W. Va. 2003)...........................................................15, 16

*In re U.S. Pipe & Foundry Co.*,
    32 F.4th 1324 (11th Cir. 2022) ..........................................................18, 21

*United States v. Jefferson Elec. Mfg. Co.*,
    291 U.S. 386 (1934)...........................................................................11, 12

*Vista Bella, Inc. v. RBL, LLC*,
    511 B.R. 163 (B.R. S.D. Ala. 2014) .......................................................19

*Walker v. S. Ry. Co.*,
    385 U.S. 196 (1966), *amended*, 386 U.S. 988 (1967)...............................8

*Whiteman v. Chesapeake Appalachia, L.L.C.*,
    729 F.3d 381 (4th Cir. 2013) ...............................................................5, 13

*Wiggins v. E. Associated Coal Corp.*,
    178 W. Va. 63 (1987) ..........................................................................7, 8

*Wiles v. Wiles*,
    134 W.Va. 81, 58 S.E.2d 601 (1950).......................................................21

*Wilson Advisory Comm. v. Bd. of Cnty. Comm'rs*,
    292 P.3d 855 (Wyo. 2012)......................................................................11

iv

**Statutes**

15 U.S.C. § 717r ....................................................................................................7

Ala. Code § 6-2-3 ......................................................................................23, 24, 25

Ala. Code § 8-9A-1 et seq. ......................................................................................2

Ala. Code § 8-9A-4 ........................................................................................20, 25

Ala. Code §§ 8-9A-4, 5 ....................................................................................18, 25

Ala. Code § 8-9A-7(a) ............................................................................................2

Ala. Code § 8-9A-9 ..............................................................................................23

Ala. Code § 8-9A-11 ............................................................................................19

Ala. Code § 8-9B-1 et seq. ......................................................................................2

Ala. Code §§ 8-9B-5(a)(2), 8-9A-4(c) ....................................................................23

Delaware Fraudulent Transfer Act ........................................................................22

Natural Gas Act ..............................................................................................7, 8

Railway Labor Act ................................................................................................9

Uniform Act ......................................................................................................19

W. Va. Code § 22-6-19 ..................................................................................*passim*

W. Va. Code § 22-6-28 ......................................................................................5, 7

W. Va. Code § 22-6-28(a) ......................................................................................6

W. Va. Code § 22-6-28(b) ..................................................................................6, 8

W. Va. Code § 22-7-1(a)(2) ....................................................................................5

W. Va. Code § 22-7-4(a) ................................................................................4, 7, 8

W. Va. Code § 22-7-8 ....................................................................................4, 7, 8

W. Va. Code § 22-10-11(a) ............................................................................4, 7, 8

**Regulations**

W. Va. Code St. R. § 35-5-3 ..................................................................................10

W. Va. Code St. R. § 35-5-4 ..................................................................................11

W. Va. Code St. R. § 35-5-5.1 ...............................................................................11

W. Va. Code St. R. § 35-5-5.2 ...............................................................................11

**Other Authorities**

75 Am. Jur. 2d § 45 ..............................................................................................14

*Black's Law Dictionary* (5th ed. 1979) ................................................................18

Restatement (Second) of Torts § 160 (1965) ........................................................14

This lawsuit seeks to vindicate the common law property rights of thousands of West Virginia landowners. Defendant Diversified is the largest owner of natural gas wells in the United States. It owns and is thus obligated to plug more than 20,000 gas wells in West Virginia. In 2018 and 2020, Diversified acquired approximately 12,000 mostly abandoned or low-producing wells from Defendant EQT, the largest producer of natural gas in the United States, in exchange for nearly $650 million. By transferring that money and assuming the billions of dollars in liabilities associated with EQT's marginal wells, Diversified ensured that it will not be able to meet its plugging and remediation liabilities, not only for the specific wells involved in the transfer but for almost all of the more than 20,000 wells it owns in West Virginia.[1] Diversified is essentially a zombie company, burdened with remediation liabilities that greatly exceed its assets. If allowed to stand, EQT's transfer of its remediation liabilities to Diversified would leave the State littered with abandoned wells—with no solvent company remaining to restore the property of thousands of West Virginia landowners.

Plaintiffs assert three common law claims against Diversified. First, because Diversified's non-producing wells are no longer "reasonable and necessary" for "mineral production," it has exceeded the right to occupy Plaintiffs' land. Diversified is, therefore, trespassing. Second, because Diversified exceeded its right to leave equipment on Plaintiffs' land and that equipment unreasonably interferes with Plaintiffs' use and enjoyment of their properties, the continued presence of those wells is a nuisance. Finally, Diversified has a duty to plug a well promptly after 12 months of failing to report production, and a breach of that duty constitutes a negligent act.

Plaintiffs also allege statutory claims related to the transfer of wells from EQT to

---

[1] *See* ECF No. 96 ¶¶ 5–12 (citing Ted Boettner et al., *Diversified Energy: A Business Model Built to Fail Appalachia*, Ohio River Valley Institute (Apr. 2022), *available at* https://ohiorivervalleyinstitute.org/diversified-energy-a-business-model-built-to-fail-appalachia/).

Diversified under the Alabama Fraudulent Transfers Act ("AFTA") and its successor, the Alabama Voidable Transactions Act ("AVTA") (collectively, the "Acts").[2] Those statutes protect creditors from debtors who would hinder or delay their claims by transferring assets to a third party. The Acts expressly authorize creditors, including creditors such as Plaintiffs with both contingent and non-contingent, fully matured claims, to void transfers that would otherwise make it impossible for their debtors to satisfy their claims. Ala. Code § 8-9A-7(a); *id.* § 8-9B-8(a)(1). Here, it is necessary to void the transfer of money from EQT to Diversified *now* to ensure there are sufficient funds available to properly plug the 12,000 wells involved in the 2018 and 2020 transfers.

In response, Defendants repeat the same arguments they previously offered to the Court. (*See* ECF No. 44, ECF No. 90). Diversified's principal defense boils down to a single argument: its agreement with a state agency to plug a small fraction of its non-producing wells displaces Plaintiffs' property rights. Diversified is wrong. The agreement does not purport to affect claims by third parties, nor could it—both the statutes themselves and the West Virginia courts recognize that the oil-and-gas regulatory program does not supersede the rights of landowners to assert common law claims. Moreover, Diversified's statute-of-limitations argument regarding those torts claims ignores West Virginia's well-established "continuing tort" doctrine. Finally, all Plaintiffs are creditors with valid claims under the AFTA/AVTA, despite some of those claims being contingent or unmatured, and their claims are not barred by the Acts' statutes of limitations.

## I.    The Consent Order Does Not Deprive the Court of Jurisdiction

Diversified's chief defense is that its Consent Order with the West Virginia Department of Environmental Protection's ("WVDEP") Office of Oil and Gas ("OOG")—drafted at Diversified's

---

[2] The AFTA, Ala. Code § 8-9A-1 et seq., applies to transfers that took place prior to January 1, 2019—in this case, the July 2018 Transfer. The AVTA, Ala. Code § 8-9B-1 et seq., applies to transactions that took place on or after January 1, 2019 — in this case, the May 2020 Transfer. The AFTA/ AVTA claims are the only claims asserted against EQT. Plaintiffs' tort claims apply solely to Diversified.

2

request, for its own reasons—precludes Plaintiffs' common law claims, which the company falsely characterizes as statutory claims. (*See* ECF No. 105 at 6–7; ECF No. 105-1 ("Consent Order").) That is wrong for several reasons. The Consent Order—which does not come close to addressing Diversified's well-plugging liabilities—has no effect on Plaintiffs' claims. First, Plaintiffs' claims are not a collateral attack on the Consent Order; they assert property rights claims that derive from the common law, not statutory rights. West Virginia law makes clear that such claims are not precluded. Second, Plaintiffs were not required to file a complaint with OOG prior to bringing their claims because the Legislature plainly did not intend for the administrative complaint procedures to be exclusive and because those procedures are inadequate to provide the relief sought by Plaintiffs. Finally, to the extent that West Virginia's well-plugging statutes are relevant to Plaintiffs' claims, the Consent Order was not intended to, and does not in fact, find a bona fide future use for *any* of Diversified's wells and thus does not establish Diversified's alleged compliance with the statute.

A. *The Consent Order Is Woefully Inadequate to Address Diversified's Problem*

The Consent Order explains that, in 2018 following Diversified's acquisition of "approximately 17,000 oil and gas wells located in West Virginia," "Diversified contacted OOG regarding a number of . . . those recently acquired wells which are shut in and which have been nonproducing wells for period of time, and some for a period of time sufficient to potentially meet the definition of an abandoned well." (Consent Order ¶¶ II.7, II.9.) Diversified and OOG then established a schedule that was "acceptable" to Diversified, under which as little as *fifty wells per year* would be *either* plugged or returned to production. (*Id.* ¶¶ I.12, II.5.b.) At that rate, it would take Diversified 340 years to plug the approximately 17,000 wells it owned in 2018 and 240 years just to plug the 12,000 wells it acquired from EQT. Additionally, under this schedule, even the

2,168 (at minimum) *currently* abandoned wells owned by Diversified and identified in Plaintiffs' Second Amended Complaint would not be addressed until after 2065, more than 40 years from now, at which point Diversified—if still in existence—would be left to deal with the thousands more wells whose productive lives will expire in the interim.[3]

     *B. Plaintiffs' Common Law Claims Are Expressly Preserved by the Oil and Gas Program*

     Diversified argues that because OOG is authorized to supervise the plugging of wells, Plaintiffs' claims are an impermissible "collateral attack" on the Consent Order. But Diversified ignores that West Virginia law allows plaintiffs to bring freestanding, common-law claims arising from the ownership of real property despite the existence of the oil and gas regulatory program.[4] Indeed, were the oil and gas program to have Diversified's claimed effect of eliminating Plaintiffs' ability to enforce their property rights, it would constitute an unconstitutional taking of Plaintiffs' land for the sole benefit of another private party. *See Mountain Valley Pipeline, LLC v. McCurdy*, 793 S.E.2d 850, 860 (W. Va. 2016).

     The West Virginia Legislature made clear that the remedies provided by the regulatory program are not exclusive and do not preclude surface owners' common law claims:

> Nothing in section three or elsewhere in this article shall be construed to diminish in any way the common law remedies, including damages, of a surface owner or any other person against the oil and gas developer for the unreasonable, negligent or otherwise wrongful exercise of the contractual right, whether express or implied, to use the surface of the land for the benefit of the developer's mineral interest.

W. Va. Code § 22-7-4(a); *see id.* § 22-7-8 ("The remedies provided by this article shall not preclude any person from seeking other remedies allowed by law."); *id.* § 22-10-11(a) (describing statutory

---

[3] The Consent Order's requirement that Diversified provide a $3 million bond provides little solace to landowners, given that its plugging obligations likely run between $2 and 3 *billion*. (ECF No. 96 ¶ 45.)

[4] Unlike their trespass and nuisance claims, Plaintiffs' negligence claim *does* rely on a breach of the statutory plugging duty. (ECF No. 96 ¶ 618–22.) However, as explained below, the Consent Order does not establish Diversified's compliance with the statute and thus does not bar Plaintiffs' negligence claim.

remedies as "additional and cumulative" and explaining that "nothing herein contained shall abridge or alter rights of action or remedies now or hereafter existing."); *id.* § 22-7-1(a)(2).

Courts have consistently recognized that principle. As the U.S. Court of Appeals for the Fourth Circuit explained, "West Virginia's regulatory scheme does not create a right of the lessor to commit a trespass if the specific use is not granted or implied in a lease." *Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381, 393–94 (4th Cir. 2013); *see also EQT Prod. Co. v. Wender*, 870 F.3d 322, 335 (4th Cir. 2017) (explaining that a locality retains its common law remedies regarding oil and gas activities despite the state regulatory program precluding a local ban on activities authorized by the program). Likewise, the West Virginia Supreme Court has long held that activities regulated by the State's oil and gas laws can give rise to common-law liability despite being subject to cumulative enforcement by the state. *See Atkinson v. Va. Oil & Gas Co.*, 79 S.E. 647, 647–49 (W. Va. 1913) (authorizing suit for damages against well operator by adjacent property owner despite state enforcement authority). And in *Magers v. Chesapeake Appalachia*, this Court declined to find an implied private statutory cause of action to enforce West Virginia's oil and gas program because "there are already ways to recover under the common law." No. 5:12-CV-49, 2013 WL 4099925, at *6 (N.D. W. Va. Aug. 13, 2013) (Bailey, J.). Because the Legislature made clear that the oil and gas program does not preclude common law tort claims like those brought by Plaintiffs, the Consent Order entered pursuant to that program cannot "gut[] Plaintiffs' tort claims as a matter of law." (ECF No. 105 at 8.)

### C.  Plaintiffs Were Not Required to File a Complaint with OOG

Diversified asserts that Plaintiffs' suit is barred because Plaintiffs did not exhaust their administrative remedies by filing a complaint with OOG pursuant to West Virginia Code § 22-6-28. (ECF No. 105 at 10–15.) That provision allows an aggrieved person to file a complaint

with the director of OOG against a well operator, alleging non-compliance with West Virginia's oil-and-gas statute. W. Va. Code § 22-6-28(a). But, despite allowing "any aggrieved person" to file a complaint, the statute provides that only a "*well operator or coal operator* adversely affected by a final decision or order of the director"—not a surface owner—may appeal that decision. *Id*. § 22-6-28(b) (emphasis added).

West Virginia law regarding the exhaustion of administrative remedies, which Diversified entirely fails to cite in its memorandum, makes clear that Plaintiffs were not required to go through the ultimately unreviewable statutory complaint process prior to bringing their common law tort claims. Exhaustion requirements under West Virginia law stem from the principle that "[w]hen a statute creates a new offence and denounces the penalty, or gives a new right and declares the remedy, the punishment or the remedy can be only that which the statute prescribes." Syl. Pt. 2, *Lynch v. Merchs. Nat'l Bank,* 22 W.Va. 554 (1883). Plaintiffs are not seeking to enforce any "new right" created by statute, however; instead they are protecting their property rights through common-law actions. For this reason, Diversified's citation to *Confer v. EXCO Res., L.L.C.*, No. 4:13-CV-2178, 2013 WL 12203016 (M.D. Pa. Nov. 19, 2013), *adopted as modified*, 2014 WL 12704714 (M.D. Pa. Mar. 14, 2014), is inapposite. (ECF No. 105 at 14.) In *Confer*, the plaintiffs' tort claims had been dismissed according to a principle of Pennsylvania law unrelated to exhaustion of administrative remedies. *Confer*, 2013 WL 12203016, at *4–5 (dismissing claims pursuant to Pennsylvania's gist-of-the-action doctrine, which precludes tort claims based on a party's failure to comply with a contract). Further, the portion of the case that Diversified quotes at length dealt not with the tort claims, but with the plaintiffs' attempt to directly enforce statutory well-plugging requirements. Because the Consent Order is only an exercise of prosecutorial discretion regarding *OOG*'s statutory enforcement authority and not the common law rights of

landowners (*see infra* Section I.D.), Plaintiffs had no reason to file a complaint to protect their common law rights. Indeed, such an appeal would not have been cognizable.

A party is only required to exhaust statutory remedies if the Legislature intended the remedy provided to be exclusive with regard to that party's claims. *Wiggins v. E. Associated Coal Corp.*, 357 S.E.2d 745, 747–48 (W. Va. 1987). As explained above, West Virginia's oil and gas regulatory scheme makes clear that the Legislature did not intend the narrowly proscribed remedy in § 22-6-28 to be the exclusive means through which landowners could protect their property rights from the adverse impacts of oil-and-gas drilling. Indeed, the oil-and-gas statute contains no language purporting to make the remedies prescribed exclusive, and instead contains several broad savings clauses. *See* W.Va. Code § 22-7-4(a); *see also id.* § 22-7-8; *id.* § 22-10-11(a). That key fact renders Diversified's cited authority entirely inapplicable. For instance, in *Sherman v. Barnhart*, No. 3:03–MC–25, 2008 WL 1994909 (N.D. W. Va. May 8, 2008) (Bailey, J.), the plaintiff filed a writ of mandamus seeking judicial review of an agency decision made pursuant to a statute that expressly stated review procedures therein were to be exclusive. (*See* ECF No. 105 at 13.)

Likewise, the *Blake* cases that Diversified discusses at length are not on point because they involved the Natural Gas Act ("NGA"), which (contrary to West Virginia law discussed above) expressly provides that its procedures for review of orders shall be exclusive. *See* 15 U.S.C. § 717r; *Blake v. Columbia Gas Transmission, LLC*, No. 3:19-CV-0847, 2021 WL 951705, at *2 (S.D. W. Va. Mar. 12, 2021). In the NGA, Congress "intended to occupy the field to the exclusion of state law by establishing . . . a comprehensive scheme of federal regulation." *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 243 (D.C. Cir. 2013). In contrast, the West Virginia Legislature expressed its intention that non-producing wells be "promptly" plugged, W. Va. Code

§ 22-6-19, and that the statutory remedies it provided not "diminish in any way the common law remedies, including damages, of a surface owner," *id*. § 22-7-4(a). S*ee also id.* § 22-7-8; *id.* § 22-10-11(a). The *Blake* court's findings (that a project's impacts that had been thoroughly studied and approved by federal authorities under the NGA could not constitute a nuisance under state law) simply have no application to Plaintiffs' claims, which are consistent with, and indeed explicitly preserved by, State law. Diversified's discussion of the *Blake* cases is a red herring.

Moreover, West Virginia law is clear that exhaustion will not be required where the statutory remedy is inadequate to fully address a plaintiffs' claims. *See* Syl. Pt. 2, *Wiggins*, 357 S.E.2d 745. The West Virginia Supreme Court has explained that its holding in *Wiggins* relied on the fact that "damages recoverable in a tort action are broader than those available administratively," and that "the primary purpose of the administrative remedy was different than" the remedies available through a private party's action in court. *Collins v. Elkay Min. Co.*, 371 S.E.2d 46, 48 (W. Va. 1988); *see also State ex rel. Ball v. Cummings*, 540 S.E.2d 917, 926–29 (W. Va. 1999) (explaining that the State's interest in enforcing its environmental laws is distinct from private parties' interest in protecting their property rights).

The remedy proffered by Diversified is even less adequate to address Plaintiffs' claims than the remedies at issue in those statutes. OOG is not authorized to award the monetary damages that Plaintiffs seek, nor could it provide relief pursuant to the AFTA/AVTA. The complaint process also fails to include procedures similar to the class action provisions that plaintiffs take advantage of here. *See Bank of Wheeling v. Morris Plan Bank & Tr. Co.*, 183 S.E.2d 692, 695 (W. Va. 1971). Finally, Plaintiffs may not seek judicial review of any order that may issue as a result of the complaint process. *See* W. Va. Code § 22-6-28(b); *Walker v. S. Ry. Co.*, 385 U.S. 196, 198 (1966), *amended*, 386 U.S. 988 (1967) (authorizing state court claims for damages despite

availability of administrative review provision under the Railway Labor Act because that provision allowed only the railroad, but not the employee, to seek judicial review of an adverse ruling). The complaint procedure identified by Diversified is thus plainly inadequate and not intended to address Plaintiffs' common law tort claims arising from their private property rights.

### D.  The Consent Order Does Not Establish Diversified's Compliance with § 22-6-19

The Consent Order does not establish Diversified's compliance with the statute. Rather, the Consent Order merely exercises OOG's prosecutorial discretion and makes plain that Diversified has *not* met the requirements that would delay its statutory plugging obligations.

### 1.  The Consent Order is merely an agreement by WVDEP not to exercise its enforcement authority over Diversified's violations of § 22-6-19

Contrary to Diversified's envisioning of the Consent Order as a blanket "get-out-of-jail-free" card for any plugging liability related to its wells, the Order on its face applies only to enforcement action *by OOG*. The Consent Order does not purport to change the legal status of any of Diversified's wells or make any determination that "Diversified is ***not*** currently obligated to plug any wells." (*See* ECF No. 105 at 10 (emphasis in original).) Rather, it says only that the non-producing wells identified by Diversified "shall not be subject to any further enforcement activities *by the OOG* with regard to any requirement to close and plug such wells based upon the lack of production in the most previous twelve months so long as Diversified is compliant with the terms and conditions of this Order." (Consent Order ¶ IV.5.b (emphasis added).)

In support of its claim that the order is "the final word on Diversified's duty to plug its wells," (ECF No. 105 at 9), Diversified cites the paragraph titled "Reservation of Rights." But that paragraph provides only that that the Order shall not "act as a bar to the enforcement of any other legal obligation of Diversified *by OOG*, except with regard to the matters specifically addressed herein." (Consent Order ¶ IV.8 (emphasis added).) The Consent Order is thus nothing more than

9

an exercise of OOG's prosecutorial discretion and has no effect on Plaintiffs' property rights. *See Citizens for a Better Env't-Cal. v. Union Oil Co. of Cal.*, 861 F. Supp. 889, 902–03 (N.D. Cal. 1994), *aff'd*, 83 F.3d 1111, 1120 (9th Cir. 1996) (explaining that extended compliance deadlines reflect prosecutorial discretion and do not bar actions separately authorized for private citizens).

2. <u>The Consent Order does not establish a bona fide future use as a matter of law</u>

Diversified rests its argument that it is in compliance with § 22-6-19 on the statute's exception from the "prompt" plugging requirement for wells for which "the operator furnishes satisfactory proof to the director that there is a bona fide future use for such well." (ECF No. 105 at 2, 6.) Diversified criticizes Plaintiffs for "selectively omit[ting]" that provision. *Id.* at 2. But Plaintiffs did not cite that provision because it has no application to the wells at issue in this case.

Diversified's argument relies on a profound mischaracterization of the Consent Order. Diversified claims that OOG in the Consent Order "found satisfactory proof that a bona fide future exists for Diversified's wells such that they need not be shut-in." (*Id.* at 7.) It did no such thing. Rather, the Consent Order merely envisions that Diversified may *potentially* demonstrate a bona fide future use for *some* of its wells at *some later time*. (Consent Order, ¶ II.10.) The Order states that Diversified still must "further assess the viability of those wells and identify those wells which have the capacity for a bona fide future use." (*Id.* ¶ II.11.)

Those statements of potential future identification of a bona fide future use do not constitute the type of "proof" envisioned by the statute. The Legislative Rule interpreting § 22-6-19 provides that, to establish a bona fide future use for a particular well, an operator must submit a "Designation of Bona Fide Future Use" specific to that well, which includes, among other things, a "viable plan for utilizing the well including an estimated time for commencement of the future use of the well." W. Va. Code St. R. § 35-5-3. The plan must be supported by specific "information

10

and data." *Id.* § 35-5-4. In making its demonstration, the operator must consider a long list of technical factors regarding the well's potential for future production. *Id.* § 35-5-4.1.a–bb. Prior to accepting the operator's designation and granting inactive status, OOG must make several specific findings regarding the condition of the well, *id.* § 35-5-5.1, and "determine whether sufficient data and information have been provided to make a determination that the well has a bona fide future use and is properly deemed in inactive status," *id.* § 35-5-5.2. Because Diversified has not provided the requisite information and OOG has not made the necessary findings, there has been no demonstration of bona fide future use.[5] *See Wilson Advisory Comm. v. Bd. of Cnty. Comm'rs*, 292 P.3d 855, 866 (Wyo. 2012) (collecting cases in support of the principle that a "requirement that certain factors be demonstrated obligates the agency to decide whether they have been and to make a finding reflecting its decision").

Contrary to Diversified's suggestion, OOG lacks discretion to find a bona fide future use absent an actual demonstration by the operator. Such unbridled discretion cannot derive from § 22-6-19's language that the necessary proof be "satisfactory" to "the director" of OOG. (*See* ECF No. 105 at 15; ECF No. 104 at 1 (claiming that § 22-6-19 is "subject to the discretion of the director" of OOG).) The United States Supreme Court has held that a provision of the tax code requiring that an element be demonstrated to "to the satisfaction" of an agency for an applicant to obtain a tax refund did not allow that agency unfettered discretion to determine whether that element had been met. *See United States v. Jefferson Elec. Mfg. Co.*, 291 U.S. 386, 397–98 (1934). The Court explained that "[o]nly by inadmissible straining could it be held to invest the [official]

---

[5] OOG certainly does not appear to believe that the Consent Order renders Diversified's wells "inactive," as opposed to "abandoned." (*See* Exs. A–S (continuing to classify wells at issue in Consent Order as "abandoned").) These documents are included herein as matters subject to judicial notice under the motions to dismiss standards set forth in *Rogers v. Tug Hill Operating, LLC*, No. 5:21-CV-199, 2022 WL 1096620, at *4 (N.D. W. Va. May 2, 2022).

with absolute authority or discretion in respect of such refunds. A more rational view is that it is largely admonitive and means that the additional element is not lightly to be inferred but to be established by proof which convinces in the sense of inducing belief." *Id.* at 397–99; *see id.* at 398 n.24 (citing cases applying the principle to provisions using various forms of "satisfy," including *Walker v. Collins*, 59 F. 70, 73 (8th Cir. 1893), *rev'd on other grounds by* 167 U.S. 57 (1897), which involves the phrase "satisfactory proof"), and *Cent. Va. Obstetrics & Gynecology Assocs. v. Whitfield,* 590 S.E.2d 631, 638 (Va. Ct. App. 2004)). Thus, even if OOG intended the Consent Decree to establish Diversified's compliance with § 22-6-19 in contravention of the statute's plain language (and OOG did not so intend), it lacked discretion to do so.

E. *The Consent Order Does Not Provide Grounds for OOG to Deny Permits Needed by Diversified to Plug the Wells on Plaintiffs' Properties*

Diversified wrongly suggests that the Consent Order would somehow prevent OOG from issuing the permits necessary to plug its wells. (ECF No. 105 at 9–10.) But Plaintiffs' requested relief is not inconsistent with the Consent Order, which requires Diversified to address "at least" 50 wells per year, (*see* Consent Order ¶ IV.5.b), and expressly contemplates that it may address more than that, (*see id.* ¶ IV.7). Plaintiffs' claims thus do not "demand the plugging of wells contrary to what Diversified may lawfully do under" the consent order." (*See* ECF No. 105 at 14); *see also Ohio Valley Env't Coal., Inc. v. Maple Coal Co.*, 808 F. Supp. 2d 868, 889 (S.D. W. Va. 2011) (holding that two orders that enforce the same obligation but contain different compliance dates do not create "inconsistent obligations" because the party can comply with both by meeting the earlier of the two compliance dates).

The requirement for OOG to issue a permit for well plugging is not an obstacle to Plaintiffs' requested relief. Courts routinely order relief that requires a defendant to obtain a separate permit or authorization. *See, e.g.*, *Balt. Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp. 2d 456, 473 (D.

Md. 2000) (appointing special master to oversee defendant's retrofitting of building to comply with Americans with Disabilities Act, including "obtaining necessary permits"). Further, OOG lacks discretion to deny such a plugging permit on the grounds that it goes beyond what is required by the Consent Order. OOG (and any other party) may *only* object to a well-plugging application on the grounds that it would violate the technical and procedural requirements governing plugging. W. Va. Code R. § 35-4-13.8. Diversified does not argue that plugging Plaintiffs' wells would require them to violate any statutory or regulatory provision. Diversified should thus have no difficulty obtaining the largely *pro forma* authorizations to plug Plaintiffs' wells.

## II.    <u>Plaintiffs' Tort Claims Are Not Barred by a Statute of Limitations</u>

Diversified's argument that Plaintiffs' tort claims are barred by the statute of limitations wholly ignores West Virginia's continuing tort doctrine. "Where a tort involves a continuous or repeated injury, the cause of action accrues at and the statute of limitations begins to run from the date of the last injury *or* where the tortious overt acts and omissions cease." Syl. Pt. 11, *Graham v. Beverage,* 566 S.E.2d 603, 606 (W. Va. 2002) (emphasis added); *see also Moore v. Wilson*, No. 2:13-CV-14393, 2014 WL 1365967, at *2 (S.D. W. Va. Apr. 7, 2014) ("It is the continuing misconduct which serves to toll the statute of limitations under the continuing tort doctrine." (citing *Roberts v. W. Va. Am. Water Co.*, 655 S.E.2d 119, 124 (W. Va. 2007))). Here, because Diversified continues to leave wells unplugged and Plaintiffs' property damage unabated, it is engaged in a continuing trespass. Similarly, Diversified is negligent and creates a nuisance— daily—when it breaches its affirmative duty to plug wells and remediate the well sites.

### A.    *Diversified's Continued Failure to Plug Wells and Remediate Sites Creates a Continuing Trespass*

A continuing trespass occurs when "one person leaves on the land of another, with a duty to remove it, 'a structure, chattel, or other thing." *Whiteman*, 729 F.3d at 393–94 (quoting

13

Restatement (Second) of Torts § 160 (1965)); *see also* Restatement (Second) of Torts § 160 (describing a continuing trespass when a structure or thing is placed on property pursuant to a "privilege conferred" but not removed "after the privilege has been terminated"); 75 Am. Jur. 2d § 45 ("A continuing trespass occurs when one person leaves on the land of another, with a duty to remove it, a structure, chattel, or other thing, and constitutes a trespass for the entire length of time such thing is wrongfully on that land."). Plaintiffs properly pled a continuing trespass. (ECF No. 96 ¶¶ 124, 133, 147, 157, 171, 180, 194, 204, 217, 226, 249, 251, 264, 273, 293, 302, 323, 334, 346, 359, 372, 380, 393, 401, 414, 422, 433, 439, 452, 464, 481, 489, 508, 517, 530, 548, 561, 569, 582, and 590.) Because Diversified continues to occupy Plaintiffs' property with gas wells and continues to leave derelict equipment on the land, its trespass is ongoing and continuous. Syl. Pt. 11, *Graham v. Beverage,* 566 S.E.2d 603; *Moore,* 2014 WL 1365967, at *2 (recognizing that a continuing trespass occurs when there is "an uninterrupted physical trespass by placement of an object on another's land").

In the specific context of a continuing trespass, any other result would eliminate core property rights. Trespass cases strongly affirm the right to a remedy, even if the trespass is slight, to protect the core right to exclude those without the right to enter or remain. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."); *see also Quarles v. United States*, 139 S. Ct. 1872, 1877 (2019) ("The law of trespass likewise proscribes remaining on the land of another without permission."); *Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d 751, 771 (S.D. W. Va. 2009) ("Any intentional use of another's real property, without authorization and without a privilege by law to do so, is actionable as a trespass without regard to harm." (citation and internal quotation marks omitted)).

14

Indeed, Diversified's view of trespass would turn property law on its head. For example, the law of adverse possession requires the adverse would-be property owner to openly and exclusively possess the property of the title owner for ten years. *Cobb v. Collins*, No. 16-1212, 2018 WL 300990, at *3 (W. Va. Jan. 5, 2018). The implication of Diversified's statute-of-limitations argument is that landowners would have only 24 months from the initial wrongful entry to eject trespassers, thereby leaving the last eight years of the ten-year period during which the trespasser could not be ejected.

### B. The "Continuing Tort" Doctrine Also Applies to Nuisance and Negligence Claims

While a continuing tort is most obvious in the context of a trespass, the doctrine also applies to Plaintiffs' nuisance and negligence claims. *See Taylor v. Culloden Pub. Serv. Dist.,* 591 S.E.2d 197, 205 (W. Va. 2003) (holding that the law of continuing torts set forth in *Graham* "was clearly intended to apply to torts of all types" and applying the doctrine to nuisance); *Handley v. Town of Shinnston,* 289 S.E.2d 201 (W. Va. 1982) (applying the doctrine to negligence claims).

In the case of a negligence action, a continuing tort occurs when there is "continuing tortious conduct, that is, a continuing violation of a duty owed the person alleging injury, rather than continuing damages emanating from a discrete tortious act." Syl. Pt. 4, *Roberts*, 655 S.E.2d at 124. Plaintiffs' operative Complaint repeatedly cites Diversified's continuing obligation to plug and reclaim nonproducing wells. (*See, e.g.*, ECF No. 96 ¶¶ 76–78, 105, 597, 607, 612, and 620.) Even without those explicit allegations, the Second Amended Complaint describes injuries that affect Plaintiffs every day, pursuant to an ongoing breach of duty that occurs each day a well remains unplugged. Diversified has an obligation to plug a well promptly after it is no longer reporting production. *See* W. Va. Code § 22-6-19 (providing the standard of care). A breach of that duty constitutes a negligent act under West Virginia law. Syl. Pt. 1, *Reed v. Phillips*, 452

S.E.2d 708 (W. Va. 1994) ("A violation of a statute is prima facie evidence of negligence."). Because Diversified's breach of duty continues every day a non-producing well is left unplugged, its negligence continues. *Moore,* 2014 WL 1365967, at *2 (finding continuing misconduct tolls the statute of limitations).

A nuisance occurs when there is "a substantial and unreasonable interference with the private use and enjoyment of another's land." Syl Pt. 3, *Burch v. Nedpower Mount Storm*, 647 S.E.2d 879 (W. Va. 2007). Again, Plaintiffs alleged such continuous interference repeatedly. (ECF No. 4 ¶¶ 133–35, 157–59, 180–81, 204–05, 226–27, 250–52, 273–74, 302–03, 334–35, 359–60, 380–81, 401–02, 422–23, 439–40, 464–65, 489–90, 517–18, 548–49, 569–70, and 590–91.) Because Diversified has no right to leave wells and associated equipment on Plaintiffs' property, any interference with the use and enjoyment of their land is unreasonable, and, as described in the Second Amended Complaint, such interference is substantial. Because the nuisance and resulting injuries continue, the statute of limitations has been tolled. Syl. Pt. 5, *Taylor,* 591 S.E.2d. at 205 (finding that a "nuisance continues until such time as those acts are abated or discontinued").

The West Virginia Supreme Court has recognized that cases involving "discrete traumatic events" are not continuing torts. *See Reilley v. Bd. of Educ. of Cnty. of Marshall*, 874 S.E.2d 333 (W. Va. 2022); *Auber v. Jellen*, 469 S.E.2d 104 (W. Va. 1996) (doctor's series of incorrect diagnoses of a patient were separate acts, rather than a single continuing violation). Such cases are immediately distinguishable, however, because of the ongoing breach-of-legal duties involved in this case. The principal cases Diversified relies on are unpersuasive. *Collia v. Grubb* does not address the law of continuing trespass because the plaintiff did not plead continuing trespass, but rather concerned a myriad of issues not present here, such as dismissal for failure to prosecute, an untimely notice of appeal, and numerous failures to appear. No. 12-0956, 2013 WL 3388294, at

16

*2–3 (W. Va. July 8, 2013). As an unpublished memorandum decision that makes no mention of the continuing tort theory, *Collia* is neither pertinent nor instructive. *See State v. McKinley*, 764 S.E.2d 303, 313 (W. Va. 2014) (stating "while memorandum decisions . . . are legal precedent, their value as precedent is necessarily more limited"). The unpublished opinion in *EQT Gathering Equity, LLC v. Fountain Place, LLC*, does discuss the continuing tort doctrine, but found it inapplicable to that case because the defendant's duty was breached by a single wrongful act, after which there was "[n]o further duty or injury." No. 2:09-CV-0069, 2011 WL 5419452, at *3 (S.D.W. Va. Nov. 9, 2011). In contrast, Diversified has an ongoing duty to plug Plaintiffs' wells that continues to breach every day. Rather than the "discrete traumatic events" described in cases such as *Fountain Place*, *Reilley*, and *Auber,* Diversified's ongoing and repeated conduct is causing ongoing and unabated injuries. The statutes of limitations have, therefore, not expired. *See Handley*, 289 S.E.2d at 202 ("[W]here a tort involves a continuing or repeated injury, the cause of action accrues at . . . the date of the last injury, or when the tortious overt acts cease.").

### III.    Plaintiffs' AFTA/AVTA Claims Should Not Be Dismissed

Defendants argue that Plaintiffs do not have a claim under the AFTA or AVTA because any right to payment associated with plugging the wells on Plaintiffs' properties is speculative such that Plaintiffs do not have a "claim" under those statutes. Additionally, they assert that Plaintiffs' AFTA and AVTA claims of constructive fraud are barred by a one-year statute of limitations because Plaintiffs failed to allege satisfaction of Alabama's "discovery rule" which provides two years to bring an action for fraud following the discovery of the "fact constituting the fraud." Defendants are wrong on both counts.

A. *All Plaintiffs Are Creditors of Diversified With Ripe Claims Because They Have Either Mature Tort Claims or Contingent, Unmatured Claims Arising from Diversified's Non-Speculative Obligation to Eventually Plug the Wells on Their Properties*

Plaintiffs' claims are ripe under Article III because they have properly pled causes of action under the AFTA and AVTA, which expressly authorize suits to protect creditors with "contingent" and "unmatured" claims. To assert a claim for relief under the AFTA or AVTA for either a constructive or actual fraudulent transfer, one must be a "creditor." Ala. Code §§ 8-9A-4, 5; *id.* §§ 8-9B-5, 6. A "creditor" is defined as "[a] person who has a claim." *Id.* § 8-9A-1; *accord id.* § 8-9B-2. "Claim" is defined broadly to be "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, *unmatured,* disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 8-9A-1 (emphasis added); *accord id.* § 8-9B-2. What constitutes a "claim" should be determined by applying the plain language of that definition.

In interpreting its UVTA, the Alabama Supreme Court has emphasized the importance of giving terms their plain meaning. *See, e.g.*, *S.J. Holding Co., Inc. v. Kadco, Inc.*, 874 So.2d 1036, 1042 (Ala. 2003). The plain meaning of "contingent" is:

> [p]ossible, but not assured; doubtful or uncertain; conditioned upon the occurrence of some future event which is itself uncertain, or questionable. Synonymous with provisional. This term, when applied to a use, remainder, devise, bequest, or other legal right or interest, implies that no present interest exists, and that whether such interest or right ever will exist depends upon a future uncertain event.

Contingent, *Black's Law Dictionary* (5th ed. 1979). Similarly, an unmatured claim is one that has yet "to become due" or is not yet "due for payment." *Id.*; *see also Grady v. A.H. Robbins,* 839 F.2d 198, 202 (4th Cir. 1988) (using Blacks' Law Dictionary to determine the plain meaning in the bankruptcy context); *In re U.S. Pipe & Foundry Co.*, 32 F.4th 1324, 1331 (11th Cir. 2022) (same).

If there were any doubt about the meaning of the words "contingent" and "unmatured" within the definition of "claim," it is clarified by comments to the Uniform Act.[6] Comment 1 of the definitions section states that "the holder of an unliquidated tort claim or a contingent claim may be a creditor protected by this Act." UVTA § 1 cmt. 1; *see also id.* § 7 cmt. 4 (stating that "a creditor is not required to obtain a judgment against the debtor-transferor or have a matured claim in order to proceed under subsection (a)"). Comments to the "Creditors Remedies" section specifically describe the status of payments to creditors with unmatured or contingent claims. *Id.* § 7 cmt. 1 ("A creditor holding an unmatured claim may be denied the right to receive payment from the proceeds of a sale on execution until the claim has matured, but the proceeds may be deposited in court or in an interest-bearing account pending the maturity of the creditor's claim.").

As the Fourth Circuit explained in *Grady v. A.H. Robbins*, the terms "contingent" and "unmatured" clearly contemplate "claims" based on future events. *See* 839 F.2d at 202 (defining "contingent" to mean a legal interest "depend[ent] upon a future uncertain event"). Thus, Plaintiffs may have (as they do here) a present "claim" that is based on a right to payment that is "depend[ent] upon a future uncertain event." *Id. Grady,* in fact, demands this interpretation.

Diversified argues that Plaintiffs are not "creditors" under the AFTA/AVTA and their claims are not ripe because any obligation to plug the wells on Plaintiffs' properties is "hypothetical" and "speculative." (*See* ECF No. 105 at 20–21.) That is not true. The duty to plug each well and remediate the well site—which stems from common law property rights—arose when the wells were drilled. No well produces forever. All wells must eventually be plugged, and

---

[6] Comments from the National Conference of Commissioners on Uniform State Laws are applicable to the interpretation of the AFTA and AVTA. *See* Ala. Code § 8-9A-11 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."); *accord id.* § 8-9B-14; *see also Vista Bella, Inc. v. RBL, LLC,* 511 B.R. 163 (B.R. S.D. Ala. 2014) (recognizing that interpretations of the uniform law are persuasive authority in Alabama courts).

19

the operator is saddled with that obligation *as soon as it drills a well* (or purchases an existing well). Although the timing of when the obligation becomes due is contingent on a future event—when the well becomes no longer "reasonable and necessary" for mineral production—the obligation to plug was incurred at the time of drilling. Indeed, as described in the Second Amended Complaint, both EQT and Diversified calculated estimates of their "Asset Retirement Obligations," *i.e.* plugging and remediation costs, for their wells at the time of the 2018 transfer. (*See, e.g.*, ECF No. 96 ¶ 627 (describing Diversified's discount of $174 million in asset retirement obligations); *id.* ¶¶ 93–96 (describing EQT's analysis of asset retirement obligations).) Defendants thus recognized at the time of the transactions and still recognize that plugging obligations attach when the well is drilled.

In an attempt to obscure that fact, Defendants set up a straw man, arguing that recognizing Plaintiffs' contingent and unmatured claims would mean that "everyone would be a creditor of everyone else because they ***could*** commit a tort against that person or company in the future." ECF No. 105 at 23 (emphasis original). Contrary to the Defendants' hypothetical, the Plaintiffs' creditor status under the AFTA/AVTA does not depend upon speculation that a person may commit a tort in the future. Instead, their status depends only upon the fact that an oil and gas operator drilled a well on their property. That act, which has already occurred, necessarily gives rise to an obligation on the part of the operator or its successor to plug the well, and until the operator or its successor actually plugs the well, the landowner has a contingent and unmatured claim for plugging that qualifies as a "claim" under the AFTA/AVTA. Thus, everyone would *not* be a creditor of everyone else because only those people owed an existing and concrete, though contingent, obligation—here, owners of land on which the relevant operators have drilled a well—qualify as creditors.[7]

_____

[7] Defendants' hypothetical also ignores that, to be applicable at all, the fraudulent transfer acts require a debtor to have engaged in a fraudulent or constructively fraudulent transfer. *See* Ala. Code § 8-

20

Defendants' assertion that Plaintiffs are not creditors because they have no "right to payment" fares no better." (*See* ECF No. 105 at 23.) At some point, Diversified's obligation to plug the wells on Plaintiffs' properties will mature. Defendants absurdly claim that the obligation to plug the wells on Plaintiffs' properties is owed only to the State and not to Plaintiffs. (*Id.* at 23.) But the State is not the surface owner. Although the State may be the only party that can directly enforce the *statutory* well plugging requirements, that does not mean Diversified can ignore Plaintiffs' property rights, including the fundamental right to exclude. Diversified's right to occupy Plaintiffs' land is only as broad as that granted by the governing deed or lease, and Diversified is obligated to remove all of their equipment when their presence is no longer authorized by those instruments. Because Plaintiffs allege that Diversified will be unable to satisfy its plugging obligations as and when they mature because the transactions have rendered it insolvent, (*see* ECF No. 96 ¶¶ 8, 12, 45, 75, 80, 88, and 111), Diversified's eventual matured obligation to pay tort damages, which is co-extensive with Plaintiffs' "right to payment," is certain, not speculative. *See Wiles v. Wiles,* 58 S.E.2d 601, 606 (W. Va. 1950) (explaining that under West Virginia law actions for trespass will generally be treated as actions for monetary damages when such trespass "is susceptible of complete pecuniary compensation").

Contrary to Defendants' contention that "Plaintiffs do not cite a single court anywhere that adopts or supports the expansive definition of 'creditor,'" (ECF No. 105 at 23)—a strange critique to appear in an opening motion—the Plaintiffs have cited extensive case law supporting their construction and application of the AFTA and AVTA. For example, in *U.S. Pipe and Foundry v. Holland*, 32 F.4th 1324 (11th Cir. 2022), cited in Plaintiffs' Response to the Diversified's first Motion to Dismiss, (ECF No. 66 at 23–24), the United States Court of Appeals for the Eleventh

---

9A-4; *id.* § 8-9B-5. Thus, if one is not engaging in a transfer with the intent to hinder or delay debt collection by another and is not engaging in transactions that will drive one to insolvency, there is no cause of action.

Circuit found that the relevant claims—for employee retirement benefits—arose not when specific individuals had an immediate "right to payment," but rather, when the debtor took on its obligation to *eventually* pay out those benefits in the future. *Id.* at 1330. Likewise, here, the relevant obligation arises not when a specific cause of action under tort accrued but rather arose when the relevant operator drilled the well and incurred the obligation to *eventually* plug the well in the future.

The case of *Burkhart v. Genworth,* cited in Plaintiffs' memorandum in support of their Motion to Amend, is also instructive. (*See* ECF No. 85 at 4–5 (citing 250 A.3d 842, 854–56 (Del. Ch. 2020).) The plaintiffs in that case were insureds who held previously issued insurance policies and the insurance agents who sold the insureds those policies. Alleging that the defendant had taken actions, alleged to be voidable, to divest itself of assets that might be used to satisfy the plaintiffs' alleged claims, the plaintiffs sued under the Delaware Fraudulent Transfer Act, even though the defendant had not yet defaulted on any payments or failed to pay commissions to the plaintiffs. *Id.* at 854. Relying on the comments to the fraudulent transfer act (discussed above) and the plain language of "contingent" and "unmatured" in the identical definition of a "claim" under the Delaware Fraudulent Transfer Act, the court explained that the right to bring an action for an unmatured claim is explicit and allowed the case to proceed despite the fact that no missed payments had yet occurred and the plaintiffs' claims therefore had not yet matured. *Id.* at 856. Because of this, the court dismissed most of plaintiffs' claims as untimely because plaintiffs waited too long after the alleged fraudulent transfers to sue—exactly the fate that Plaintiffs seek to avoid.

Defendants' parade of horribles is an attempt to distract the Court from the statute, the case law, and the unjust consequences that would befall those who hold unmatured claims that will come due in the future (and after the statute of limitations runs). If only those with a present right to payment were considered to have "claims" under the Acts, then those whose rights to payment

mature in the future would be left without any recourse regarding the transactions that rendered the debtor unable to perform the obligation or make the payment as and when they mature. As the Second Circuit Court of Appeals recognized, the fraudulent transfer laws do not require contingent and unmatured creditors "to stand by helplessly until a distant maturity date arrives while [the] debtor is fraudulently depleted of its assets." *Cruden v. Bank of N.Y.*, 957 F.2d 961, 974 (2d Cir. 1992); *see also Burkhart*, 250 A.3d at 855 (recognizing the same). Indeed, if Plaintiffs with unmatured claims in these actions are not allowed to assert their claims alongside those with matured claims, their fraudulent transfer actions may be forever barred by the statute of limitations. The fact the statute of limitations runs from the time of the transfer (or discovery of the fraudulent nature of the transfer) and not the accrual of a right to immediate payment is further evidence Defendants' arguments are wrong. *See* Ala. Code § 8-9A-9; *id.* § 8-9B-10. Plaintiffs are thus properly "creditors" with valid existing "claims" against Defendants under the AFTA and AVTA.

### B. Plaintiffs' Claims Are Not Barred by the AFTA/AVTA's Statute of Limitations Because Plaintiffs Properly Alleged That They Satisfy Alabama's Discovery Rule Under the "Person of Ordinary Prudence" Standard

The AFTA and AVTA's one-year statutes of limitations on claims of constructive fraud, Ala. Code §§ 8-9B-5(a)(2), 8-9A-4(c), are subject to Alabama's "discovery rule," which provides that "[i]n actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action." Ala. Code § 6-2-3. Contrary to Defendants' arguments, Plaintiffs' Second Amended Complaint plainly alleges satisfaction of the discovery rule under the "person of ordinary prudence" standard.

Defendants argue that Plaintiffs cannot satisfy the discovery rule because "the transfers about which Plaintiffs complain were highly public and reported to federal and state regulators." (ECF No. 105 at 25.) In doing so, they create a false standard. The standard is not whether the

fraudulent transfers were "highly public" such that they *could have been discovered*—it is whether fraud *actually had been* discovered. *See* Ala. Code § 6-2-3 (explaining that "the claim must not be considered as having accrued *until the discovery by the aggrieved party* of the fact constituting the fraud" (emphasis added)). In applying the provision, Alabama courts recognize that fraud has been discovered only "at the time of the discovery of facts which would provoke inquiry by a person of ordinary prudence and which, if followed up, would have led to the discovery of the fraud." *Papastefan v. B&L Constr. Co. Inc. of Mobile,* 385 So.2d 966, 967 (Ala. 1980). Alabama recognizes that facts constituting fraud may not be discoverable by a plaintiff until informed of them by their attorney. *Hurry v. Gen. Motors LLC,* 2022 WL 3587349, at *10 (M.D. Ala. Aug. 22, 2022) ("Plaintiffs sufficiently allege the time and circumstances of their discovery of the fraud because they allege that they did not know, nor could have known, about the Oil Consumption Defect afflicting the Generation IV Engines in their Class Vehicles 'until after Plaintiffs' counsel's investigation led to the filing of the *Siqueiros* Action on December 19, 2016.'").

As an initial matter, it is well settled that the "person-of-ordinary-prudence" standard creates a question for the jury and is thus unfit for resolution on a motion to dismiss. *In re Gaddy*, 622 B.R. 440, 456 (Bankr. S.D. Ala. 2020) ("[T]he issue of when SEPH discovered or should have discovered the alleged fraud will be for the jury."); *Potter v. First Real Estate Co.*, 844 So.2d 540, 546 (Ala. 2002) ("The question of when a party discovered or should have discovered the fraud is generally one for the jury.").

Regardless, Plaintiffs have satisfied the standard. Here, the named Plaintiffs did not actually discover that Diversified's transfers with EQT were fraudulent until they were told by their attorneys. (ECF No. 96 ¶ 98.) Additionally, Plaintiffs could not reasonably have been expected to have discovered facts revealing the fraudulent nature of the transactions until "they

were informed by their attorneys or at the very earliest the publication of the Boettner Report on April 12, 2022." (*Id.* ¶ 99.) Defendants' arguments that the transfers themselves were public information or even that EQTs' liability dump was known in 2020 are immaterial. (*See* ECF No. 105 at 25.) The relevant question is whether Plaintiffs knew of the "fact[s] constituting the fraud." Ala. Code § 6-2-3. Here those facts are that Diversified undertook the transaction with specific intent to "hinder, delay, or defraud its creditors," *id.* § 8-9A-4; *id.* § 8-9B-5, or facts showing that at the time of the transaction Diversified was insolvent, *id.* §§ 8-9A-4, 5; *id.* §§ 8-9B-5, 6. Those facts were not discoverable by a "person of ordinary prudence" because Diversified used unorthodox and sophisticated accounting strategies to hide the truth by falsely inflating the perceived value of its assets and diminishing the perceived value of its liabilities. (ECF No. 96 ¶¶ 100–01.) The Boettner Report was the first public revelation of the extent of these accounting tricks and the fact of Diversified's insolvency. (*Id.* ¶ 103.) That the Boettner report relied on public information does not mean that any "person of ordinary prudence" could have seen behind the Defendants' clever obfuscation of the fraudulent nature of the transfers. The report was authored by well-funded financial and policy experts who spent significant time and resources compiling the report. (*See* ECF No. 96-1 (Boettner Report).)

In short, Defendants' arguments as to the allegations supporting the "discovery rule" are based on a false standard. When viewed under the correct standard, it is clear that Plaintiffs' allegations include all of the elements listed by the court in *Int'l Mgmt. Grp., Inc. v. Bryant Bank*, 274 So. 3d 1003, 1014 (Ala. Civ. App. 2018). (*See* ECF No. 105 at 25.) Moreover, under Alabama law, disputes as to when facts underlying the discovery rule should have been discovered must be decided by a jury and thus cannot be determined on a motion to dismiss. *See, e.g.*, *Papastefan,* 385 So. 2d at 967.

Dated: February 1, 2023                    Respectfully submitted,


                                           /s Benjamin A. Luckett
                                           Benjamin Luckett (WVSB No. 11463)
                                           J. Michael Becher (WVSB No. 10588)
                                           Joseph M. Lovett (WVSB No. 6926)
                                           Isak Howell (WVSB No. 11558)
                                           Amanda Demmerle (WVSB No. 13930)
                                           APPALACHIAN MOUNTAIN ADVOCATES
                                           P.O. Box 507
                                           Lewisburg, WV 24901
                                           (304) 645-9006
                                           jlovett@appalmad.org
                                           mbecher@appalmad.org
                                           ihowell@appalmad.org
                                           bluckett@appalmad.org
                                           admmerle@appalmad.org


                                           Brian A. Glasser, Esq. (WVSB No. 6597)
                                           John W. Barrett, Esq. (WVSB No. 7289)
                                           Brian R. Swiger (WVSB No. 5872)
                                           Athanasios Basdekis (WVSB No. 9832)
                                           William S. Flynn (WVSB No. 13947)
                                           Panida Anderson (admitted *pro hac vice)*
                                           BAILEY & GLASSER, LLP
                                           209 Capitol Street
                                           Charleston, West Virginia 25301
                                           (304) 345-6555 (phone)
                                           (304) 342-1110 (fax)
                                           bglasser@baileyglasser.com
                                           jbarrett@baileyglasser.com
                                           bswiger@baileyglasser.com
                                           tbasdekis@baileyglasser.com
                                           wflynn@baileyglasser.com
                                           panderson@baileyglasser.com


                                           *Attorneys for Plaintiffs and Proposed Class*

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

MARK MCEVOY, et al., individually and
on behalf of a proposed class,

        Plaintiffs,

                                    Civil Action No. 5:22-cv-171

v.                                    The Honorable John P. Bailey

DIVERSIFIED ENERGY COMPANY PLC,
et al.,

        Defendants.

**<u>CERTIFCATE OF SERVICE</u>**

      I, Benjamin Luckett, hereby certify that on February 1, 2023, I caused to be filed the foregoing with the Clerk of the Court using the CM/ECF System, which caused a true and accurate copy of such filing to be served upon all attorneys of record.

                                        */s/ Benjamin A. Luckett*
                                        Benjamin Luckett (WVSB No. 11463)