IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling

**MARK McEVOY**, *et al.*,

        Plaintiffs,

v.                                **Civil Action No. 5:22-CV-171**
                                                Judge Bailey

**DIVERSIFIED ENERGY COMPANY PLC**,
*et al.*,

        Defendants.

## ORDER DENYING SECOND MOTION TO DISQUALIFY COUNSEL

Pending before this Court is EQT's Motion to Disqualify Plaintiffs' Counsel Related to Bryant "Wayne" Bowman II [Doc. 106]. The motion has been fully briefed and is ripe for decision.

In their motion, EQT seeks to disqualify plaintiffs' counsel on the basis that plaintiffs' counsel hired Bowman as a consultant. Mr. Bowman was formerly employed by EQT as a landman for over 22 years. During that period, Mr. Bowman, among other things:

- "[s]erved as the liaison between the legal, land, and other departments in litigation avoidance and litigation preparation," and

- "acted as a corporate witness during depositions and litigation."

EQT terminated Mr. Bowman's employment effective September 10, 2019. As part of the termination, EQT and Mr. Bowman entered into a Confidential Agreement and General Release. Relevant to the pending motion, the parties agreed that:

1

> Employee, upon reasonable notice and at reasonable times, agrees to cooperate with the Company in the defense of litigation and in related investigations of any claims or actions now in existence or that may be threatened or brought in the future relating to events or occurrences that transpired while Employee was employed by the Company.

[Doc. 107-2].

In addition, the Agreement provides that Mr. Bowman acknowledges his continuing obligations at law, under the Non-Compete Agreement and under EQT's policies to preserve EQT's confidential information and that he has returned all EQT confidential information. [Id.].

Attorneys practicing in this Court are required to conduct themselves in accordance with the Rules of Professional Conduct and the Standards of Professional Conduct adopted by the West Virginia Supreme Court of Appeals and the Model Rules of Professional Conduct published by the American Bar Association. *See* Local Rules of General Procedure 84.01.

In support of their motion, EQT seeks to apply Rule of Professional Conduct § 1.09 to this situation, relying on **Richards v. Jain**, 168 F.Supp.2d 1195, 1201–02 (W.D. Wash. 2001). However, in **Richards**, the court discussed the ethical duties of attorneys and paralegals who receive inadvertently produced privileged documents and cited to the Committee's Formal Opinion 94–382 (1994). Formal Opinion 94–382 was withdrawn on May 13, 2006. **Mt. Hawley Ins. Co. v. Felman Prod., Inc.**, 271 F.R.D. 125, 130 (S.D.

W.Va. 2010) (Stanley, M.J.), *objections overruled sub nom.* 2010 WL 2944777 (S.D. W.Va. July 23, 2010) (Chambers, J.).

The Chief Judge of the Western District of Washington noted that **Richards** is a case "applying an old version of the model ethical rules and an outdated ABA opinion." ***Kyko Glob. Inc. v. Prithvi Info. Sols. Ltd.***, 2014 WL 2694236, at *2 (W.D. Wash. June 13, 2014) (Pechman, C.J.).

"[D]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary. A disqualification of counsel, while protecting the attorney-client relationship, also serves to destroy a relationship of their own choosing.... [S]uch motions should be viewed with extreme caution for they can be misused as techniques of harassment." ***State ex rel. Verizon West Virginia, Inc. v. Matish***, 230 W.Va. 489, 504, 740 S.E.2d 84, 99 (2013) (citations and internal quotation marks omitted) (citing ***State ex rel. Ogden Newspapers, Inc. v. Wilkes***, 198 W.Va. 587, 591, 482 S.E.2d 204, 208 fn. 10 (1996) ("***Ogden I***")).

Similarly, "[m]otions to disqualify are not favored because of the overwhelming preference to permit litigants to elect their own counsel and the potential 'of opposing parties to misuse disqualification motions for strategic reasons.' ***Shaffer v. Farm Fresh, Inc.***, 966 F.2d 142, 146 (4th Cir. 1992). Thus, courts are to 'avoid overly-mechanical adherence to disciplinary canons' so as to preserve 'litigants' rights freely to choose their counsel.' *Id.*" ***In re Corwin Place, LLC***, 562 B.R. 663, 667 (Bankr. N.D. W.Va. 2016) (Flatley, J.).

This Court finds as follows:

1. Mr. Bowman was hired by EQT on July 3, 1997, and was fired by EQT on September 10, 2019.

2. Mr. Bowman was hired by Bailey Glasser on March 26, 2020.

3. Bailey Glasser did not begin work on the present case until April 2022.

4. Inasmuch as Mr. Bowman is not an attorney, it would appear that his duty to preserve confidential information is governed by contract.

5. Attorneys practicing in this Court are required to conduct themselves in accordance with the Rules of Professional Conduct and the Standards of Professional Conduct adopted by the West Virginia Supreme Court of Appeals and the Model Rules of Professional Conduct published by the American Bar Association. *See* Local Rules of General Procedure 84.01.

6. In West Virginia, the Rules of Professional Conduct were amended in 2015. Accordingly, case law prior to 2015 are of limited utility.

7. Comment 7 to West Virginia Rules of Professional Conduct ("RPC") 4.2 provides, in part:

> Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4.

4

8. ABA Ethics Opinions, Formal Opinion 91-359, March 22, 1991, Contact With Former Employee Of Adverse Corporate Party provides:

Accordingly, it is the opinion of the Committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer.

With respect to any unrepresented former employee, of course, the potentially-communicating adversary attorney must be careful not to seek to induce the former employee to violate the privilege attaching to attorney-client communications to the extent his or her communications as a former employee with his or her former employer's counsel are protected by the privilege (a privilege not belonging to or for the benefit of the former employee, by the former employer). Such an attempt could violate Rule 4.4 (requiring respect for the rights of third persons).

9. In *In re RSR Corp.*, 475 S.W.3d 775 (Tex. 2015), RSR's lawyers hired a former financial manager for Inppamet to help sue Inppamet for breach of contract and misappropriating trade secrets. Prior to filing suit, RSR requested an audit that would serve as a basis for litigation. The financial manager, still employed at Inppamet at the time, "discussed the audit with Inppamet's lawyers and company officers," "discussed litigation strategy with company officers, communicated with Inppamet's lawyers, and reviewed invoices describing the attorneys' work." *In re RSP Corp.*, 475 S.W.3d at 777.

When ending his employment, he signed a "contract with Inppamet stat[ing] that all

information [he] obtained during his employment was confidential and could not be disclosed to third parties, even after his employment ended." *Id*. Thereafter, he "supplied significant information regarding Inppamet" to RSR's lawyers. *Id*. Inppamet's counsel moved to disqualify RSR's lawyers under Rule 1.9, but, notwithstanding those facts, the Supreme Court of Texas found that disqualification was unwarranted because the financial manager was a "fact witness," his "position with his former employer existed independently of litigation, and his function was not primarily to report to lawyers." *Id*. at 780. The Court relied on the Texas Rules of Professional Conduct, which allow contact with former employees of an adverse litigant. *Id*. at 781 (citing Tex. Disciplinary R. Prof'l Conduct 4.02 cmt. 4).

10. The Alabama Supreme Court reached the same conclusion in evaluating the imputation of conflict of a former Terminix manager who was hired as an investigator and consultant by plaintiffs' counsel for a suit against Terminix on behalf of unit owners at the Bay Forest condominium complex. *See* ***Ex parte Terminix Int'l Co., LP***, 325 So.3d 800, 802 (Ala. 2020). The basis for the suit was a contract between Terminix and the condominium complex for termite protection services. In that case, while the Terminix manager was still employed at Terminix, Bay Forest was attempting to get Terminix to perform under its contract by addressing discovered termite damage. As the process was unfolding, the manager's employment was terminated and, the next month, Bay Forest's counsel hired him. In analyzing a motion to disqualify based on the manager's involvement in the litigation, the Court held "there is a meaningful distinction between lawyer employees who 'switch sides' and non-lawyer employees who do the same," and that "the ethical

6

considerations that apply to 'a side-switching paralegal'" do not apply to a fact witness such as the manager. *Id.* at 809. Thus, "[b]ased on the evidence of [the former employee's] limited involvement in Terminix's legal affairs generally and the Bay Forest matter in particular," the Court found no Rule 1.9(a) violation. *Id.*

11. Mr. Bowman has executed a declaration in connection with this case, which provides, in part:

> 7. During my employment at EQT, I did not serve in any official capacity in its in-house legal department.
>
> 8. However, from time to time, I served as a liaison between the legal, land, and other departments.
>
> 9. I have reviewed the Second Amended Complaint in this case and am familiar with the claims brought by Plaintiffs in this matter. None of my work at EQT involved matters that were or are the same or substantially similar to the current claims against EQT and Diversified.
>
> \* \* \*
>
> 12. While at EQT, I never worked on any aspect of the July 2018 Fraudulent Transfers or the May 2020 Fraudulent Transfers, as those terms are defined in the Plaintiffs' Second Amended Class Action Complaint. Moreover, the business development group that was in charge of the July 2018 transaction closely guarded the

information and data relating to their work — they had it "siloed," so to speak — and indeed, I received no such information and data and was surprised when the July 2018 Fraudulent Transfer was publicly disclosed, which is when I first learned of the transaction. I was not employed by EQT at the time of the May 2020 Fraudulent Transfer and therefore likewise do not have any confidential, non-public information pertaining to that second transaction. To be clear, I worked on no aspect of the May 2020 Fraudulent Transfers and had no knowledge of the transaction until EQT disclosed it to the public.

* * *

19. The next generalized allegation made by EQT is that "Bowman's work is involved in the P&A program at the heart of Plaintiffs' claims." (Defs.' Mem. at 14.) This is a gross overgeneralization. This quote is taken out of context because, among other things, the quote relied upon by EQT was dealing with "acquiring title, lease curative matters, and dealing with landowners and royalty owners." (See Defs.' Mem., Ex. 2, at 28 (deposition transcript).) The bottom line is that lease curative measures and dealing with landowners and

royalty owners is work that is extremely limited and very peripheral to the core matters involved in AROs and P&A programs. While at EQT, I never worked directly on ARO or P&A programs. My group simply provided ownership information to the people running the ARO and P&A programs; we had no operational role in the ARO and P&A programs themselves. Pulling records and providing ownership information about certain leases does not in any way go to heart of ARO and P&A programs.

\* \* \*

21. EQT further claims that I regularly responded to discovery requests regarding wells, leases, and operations in West Virginia. Specifically, EQT claims that I "had intimate knowledge of EQT's systems, data repositories, and recordkeeping practices around the time of the challenged transfers." (Defs.' Mem. at 17.) The deposition passages EQT cites make clear that I had a working knowledge of certain software programs such as DocuSphere, Enertia, Geocortex, and the Microsoft Office Suite, which of course includes Microsoft Outlook, Microsoft Word, and Microsoft PowerPoint. It is true that I have some familiarity with

9

how to work those industry-standard software programs which are commonly used in the oil-and-gas industry, but I know of no litigation advantage in my having such general knowledge or familiarity with how to operate publicly available and commonly-used software. In addition, prior to EQT disclosing their use of DocuSphere, Enertia and Geocortex, I had not told anyone at Bailey & Glasser that EQT regularly used such software.

\* \* \*

23. I was never responsible for calculating the plugging and abandonment costs of a well, or the approval of such costs, during my time at EQT.

\* \* \*

27. I have had limited involvement in the case at bar. I mostly tracked down publicly available information to assist the attorneys in understanding the oil-and-gas industry. I have provided to counsel, which I understand has either provided or will be providing to defense counsel, my file of pulled documents in the case. Indeed, after EQT raised a concern about my involvement in the case, Bailey & Glasser walled me off from the case and I have had no further involvement

other than in addressing this conflict issue raised by EQT. [In a footnote, Mr. Bowman states: I note that, following Bailey & Glasser's decision to wall me off, I was inadvertently copied on a few emails between counsel. The three emails, which involved non-privileged communications with opposing counsel, are attached [to the declaration]].

* * *

29. No one at Bailey & Glasser or Appalachian Mountain Advocates has ever asked me for confidential or privileged information about EQT.

30. I have never shared any confidential or privileged information about EQT with either Bailey & Glasser or Appalachian Mountain Advocates.

31. When I was terminated at EQT, I did not take away or keep any EQT-related files with me other than my separation agreement.

32. I am not currently in possession of any privileged or confidential information concerning EQT.

33. When I first started working at Bailey & Glasser, I signed its "Employment Handbook." The Employee Handbook made clear that I was not to disclose any

privileged or confidential information from my prior employer(s), and I have abided by that dictate.

34. Further, during my time at Bailey & Glasser, partner Brian Swiger stated to me that I was not to disclose any privileged or confidential information about EQT to the firm. I have abided by that request.

35. With that said, I have no confidential or proprietary information concerning EQT that I know of that would be relevant in any way to these legal proceedings.

36. I was terminated by EQT in September 2019. Nearly six months passed before I was hired by Bailey & Glasser around March 26, 2020. Moreover, it is my understanding that the lawyers at Bailey & Glasser did not begin to work on this case until approximately April 2022. Thus, I had been at Bailey & Glasser for nearly two years prior to when I understand the firm began working on the instant case. In my view, I was not "recruited" by the firm to work on this particular case, and the time gap supports that statement.

37. I further understand that EQT wishes to speak to me possibly in aid of their defense in this case. I note that since September 2019, EQT has never sought to interview me with respect to any of their other cases or

>> legal matters. I find it unusual that EQT would elect not to reach out to me on any legal matters in the roughly 40 months since it terminated my employment but now wish to speak to me about the defense of EQT here because I possess no relevant information on the subject matters raised in the Second Amended Class Action Complaint, which focus on the Alabama Fraudulent Transfer and Voidable Transactions Act. My main role at Bailey & Glasser has simply been to track down publicly available information, and as I said, all of that information either has been or will be made available during discovery. Moreover, EQT has always had equal access to the same public information.

[Doc. 129-2 at 2–11].

12. In addition, each of the then counsel for plaintiffs in this case have filed declarations noting that he or she has never requested that Mr. Bowman share any privileged or confidential information regarding EQT with either him or her or the firm and he or she has not in fact received any such privileged or confidential information regarding EQT from Mr. Bowman, and neither has anyone else involved in the case.

13. The issues in this case are not substantially related to the work that Mr. Bowman did for EQT.

13

14. With regard to the duty to consult with EQT regarding events in the past, the Court notes that during the 40 month period following the termination of Mr. Bowman, EQT have never requested any consultation.

15. Nevertheless, if requested by EQT, Mr. Bowman may consult with EQT concerning events within his knowledge prior to his termination. Of course, Mr. Bowman may not divulge any confidential information from plaintiffs.

16. This Court finds no ethical violation on the part of Mr. Bowman or the plaintiffs' law firms.

17. EQT's backup argument of appearance of impropriety is equally unavailing. Federal courts have held that, without more, "the possible appearance of impropriety . . . is simply too weak and too slender a reed on which to rest a disqualification order. . . ." **Freeman v. Chicago Musical Instrument Co.**, 689 F.2d 715, 723 (7th Cir. 1982) (citing **Armstrong v. McAlpin**, 625 F.2d 433, 445 (2d Cir. 1980) (vacated on other grounds)). This analysis from the Second and Seventh Circuits is particularly convincing as motions to disqualify are not looked upon favorably in this Circuit or in others. "As disqualifications 'may not be rested on mere speculation that a chain of events whose occurrence theoretically could lead counsel to act counter to his clients interest might in fact occur' and as the Debtor was only able to set forth hypothetical situations which may harm it, the motion to disqualify must be denied. **Shaffer v. Farm Fresh, Inc.**, 966 F.2d 142, 145 (4th Cir. 1992)." **In re Corwin Place, LLC**, 562 B.R. at 670.

18. Equally unavailing is the general "playbook" argument. In **State ex rel. Ogden Newspapers, Inc. v. Wilkes**, 211 W. Va. 423, 429, 566 S.E.2d 560, 566 (2002)

("***Ogden II***"), the West Virginia Supreme Court noted that "[o]bserving that few courts today generally follow the broad-based, 'playbook' rationale for disqualification announced in ***Chugach [Electric Association v. United States District Court***, 370 F.2d 441 (9th Cir.1966)], one authority reasons that '[p]ressed too far, the playbook rationale can give a former client an unjustifiably broad right to bar his or its former counsel from representing a later opponent; if "insight" into intangibles is sufficient, it would be a rare case indeed that would not qualify.' G.C. Hazard, Jr. & W.W.Hodes, 1 *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* § 13.7 (3d ed. 2000). It also appears that the playbook rationale is not favored under our Rules of Professional Conduct, with the commentary following Rule 1.9 stating: '[T]he fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about the client when later representing another client.' *Id*. Even those authorities which recognize the value of a playbook basis for disqualification limit the circumstances in which it is deemed applicable. *See*, e.g., 2 *Restatement (Third) Law Governing Lawyers* § 132 cmt. d(iii) (2000) (disqualification based on playbook information limited to situations in which the general information 'will be directly in issue or of an unusual value in the subsequent matter.')." ***State ex rel. Ogden Newspapers, Inc. v. Wilkes***, 211 W. Va. at 429, 566 S.E.2d at 566. "As previously discussed, it is not until a substantial relationship is found as a result of a thorough comparison of the two representations at issue that disclosure of confidential information—not insight into corporate policies—is presumed." ***Id***.

19. It would appear that EQT is attempting to foreclose an employee that they terminated from securing any meaningful employment in the oil & gas industry, by claiming

15

that any employment could lead to the confidential information being divulged or by claiming that the duty to consult constitutes a conflict.

For the reasons stated above, EQT's Motion to Disqualify Plaintiffs' Counsel Related to Bryant "Wayne" Bowman II [**Doc. 106**] is **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record.

**DATED**: February 22, 2023.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE