**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

**MARK McEVOY**, *et al.,*

           Plaintiffs,

      v.                              **Civil Action No. 5:22-CV-171**
                                                    Judge Bailey

**DIVERSIFIED ENERGY COMPANY PLC**,
*et al.,*

           Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

Pending before this Court is Defendants'[1] Motion to Dismiss Second Amended Complaint [Doc. 104], filed January 18, 2023.  A Response [Doc. 126] was filed on February 1, 2023.  A Reply [Doc. 134] was filed on February 8, 2023.  The Gas and Oil Association of WV, Inc. filed an *Amicus Curiae* Brief [Doc. 160] on February 23, 2023.  Plaintiffs filed a Response to *Amicus Curiae* Brief [Doc. 181] on March 7, 2023.  Having been fully briefed, the Motion to Dismiss is ripe for adjudication.

This Court held a hearing on the Motion on March 16, 2023.  *See* [Doc. 161].

For the reasons that follow, this Court will deny Defendants' Motion to Dismiss Second Amended Complaint.

---

[1] All defendants, including both those affiliated with Diversified and those affiliated with EQT, join in the motion to dismiss.  *See* [Doc. 104 at 1, fn.1].

## **BACKGROUND**

This case stems from thousands of abandoned gas wells in West Virginia that plaintiffs allege Diversified Defendants had a duty to plug and decommission. Moreover, this case also concerns alleged fraudulent transfers made between Diversified Defendants and EQT Defendants. A Second Amended Class Action Complaint [Doc. 96] was filed on January 5, 2023. Plaintiffs bring this action under Federal Rules of Civil Procedure 23(b)(2), (b)(3), and (c)(4) on behalf of the following proposed classes:

The Voidable Transfer Class, consisting of all persons or entities that own property in West Virginia on which Diversified owns a well, regardless of whether the wells are currently abandoned or non-producing; and

The Common Law Class, consisting of all persons or entities who own land in West Virginia containing at least one well that (1) is not producing and/or has not produced oil or gas for 12 consecutive months, (2) is currently owned or operated by Diversified, and (3) has not been plugged or properly decommissioned.

[Doc. 96 at 64–65]. In the Second Amended Complaint, plaintiffs assert five causes of action:

Count I - Trespass by Diversified (Common Law Class only) [Doc. 96 at 68–69];

Count II - Nuisance by Diversified (Common Law Class only) [Id. at 69–70];

Count III - Negligence by Diversified (Common Law Class only) [Id. at 70];

2

Count IV - Avoidance and Recovery of a Voidable Transfer as the Result of an Actual Fraudulent Transfer (Voidable Transfer Class only) [Id. at 71–72]; and

Count V - Avoidance and Recovery of Voidable Transfer as the Result of a Constructive Fraudulent Transfer (Voidable Transfer Class only) [Id. at 73–74].

For relief, plaintiffs seek the following:

1.      Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), certify the proposed class for the purpose of determining Defendants' liability to Plaintiffs;

2.      Enforce the Plaintiffs' and class members' private property rights by declaring that Diversified's failure to promptly plug its abandoned wells on Plaintiffs' and class members' properties constitutes trespass, nuisance, and negligence such that Plaintiffs and class members are entitled to appropriate damages necessary to remedy their injuries;

3.      Award Plaintiffs and class members damages from Diversified to compensate them for trespass (calculated at the cost of plugging, remediation, and demolition of the abandoned wells), nuisance, and negligence;

4.      Declare that Diversified's July 2018 Voidable Transfer of nearly $523.4 million to EQT and the assumption of plugging obligations in exchange for approximately 11,000 wells is avoided as a fraudulent transfer as defined by the Alabama UFTA;

3

5.      Declare that Diversified's May 2020 Voidable Transfer of nearly $114.5 million to EQT and the assumption of plugging obligations in exchange for approximately 900 wells is avoided as fraudulent transfer as defined by Alabama UVTA;

6.      Direct the recovery of the assets Diversified transferred to EQT and reimpose the plugging and decommissioning obligations incurred by Diversified in the July 2018 and May 2020 Voidable Transfers back onto the transferor, EQT, to the extent necessary to satisfy Plaintiffs' claims under Sections 8-9A-7 and 8-9B-8 of the Alabama Code or under otherwise applicable fraudulent transfer laws, or, alternatively, in accordance with Alabama Code §§ 8-9A-7 and 8-9B-9, enter Judgment for the value of the property transferred and the obligations incurred by Diversified up to the amount necessary to satisfy Plaintiffs' claims;

7.      Create a fund from the damages awarded from EQT to be used to plug and otherwise decommission Class Members' wells in West Virginia;

8.      Create a separate fund from damages awarded from Diversified to be used to plug and otherwise decommission Class members' wells;

9.      Appoint a receiver to take charge of and administer both of those funds;

10.     Award attorney's fees as appropriate; and

11.     Grant Plaintiffs and all Class members such other and further relief as is just and equitable under the circumstances.

[Doc. 96 at 74–76].

4

On January 18, 2023, defendants filed their Motion to Dismiss Second Amended Complaint [Doc. 104] and accompanying Memorandum of Law in Support [Doc. 105]. Therein, defendants assert that "[a]ll claims in Plaintiffs' Second Amended Class Action Complaint . . . depend on the theory that Diversified must plug natural gas wells on plaintiffs' land pursuant to West Virginia Code Section 22-6-19." *See* [Doc. 104 at 1]. Defendants argue because Diversified has no existing duty to plug the wells on plaintiffs' property, plaintiffs' tort claims based on the alleged breach of that purported duty fail as a matter of law.  Furthermore, defendants argue because plaintiffs do not have any valid tort claims against Diversified, plaintiffs cannot maintain their derivative claims for fraudulent transfer against any of the defendants as a matter of law.

## STANDARD OF REVIEW

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." ***Bell Atl. Corp. v. Twombly***, 550 U.S. 544, 570 (2007); *see also* ***Giarratano v. Johnson***, 521 F.3d 298, 302 (4th Cir. 2008) (applying the ***Twombly*** standard and emphasizing the necessity of *plausibility*).  When reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must assume all of the allegations to be true, must resolve all doubts and inferences in favor of the plaintiff, and must view the allegations in a light most favorable to the plaintiff.  ***Edwards v. City of Goldsboro***, 178 F.3d 231, 243–44 (4th Cir. 1999).

When rendering its decision, the Court should consider only the allegations contained in the Complaint, the exhibits to the Complaint, matters of public record, and other similar materials that are subject to judicial notice.  ***Anheuser-Busch, Inc. v.***

*Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995).  In ***Twombly***, the Supreme Court, noted

that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do. . . ." ***Twombly***, 550 U.S. at 555, 570 (upholding the dismissal of a

complaint where the plaintiffs did not "nudge[ ] their claims across the line from conceivable

to plausible.").

      "[M]atters outside of the pleadings are generally not considered in ruling on a Rule

12 Motion."  ***Williams v. Branker***, 462 F. App'x 348, 352 (4th Cir. 2012).  "Ordinarily, a

court may not consider any documents that are outside of the Complaint, or not expressly

incorporated therein, unless the motion is converted into one for summary judgment."

***Witthohn v. Fed. Ins. Co.***, 164 F. App'x 395, 396 (4th Cir. 2006).  However, the Court may

rely on extrinsic evidence if the documents are central to a plaintiff's claim or are

sufficiently referred to in the Complaint.  ***Id***. at 396–97.

## DISCUSSION

      Plaintiffs assert that West Virginia Code § 22-6-19 imposes a duty on Diversified to

plug wells on their property.  West Virginia Code Section 22-6-19 states:

> Any well which is completed as a dry hole or which is not in use for a period
> of twelve consecutive months shall be presumed to have been abandoned
> and shall promptly be plugged by the operator in accordance with the
> provisions of this article, unless the operator furnishes satisfactory proof to
> the director that there is a bona fide future use for such well.

Based on this duty, plaintiffs assert common law claims for trespass, nuisance, and negligence against Diversified.

West Virginia has adopted an administrative scheme to oversee drilling and plugging of natural gas wells, including those on plaintiffs' land. Under West Virginia Code § 22-6-28, West Virginia has appointed its Office of Oil and Gas ("OOG") to "exercise supervision over the drilling, casing, plugging, filling and reclamation of all wells and shall have access to the plans, maps and other records and to the properties of the well operators as may be necessary or proper for this purpose. . . ." W.Va. Code § 22-6-28(a). "[A]ny operator or coal operator adversely affected by a final decision or order of the director, may appeal in the manner prescribed in section four, article five, chapter twenty-nine-a of this code." Id. at § 22-6-28(b).

West Virginia's administrative scheme "permit[s] any aggrieved person to file before the director, a formal complaint charging any well operator with not drilling or casing, or not plugging or filling, or reclaiming any well. . . ." Id. at § 22-6-28(a). Moreover, "[a]t the time and place fixed for hearing, full opportunity shall be given any person so charged or complaining to be heard and to offer such evidence as desired, and after a full hearing, . . . the director shall make findings of fact and enter such order in the director's judgment is just and right and necessary to secure the proper administration of this article, and if the director deems necessary, restraining the well operator from continuing to drill or case any well or from further plugging, filling or reclaiming the same. . . ." Id.

A private party cannot plug a well in West Virginia without permission and a permit from the Office of Oil and Gas. Id. at § 22-6-23.

I.      **Consent Order**

Both parties heavily briefed the issue of whether the Consent Order deprives this Court of jurisdiction.   Defendants argue that plaintiffs' claims are an impermissible collateral attack on an administrative order.   Plaintiffs argue that the Consent Order has no effect on plaintiffs' claims because it is "nothing more than an exercise of [the Office of Oil and Gas's] prosecutorial discretion and has no effect" on plaintiffs' property rights.  This Court agrees with plaintiffs.

In short, the defendants contend that the Consent Order completely preempts the regulation of well plugging.  This Court cannot agree.

In reviewing the effect of the Consent Order, it is necessary to keep in mind that "[h]istorically, statutory and regulatory remedies and concern for surface damage caused by mining operations has focused on the superjacent landowner, who leased the mineral rights to their land to another.  This is because under the common law, surface owners had no right to prevent the mineral rights owner from performing all reasonable mining operations on the land below which mining was taking place, and reasonableness was determined in comparison to industry practice. Ronald W. Polston, *Surface Rights of Mineral Owners—What Happens When Judges Make Law and Nobody Listens?*, 63, N.D. L.Rev., 41, 42–43 (1987) (outlining the common law approach)."   *Magers v. Chesapeake Appalachia, LLC*, 2013 WL 4099925, at *5 (N.D. W.Va. Aug. 13, 2013) (Stamp, J.).

As a result, the mineral lessee may select and use the surface owner's land without compensation to the land owner.  Of course, the operator selects a nice, flat parcel of land, which is rare in the Mountain State.

This use by the mineral lessee is via an implied easement.  "In order for a claim for an implied easement for surface rights in connection with mining activities to be successful, it must be demonstrated not only that the right is reasonably necessary for the extraction of the mineral, but also that the right can be exercised without any substantial burden to the surface owner." Syl. Pt. 3, **Buffalo Mining Co. v. Martin**, 165 W.Va. 10, 267 S.E.2d 721 (1980)."  Syl. Pt. 1, **Andrews v. Antero Res. Corp.**, 241 W.Va. 796, 828 S.E.2d 858 (2019).

Despite the foregoing, the Consent Order issued by the OOG allows abandoned wells to stay in place for years and years.[2]

What exactly is this Consent Order?  It is an agreement entered into between the OOG and the well operators, without prior notice to the surface owners or lessees, without subsequent notice to the surface owners or lessees, with no right of appeal.  Furthermore, by its own terms, the Consent Order admits that the operators have not furnished satisfactory proof to the director that there is a bona fide future use for such well.

For the foregoing reasons, it is the finding of this Court that the Consent Order is simply an exercise of OOG's prosecutorial discretion and has no effect on the plaintiffs' property rights.  *See* **Citizens for a Better Env't-Cal. v. Union Oil Co. Of Cal.**, 861

---

[2] The defendants contend that the Consent Order allows them until 2034, yet the Consent Order requires less than 50 wells per year be plugged.  The OOG lists Diversified as having 2,394 abandoned wells.  At the rate of 50 wells per years, it may take 480 years, during which the suface owners land will be occupied.

F.Supp. 889, 902–03 (N.D. Cal. 1994), *aff'd*, 83 F.3d 1111, 1120 (9th Cir. 1996), *cert. denied*, 519 U.S. 1101 (1997).

The West Virginia Legislature made clear that the remedies provided by the regulatory program are not exclusive and do not preclude surface owners' common law claims:

> Nothing in section three or elsewhere in this article shall be construed to diminish in any way the common law remedies, including damages, of a surface owner or any other person against the oil and gas developer for the unreasonable, negligent or otherwise wrongful exercise of the contractual right, whether express or implied, to use the surface of the land for the benefit of the developer's mineral interest.

W.Va. Code § 22-7-4(a).  *See also* id. § 22-7-8 ("The remedies provided by this article *shall not preclude* any person from seeking other remedies allowed by law." (emphasis added)); id. § 22-10-11(a) ("It is the purpose of this article to provide additional and cumulative remedies to address abandoned wells in this state and nothing herein contained shall abridge or alter rights of action or remedies now or hereafter existing, nor shall any provisions in this article, or any act done by virtue of this article, be construed as estopping the state, municipalities, public health officers or persons in the exercise of their rights to suppress nuisance . . . now or hereafter existing, or to recover damages.").

The United States Court of Appeals for the Fourth Circuit has recognized this principle.  In **Whiteman v. Chesapeake Appalachia, L.L.C.**, 729 F.3d 381, 393–94 (4th Cir. 2013), the Fourth Circuit stated that "West Virginia's regulatory scheme does not

10

create a right of the lessor to commit a trespass if the specific use is not granted or implied in a lease. . . ."  *See also* **EQT Prod. Co. v. Wender**, 870 F.3d 322 (4th Cir. 2017).

The West Virginia Supreme Court of Appeals likewise held that activities regulated by the State's oil and gas laws can give rise to common-law liability despite being subject to cumulative enforcement by the state.  **Atkinson v. Va. Oil & Gas Co.**, 72 W.Va. 707, 79 S.E. 647 (1913) (authorizing suit for damages against well operator by adjacent property owner despite state enforcement authority).

This Court declined to find an implied private statutory cause of action to enforce West Virginia's oil and gas program because "there are already ways to recover under the common law."  **Magers v. Chesapeake Appalachia, LLC**, 2013 WL 4099925, at *6 (N.D. W.Va. Aug. 13, 2013) (Stamp, J.).

The West Virginia Legislature has made clear that the oil and gas program *does not preclude* common law tort claims like those brought by plaintiffs.  The Consent Order entered cannot leave plaintiffs' with no recourse for the alleged tort claims.

A party is only required to exhaust statutory remedies if the Legislature intended the remedy provided to be exclusive with regard to the party's claims.  **Wiggins v. Eastern Associated Coal Corp.**, 178 W.Va. 63, 66, 357 S.E.2d 745, 748 (1987).  As stated above, the West Virginia oil and gas regulatory scheme makes clear that the Legislature did not intend the narrowly prescribed remedy in § 22-6-28 to be the exclusive means through which landowners could protect their property rights from the adverse impacts of oil-and-gas drilling.

Moreover, exhaustion is not required where the statutory remedy is inadequate to fully address a plaintiff's claim(s).  *See* Syl. Pt. 2, ***Wiggins***, 178 W.Va. 63, 357 S.E.2d 745 ("Where the available administrative remedy is inadequate, this Court recognizes an exception to the general rule that where a new right is created by statute, the remedy can be only that which the statute prescribes.").  The West Virginia Supreme Court of Appeals further explained its holding in ***Wiggins***, noting that "damages recoverable in a tort action are broader than those available administratively and also observed that the primary purpose of the administrative remedy was different than the interests protected in a retaliatory discharge action."  ***Collins v. Elkay Min. Co.***, 179 W.Va. 549, 552, 371 S.E.2d 46, 48 (1988).  *See also* ***State ex rel. Ball v. Cummings***, 208 W.Va. 393, 402–405, 540 S.E.2d 917, 926–29 (1999) (explaining that the State's interest in enforcing its environmental laws is distinct from private parties' interest in protecting their property rights).

Lastly, the Consent Order does not establish Diversified's compliance with West Virginia Code Section 22-6-19.  The Consent Order says that the non-producing wells identified by Diversified "shall not be subject to any further enforcement activities by the OOG with regard to any requirement to close and plug such wells based upon the lack of production in the most previous twelve months so long as Diversified is compliant with the terms and conditions of this Order. . . ."  *See* [Doc. 44-1 at 5].  The requirement for the Office of Oil and Gas to issue a permit for well plugging is not an obstacle to plaintiffs' requested relief.

12

Prior to the enactment of the OOG statute, West Virginia law required an operator, upon the abandonment or cessation of operation, to immediately fill and plug the well. W.Va. Code XX-XX-1, enacted in 1929.  The present statute extended the period in which plugging had to take place to one year - not 400 years.  The present one year period provides the standard of reasonability applicable to plaintiffs' common law actions.

Seeing as the Consent Order does not strip this Court of jurisdiction, this Court will turn to each of plaintiffs' claims to see whether the claim warrants dismissal.

## II.      Continuing Tort Doctrine

"Where a tort involves a continuous or repeated injury, the cause of action accrues at and the statute of limitations begins to run from the date of the last injury *or* when the tortious overt acts and omissions cease."  Syl. Pt. 11, *Graham v. Beverage*, 211 W.Va. 466, 469, 566 S.E.2d 603, 606 (2002) (emphasis added); *see also **Moore v. Wilson***, 2014 WL 1365967, at *2 (S.D. W.Va. Apr. 7, 2014) (Copenhaver, J.) ("It is the continuing misconduct which serves to toll the statute of limitations under the continuing tort doctrine." (citing ***Roberts v. West Virginia American Water Co.***, 211 W.Va. 373, 378, 655 S.E.2d 119, 124 (2007))).

The continuing tort doctrine also applies to nuisance and negligence claims.  *See **Taylor v. Culloden Pub. Serv. Dist.***, 214 W.Va. 639, 647, 591 S.E.2d 197, 205 (2003) (holding that the law of continuing torts set forth in *Graham* "was clearly intended to apply to torts of all types" and applying the doctrine to nuisance); ***Handley v. Town of Shinnston***, 169 W.Va. 617, 289 S.E.2d 201 (1982) (applying the doctrine to negligence claims).

13

Defendants argue that plaintiffs' tort claims are barred by a two-year statute of limitations in West Virginia Code Section 55-2-12(a).  *See* [Doc. 105 at 20–24].  West Virginia Code Section 55-2-12(a) provides: "Within two years next after the right to bring the same shall have accrued, if it be for damage to property."  Defendants assert because plaintiffs' tort claims accrued more than two years before they filed even the original complaint, the claims are time-barred.

In response, plaintiffs assert that their tort claims are not barred by the two-year statute of limitations because of West Virginia's continuing tort doctrine.  *See* [Doc. 126 at 20].

Here, because defendants continue to leave wells unplugged and plaintiffs' property damage unabated, plaintiffs' tort claims are not barred by a two-year statute of limitations in West Virginia pursuant to the continuing tort doctrine.

### III.   Count I - Trespass by Diversified

Plaintiffs first allege that because Diversified's non-producing wells are no longer "reasonable and necessary" for "mineral production," it has exceeded the right to occupy plaintiffs' land and is thus trespassing.

"Under West Virginia law, to constitute a trespass, the defendant's conduct must result in an actual, nonconsensual invasion of the plaintiff's property, which interferes with the plaintiff's possession and use of that property."  ***Rhodes v. E.I. du Pont de Nemours & Co.***, 636 F.3d 88, 96 (4th Cir. 2011); *see also* ***Hark v. Mountain Fork Lumber Co.***, 127 W.Va. 586, 34 S.E.2d 348, 352 (1945) ("Trespass is defined . . . as an entry on another

14

man's ground *without lawful authority*, and doing some damage, however inconsiderable, to his real property."  (emphasis added)).

A continuing trespass occurs when "one person leaves on the land of another, with a duty to remove it, 'a structure, chattel, or other thing.'"  ***Whiteman***, 729 F.3d at 386 (quoting Restatement (Second) of Torts § 160 (1965)); *see also* Restatement (Second) of Torts § 160 (describing a continuing trespass when a structure or thing is placed on property pursuant to a "privilege conferred" but not removed "after the privilege has been terminated").

Here, plaintiffs have alleged enough facts to state a claim for relief that is plausible on its face.  Diversified continues to occupy plaintiffs' property with gas wells and continues to leave derelict equipment on the land.  Thus, Defendants' Motion to Dismiss Second Amended Complaint is hereby **DENIED** as it pertains to trespass by Diversified.

## IV.    Count II - Nuisance by Diversified

Plaintiffs next allege that because Diversified exceeded its right to leave equipment on plaintiffs' land and that equipment unreasonably interferes with plaintiffs' use and enjoyment of their properties, the continued presence of those wells is a nuisance.

Under West Virginia law, a private nuisance arises when a person or entity has created a "substantial and unreasonable interference with the private use and enjoyment of another's land."  ***Hendricks v. Stalnaker***, 181 W.Va. 31, 33, 380 S.E.2d 198, 200 (1989).

Reviewing allegations in a light most favorable to plaintiffs, this Court concludes that plaintiffs have alleged enough facts to state a claim for relief that is plausible on its face.

15

Diversified continues to leave wells and associated equipment on plaintiffs' properties that interfere with the use and enjoyment of plaintiffs' land.   Thus, Defendants' Motion to Dismiss Second Amended Complaint is hereby **DENIED** as it pertains to nuisance by Diversified.

## V.    Count III - Negligence by Diversified

Plaintiffs allege that because Diversified has a duty to plug a well promptly after twelve (12) months of failing to report production, and because Diversified breached that duty, negligence has occurred.

"In order to establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff.   No action for negligence will lie without a duty broken."   Syl. Pt. 1, ***Parsley v. Gen. Motors Acceptance Corp.,*** 167 W.Va. 866, 280 S.E.2d 703 (1981);   Syl. Pt. 4, ***Jack v. Fritts****,* 193 W.Va. 494, 457 S.E.2d 431 (1995); Syl. Pt. 3, ***Aikens v. Debow***, 208 W.Va. 486, 541 S.E.2d 576 (2000); Syl. Pt. 5, ***Lockhart v. Airco Heating & Cooling, Inc.***, 211 W.Va. 609, 567 S.E.2d 619 (2002).

"The determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law." Syl. Pt. 5, ***Aikens v. Debow***, 208 W.Va. 486, 541 S.E.2d 576 (2000); Syl. Pt. 3, ***Lockhart v. Airco Heating & Cooling, Inc.***, 211 W.Va. 609, 567 S.E.2d 619 (2002); Syl. Pt. 3, ***Jackson v. Putnam Cty. Bd. of Educ.***, 221 W.Va. 170, 653 S.E.2d 632 (2007).   "The ultimate test of the existence of a duty to use care is found in the foreseeability that harm

16

may result if it is not exercised.  The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?"  Syl. Pt. 3, **Sewell v. Gregory**, 179 W.Va. 585, 371 S.E.2d 82 (1988).

Plaintiffs' Complaint repeatedly cites Diversified's continuing obligation to plug and reclaim nonproducing wells.   *See* [Doc. 96 at ¶¶ 76–78, 105, 597, 607, 612, & 620]. Plaintiffs have also alleged injuries that affect plaintiffs, such as the "exclusive use and enjoyment of their properties, lowering the value of their properties, and otherwise causing Plaintiffs annoyance, inconvenience, and aggravation in the use of their properties." *See* [id. at ¶ 620].  At this stage, plaintiffs have sufficiently alleged enough facts to state a claim for negligence that is plausible on its face. Thus, Defendants' Motion to Dismiss Second Amended Complaint is hereby **DENIED** as it pertains to <u>negligence by Diversified</u>.

## VI.   Count IV - Avoidance and Recovery of Fraudulent Transfer as the Result of an Actual Fraudulent Transfer and Count V - Avoidance and Recovery of Fraudulent Transfer as the Result of a Constructive Fraudulent Transfer

In Counts IV and V of the Second Amended Complaint, plaintiffs seek to avoid the alleged fraudulent transfers pursuant to Sections 8-9A-4 and 8-9B-5 of Alabama's Fraudulent Transfer Act ("AFTA"), and its successor, the Alabama Uniform Voidable Transactions Act ("AVTA").[3]

---

[3] The AFTA and AVTA are at issue in this case because of the choice of law provisions contained in the subject leases.  Defendant Diversified is headquartered in Alabama.

The AFTA, Ala. Code § 8-9A-1 *et seq.*, applies to transfers that took place prior to January 1, 2019—in this case, the July 2018 Transfer.  The AVTA, Ala. Code § 8-9B-1 *et seq.*, applies to transactions that took place on or after January 1, 2019—in this case, the May 2020 Transfer.

Plaintiffs first allege the July 2018 Voidable Transfers are avoidable under Section 8-9A-4 of the AFTA.  That statutory section provides as follows:

> (a) A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor.

Ala. Code § 8-9A-4(a).

Plaintiffs next allege the May 2020 Voidable Transfers are avoidable under Sections 8-9B-5 of the AVTA.  That statutory section provides as follows:

> (a) A transfer made by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer:
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer, and the debtor:
>
> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Ala. Code § 8-9B-5(a).

To assert a claim for relief under the AFTA or AVTA for either an actual or constructive fraudulent transfer, one must be a "creditor."  Ala. Code §§ 8-9A-4, 5; §§ 8-9B-5, 6.  A "creditor" is defined as "[a] person who has a claim."  Id. § 8-9A-1(4); *accord* id. § 8-9B-2(4).  "Claim" is defined as "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, *unmatured*, disputed, undisputed, legal, equitable, secured, or unsecured. . . ."  Id. § 8-9A-1(3) (emphasis added); *accord* id. § 8-9B-2(3).

With respect to statutory construction, the Alabama Supreme Court has emphasized the importance of giving terms their plain meaning:

> "Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says.  If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect."

*Blue Cross and Blue Shield of Ala., Inc. v. Nielsen*, 714 So.2d 293, 296 (Ala. 1998) (quoting *IMED Corp. v. Systems Engineering Assocs. Corp.*, 602 So.2d 344, 346 (Ala. 1992)).  The plain meaning of "contingent" is:

**1.** Possible; uncertain; unpredictable . . . .

**2.** Dependent on something that might or might not happen in the future; conditional. . . .

Contingent, *Black's Law Dictionary* (11th ed. 2019).  The plain meaning of "unmatured claim" is one that has yet to become due.  *Id*.  The United States Court of Appeals for the Fourth Circuit explained in **Grady v. A.H. Robins Co., Inc.**, 832 F.2d 198, 202–203 (4th Cir. 1988) that the terms "contingent" and "unmatured" "depend[] upon a future uncertain event. . . ."

Thus, plaintiffs may have a present "claim" that is based on a right to payment that is dependent upon a future uncertain event.

Defendants argue that plaintiffs are not "creditors" under the AFTA/AVTA and their claims are not ripe because any obligation to plug the wells on plaintiffs' properties is "hypothetical" and "speculative."  *See* [Doc. 105 at 20–21].  This Court does not agree.  Plaintiffs status as "creditors" depends on the fact that an oil and gas operator drilled a well on their property.  That act, which has already occurred, necessarily gives rise to an obligation on the part of the operator or its successor to plug the well, and until the operator or its successor actually plugs the well, the landowner has a contingent and unmatured claim for plugging that qualifies as a "claim" under the AFTA/AVTA.  At some point, defendants obligation to plug the wells on plaintiffs' properties will mature.  The relevant obligation arises not when a specific cause of action under tort accrued, but rather arose when the relevant operator drilled the well and incurred the obligation to eventually plug the well in the future.  This Court refuses to allow unjust consequences befall plaintiffs who hold unmatured claims that will come due in the future and after the statute of limitations runs.

Defendants additionally argue that plaintiffs' constructive fraudulent transfer claim is time-barred.  *See* [Doc. 105 at 29–30].  Defendants assert the disputed transfers happened in July 2018 and May 2020.  *See* [id. at 29].  Defendants further argue plaintiffs cannot avoid the statute of limitations through what they have called the discovery rule because plaintiffs have not pleaded the requirements to invoke the rule.

In response, plaintiffs argue that the Second Amended Complaint "plainly alleges satisfaction of the discovery rule under the 'person of ordinary prudence' standard."  *See* [Doc. 126 at 30].

A claim under either the AFTA or the AVTA "is extinguished unless action is brought . . . within one year after the transfer was made when the action is brought by a creditor whose claim arose after the transfer was made[.]" Ala. Code § 8-9B-10(d); Ala. Code § 8-9A-9(4).

The AFTA and the AVTA's one-year statutes of limitations on claims of constructive fraud are subject to Alabama's "discovery rule," which provides that "[i]n actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action."  Ala. Code § 6-2-3.

A party seeking to invoke § 6-2-3 must

(1) aver with precision the facts and circumstances which allegedly were not discovered and to which plaintiff allegedly was defrauded, (2) aver how or when these facts were discovered, (3) aver what prevented these facts from being discovered before the bar of the statute became complete and (4) aver

21

facts acquitting the plaintiff of all knowledge of facts which ought to have put

it on inquiry.

**Int'l Mgmt. Grp., Inc. v. Bryant Bank**, 274 So.3d 1003, 1014 (Ala. Civ. App. 2018)

(internal alterations removed) (citations omitted).

In applying Section 6-2-3, Alabama courts recognize that fraud has been discovered

only "at the time of the discovery of facts which would provoke injury by a person of

ordinary prudence and which, if followed up, would have led to the discovery of the fraud."

**Papastefan v. B & L Const. Co., Inc. of Mobile**, 385 So.2d 966, 967 (Ala. 1980); *see also*

**Johnson v. Shenandoah Life Ins. Co.**, 291 Ala. 389, 281 So.2d 636 (1973).  Alabama

courts further recognize that facts constituting fraud may not be discovery by a plaintiff until

informed of the facts by his or her attorney.  **Hurry v. General Motors LLC**, 2022 WL

3587349, at *10 (M.D. Ala. Aug. 22, 2022) ("Plaintiffs sufficiently allege the time and

circumstances of their discovery of the fraud because they allege that [they] did not know,

nor could have known, about the Oil Consumption Defect afflicting the Generation IV

Engines in their Class Vehicles 'until after Plaintiffs' counsel's investigation led to the filing

of the . . . Action. . . .'").

It is well settled that the "person of ordinary prudence" standard creates a question

for the jury and is thus unfit for resolution on a motion to dismiss.  **In re Gaddy**, 622 B.R.

440, 456 (Bankr. S.D. Ala. 2020); **Potter v. First Real Estate Co.**, 844 So.2d 540, 546

(Ala. 2002) ("The question of when a party discovered or should have discovered the fraud

is generally one for the jury.").

At this stage of litigation, plaintiffs' allegations are sufficient to meet all of the elements listed in *Int'l Mgmt. Grp., Inc.*  Moreover, under Alabama law, disputes as to when facts underlying the discovery rule should have been discovered must be decided by and jury and cannot be determined by this Court on a motion to dismiss.

Thus, this Court finds that plaintiffs are properly "creditors" with valid existing "claims."  Plaintiffs have alleged enough facts to state a claim to relief to Counts IV and V that is plausible on its face.  Defendants' Motion to Dismiss Second Amended Complaint is hereby **DENIED** as it pertains to Count IV - Avoidance and Recovery of Fraudulent Transfer as the Result of an Actual Fraudulent Transfer and Count V - Avoidance and Recovery of Fraudulent Transfer as the Result of a Constructive Fraudulent Transfer.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss Second Amended Complaint [**Doc. 104**] is **DENIED**.

It is so **ORDERED**.

The Clerk shall transmit copies of this Order to all counsel on record.

**DATED:** April 3, 2023.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

23