IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

WHEELING DIVISION

MARK MCEVOY, et al., individually
and on behalf of a proposed class,

        Plaintiffs,

                               Civil Action No. 5:22-cv-171

    v.                          The Honorable John P. Bailey

DIVERSIFIED ENERGY COMPANY PLC,
et al.,

        Defendants.


OBJECTIONS TO AND MOTION TO QUASH
"SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION."
SERVED BY DEFENDANT DIVERSIFIED
ON DAVID MCMAHON, J.D., NOT  PARTY,
OR IN THE ALTERNATIVE,
<u>FOR A PROTECTIVE ORDER</u>


**Introduction.**

      I am a semi-retired lawyer and I am not a party to this litigation or counsel of record.

Since the early 1980's I have part-time represented and advocated for surface owners.  At the

same time, until 2008, I also worked part-time as a front-line lawyer for Legal Aid of West

Virginia and its predecessors.  From 1996 through 2021 I was also employed part-time by

Mountain State Justice doing advocacy, but not litigation, on surface owners' issues and on many

other unrelated issues.  To the extent my hours educating and advocating for surface owners

exceeded the time for which I was paid by either employer my time was *pro bono*.  Since 2008 I

have also had a part-time private practice concentrating on representing surface owners and

small and medium sized mineral owners.  I am 73 and I was last a full or part-time employee of

about May of 2021.  I currently do some private practice oil and gas lease etc. negotiation for

mineral owners and representation of surface owners as  noted above and a little reimbursed

advice for surface owners.  I also do pro-bono surface owner and small and medium mineral

owner advocacy.  All my work since March of 2020 is out of a home office.

I object to and move to quash the subpoena served upon me by a process server on May

22, 2023, in its entirety as more fully set out below 1) on the grounds that what is sought is not

relevant, 2) on the grounds that what is sought is subject to attorney-client and attorney work

product privilege, or in the alternative subject to the non-testifying expert exception, and 3) on

the grounds of burdensomeness.  And if discovery is ordered, I pray that an independent special

master with experience in the open-source Thunderbird e-mail software I use be paid for by the

defendant to mirror my email files and other required materials from my computer and do the

searches and production all the while maintaining confidentiality of my unrelated matters.

**Relevance**

Count I of the Complaint is based on the facts that Diversified owns oil and/or gas wells

(hereinafter "wells") located on the plaintiffs' class's lands that are no longer reasonably

necessary for production of oil or gas because they no longer produce oil or gas but are not

plugged and the wells  are therefore a trespass.  The only way I know about the existence of, and

lack of production from, the wells is from information submitted to the West Virginia

Department of Environmental Protection ("DEP") by Diversified itself.  I believe I have no other

significant information on their location and production, and I know of no further facts relevant to the Claim I.

Count II of the complaint is based on the same facts plus that perhaps equipment (such as tanks) other than the wellhead and casing is still on plaintiffs' lands that again are no longer reasonably necessary for production from wells the location of which and the lack of production of which is reported by Diversified to the DEP, and such equipment is therefore a nuisance.  I have no other significant information on their location and production and existence of equipment on such wells and I believe I know of no further facts relevant to the Claim II.  I have only knowingly, personally, actually been physically present on a handful of Diversified well sites and they are mostly  in Kanawha State Forest.

Count III of the complaint for negligence by Diversified is based on the same facts and Counts I and II and the same objection and statement of lack of knowledge is given.

Counts IV and V are again on based on the facts that Diversified owns wells located on the plaintiffs' lands that are no longer reasonably necessary for production of oil or gas because they no longer produce oil or gas but were not plugged.  I believe I have no other information on their location and production than the facts reported to the DEP by Diversified.

Counts IV and V are also based on the facts that EQT owned a number of wells located on the plaintiffs' lands that are no longer reasonably necessary for production of oil or gas because they no longer produce oil or gas but were not plugged, and that they were transferred to Diversified.  The only way I know about the existence of the wells, and the lack of production from the wells, their plugging status and that the wells were transferred is from information submitted to the DEP by Diversified and EQT and published on the DEP's web site and possibly by the two defendants' public disclosures, plus possibly from media articles and reports again

3

based on public information.  I believe I have no other information on the location and production of those wells and their transfer from EQT to Diversified .

Counts IV and V are further based on the fact that the plaintiffs have a "claim" under Alabama's uniform transfer statutes as already  ruled by this Court.

Counts IV and V are further based on the fact that EQT transferred those wells and the statutory obligation to plug them to Diversified giving rise to constructive fraud and on the fact that Diversified did not receive reasonably equivalent value to provide for Diversified to comply with the obligation to plug the wells and should have believed that Diversified would incur plugging obligation debts beyond Diversified's ability to satisfy.  My only knowledge of this came from the sources noted above and a few reports made by Diversified to the public and to its shareholders on a Great Britain stock exchange that were pointed out to him.  See Exhibit A as discussed later.

With regard to whether Counts IV and V claims are time-barred, I am  aware of no West Virginia statute or rule that requires notice of the transfer of the ownership of wells and certainly not of the financial condition of the transferee to any owners of the surface where wells are located, to the DEP or even to the mineral lessors of the drilled mineral tract who may or may not own the surface.  Further, I know of no actual practice by Diversified or EQT revealing to the surface owners the financial condition or amassed insufficient plugging obligations of Diversified.[1]   I believe I have no further facts relevant whether Claims IV and V are time barred.

---

[1]And how could the plaintiff surface landowners be on notice to suspect the adverse financial condition  of a company that can apparently afford to sponsor West Virginia University basketball and football.

**Attorney-client/attorney work product/non-testifying expert.**

The underlying legal theory of this case is that an unplugged well that is no longer producing on an un-reclaimed well site was is no longer a reasonable use of the surface and therefore unlawful and that this presence affects the surface owner's property rights and value; plus there is potential if not actual groundwater and other pollution effects or dangers thereof further affecting property use and rights.  I am the attorney who brought this legal concept and industry practices to Appalachian Mountain Advocates, educated them on these matters -- and I suggested they begin litigation for a surface owners' class on this basis.  As a result they did so. I participated in drafting the complaint.  I participated in named plaintiff selection.  I did not become an attorney of record, but during the litigation I wrote one draft pleading, portions of which I was advised were used in pleadings filed.  Any discovery requested that is relevant to the case falls under the attorney-client privilege or the attorney work product privilege.

Regarding attorney-client privilege, the present situation has a similar relevant fact  to the facts in recent *L&G Investments, Inc. et al., vs Antero Resources Corporation et al.* West Virginia Supreme Court of Appeals No. 21-0613, April 24, 2023. The case was about mineral owners rather than surface owners, but about oil and gas issues.  And it was a common fund case as opposed to a class action.  However, the West Virginia Supreme Court recognized that an attorney who represented, as an attorney, unlocatable heirs in a common fund oil and gas royalty case was their attorney even though the attorney's work was done before, or in that case actually without ever, an actual written or oral agreement of representation with the client.  And the extent of attorney client privilege is broad.  "The confidentiality rule . . . apples not only to matters communicated in confidence by the client but also total information relating to the

representation , whatever its source."  W.Va. R Prof'l. Cond. 1.6, *Confidentiality of Information*, (2121 Edition) Comment 3.

Regarding work product privilege, "Where the attorney-client privilege does not apply, material sought by Respondent may still be protected by the work product doctrine."[2] "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). . . "  Fed. R Civ. P. 26(b)(3)(A).  Also, " [A]n attorney is not required to divulge, by discovery or otherwise, facts developed by his efforts in preparation of the case or opinion I have formed about *any phase of the litigation*. [Emphasis added]" [3] With regard to documents in particular, work product applies for "pending or *probable future* litigation. [Emphasis added]"[4]

From my nearly five decades in the field I have highly significant knowledge of the oil and gas industry and its practices and the relevant law including the practices and law that lead to the many thousands of unplugged, non-producing ["abandoned"[5]] and then orphaned wells on surface landowners in West Virginia.  To the extent anything I contributed to the present case

---

[2] *State ex rel. Medical Assurance v Recht*, 213 W.Va. 457, 583 S.E. 2d 80 at 89 (W.Va. 2003),

[3] Ibid. quoting *In re Doe*, 662 F2d 1073, 1077 (4th Cir. 1981)

[4] Ibid. quoting Syllabus Point 7, *State ex rel. United Hosp. v. Bedell, 199 W.Va. 316, 484 S.E.2d 199 (1997)..*

[5] The term "abandoned well" is misnomer term of art in the West Virginia Code.  The Code calls wells "abandoned" that have not produced for 12 months (unless the responsible operator has applied for and received a "bona fide future use" determination which is rarely granted).  W.Va. Code §22-6-19.  35 Code of State Rules 05.  So the Code call a non-producing, unplugged well "abandoned" even though it is still under the bond of a responsible operator.  It is only after the operator disappears that well is abandoned in the usual sense of the word and then is usually termed an "orphaned" well.

that is not privileged attorney-client communication or work product, I am an expert that is not

testifying, so my information is not discoverable and no exceptional circumstances exist that

prevent Diversfied from obtaining what I do know, almost if not entirely from itself, as outlined

above. *See* Fed. R Civ. P. 26(b)(4)(C).

Anything that does not fall under attorney-client communication, attorney work product

or non-testifying expert information/opinion would not be relevant.  It cannot be relevant without

falling into one of those categories.


**Burdensomeness**

Even if the materials sought were relevant, and if they were not privileged, then the

requests are overly broad and unduly burdensome and not proportional to the needs of the case.

*See* Fed. R Civ. P. 26(b)(1)

Items 4 and 5 of the subpoena each request all communications with Ted Boettner and

with Kathy Hipple or the Ohio River Valley Institute from July 1, 2016 to the present about

Diversified even if not related to the "above captioned" matter!  Each of those requests would

require a search of roughly 70,000[6] emails in my email "trash" folders.  On top of that my "sent"

folders would have to be searched.

Item 3 would require the same emails and probably even hard copy files to be searched

again to find "Communications discussing or otherwise related to Ted Boettner, Kathy Hipple,

and Anthony Ingraffea from July 1, 2016 to the present" even if not related to this  present

---

[6]I roughly estimate I get 40 to 80 emails on business days.  Five days a week times 53
weeks is 260 business days (not deducting holidays and vacations).  Using the 40 emails a day
low figure (40 x 260) results in a little over 10,000 emails a year and the subpoena asks for 7
years worth, for a total of at the very least 70,000 emails to search.  Again, not counting sent
folders.

action, or Diversfied, or EQT.  This is so broad it would include personal gossip about three persons who are not parties personally or as employees of a party to the present suit.

There are nine additional discovery items in the subpoena --also burdensome.


**Cross-examination credibility and bias?**

Is the purpose of the discovery requested by Diversified to find information which might point out that any party or person or attorney somehow involved in this action has a motive adverse to EQT or Dominion in order to show bias or otherwise attack their credibility?  If so the Court should consider the possible motive that Diversified and EQT have to unduly burden and consume my time and resources.

Regarding EQT, I argued before the West Virginia Supreme Court the case of *EQT Production Company v. Crowder*, 241 W.Va. 738, 828 S.E.2d 800 (W.Va. 2019) that I won 5-0. This decision stopped EQT from bulldozing its way (literally) onto surface owners' land without their consent in order to create multi-acre well pads for months and months of drilling multiple wells that turned horizontal to produce gas, and to produce gas not just from the mineral tract under that surface owner's land, but from hundreds and hundreds of mineral acres not under the surface owner's land.

Regarding Diversified, in lobbying for better statutes and rules and practices, I have shown to Legislators and others the attached Exhibit A which contains pages from two disclosures Diversified made to the public and to Diversified's shareholders on its stock exchange in Great Britain.  The second page of the disclosures Exhibit A attached shows that Diversified, ". . . expects its producing oil and gas properties to reach the end of their economic lives in 2048."  In other words those wells will not be producing more than it costs to operate

them after 2048.  No doubt this was to convince investors to invest in and stick with investing

with Diversified until 2048.  The fourth page shows that in 2049 Diversified will have 20,000 or

30,000 of those wells that have not been plugged -- and if the wells are not economic even to just

operate, there is no way there will be money to plug them.  This was part of my advocacy *inter

alia* for "The Orphaned Well Prevention Act" introduced in several previous regular sessions of

the West Virginia Legislature, but opposed by industry and never passed.[7]

      The time I have spent already just assisting in the preparations of these objections and

this motion has taken time I intended to use *inter alia* to get publicity in an influential journal on

the need for more than the current 23 DEP oil and gas inspectors for the *at least* 70,000 oil and

gas wells in West Virginia, for the 20,000 associated tanks, for the review of more than 200

permits a year, and for inspections of currently 15 horizontal drilling rigs going 24 hours a day in

West Virginia.  (Due to the lack of DEP oil and gas inspectors, the first $25 Million dollar

tranche of federal orphaned well plugging money is overseen only by "compliance officers" who

the companies doing the plugging pay and get to choose.  Diversified's subsidiary is one of the

contractors getting paid $125,000  federal money per well to select, do research for, and plug

orphaned wells that for the most part it gets to choose.  Advocacy is needed to stop the second

tranche of federal orphaned well plugging money from having that same weak oversight.

      If this subpoena is not for burdening me to stifle my opposition to its practices and my

advocacy for better regulation, then this subpoena is a fishing expedition in the tradition of using

a stick of dynamite in a river or lake.

---

[7] *e.g.*
http://www.wvlegislature.gov/Bill_Text_HTML/2023_SESSIONS/RS/bills/sb109%20intr.pdf

**Special master and costs and discovery ESI protocol.**

 In the event I am required to produce discovery, considering the potential for the burden of that discovery, I pray that a special master be agreed upon with, and paid for by, the defendant(s) to act to mirror the relevant portions of my laptop hard drive for emails or other matters as required and take the actions required with a duty of confidentiality toward me with regard to matters not required to be discoverable.

 Should I be required to produce electronic or paper discovery I do not agree to any discovery protocol agreed to only by the parties that was attached to my subpoena, but would only act within the limits of my home office equipment and software unless otherwise ordered by the Court.

 WHEREFORE, I object to the discovery subpoena in question in total, and I PRAY:

 A.  That the subpoena in question be quashed in total, or in the alternative,

 B.  That the Court issue a protective order with the protection of a special master agreed upon by me and the defendant(s) and paid for by the defendant(s) and other protections noted subsection immediately above, and

 C.  For such other and further relief as to the court may seem just and proper.

Respectfully submitted,

*/s/David McMahon*

David McMahon J.D.
WV Bar No. 2490
1624 Kenwood Rd.
Charleston, WV  25314

Pro Se, Non-Party

<u>CERTIFICATE OF SERVICE</u>

I certify that on this 5th day of June, 2023, the foregoing **OBJECTIONS TO AND MOTION TO QUASH "SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION." SERVED ON BY DEFENDANT DIVERSIFIED ON DAVID MCMAHON, J.D., OR IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER** was served on all counsel of record using the Court's ECF system.

*/s/David McMahon*

David McMahon J.D.  *Pro Se*

12