**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA**

**AT WHEELING**

MARK MCEVOY, et al., individually and
on behalf of a proposed class,

       Plaintiffs,

                                    Civil Action No. 5:22-cv-171
v.                                   The Honorable John P. Bailey

DIVERSIFIED ENERGY COMPANY PLC,
et al.,

       Defendants.

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................iii

Introduction .................................................................................................................. 1

Claims & Proposed Class Definitions........................................................................... 2

   A.   Voidable Transfer Class.................................................................................... 2

   B.   Common Law Class. .......................................................................................... 6

Argument ...................................................................................................................... 8

   A.   All class certification requirements are met with respect to both classes......... 8

      1.   The proposed class is ascertainable, as it is objectively defined and readily
         identifiable. ................................................................................................ 9

      2.   All Rule 23(a) requirements are met.......................................................... 10

         a.   Rule 23(a)(1): 9,810 Voidable Transfer Class members and 1,737 Common
            Law Class members satisfy numerosity requirements............................... 10

         b.   Rule 23(a)(2): Dispositive questions uniformly and commonly apply to all
            class members. .......................................................................................... 11

         c.   Rule 23(a)(3): Typicality is satisfied because the class representatives include
            persons and entities with abandoned and active wells, characteristics shared by
            class members. .......................................................................................... 13

         d.   Rule 23(a)(4): The named plaintiffs and their counsel are adequate to represent
            the proposed class. ................................................................................... 14

      3.   All Rule 23(b)(3) requirements are met, because common issues predominate
         and a class action is the superior method of adjudicating this matter.......... 15

         a.   Common issues predominate. ................................................................... 15

         b.   The class action mechanism is the superior method of resolving plaintiffs'
            claims. ...................................................................................................... 18

Conclusion .................................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alig v. Quicken Loans, Inc.*,
  No. 5:12-cv-114, 2016 WL 10489897 (N.D. W. Va. June 2, 2016)........................................11

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)............................................................................................................19

*Bell v. Disner*,
  No. 3:14-cv-91, 2015 WL 540552 (W.D.N.C. Feb. 10, 2015), *aff'd sub nom.*
  *Bell v. Brockett*, 922 F.3d 502 (4th Cir. 2019)..................................................................17

*Carroll v. Stettler*,
  Civ. No. 10-2262, 2011 WL 5008349 (E.D. Pa. Oct. 19, 2011)..........................................17

*Charlebois v. Angels Baseball, LP*,
  2011 WL 2610122 (C.D. Cal. June 30, 2011) ......................................................................3

*Cork v. CC-Palo Alto, Inc.*,
  No. 5:14-cv-00750, 2021 WL 3373582 (N.D. Cal. Aug. 3, 2021)........................................17

*Deiter v. Microsoft Corp.*,
  436 F.3d 461 (4th Cir. 2006) ...............................................................................................13

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) ............................................................................................8, 9

*Fager v. CenturyLink Commc'ns, LLC*,
  854 F.3d 1167 (10th Cir. 2016) ..........................................................................................10

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982)............................................................................................................15

*Good v. Am. Water Works Co., Inc.*,
  310 F.R.D. 274 (S.D. W. Va. 2015)....................................................................................16

*Grady v. A. H. Robbins Co.*,
  839 F.2d 198 (4th Cir. 1988) ................................................................................................4

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003) ..............................................................................................15

*Hopper v. Jay-Bee Oil & Gas, Inc.*,
  No. 5:20-cv-101, 2023 WL 3695608 (N.D. W. Va. Apr. 4, 2023)................................. *passim*

*In re Integra Realty Res., Inc.*,
    354 F.3d 1246 (10th Cir. 2004) ........................................................................17

*Kay Co., LLC v. EQT Prod. Co.*,
    No. 1:13-cv-151, 2017 WL 10436074 (N.D. W. Va. Mar. 13, 2023) ..............13, 16

*Krakauer v. Dish Network, LLC*,
    925 F.3d 643 (4th Cir. 2019) .......................................................................9, 19

*McAdams v. Robinson*,
    26 F.4th 149 (4th Cir. 2022) ...........................................................................10

*Murphy v. N. Am. River Runners*,
    412 S.E.2d 504 (W. Va. 1991) .........................................................................10

*Poling v. Bd. of Ed. of Phillipi Ind. Dist.*,
    49 S.E. 148 (W. Va. 1904) ..............................................................................10

*Reed v. Alecto Healthcare Servs., LLC*,
    No. 5:19-cv-263, 2022 WL 4115858 (N.D. W. Va. July 27, 2022) ......13, 14, 15, 18

*Southern Country Farms, Inc. v. THQ Appalachia I, LLC*,
    No. 5:21-cv-84, 2023 WL 2824907 (N.D. W. Va. Mar. 13, 2023) ............... *passim*

*Takiguchi v. MRI Int'l, Inc.*,
    No. 2:13-cv-01183, 2016 WL 1091090 (D. Nev. Mar. 21, 2016) .........................17

*Vance v. DirecTV, LLC*,
    No. 5:17-cv-179, 2022 WL 3044653 (N.D. W. Va. Aug. 1, 2022) ....................9, 16

*Vengurlekar v. HSBC Bank*,
    Civ. No. 03-0243, 2007 WL 1498326 (S.D.N.Y. May 22, 2007) .........................17

*Villanueva v. Liberty Acquisitions Servicing, LLC*,
    319 F.R.D. 307 (D. Or. 2017) .........................................................................18

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...................................................................................11, 12

**Statutes**

Ala. Code § 8-9A-1 ..............................................................................................3, 4

Ala. Code. § 8-9A-2 ................................................................................................5

Ala. Code § 8-9A-4 ....................................................................................3, 4, 5, 12

Ala. Code § 8-9A-7 ..................................................................................................4

Ala. Code § 8-9B-1 ................................................................................................3

Ala. Code § 8-9B-2 ................................................................................................4

Ala. Code § 8-9B-3 ................................................................................................5

Ala. Code § 8-9B-5 .............................................................................................3, 5

Ala. Code § 8-9B-8 ................................................................................................4

Pennsylvania Uniform Fraudulent Transfers Act ........................................................17

W. Va. Code § 22-6-19 ....................................................................................7, 10, 13

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1759
    (3d ed.) ......................................................................................................3

**Introduction**

This class action seeks to vindicate the common law property rights of thousands of West Virginia landowners whose surface properties are burdened with Defendant Diversified Energy Company's gas wells.  Diversified is the largest owner of natural gas wells in the United States. It owns more than 20,000 gas wells in West Virginia. Each of those carries with it an obligation to plug and remediate the surface property when the well stops producing, under both West Virginia's common law and its statutory oil and gas laws.

In 2018 and 2020, Diversified acquired approximately 12,000 mostly nonproducing or low-producing wells from Defendant EQT, the largest producer of natural gas in the United States, in exchange for nearly $700 million.  Diversified purchased these wells with full knowledge of its massive obligations to plug them, but with no intention to do so.

Diversified is essentially engaged in a Ponzi scheme—it is burdened with remediation liabilities that greatly exceed its assets, holding billions of dollars' worth of obligations in the form of unplugged gas wells that will remain abandoned long after insiders and investors pull the remaining capital from the company. Diversified maintains the appearance of solvency only by buying additional wells, which provides a short-term influx of cash, and by minimizing its well-plugging liabilities through various deceptive accounting tricks. In their recently-produced expert reports, Plaintiffs' experts have demolished Diversified's brazen falsehoods—some of which were called out by their own independent auditors, whom Diversified promptly shed in favor of new hand-picked auditors—and will testify that Diversified is now insolvent to the tune of $2.9 billion on a book value balance sheet basis, and $6.7 billion using an undiscounted cash-flow test. *See infra* at 6-7.

Diversified's business model is to enrich investors and insiders by squeezing short-term profits from the relatively small number of still-producing wells it acquires, while essentially ignoring the rest, leaving landowners with abandoned Diversified wells holding the bag to clean up Diversified's messes. EQT's role was to dump its own massive liabilities onto a company destined to fail. In essence, this scheme involves a gamble that no one will demand performance of Diversified's full plugging obligations because no one ever has before. This lawsuit is designed to rectify that by holding these defendants accountable and ensuring that sufficient funds are available to pay to plug Diversified's fleet of zombie wells in West Virginia when the time for doing so inevitably arises.

Plaintiffs therefore seek certification of two distinct classes under Rule 23(b)(3), each outlined below. Class certification is warranted because the claims asserted by all class members share myriad common questions of fact and law. Absent class certification, moreover, class members would simply not be able to recover a penny from either Defendant, thereby ensuring that their properties will continue to be burdened by the blight of Diversified's wells. Class certification is therefore the superior method of adjudicating these claims, all of which can be proven without any need for individualized factual determinations as to liability or damages.

### Claims & Proposed Class Definitions

Plaintiffs seek certification of two classes: the Voidable Transfer Class and the Common Law Class. As explained below, each class is appropriate for certification.

### A. Voidable Transfer Class.

The Voidable Transfer Class consists of all persons or entities that owned property on April 2, 2024, in West Virginia on which Diversified[1] owns a well, regardless of whether the

---

[1] Plaintiffs learned by happenstance (rather than through formal discovery or related-party disclosures in Diversified's public filings) that Diversified transferred some of its West Virginia wells to WV Mineral

wells are currently abandoned or non-producing.[2] This class brings claims of actual (Count Three) and constructive (Count Four) fraudulent transfer under the Alabama Fraudulent Transfer Act (Ala. Code § 8-9A-4, "AFTA") and the Alabama Uniform Voidable Transactions Act (*id.* § 8-9B-5, "UVTA").[3] *See* Doc. 322, Third Am. Compl. ¶¶ 501–521.

The point of these claims is to ensure that the $700 million that Diversified paid EQT in 2018 and 2020 to purchase more than 12,000 abandoned and marginally producing EQT wells is made available to fund the plugging of Diversified's West Virginia wells, over 22,000 of which are in West Virginia, when they inevitably cease production. These claims can and must be brought now, within the applicable limitations period, to recover the needed well-plugging funds, given Diversified's insolvency and inability to cover these costs. *See* Ala. Code §§ 8-9A-4, 8-9B-5 (establishing a statute of limitations based on the date of the transfer, not the maturation of the underlying claims).

More specifically, in Counts Three and Four, Plaintiffs seek to "recover judgment for the value of the assets transferred"—that is, the $700 million Diversified paid EQT—from EQT,

---

Group LLC. After further investigation, this Group appears to be a related entity, controlled by a family member of Diversified's CEO and organized by Diversified's general counsel. Plaintiffs are deposing Diversified's corporate representative regarding these transactions, and may request further relief from this Court based on that testimony. As a result, the list of proposed class representatives in Plaintiffs' Motion for Class Certification includes Named Plaintiffs who have wells on their property that were transferred from Diversified to WV Mineral Group LLC during the pendency of this case.

[2] This definition is similar to the one proposed in the Third Amended Complaint (Doc. 322, ¶ 475(a)), but it adds a cut-off date. The Court has broad discretion to define the class differently than was alleged in the complaint. *See, e.g.*, *Charlebois v. Angels Baseball, LP*, 2011 WL 2610122, at *3 (C.D. Cal. June 30, 2011) ("[T]he Court is free to limit the class definition or give Plaintiffs leave to do so."); 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1759 (3d ed.) ("[T]he court may construe the complaint or redefine the class to bring it within the scope of Rule 23 or it may allow plaintiff to amend in order to limit the class.").

[3] Alabama law, which governs under the applicable sale contracts, adopted the Uniform Voidable Transactions Act in 2019, Ala. Code § 8-9B-1; the state enacted the Alabama Fraudulent Transfer Act in 1975, and it remains in effect. Ala. Code § 8-9A-1. For purposes of this motion, differences between the statutes are immaterial.

Third Am. Compl. ¶¶ 512, 521, and "create a fund from the damages awarded from EQT to be used to plug and otherwise decommission Class members' wells in West Virginia[.]" *Id.* at 63, ¶ 7 (Req. for Relief). Under the remedy provisions of both statutes (*see* Ala. Code § 8-9B-8(a)(3)(ii) (UVTA); Ala. Code. § 8-9A-7(B)(3)(b) (AFTA)), a Court-appointed receiver will oversee and administer these well-plugging funds as these wells become abandoned. *See also* Third Am. Compl. at 64, ¶ 9 (Req. for Relief).

Counts Three and Four require Plaintiffs to prove two elements, each of which involves questions common to all class members. *First*, Plaintiffs must establish they are "creditors" of Diversified, meaning that they have a "claim" against Diversified, *i.e.*, a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal equitable, secured or unsecured." Ala. Code §§ 8-9A-1(3) (AFTA), 8-9B-2(4) (UVTA).

This issue has already effectively been decided in Plaintiffs' favor. As the Court has held here, "Plaintiffs' status as 'creditors' depends on the fact that an oil and gas operator drilled a well on their property. That act, which has already occurred, necessarily gives rise to an obligation on the part of the operator or its successor to plug the well, and until the operator or its successor actually plugs the well, the landowner has a contingent and unmatured claim for plugging that qualifies as a 'claim' under the AFTA/[U]VTA." Doc. 204, Mem. Op. Denying Mot. Dism. Sec. Am. Compl. ("Mot. Dism. Op."), at 20. The Court's ruling on this point is consistent with the statute's broad definition of "claim," and with the Fourth Circuit's interpretation of an identical definition of the term "claim" in the bankruptcy code, *Grady v. A. H. Robbins Co.,* 839 F.2d 198, 202–03 (4th Cir. 1988).

*Second*, Plaintiffs must prove either that Diversified engaged in transfers with EQT with specific intent to "hinder, delay, or defraud" its creditors, or that Diversified is insolvent under any of the available solvency tests and failed to receive reasonably equivalent value in its transfers with EQT. Ala. Code §§ 8-9A-4, -5; 8-9B-5, -6. The tests for insolvency include: (1) the "balance sheet" test, where "the sum of the debtor's [here, Diversified's] debts is greater than all of the debtor's assets at a fair valuation," *id.* §§ 8-9A-2; 8-9B-3(a), or (2) the "inability to pay debts test," where "the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer *and* the debtor either (a) was engaged in or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; *or* (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond his or her ability to pay as they became due." *Id.* §§ 8-9A-4(c); 8-9B-5(a)(2).

This second element also involves no individualized factual or legal issues. Its proof will be established largely through competing expert testimony focused not on the particulars of any plaintiff or class member, but on Diversified's financial condition, the accuracy of its reporting of its plugging liabilities, and the reasonableness of its production forecasts for its well inventory.

On this point, Plaintiffs have produced several expert reports demonstrating that Diversified has vastly underestimated its plugging costs, unreasonably delayed the timing of plugging those wells, and generally manipulated the cost to plug its wells—a cost category called asset retirement obligations, or AROs—to artificially inflate the value of the company. To summarize these reports and illustrate how the fraudulent transfer issues will be tried strictly on classwide evidence from Diversified:

- Plaintiffs' expert Luke Plants, the CEO of one of the largest plugging companies in Appalachia, will testify that his 2018 costs to plug Appalachian wells similar to

Diversified's were approximately $███ per well, a figure that rose to $███ in 2020. He estimates that a conservative plugging cost estimate in 2020 and today is $███ per well, ███ times the $25,000 figure Diversified used in its manipulated forecasts.

- Plaintiffs' second expert, Mr. John Morgan, will opine that EQT's own average plugging costs for conventional gas wells in West Virginia approached $███ in 2020—again, ███ of Diversified's false projections.

- A third expert, reservoir engineer Dwayne Purvis, will testify that Diversified ignored industry standards regarding the anticipated time in which its wells will require plugging, and instead deployed a clandestine accounting maneuver that Diversified's own reserve auditors deemed "false" and which Diversified's own financial auditors seemed unaware of in order to reduce its forecasted ARO costs by more ███

And finally, tying all the above together, economic expert Dana Messina used the above information to evaluate Diversified's financial health and the value of its transactions with EQT. *See generally* Messina Rep. (attached under seal as **Exhibit A**). Mr. Messina will testify: (1) under a "book value balance sheet" test, Diversified's liabilities exceeded its assets by $1.8 billion in 2018, $4 billion in 2020, and $2.9 billion at the end of 2023, *id.* at 5; (2) using an undiscounted cash-flow test, Diversified was cash deficient by $6.6 billion in 2018, $5.6 billion in 2020, and $6.7 billion today, *id.* at 6; (3) the amount Diversified paid for EQT's wells was more than $400 million above fair market value in 2018, and $80 million above fair market value in 2020; and (4) Diversified's well-plugging obligations regarding its West Virginia wells are approximately $3.3 billion on an undiscounted basis, and $1.3 billion on a discounted basis, *id.* at 75–76.

### B. Common Law Class.

The proposed Common Law Class consists of all persons or entities who owned land in West Virginia as of April 2, 2024, containing at least one well that (1) is not producing and/or has not produced oil or gas for twelve consecutive months, (2) is currently owned or operated by

Diversified,[4] and (3) has not been plugged or properly decommissioned.[5] This putative class asserts claims against Diversified only, for trespass (Count One) and negligence (Count Two).

These claims, which center on Diversified's continued occupation of Plaintiffs' and class members' properties through unplugged, nonproducing, and abandoned wells, are also well suited for class-wide adjudication.  As a lessee of the minerals beneath these properties, Diversified has an implied easement for surface rights, but only to the extent "reasonably necessary for the extraction of the mineral[s], . . . without any substantial burden to the surface owner." Doc. 204, Mot. Dism. Op., at 9 (quoting Syl. Pt. 3, *Buffalo Mining Co. v. Martin,* 267 S.E.2d 721 (W. Va. 1980); Syl. Pt. 1, *Andrews v. Antero Res. Corp.,* 828 S.E.2d 858 (W. Va. 2019)). But this implied easement is not of indefinite duration; as this Court put it, "the standard of reasonability applicable to plaintiffs' common law actions" is one year, "not 400 years."  Doc. 204, Mot. Dism. Op., at 13; *see also* W. Va. Code § 22-6-19 (wells that have not produced for twelve consecutive months "shall be presumed to have been abandoned and shall promptly be plugged by the operator."). Plaintiffs accordingly assert that any well on a class member's property that has not produced for over one year is abandoned and must be plugged.

As this Court has already ruled, proof of the trespass claim merely requires a showing that Diversified owns unplugged and abandoned wells on class members' properties, and that its occupation of their land is not reasonable and necessary to extract minerals. Doc. 204, Mot. Dism. Op., at 9. These elements can easily be proven through DEP records that list all Diversified wells that have not produced within twelve months. *See* W. Va. Code § 22-6-19

---

[4] *See supra* n.1.

[5] This definition is similar to the one proposed in the Third Amended Complaint (Doc. 322, ¶ 475(b)), but it adds a cut-off date. *See supra* n.2. Proposed class representatives are listed in Plaintiffs' Motion for Class Certification.

(wells that have not produced for twelve consecutive months "shall be presumed to have been abandoned and shall promptly be plugged by the operator."). The negligence claim, which alleges a breach of the duty established by this Code provision, will require substantially the same proof and thus is well-suited for class-wide litigation.  Doc. 204, Mot. Dism. Op., at 16–17.

## Argument

### A.  All class certification requirements are met with respect to both classes.

To obtain class certification, the proponent must establish each requirement of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Hopper v. Jay-Bee Oil & Gas, Inc.*, No. 5:20-cv-101, 2023 WL 3695608, at *1 (N.D. W. Va. Apr. 4, 2023) (Bailey, J.). A proposed class must further fall into one of the three categories enumerated in Rule 23(b).  Here, Plaintiffs seek certification under Rule 23(b)(3), which imposes the additional criteria of (1) predominance of common questions over individualized questions, and (2) the superiority of the class action device as a means of resolving the dispute. *See Southern Country Farms, Inc. v. THQ Appalachia I, LLC*, No. 5:21-cv-84, 2023 WL 2824907, at *4 (N.D. W. Va. Mar. 13, 2023) (Bailey, J.). The class is also obliged to meet Rule 23's "implicit threshold requirement" of "ascertainability," which requires that class members be "readily identifiable . . . in reference to objective criteria." *Id.* (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014)).

In seeking class certification, the plaintiff bears the burden of establishing that the requirements for class-wide adjudication are met. *See Adair*, 764 F.3d at 358. Yet in undertaking the certification analysis, a court should not "engage in free-ranging merits inquiries," instead "consider[ing] merits questions only to the extent that they are relevant to determining whether the Rule 23 prerequisites . . . are satisfied." *Id.* at 357–58. Ultimately, the court enjoys "broad

discretion in deciding whether to certify a class," and class certification orders are reviewed only for abuse of discretion. *Hopper*, 2023 WL 3695608, at *1.

> **1.  The proposed class is ascertainable, as it is objectively defined and readily identifiable.**

Rule 23's "threshold" ascertainability standard requires that it be "administratively feasible" for the Court to "readily identify the class members in reference to objective criteria." *Adair*, 764 F.3d at 358. Plaintiffs are *not* required to "be able to identify every class member at the time of certification." *Southern Country Farms*. 2023 WL 2824907, at *5.  Instead, Plaintiffs are merely obliged to define the class in a way that will ensure the Court's ability "to determine whether a particular individual is a member *at some point*," *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 658 (4th Cir. 2019) (emphasis added); *see also Vance v. DirecTV, LLC*, No. 5:17-cv-179, 2022 WL 3044653, at *4 (N.D. W. Va. Aug. 1, 2022) (Bailey, J.) (same). A proposed class is ascertainable when, for instance, "the defendant's own records [can] be used" to objectively identify individual class members. *Id.* Ascertainability will only pose a hurdle when class members prove "impossible to identify without extensive and individualized fact-finding or mini-trials." *Southern Country Farms*, 2023 WL 2824907, at *5.

The ascertainability requirement is readily met here. The attached expert report of Matthew Hodge lists the putative class members and the API numbers of their wells. Rep. of M. Hodge, June 19, 2024, **Exhibit B**. To develop this list, Mr. Hodge relied on three data sources: Diversified's most recent (2023) well production data as reported to the West Virginia Department of Environmental Protection (WV DEP); 2024 well location data from West Virginia Geologic and Economic Survey; and 2024 surface tax parcel maps from the West Virginia Geographic Information Systems Technical Center (WVGISTC). The resulting list identifies 9,810 Voidable Transfer Class members (who cumulatively own property with 22,623

Diversified wells) by name and address, and may be used to disseminate class notice in a manner that "provide[s] 'minimal procedural due process protection'" so as to bind absent class members to any judgment. *McAdams v. Robinson*, 26 F.4th 149, 157 (4th Cir. 2022) (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12 (1985)). Similarly, the results show 1,737 Common Law Class members, who cumulatively own property with 2,584 wells that did not produce in 2023.  Based on this data, an objective test for identifying class members poses no challenge here.[6]

Should the Court grant this motion, Plaintiffs will propose a detailed notice plan (including mailed and published notice) and proposed form of notice within ten days of the Court's entry of the certification order. *See, e.g.*, *Fager v. CenturyLink Commc'ns, LLC*, 854 F.3d 1167 (10th Cir. 2016) (approving notice based on similar information and methods).

    **2.   All Rule 23(a) requirements are met.**

        **a.   Rule 23(a)(1): 9,810 Voidable Transfer Class members and 1,737 Common Law Class members satisfy numerosity requirements.**

Numerosity requires that a class be of sufficient size that individual joinder of all its members is "impracticable." Fed. R. Civ. P. 23(a)(1). The practicability of joinder can turn on factors including the size of the class, the class's geographic dispersion, the ease of identifying

---

[6] Defendants will likely argue that review of individual deed and lease language is necessary to identify class members. Specifically, Defendants may try to defeat class certification by arguing that some class members' deeds or leases might allow a well to remain unplugged after twelve months of no production—and that any such person would need to be excluded from the class.  However (and this presents a question of law common to all Common Law Class members), any deed or lease provision with this type of language would be void as contravening the public policy embodied by West Virginia Code § 22-6-19, which requires a well to be plugged "promptly" after twelve consecutive months of non-production.  It is black letter law in West Virginia that "[w]hen a statute imposes a standard of conduct, a clause in an agreement purporting to exempt a party from tort liability to a member of the protected class for the failure to conform to that statutory standard is unenforceable." Syl. Pt. 1, *Murphy v. N. Am. River Runners,* 412 S.E.2d 504 (W. Va. 1991); *see also Poling v. Bd. of Ed. of Phillipi Ind. Dist.*, 49 S.E. 148, 148–50 (W. Va. 1904) ("[N]either a court of equity nor law will enforce a contract in violation of laws enacted for the public good." (internal citations omitted)).

its numbers, and the impacts on judicial economy in the event of requiring individual suits. *See Alig v. Quicken Loans, Inc.*, No. 5:12-cv-114, 2016 WL 10489897, at *16 (N.D. W. Va. June 2, 2016) (Bailey, J.).

While there is "no bright line test for determining numerosity" and "the determination rests on the court's practical judgment in light of the particular facts of the case . . . the Fourth Circuit has recognized that where the class numbers twenty-five or more, joinder is usually impracticable." *Southern Country Farms*, 2023 WL 2824907, at *6 (citing *Kay Co., LLC v. EQT Prod. Co.*, No. 1:13-cv-151, 2017 WL 10436074, at *8, 10 (N.D. W. Va. Mar. 13, 2023) (Bailey, J.)).

This case involves thousands of wells, and Plaintiffs' expert has identified 9,810 landowners with Diversified wells on their properties and 1,737 landowners with abandoned Diversified wells on their properties. Joining all landowners individually is impracticable. This unquestionably satisfies numerosity.

## b. Rule 23(a)(2): Dispositive questions uniformly and commonly apply to all class members.

Rule 23(a)(2) next requires that there be a "common question of fact or law among the members of the class." Fed. R. Civ. P. 23(a)(2). While both common questions of law and common questions of fact exist as to this class, both need not be shown to satisfy the rule. *See Hopper*, 2023 WL 3695608, at *4 ("Demonstrating class commonality is a low hurdle . . . [c]ommonality requires only a single issue common to the class."). To meet the commonality requirement, the representative plaintiffs must demonstrate that the proposed class members "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). In other words, commonality requires that the claims of the class "depend upon a common contention . . . of such a nature that

it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

As explained above, the common questions here are quite straightforward. For the **Voidable Transfer Class**, they include:

(1) Whether Plaintiffs and class members are "creditors" under the broad provisions of the applicable statutes, *see supra* at 5;

(2) Whether Diversified transferred money with the specific intent to "hinder, delay, or defraud any creditor of the debtor," Ala Code §§ 8-9A-4; 8-9B-5;

(3) Whether Diversified is insolvent under the "balance sheet" test, where the sum of its debts was greater than its assets, *see supra* at 6-7;

(4) Whether Diversified is insolvent under the "inability to pay debts test"—that is, where it paid the $700 million to EQT without receiving a reasonably equivalent value in exchange for the transfer, *see supra* at 6-7;

(5) Whether, under the "inability to pay debts" test, (a) Diversified was engaged in or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; *or* (b) Diversified intended to incur, or believed or reasonably should have believed, that it would incur debts beyond its ability to pay as they became due, *see supra* at 6-7;

(6) What is the appropriate plugging cost, well life, and discount rate to use in Diversified's ARO liability calculation;

(7) Whether Plaintiffs and the class are entitled to damages, including the cost to plug all West Virginia wells; and

(8) Whether the 2018 and 2020 Transfers need to be avoided to satisfy Plaintiffs' claims.

For the **Common Law Class**, common questions include:

(1)  Whether failing to plug a well that has not produced for twelve months is a trespass;

(2)  Whether any provisions in deeds or leases purporting to exempt Diversified from the requirements of West Virginia Code § 22-6-19 are unenforceable for contravening public policy;

(3)  Whether failing to plug a well that has not produced for twelve months is negligence per se; and

(4)  The amount of damages owed to the class for Diversified's failure to plug these wells.

These common questions suffice to meet the "low hurdle" of the commonality requirement.  *Hopper,* 2023 WL 3695608, *4 (citing *Williams v. Mohawk Indus., Inc.,* 568 F.3d 1350, 1356 (11th Cir. 2009)).

>          **c.   Rule 23(a)(3): Typicality is satisfied because the class representatives include persons and entities with abandoned and active wells, characteristics shared by class members.**

As with commonality, the requirement for establishing typicality is "not meant to be an onerous one." *Hopper*, 2023 WL 3695608, at *5. Typicality requires class representatives to "be part of the class and possess the same interest and suffer the same injury as the class members." *Kay Co.*, 2017 WL 10436074, at *6 (quoting *Falcon*, 457 U.S. at 156).

A "sufficient nexus" is established for typicality purposes "if the claims or defenses of the class and class representatives arise from the same event or pattern or practice and are based on the same legal theor[ies]." *Reed v. Alecto Healthcare Servs., LLC*, No. 5:19-cv-263, 2022 WL 4115858, at *5 (N.D. W. Va. July 27, 2022) (Bailey, J.). In other words, the "essence" of typicality is "captured by the notion that as goes the claim of the named plaintiff, so go the claims of the class"—though "[t]hat is not to say that typicality requires that the plaintiff's claim and the claims of the class be perfectly identical or perfectly aligned." *Deiter v. Microsoft Corp.*,

436 F.3d 461, 466-67 (4th Cir. 2006). Ultimately, typicality "tend[s] to merge" with the commonality and adequacy inquiries, as each "serv[e] as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Reed*, 2022 WL 4115858, at *3, 5 (quoting *Falcon*, 457 U.S. at 157 n.13).

Here, consistent with the class definition, the proposed Voidable Transfer Class is comprised of both class representatives who own properties with abandoned/non-producing wells and those who own properties with currently producing wells. All members in the Voidable Transfer Class have claims that Diversified and EQT engaged in a fraudulent transfer in 2018 and a voidable transfer in 2020 by transferring away hundreds of millions of dollars that could have been used to plug Plaintiffs' wells.

Similarly, the proposed class representatives for the Common Law Class all have Diversified or WV Mineral Group LLC wells that have no reported production for at least twelve months. All members of the Common Law Class have claims that Diversified is committing a trespass and negligence per se by leaving these wells unplugged on their property after twelve months of no production.

All claims are common between these class members and the proposed representatives, thus satisfying typicality.

### d. Rule 23(a)(4): The named plaintiffs and their counsel are adequate to represent the proposed class.

Rule 23(a)'s final requirement, that class representatives "fairly and adequately protect the interests of the class," is met with respect to both the named Plaintiffs and their counsel. Fed. R. Civ. P. 23(a)(4). The "adequacy" standard requires a two-part showing: (1) the named plaintiffs must not possess interests "antagonistic to those of the class," and (2) plaintiffs'

counsel "must be qualified, experienced and generally able to conduct the litigation." *Hopper*, 2023 WL 3695608, at *6 (citation omitted).

As to the class representatives, when the commonality and typicality criteria of Rule 23(a)(2)-(3) are met, the interests of class members will ordinarily be adequately protected by the class representatives in their absence. *See Falcon*, 457 U.S. at 157 n.13. A class representative will be deemed inadequate only in the event of a true conflict of interest with the class, which "must be more than merely speculative or hypothetical." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) (quoting 5 *Moore's Federal Practice* § 23.25.[4][b][ii] (2002)). Regarding class counsel, courts presume that counsel is competent and sufficiently experienced absent proof to the contrary. *Reed*, 2022 WL 4115858, at *6.

Attached as **Exhibits C** and **D** are declarations from representatives of Bailey & Glasser, LLP and Appalachian Mountain Advocates outlining their qualifications to serve as class counsel here. Bailey & Glasser brings its experience litigating class actions, complex financial cases, and natural resource matters, while Appalachian Mountain Advocates provides a deep bench of experience in major natural resource and other complex litigation matters. The combined resources and personnel of these firms will serve the class well, and have done so to date, as each firm has incurred enormous costs to pursue these claims against two separate litigation teams from one of the largest law firms in the world.

### 3. All Rule 23(b)(3) requirements are met, because common issues predominate and a class action is the superior method of adjudicating this matter.

#### a. Common issues predominate.

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Southern Country Farms*, 2023 WL 2824907, at *8 (citation omitted). Questions of law or fact that are common to the class will predominate if

class-wide resolution of those issues "will significantly advance the adjudication of the merits of all class members' claims." *Kay Co.*, 2017 WL 10436074, at *10.

The predominance analysis is qualitative, not quantitative, such that common issues may predominate even when some individualized inquiry is required. *See Vance*, 2022 WL 3044653, at *8; *see also Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 296 (S.D. W. Va. 2015) ("A principle often forgotten is that the balancing test of common and individual issues is qualitative, not quantitative. Common liability issues may still predominate even when individualized inquiry is required in other areas." (citation omitted)). Common issues predominate so long as any individualized determinations "can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim." *Hopper*, 2023 WL 3695608, at *7 (quoting William B. Rubenstein, *Newberg on Class Actions* § 4:50 (5th ed.)).

With respect to the Voidable Transfer Class, the liability questions focus not on individualized questions regarding the class representatives, but rather on questions regarding Diversified's financial condition at the time of the transactions. And with respect to the Common Law Class, the predominant questions applicable to the entire class are whether the "twelve-months with no production" rule supplies the relevant standard for determining Diversified's plugging obligation; whether the class wells are in fact "abandoned" under that standard, as the WVDEP OOG itself has determined; whether Diversified has committed a trespass against the class or behaved in a matter that constitutes negligence per se by leaving abandoned wells on class members' property after twelve months of no production; and whether  damages calculated as the average cost of plugging the wells should be awarded to the class. To prove damages, Plaintiffs intend to use the average cost to plug a well in Appalachia, rather than a well-by-well

cost—precisely the same methodology both Diversified and EQT use in calculating and disclosing its own plugging obligations each year.

Courts regularly certify classes pursuing fraudulent transfer claims like those asserted here by the Voidable Transfer Class, concluding that the many common legal and factual issues posed by such claims tilt heavily in favor of class-wide adjudication. As one court cogently put it, "[t]he fraudulent transfer claim raises more common questions of fact and law, including but not necessarily limited to: (i) whether [defendant] transferred property and incurred an obligation to [its co-defendant] with the intent to hinder, delay, or defraud one or more of its creditors; and (ii) whether Plaintiffs suffered harm as a result of alleged fraudulent transfers of assets between [defendant] and [the co-defendant]." *Cork v. CC-Palo Alto, Inc.*, No. 5:14-cv-00750, 2021 WL 3373582, at *3-7 (N.D. Cal. Aug. 3, 2021).

Other decisions are in accord. *See, e.g.*, *Carroll v. Stettler*, Civ. No. 10-2262, 2011 WL 5008349, at *2-4 (E.D. Pa. Oct. 19, 2011) ("The Court finds that the elements of [the Pennsylvania Uniform Fraudulent Transfers Act] can be proven by evidence common to all in the class."); *Takiguchi v. MRI Int'l, Inc.*, No. 2:13-cv-01183, 2016 WL 1091090, at *11 (D. Nev. Mar. 21, 2016) (concluding claim of constructive fraudulent transfer under Nevada law appropriate for class certification because no individualized issues predominated); *Vengurlekar v. HSBC Bank*, Civ. No. 03-0243, 2007 WL 1498326, at *4–8 (S.D.N.Y. May 22, 2007) (certifying fraudulent transfer class because "Plaintiffs have met their burden of demonstrating the requisite commonality and typicality of their claims," with "common issues includ[ing] whether Defendants' transfers of funds . . . were fraudulent in relation to [a third party's] pre-existing obligations"); *see also In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1254 (10th Cir. 2004) (certification of defendant class facing fraudulent transfer claim); *Bell v. Disner*, No. 3:14-

17

cv-91, 2015 WL 540552, at *3, 6 (W.D.N.C. Feb. 10, 2015), *aff'd sub nom. Bell v. Brockett*, 922 F.3d 502 (4th Cir. 2019) (same).

As another court stated, "Every class member's fraudulent transfer claim will be adjudicated under the law of one jurisdiction . . . [,] the conduct at issue is the same for all class members . . . [and] common proof will be used to determine Defendants' liability." *Villanueva v. Liberty Acquisitions Servicing, LLC*, 319 F.R.D. 307, 325-26, 334 (D. Or. 2017).   That's all true here.

For the Common Law Class, the legal issue of whether Diversified's wells that have not produced for twelve months must be plugged under theories of trespass or negligence will be dispositive on the claims of 1,737 well owners. If Plaintiffs prevail on that theory, and ultimately can prove damages based on the average cost to plug a well (the same method Diversified itself uses to calculate its corporate-wide asset retirement obligations), few individual questions of law or fact will remain.

Thus, common questions predominate here.

### b. The class action mechanism is the superior method of resolving plaintiffs' claims.

Rule 23(b)(3)'s superiority requirement is also met. The four factors listed in Rule 23(b)(3)—class members' interests in individually "controlling the prosecution" of separate actions, the existence of other related litigation, the desirability of concentrating the litigation in the present forum, and any difficulties in managing the class action—"are simply a guideline to help the court determine the benefit of the proposed class action." *Reed*, 2022 WL 4115858, at *7 (citation omitted). A class action will provide the superior mode of adjudication when it "achieve[s] economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated." *Southern Country Farms*, 2023 WL 2824907, at *10 (quoting

*Amchem Prods.*, 521 U.S. at 615). And the efficiencies of a class action are especially pronounced where, as here, the class is large—"[t]he need to avoid duplicative litigation can be significant even when the class is relatively small in number, but it is when there are many potential claimants that class action bring the greatest efficiencies." *Id.*

These standards are all satisfied.  Most importantly, if this class action is not permitted to proceed, the alternative result is likely a lack of any relief for class members because the costs of individual litigation—which would require extensive and expensive expert testimony outlined above—would far exceed the amount of any individual recovery.

 This alone shows the superiority of class certification as a means of resolving these claims.  As the Supreme Court observed in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 616 (1997), "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights" (internal quotation marks and citation omitted).  Likewise, in *Krakauer*, 925 F.3d at 656, the Fourth Circuit observed that "[s]ince few individuals would have an incentive to bring suit, no matter how frustrated they were with the intrusion on their [rights], [class actions provide] a model that allows for resolution of issues without extensive individual complications."

These observations apply with full force here.  Absent a class action, a case of this magnitude and importance could never be brought, and West Virginia property owners would be left with no recourse at all from these Defendants.

### Conclusion

So that the critical property-rights claims of thousands of West Virginia property owners may be vindicated, and in accordance with all requirements of Fed. R. Civ. P. 23(b)(3), Plaintiffs

respectfully request the Court (1) certify the proposed classes as defined *supra* at 3-8; (2) appoint the undersigned counsel as class counsel; (3) appoint those persons identified in Plaintiffs' Motion for Class Certification as representatives of the Common Law Class; (4) appoint those persons identified in Plaintiffs' Motion for Class Certification as representatives of the Voidable Transfer Class; and (5) direct Plaintiffs to submit a proposed notice plan within ten days of the entry of a class certification order.

Dated: June 21, 2024                                   Respectfully submitted,

*/s/ John W. Barrett*
Brian A. Glasser, Esq. (WVSB No. 6597)
John W. Barrett, Esq. (WVSB No. 7289)
Brian R. Swiger, Esq. (WVSB No. 5872)
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555 (phone)
(304) 342-1110 (fax)
bglasser@baileyglasser.com
jbarrett@baileyglasser.com
bswiger@baileyglasser.com

Joseph M. Lovett (WVSB No. 6926)
J. Michael Becher (WVSB No. 10588)
Benjamin A. Luckett (WVSB No. 11463)
Amanda Demmerle (WVSB No. 13930)
APPALACHIAN MOUNTAIN
ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006
ademmerle@appalmad.org
mbecher@appalmad.org
jlovett@appalmad.org
bluckett@appalmad.org

*Attorneys for Plaintiffs and Proposed Class*