**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

MARK MCEVOY, *et al.*,

                Plaintiffs,

v.

DIVERSIFIED ENERGY COMPANY PLC, *et al.*,

                Defendants.

Civil Action No. 5:22-cv-00171-JPB
Judge John P. Bailey

**EQT'S MEMORANDUM IN SUPPORT OF
MOTION TO ABSTAIN**

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT ON RIPENESS OF THIS MOTION**................................... 1

**SUMMARY OF MERITS ARGUMENT** ........................................................ 3

**LEGAL STANDARD** ................................................................... 5

**ARGUMENT** ......................................................................... 6

**I.**     **The plaintiffs seek equitable or otherwise discretionary relief, requiring abstention under Burford**........................................................ **6**

**II.**    **Comity to West Virginia requires the Court to abstain under any formulation of the Burford doctrine.** ..................................... **9**

      A.    West Virginia's objection to the creation of a federal trust fund administered by a federal receiver weighs overwhelmingly in favor of abstention. ........................................................... 9

      B.    That this is a state law land use case with no federal issues effectively requires the Court to abstain. .................................... 13

**III.**   **All relevant factors weigh strongly in favor abstention.** ........................... **16**

      A.    The absence of federal claims favors abstention. ................................. 16

      B.    The case here involves unsettled state law or detailed local facts. ...................... 16

      C.    West Virginia has critical interests in this litigation........................... 17

      D.    West Virginia has a need for a coherent policy related to securing liabilities for producing wells and overseeing well plugging. ............................. 18

      E.    The existence of a special forum, the WVDEP, weighs in favor of abstention. .......................................................... 20

**CONCLUSION** ................................................................. **20**

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Browning-Ferris, Inc. v. Baltimore Cnty., Md.*,
  774 F.2d 77 (4th Cir. 1985) ...........................................................................14

*Burford v. Sun Oil*,
  319 U.S. 315 (1943)................................................................................. *passim*

*Burgess v. Corp. of Shepherdstown*,
  2012 WL 664495 (N.D.W. Va. Feb. 28, 2012) (Bailey, J.).......................5, 9, 13, 14

*Elec. Reliability Council of Tex., Inc. v. Just Energy Tex., L.P.*,
  57 F.4th 241 (5th Cir. 2023) ...........................................................16, 17, 18, 19

*EQT Prod. Co. v. Wender*,
  870 F.3d 322 (4th Cir. 2017) ..........................................................................13

*Fessler v. Int'l Bus. Machines Corp.*,
  959 F.3d 146 (4th Cir. 2020) ..........................................................................16

*Gray v. Bush*,
  628 F.3d 779 (6th Cir. 2010) ............................................................................7

*Guar. Tr. Co. v. York*,
  326 U.S. 99 (1945)...................................................................................15, 16

*Johnson v. City of Chesapeake, Virginia*,
  205 F.3d 1333 (4th Cir. 2000) ..........................................................................9

*Johnson v. Collins Entm't. Co.*,
  199 F.3d 710 (4th Cir. 1999) ...........................................................6, 10, 11, 13

*Kirgan v. Mfrs. & Traders Tr. Co.*,
  810 F. App'x 187 (4th Cir. 2020) .....................................................................15

*MLC Auto., LLC v. Town of S. Pines*,
  532 F.3d 269 (4th Cir. 2008) ........................................................................5, 6

*Pomponio v. Fauquier Cnty. Bd. of Supervisors*,
  21 F.3d 1319 (4th Cir.) (en banc), *cert. denied*, 513 U.S. 870 (1994),
  *overruled on other grounds*, 517 U.S. 706 (1996)................................................13

*U.S. ex rel. Rahman v. Oncology Assocs., P.C.*,
  198 F.3d 489 (4th Cir. 1999) .....................................................................6, 7, 8

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Volvo Trucks N. Am., Inc. v. Crescent Ford Truck Sales, Inc.,*
  2003 WL 1936356 (E.D. La. Apr. 22, 2003) ................................................................16

*Washington Gas Light Co. v. Prince George's Cnty. Council,*
  711 F.3d 412 (4th Cir. 2013) ........................................................................................6

**Statutes**

28 U.S.C. § 2201 ..............................................................................................................8

Ala. Code § 8-9A-7(a)(1) ................................................................................................8

Ala. Code § 8-9A-8(b) .....................................................................................................8

Ala. Code § 8-9A-8(c) ......................................................................................................8

UVTA ...............................................................................................................................3

W. Va. Code R. § 35-4-10.5.c .........................................................................................12

W. Va. Code R. § 35-4-18 ...............................................................................................12

W. Va. Code R. § 35-6-4 .................................................................................................12

W. Va. Code § 22-6-6 ......................................................................................................12

W. Va. Code § 22-6-26(d) ...............................................................................................12

W. Va. Code § 22-6-26(h) ...............................................................................................12

W. Va. Code § 22-10-2 ....................................................................................................12

W. Va. Code § 22-10-4 ....................................................................................................12

W. Va. Code § 22-10-5 ....................................................................................................12

## PRELIMINARY STATEMENT ON RIPENESS OF THIS MOTION

This Court should abstain from granting the sole remedy sought by the Voidable Transfer Class against EQT, an issue the Court previously left open under *Burford v. Sun Oil*, 319 U.S. 315 (1943). In response to the defendants' prior motion to dismiss (ECF 338), the plaintiffs conceded that their "request to establish a well plugging fund overseen by a special receiver could potentially implicate the [*Burford*] doctrine," but dodged the issue by asserting that they also sought "common law tort damages" from EQT to which *Burford* does not apply. ECF 351 at 1 n.1. The plaintiffs went so far as to represent to the Court in other briefing that "the *only* relief that Plaintiffs request is money damages." ECF 295 at 26 (emphasis added). With the plaintiffs' representing that they sought "common law tort damages" from EQT, the Court deferred on the motion to abstain "*without* prejudice" because, at the pleading stage, "it is premature for this Court to dismiss a request made by plaintiffs in their 'Request for Relief.'" ECF 362 at 8 (emphasis added).

The situation has materially changed since the Court first considered whether to abstain from granting equitable relief. Three important developments warrant considering the issue now and granting this motion to abstain. ***First***, the plaintiffs have now conceded that they are not seeking any "common law tort damages" from EQT. ECF 617 at 7–8. Only the proposed Voidable Transfer Class brings claims against EQT. None are based on common law, and by extension, no common law damages are sought. In the motion to certify, the proposed Voidable Transfer Class seeks one class-wide remedy from EQT: an order forcing EQT to create a $700 million federal trust fund, administered by a federal receiver, to secure a different operator's plugging obligations for 20,000+ producing wells in West Virginia. ECF 617 at 8. The "Court-appointed receiver will oversee and administer these well-plugging funds as these wells become abandoned." *Id.* at 9. Because this relief is equitable, the Voidable Transfer Class now seeks no class-wide remedies that can avoid *Burford*. As such, the *Burford* issue is now ripe.

1

***Second***, West Virginia has now set forth its position that establishing a federal trust fund to oversee plugging, as requested by the Voidable Transfer Class, would create friction with state policies. That is the ultimate question underlying *Burford* abstention, and when the Court previously considered whether it "should dismiss plaintiffs' claims for equitable relief under *Burford* because such relief would disrupt West Virginia's comprehensive plugging, bonding, and decommissioning policies," ECF 362 at 7, the state had not yet weighed in. But West Virginia has now filed ***four*** briefs maintaining that the case should be dismissed and expressly objecting to the federal trust proposed by the Voidable Transfer Class because (1) it would "impermissibly create an alternative bonding scheme outside of the bonding system created by the West Virginia Legislature and which WVDEP OOG supervises," by requiring EQT to post the equivalent of a $700-million bond to secure future plugging obligations, and (2) "*de facto* force the unwinding of well transfers the State has approved," by shifting the obligation to fund future plugging of Diversified's producing wells back onto EQT. Ex. 1 at 7 (WVDEP Amicus). "Consideration of the merits of these issues in the WVDEP OOG's absence does irreparable harm to the agency's ability to effectively discharge its statutory duties." *Id.* As WVDEP put it: "Because the WVDEP OOG already determined the type of bond . . . for plugging wells, the risk of inconsistent obligations is imminent." ECF 647-2 at 10.

With WVDEP confirming that "this case is interfering with WVDEP OOG's interests and is contrary to WVDEP OOG's administrative powers," ECF 647 at 2–3, it is indisputable that adjudicating whether to grant the Voidable Transfer Class's equitable relief creates friction with West Virginia's policies—requiring abstention. *Id.* ("Plaintiffs' claims interfere with matters committed to the WVDEP OOG's discretion."). "[A]ny other result harms the WVDEP OOG's sovereign immunity." ECF 647-2 at 3. With friction now crystal clear, abstention is now ripe.

*Third*, the plaintiffs' opposition to the prior motion for abstention consisted only of a defense of their common law claims and remedies. *E.g.*, ECF 351 at 7 ("Defendants' invocation of the oil and gas program's bonding requirements does not change those facts, particularly because, as noted above, the oil and gas laws preserve Plaintiffs' ***common law claims***.") (emphasis added) (internal citation omitted). But the Common Law Class has been stricken, and in any event, the plaintiffs' motion for class certification confirms that the Voidable Transfer Class does not assert any common law claims or seek any common law remedies against EQT. ECF 617 at 7–8, 12 ("This putative class asserts claims against Diversified only."). The Voidable Transfer Class only asserts equitable claims under UFTA and UVTA ("the Voidable Transfer Statutes"). The common law does not serve as the basis for the remedies sought by the Voidable Transfer Class. The Voidable Transfer Class instead seeks equitable relief that a federal court cannot award.

The abstention issue is thus ripe, and the Court should now grant EQT's Motion.

## SUMMARY OF MERITS ARGUMENT

This motion concerns the relief that the plaintiffs seek for Diversified's wells that are currently *producing*, *which make up more than 90% of the wells in the Voidable Transfer Class*. The Voidable Transfer Class does not argue these producing wells are abandoned or that these producing wells should have already been plugged. The Voidable Transfer Class has not asserted these producing wells give rise to claims for trespass, negligence, nuisance, or any other common law claims for infringement of property rights. The Voidable Transfer Class does not argue that the leases allowing these wells to continue to produce are invalid or have been breached (nor could they). The Voidable Transfer Class does not claim that the producing wells have caused them any monetary losses, or assert that today's surface owner can be paid now to plug wells that will be producing and paying royalties to the mineral owners for years to come.

3

The proposed Voidable Transfer Class instead claims that, at an unknown time many years off, WVDEP may not enforce plugging obligations for wells that are now producing. ECF 617 at 7. The plaintiffs want the Court to create a federal trust fund to "ensur[e] that sufficient funds are available to pay to plug Diversified's fleet of [still-producing] wells in West Virginia when the time to do so inevitably arises." *Id.* Unable to seek common law damages, the proposed class only seeks equitable relief: a court-order creating a $700 million federal trust fund to plug wells "when they inevitably cease production." *Id.* at 8–9. For ***decades***, "a Court-appointed receiver will oversee and administer these well-plugging funds as these wells become abandoned." *Id.*

As West Virginia has said, Ex. 1 at 7, the Court cannot award this relief without creating friction with West Virginia policy. ECF 661 at 10 ("Plaintiffs' requested relief" would "inevitably usurp[] the authority of WVDEP OOG and interfere[] with its regulatory actions under the statute at issue"); ECF 647 at 5 ("WVDEP OOG has an interest in . . .  the transfer or assignment of plugging obligations (all of which is committed to the WVDEP OOG's sole discretion"). West Virginia already has a comprehensive scheme calibrated to address the exact issue that the Voidable Transfer Class seeks to remedy: enforcing future plugging obligations for now-producing wells. Ex. 1 at 7. That comprehensive scheme includes mechanisms to, in the plaintiffs' parlance, "ensur[e] that sufficient funds are available to pay to plug Diversified's fleet of [producing] wells in West Virginia when the time to do so inevitably arises," ECF 617 at 7, including the requirement that the state-approved operator provide security approved by WVDEP. And WVDEP has sole discretion to "oversee and administer" plugging wells if and when they "become abandoned," and require a bond if one is needed to cover any of the subject wells. *Id.* at 9.

Plaintiffs' requested equitable relief would disrupt West Virginia's regulatory scheme for producing wells and diminish WVDEP's authority. ECF 661 at 9 ("Plaintiffs . . . ask the Court to

create an alternate version of the WVDEP OOG and to place this parallel agency and its de facto bonding framework outside the scope of WVDEP OOG's control or review."). This result, in the words of West Virginia, would cause "irreparable harm to the agency's ability to effectively discharge its statutory duties." Ex. 1 at 7. Worse yet, this requested relief "would interfere with WVDEP OOG's oversight of the regulatory scheme governing bonding by operators for the plugging of wells in West Virginia." ECF 661 at 9–10. Balancing the competing interests of different stakeholders, WVDEP already found that a $3 million bond from Diversified appropriate to secure plugging obligations for Diversified's producing wells, in a process overseen by WVDEP. Ex. 2 (WVDEP Consent Order 2018-22) at 5. WVDEP's plan is working—Diversified has restarted (or plugged) numerous wells. But the Voidable Transfer Class would create and impose brand new federal standards that require a non-operator (EQT) to create a $700-million federal trust fund for thousands of wells it never owned. And, despite WVDEP having the only say to "oversee and administer" the well-plugging process, the Voidable Transfer Class wants a federal receiver to adjudicate when wells "become abandoned" and must be plugged. In a diversity case like this, a federal court should heed the state's position that equitable relief would disrupt the state's policies and comprehensive administrative systems. The Court should abstain.

## LEGAL STANDARD

"There is no specific formula for applying *Burford* abstention; despite the doctrine's many different forks and prongs, its central idea has always been one of simple comity." *Burgess v. Corp. of Shepherdstown*, 2012 WL 664495, at *3 (N.D.W. Va. Feb. 28, 2012) (Bailey, J.) (cleaned up) (citing *MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 280 (4th Cir. 2008)). Thus, "abstention's 'importance in our system of dual sovereignty cannot be underestimated.'" *Washington Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412, 418 (4th Cir. 2013). "[F]ederal courts must 'exercise their discretionary power with proper regard for the rightful

independence of state governments in carrying out their domestic policy.'" *Id.* "Federal courts should abstain from deciding cases presenting difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or whose adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *MLC*, 532 F.3d at 280.

## ARGUMENT

**I.      The plaintiffs seek equitable or otherwise discretionary relief, requiring abstention under *Burford*.**

*Burford* comes into play "where the relief being sought is equitable or otherwise discretionary," including "claims for both injunctive and declaratory relief." *Johnson v. Collins Entm't. Co.,* 199 F.3d 710, 727 (4th Cir. 1999). "[C]laims for equitable relief" that are subject to abstention under *Burford* "are dismissed entirely," not merely stayed. *Id.* Here, the sole class-wide relief sought by the Voidable Transfer Class—a court order requiring EQT to establish a federally-administered trust fund to plug another operator's now-producing wells subject to oversight by a federal receiver—is equitable or otherwise discretionary for multiple reasons.

First, all the relief sought by the Voidable Transfer Class is, as the name of the proposed class implies, predicated on avoiding the transactions between EQT and Diversified. That relief, a form of rescission, is an equitable remedy. *U.S. ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 498 (4th Cir. 1999) ("The complaint's request to void transfers as fraudulent—a form of rescission—is also an equitable remedy."). Whatever particulars the Voidable Transfer Class proposes, including the trust fund it proposes, the fact that the claim stems from a request to avoid of the transfers—an equitable remedy—alone triggers *Burford*. There are no common law claims and, by extension, no common law remedies.

Second, the specific remedy requested by the Voidable Transfer Class is a federal trust fund administered by a federal receiver, which is a form of "equitable or otherwise discretionary" relief. The Voidable Transfer Class does not request any other remedy for the tens of thousands of wells that are now producing, nor does any other potential remedy exist, given that no one knows how much money should be paid, when exactly to pay it, or to whom. No one knows when a given well will stop producing. Diversified will plug the wells without the need for funding from EQT, or may sell producing wells to another operator to keep producing. No one knows who the surface owner will be when the well stops producing, how much it will cost to plug the well, whether WVDEP will allow the well to be plugged, and so on. Holding money in trust for future use by creating a federal "fund" from the assets transferred under the supervision of a federal receiver, is equitable or otherwise discretionary. *Id.* ("[T]o the extent that the United States has alleged claims seeking to impose a constructive trust on assets as 'equitable property' of the United States and to void fraudulent transfers of assets and have them transferred to the United States, the United States claims an equitable interest in the assets of the defendants."); *Gray v. Bush,* 628 F.3d 779, 785 (6th Cir. 2010) ("Gray asked the court to impose a constructive trust over the funds disbursed under the Michigan court settlement and to enjoin further transfer of the funds, both of which amount to equitable forms of relief that the court could have denied altogether [under *Burford*].").

Third, the Voidable Transfer Class has acknowledged that the way in which the federal receiver would "oversee and administer these well-plugging funds" necessarily involves requests for injunctive and declaratory relief, which are textbook types of equitable or otherwise discretionary relief. The proposed class wants the Court and the federal receiver to find that "*the liabilities* associated with the more than 12,000 transferred wells (*i.e.*, the monetary obligations for plugging those wells) [should be] re-imposed on EQT to the extent they cannot be satisfied by

7

Diversified[.]" Ex. 3 (Plaintiffs' COA.4 Resp. Br.) at 29. Entering an order that declares the relative rights and liabilities of Diversified and EQT is the definition of declaratory relief. *See* 28 U.S.C. § 2201. And, the Voidable Transfer Class wants an order to "have *the assets* (*i.e.*, the nearly $700 million dollars) preserved to satisfy their claims" to plug now-producing wells in the future. An order for EQT to preserve assets, in this case by establishing a fund, constitutes an injunction.

Fourth, the dollar amount of the federal trust fund that the Voidable Transfer Class asks the court to create is based on "the value of the assets transferred—that is, the $700 million Diversified paid EQT," ECF 617 at 8, and whether to award this or another amount is equitable or otherwise discretionary under the Voidable Transfer Statutes. The basis for requesting a trust fund in the amount of "the value of the assets transferred" arises by statute, *e.g.*, Ala. Code § 8-9A-8(b), not common law. The statute requires an adjustment to the amount "as the equities may require," showing that the remedy is equitable or discretionary. *Id.* (requiring the amount awarded to be "adjusted under subsection (c)"); Ala. Code § 8-9A-8(c) ("If the judgment under subsection (b) is based upon the value of the asset transferred, the judgment" is "subject to adjustment as the equities may require."). Moreover, this remedy—a judgment for the value of the assets transferred—is available only "to the extent a transfer is voidable in an action by a creditor under Section 8-9A-7(a)(1)," the statute for avoiding a transaction to satisfy a creditor's claim. As noted, avoidance of a transaction itself is an equitable remedy. *Rahman*, 198 F.3d at 498. Thus, the dollar amount to be held in trust, like the trust itself, is a type of equitable or otherwise discretionary relief.

Finally, the Voidable Transfer Class does not assert common law claims against EQT, or by extension, seek common law money damages against EQT. The 20,000+ plaintiffs with producing wells have not presently suffered any financial losses or other damages that could be compensated at law, as the named plaintiffs acknowledged. ECF 617 at 7 (seeking purported future

damages "when the time for" plugging obligations "inevitably arises" for still-producing wells and notably not seeking any damages for present harm); Ex. 4 (Dep. Trs. of Voidable Transfer Pltfs.).

The request to create a federal trust fund from assets transferred does not mean the class is somehow seeking common law money damages just because the assets are money. *Johnson v. City of Chesapeake, Virginia*, 205 F.3d 1333 (4th Cir. 2000) (holding that a request for monetary relief falls outside *Burford* only if the plaintiff seeks "damages *at law*," and distinguishing "monetary relief sought [that] was in the nature of restitution" "[b]ecause restitution is an equitable remedy").

In sum, a federal trust fund—the only class-wide relief against EQT in the motion to certify—is equitable or otherwise discretionary. That relief does not survive *Burford*.

## II. Comity to West Virginia requires the Court to abstain under any formulation of the *Burford* doctrine.

### A. West Virginia's objection to the creation of a federal trust fund administered by a federal receiver weighs overwhelmingly in favor of abstention.

This is a state law case in which West Virginia has now filed four briefs objecting that the remedy requested by the Voidable Transfer Class would interfere with the uniform regulation and administration of state land use policy. Making this case even more exceptional, the Voidable Transfer Class would have the Court totally disregard West Virginia's position. Ignoring West Virginia's objection would be error, and would demonstrate the very opposite of the comity that *Burford* is designed to preserve. *Burgess*, 2012 WL 664495 at *3 (holding that "[the] central idea has always been one of simple comity.").

When a state takes a position that favors abstention on the basis that federal equitable relief would interfere with a state scheme, a federal court must listen. The Fourth Circuit has held that "[t]he position of the state's chief law enforcement officer on the significant enforcement role accorded state regulatory agencies should have discouraged the district court from assuming a substantial enforcement and interpretative role itself." *See, e.g.*, *Johnson*, 199 F.3d at 723–25. It

was South Carolina's position in *Johnson* which all but required the federal district court to abstain. *Id.* The Fourth Circuit reasoned that the equitable relief requested by the plaintiff "effectively established parallel federal and state oversight of the South Carolina video poker industry," *id.*, which was impermissible because "[f]ederalism does not countenance one cook too many stirring the state brew." *Id.* The court pointed to South Carolina's official position to defer to "the state agencies responsible for enforcement" and held that "[f]ederal equitable forays into such state enforcement schemes risk the creation of confusing, duplicative directions that cause friction and impermissibly transfer power from democratically accountable state officials to life-tenured federal judges." *Id.*

Here, like *Johnson*, West Virginia objects to the equitable relief sought by the Voidable Transfer Class because it would create parallel federal and state oversight of future plugging obligations for producing wells. Ex. 1 at 7 (objecting to "impermissibly creat[ing] an alternative bonding scheme outside of the bonding system created by the West Virginia Legislature and which WVDEP OOG supervises"); ECF 647-2 at 10 ("Because the WVDEP OOG already determined the type of bond . . . the risk of inconsistent obligations is imminent."); ECF 661 at 9–10 (objecting that a federal receiver would "create an alternate version of the WVDEP OOG and to place this parallel agency and its de facto bonding framework outside the scope of WVDEP OOG's control or review"). This case is clearer than *Johnson*: West Virginia's objection to a federal receiver is more explicit than the position statement filed by South Carolina in *Johnson*. *Compare, e.g.*, Ex. 1 at 7 ("Consideration of the merits of these issues in the WVDEP OOG's absence does irreparable harm to the agency's ability to effectively discharge its statutory duties."), *with Johnson*, 199 F.3d at 719 (notice of position filed on withdrawal from the case). The concerns articulated by West Virginia align with those that the Fourth Circuit found in *Johnson* required abstention. *Compare*,

*e.g.*, Ex. 1 at 10 (objecting that the relief sought by the plaintiffs disrupts "the State's strong interest in the efficient workings of its regulatory regime" and "any consideration or determination of the merits in this case interferes with matters committed to WVDEP OOG's discretion"), *with Johnson*, 199 F.3d at 715 ("the district court improperly interfered with a state regulatory scheme whose design is at the heart of the state's police power"). As in *Johnson*, the Court should abstain.

The Voidable Transfer Class would have a federal court disregard West Virginia's objection and instead substitute the plaintiffs' own view of "equity" for the policy judgments of West Virginia's chosen regulator over state land issues. More specifically, the Voidable Transfer Class wants a federal court, sitting in equity, to decide an issue WVDEP has already considered and administered: the form and amount of a security that strikes the right balance of competing considerations to secure future plugging obligations for producing wells. WVDEP has specifically objected to the Voidable Transfer Class's effort to reimpose this liability on EQT: "Plaintiffs challenge well transfers between Defendants that the WVDEP OOG approved at the time they were effectuated. The WVDEP OOG, not Plaintiffs, is in the best position to ascertain the operator most able to manage assets and, ultimately, plug wells at the end of their lives." ECF 647-2 at 10; *see also id.* ("The agency also oversees the transfer of wells between operators (which determines who bears plugging liability). Plaintiffs' claims demand that the WVDEP OOG exercise that authority."). Under *Johnson*, disregarding West Virginia's stated position would be error.

Moreover, the plaintiffs' rationale for demanding that the Court order EQT post a $700 million bond in a federal trust is that more security is required for producing wells, which is an issue the WVDEP has already considered and rejected. If the Court accepts WVDEP's position that Diversified's $3 million bond is adequate, there is no fair or equitable reason to hold EQT's money in trust. Creating a decades-long federal trust fund—and parallel, interfering oversight from

11

a federal receiver—thus conflicts with WVDEP's judgment that enough has already been set aside for producing wells. Such relief is an effort to freeze hundreds of millions of dollars for decades that WVDEP did not to freeze. Second guessing WVDEP's judgment undermines comity.

The plaintiffs keep insisting that their request that the Court for a federal receiver and trust does not interfere with WVDEP, but West Virginia explicitly disagrees. WVDEP analyzed the appropriate way to secure future plugging obligations in response to complaints by the West Virginia Surface Owners Rights Organization ("WV-SORO"), an organization in which certain plaintiffs are members Ex. 5 (November 20, 2018 WV-SORO Press Release) at 1 ("WV-SORO is today publicly urging the DEP to grant our hearing request so we can give the DEP evidence that the transfer of wells by EQT and others to Diversified is a constructive fraud on the surface owners"); Ex. 6 (May 10, 2024 Dep. Tr. of N. Googel) at 87:15–88:12 (testifying he "was a member" of "SORO"). Rejecting these points under its complex regulatory scheme, West Virginia instead required a $3 million bond from Diversified and found that EQT does not need to post security for the same obligations. W. Va. Code § 22-6-26(d), (h); W. Va. Code §§ 22-10-4 & 22-10-5; W. Va. Code § 22-10-2; W. Va. Code § 22-6-6; W. Va. Code R. § 35-6-4; W. Va. Code R. § 35-4-18; W. Va. Code R. § 35-4-10.5.c.

When the Voidable Transfer Class demands that this Court conclude the "fair" outcome to require more security in the form of a federal trust fund by EQT, it would simply be exercising its own discretion about what is right and wrong, when those policy decisions have already been determined by West Virginia. West Virginia exercised its discretion and made a policy-based determination, under a complex regulatory scheme under which it has exclusive authority, in a way that balanced the competing considerations of mineral interest owners, operators, and surface owners. *See EQT Prod. Co. v. Wender*, 870 F.3d 322, 336 (4th Cir. 2017) ("[T]he legislature has

vested in the state DEP the *exclusive authority* over regulation of the state's oil and gas resources, including in 'all matters' related to the 'development, production, storage and recovery of this state's oil and gas.'" (emphasis added)). Federal courts should not go on "[f]ederal equitable foray[] into [the] state enforcement scheme[]" which "risk[s] the creation of confusing, duplicative directions that cause friction and impermissibly transfer power from democratically accountable state officials to life-tenured federal judges." *Johnson*, 199 F.3d at 725. Federalism "considerations counsel abstention especially where, as here, state actors are charged with resolving state law issues that intimately affect state regulation of a core state concern." *Id.* at 729.

Comity requires a federal court to respect West Virginia's positions, both on the right amount of security and that a federal trust fund with federal oversight would interfere with WVDEP. That should end the analysis. Yet it is just one of many reasons to abstain here.

### B.   That this is a state law land use case with no federal issues effectively requires the Court to abstain.

The fact that this is a state law land use case, without any federal issues, effectively requires the Court to abstain under Fourth Circuit precedent. "In cases in which plaintiffs' federal claims stem solely from construction of state . . . land use . . . law, not involving constitutional validity of the same and absent exceptional circumstances the district courts *should abstain* under the *Burford* doctrine to avoid interference with a State's . . . land use policy." *Burgess*, 2012 WL 664495, at *3 (internal alterations omitted) (emphasis added) (quoting *Pomponio v. Fauquier Cnty. Bd. of Supervisors*, 21 F.3d 1319, 1328 (4th Cir.) (en banc), *cert. denied*, 513 U.S. 870 (1994), *overruled on other grounds,* 517 U.S. 706 (1996)). "We can conceive of few matters of public concern more substantial than . . . land use laws." *Pomponio*, 21 F.3d at 1327-28. "[F]ederal courts have not interfered with state courts in the area of land use policy." *Browning-Ferris, Inc. v. Baltimore Cnty., Md.*, 774 F.2d 77, 79 (4th Cir. 1985).

13

The Court should abstain because the Voidable Transfer Class's claims for equitable relief fit squarely within this category of state law land use cases. The Voidable Transfer Class's claims against EQT arises from state land use law: the class cannot obtain any relief if they do not have a "right to payment," so as the source of one, they rely on an operator's alleged obligation to eventually plug a producing well. That is a function of West Virginia land use law; the Voidable Transfer Class's claims against EQT stem solely from construction of state land use laws like § 22-7-19 and related regulations. The only way the Court can adjudicate the "right to payment" is to interpret whether this body of state land use law creates one.

Moreover, granting the plaintiffs' equitable relief would leave an "indelible print" on West Virginia land use laws, *Burgess*, 2012 WL 664495, at *2, the same rationale supporting the Fourth Circuit's holding that a federal court "should abstain" in a land use case. The federal receiver would oversee the permanent plugging of more than 20,000 producing wells, by definition affecting how land is used. If the federal receiver pays to permanently plug a well, that well can never produce again. In even deciding whether to disburse funds, the federal receiver would have to adjudicate the land use questions raised by § 22-6-19, such as whether the operator submitted evidence that the well has a bona fide future use or any presumption of abandonment has been rebutted. In short, an entire state scheme governing state land use would be subject to federal oversight, which is exactly what the abstention rule in land use cases is designed to avoid.

This Court would also be making land use policy decisions. Awarding equitable relief to the Voidable Transfer Class would require the Court to interpret West Virginia land use law as creating a contingent "right to payment" in favor of surface owners against operators with producing wells. Because the alleged "right to payment" arises solely from the fact that a well has been drilled on the surface owner's land, this rule would extend to every plot of land with a

14

producing well in all of West Virginia, not just those owned by Diversified. A federal court would thereby transform every surface owner in West Virginia with a producing well into a "creditor" of every operator, indelibly altering West Virginians' legal relationships in land. Such an expansion of surface owner rights would increase the transactional costs to sell wells and expose every transaction to fraudulent transfer and other claims that creditors can bring. That will affect everything from whether to sell wells to who to sell wells to, impacting who owns the land and how it is used. There is no way to make these decisions without impacting state land use law.

The plaintiffs acknowledge their intention to create new policy. As the plaintiffs see it, without a federal receiver, "no one will demand performance of Diversified's full plugging obligations . . . ." ECF 617 at 7. Of course, WVDEP's consent order expressly says otherwise. Ex. 2 at 4–5 (establishing schedule for plugging obligations). That their remedy is targeted at enforcing plugging obligations shows this is a state land use law case. Similarly, the plaintiffs acknowledge their claims cannot survive in a West Virginia court: "the procedures provide only operators and mineral owners—*not surface owners*—the right to seek judicial review of DEP's ultimate decisions." ECF 351 at 3. The plaintiffs went so far as to argue that "Defendants' interpretation of the effect of the Consent Order"—which is the same as West Virginia's interpretation of the Consent Order, *see* Ex. 1 at 8–9 *and* ECF 647 at 5–6—"would leave Plaintiffs without 'timely and adequate state-court review.'"[1] ECF 351 at 3. Rather than supporting federal intervention, these arguments show how far this Court would be deviating from West Virginia's land use policies.

---

[1]   This concession by the plaintiffs independently requires dismissal. "A federal court adjudicating a State-created right—such as this one—solely because of the diversity of citizenship of the parties cannot afford recovery if the right to recover is made unavailable by the State." *Kirgan v. Mfrs. & Traders Tr. Co.*, 810 F. App'x 187, 196 (4th Cir. 2020) (cleaned up) (quoting *Guar. Tr. Co. v. York*, 326 U.S. 99, 108-109 (1945)). "[A] federal court adjudicating a state-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State." *Fessler v. Int'l Bus. Machines Corp.*, 959 F.3d 146, 153 (4th Cir. 2020) (quoting *York*, 326 at 108); *e.g.*, *Volvo Trucks N. Am., Inc. v. Crescent Ford Truck Sales, Inc.*, 2003 WL 1936356, at *4 (E.D. La. Apr. 22, 2003) ([the] "substantive right to litigate its claim . . . is limited to the appropriate administrative procedure . . . Federal court cannot provide other or additional relief.").

### III.     All relevant factors weigh strongly in favor abstention.

This case has all the hallmarks of one where a federal court should abstain from granting equitable relief. "In deciding whether to abstain under *Burford*, federal courts consider: (1) whether the plaintiff raises state or federal claims, (2) whether the case involves unsettled state law or detailed local facts, (3) the importance of the state's interest in the litigation, (4) the state's need for a coherent policy in the area, and (5) whether there is a special state forum for judicial review." *Elec. Reliability Council of Tex., Inc. v. Just Energy Tex., L.P.*, 57 F.4th 241, 249 (5th Cir. 2023) (cleaned up). Abstention is required where at least four of the five factors favor abstention. *Id.* at 254.  (holding, with four factors satisfied, that "[the non-movant] fails to cite any caselaw where the scoreboard is this lopsided in favor of abstention, yet *Burford* was inapplicable."). Here, all five factors favor abstention.

### A.     The absence of federal claims favors abstention.

No federal claims exist in the case. The first factor favors abstention.

### B.     The case here involves unsettled state law or detailed local facts.

First, as is evident from each motion to dismiss filed in this case, the claims for equitable relief involve unsettled state law questions. Whether West Virginia land use law creates a contingent "right to payment" in favor of surface owners against operators with producing wells is something no West Virginia court has ever held. The plaintiffs also want this Court to be the first to define the quantum of proof required to show sufficient evidence of a bona fide future use has been submitted to the WVDEP to avoid plugging and/or to overcome any alleged presumption of abandonment. These questions raise subsidiary questions about the effect of an operator's consent order with WVDEP, the impact of a decision by WVDEP to absolve a former operator of liability, and the degree to which deeds and leases can alter plugging obligations.

Whether equity allows EQT to create a $700-million trust to plug wells that, in most cases, EQT never even owned is another pure state law question. That question amounts to an open-ended inquiry into how much security it is fair to require for producing wells owned by Diversified, requiring analysis of whether the security *already required* by WVDEP is adequate. These questions are *at best* unsettled, implicate general concerns of "fairness," and second guess whether West Virginia made the correct decision. This favors of abstention. *Just Energy*, 57 F.4th at 250 (instructing against "the federal court in an open-ended 'fairness' inquiry into predominantly local matters or allow the court to second guess the policy decisions of state regulators.'").

Second, as discussed, the case involves detailed local facts. The putative class includes at least 22,000 wells across at least 41 different counties. The federal receiver would decide when to pay money to plug each of them, how much money to pay, and to whom, all local land use issues. The federal receiver will have to factor in the specific local facts to the land, such as when it is appropriate to plug a well (which affects when to pay), and how the well should be plugged (which affects how much to pay). Detailed local facts surrounding a well's current uses and bona fide future uses, the WVDEP's findings regarding the well, the permits and consent orders issued by the WVDEP, and so forth, will influence these questions. The unsettled nature of the state-law questions at issue in this case strongly favors *Burford* abstention.

### C.     West Virginia has critical interests in this litigation.

This factor is satisfied by interests asserted by West Virginia in its briefing and the other arguments in the "comity" section above. Ex. 1; ECF 647, 647-2, and 661. "With the state interest so strong, this factor counsels in favor of abstention." *See Just Energy*, 57 F.4th at 251–52. The relief sought by the plaintiffs would directly impact tens of thousands of producing wells which would have their production and plugging subject to scrutiny by a federal receiver. It would indirectly impact every producing well in the state by holding that surface owners have a

contingent right to payment from their operators. *Burford*, 319 U.S. at 320 ("Texas interests in this matter are more than that very large one of conserving gas and oil. . . . It must also weigh the impact of the industry on the whole economy of the state and must consider its revenue, much of which is drawn from taxes on the industry and from mineral lands . . . .").

West Virginia's detailed regulatory regime confirms it has an interest in regulating the plugging of wells. *See id.* ("Texas's interest in utility regulation and litigation is clear from the face of PURA."). That West Virginia gave WVDEP exclusive authority to regulate all matters to oil and gas wells, including plugging, underscores its interest. *Just Energy*, 57 F.4th at 251–52. ("That the state retains exclusive control and oversight of the market underscores its interest in this electricity-related litigation."). Appointing a federal receiver would mean that WVDEP is no longer the *exclusive* entity that adjudicates plugging issues and determines the appropriate security for producing wells. Taking away exclusive authority diminishes the WVDEP's power and alters the predictability of how regulations will apply. West Virginia has strong interests in these issues.[2]

### D. West Virginia has a need for a coherent policy related to securing liabilities for producing wells and overseeing well plugging.

This factor is satisfied by the same points made above. Forcing EQT to create a $700-million fund that covers 20,000+ wells, administered by a federal receiver, would have a "domino effect" that results in "recurring and confusing federal intervention in an ongoing state scheme, or worrisome meddling." *Just Energy*, 57 F.4th at 252–53 (cleaned up). The plaintiffs' fund would persist for decades. When circumstances change, so too will the equitable considerations. For example, if new technology is discovered that lowers the cost of well plugging, or repurposes non-

---

[2]    The fact that the Plaintiffs bring its Voidable Transfer Statutes claims under Alabama law does not change the analysis here or under any of the *Burford* factors. ECF 322 at ¶¶ 501–512. The underlying source of the plugging obligations is land use law of West Virginia. The Alabama statutes thus do not reduce West Virginia's interest in this matter—especially regarding the state's policies, interpretation of its consent orders, its land, and regulatory scheme. Nor do the Alabama statutes provide some sort of workaround past the requirements for the Plaintiffs to qualify as creditors and seek the equitable relief that the Voidable Transfer Class seeks against EQT.

producing wells, what is "fair" will change. Recurring intervention to balance of competing fairness and equity considerations is inevitable.

And those would be the least of the issues created by a federal receiver. "Federal intervention necessarily affects all market participants." *See id.* For example, the person who has the alleged contingent "right to payment" from Diversified changes every time a surface owner marries, divorces, dies, sells, or gifts land with a producing well, meaning the federal receiver will have to figure out a way to track this for 22,000+ wells and resolve any ownership disputes on a recurring basis. Likewise, the fund only exists to secure Diversified's obligations for producing wells, so for any wells that Diversified sells to someone else, the federal receiver would be called to reduce the amount of security required by EQT. Thus, the appropriate amount of security would have to be addressed on a recurring basis.

And, holding that all surface owners have a contingent right to payment from all operators would obviously alter the relative legal relations of all surface owners, operators, and anyone with a working interest in any wells, subjecting transactions to recurring litigation over fraudulent transfers. Over decades, federal intervention would spawn further federal intervention.

And then there is the recurrent conflict and confusion resulting from a parallel scheme to WVDEP. Every dollar held in federal escrow is one less dollar available to invest in West Virginia. That is why it is WVDEP's role to determine the appropriate security and who should post it. WVDEP's decisions cannot provide certainty if a federal court can require something else. The WVDEP itself has argued that this type of federal intervention would "render[]" the state's orders "valueless and without authority." *See* ECF 647 at 5.

Further, the mere possibility that a federal court could require a different form of security (by a former operator) for a producing well than what WVDEP requires will introduce litigation

19

risk into transactions, make West Virginia a less attractive place to sell wells, and thereby alter the economic calculus of selling wells in West Virginia. *Burford* abstention exists precisely to ensure that federal courts will not be drawn into such matters of state regulation. *See Burford*, 319 U.S. at 332 ("[Q]uestions of regulation of the industry by the state administrative agency . . . so clearly involve[] basic problems of Texas policy that equitable discretion should be exercised to give the Texas courts the first opportunity to consider them.").

When it comes to plugging itself, if the federal receiver decides it is appropriate to plug a well, but WVDEP disagrees, there will be confusion. Likewise, if the federal receiver decides how a well must be plugged, and WVDEP approves a different method, confusion would result. A coherent state policy will not be possible on any of these issues. Only abstaining will avoid recurring and confusing federal intervention in the state's unified regulatory scheme.

### E.     The existence of a special forum, the WVDEP, weighs in favor of abstention.

The WVDEP alone decides both whether an operator may transfer plugging liability to a new operator, and the appropriate security for producing wells. State law allows parties to file a complaint in WVDEP, and for WVDEP to hold a hearing and make evidentiary findings. ECF 339 at 10–11 (detailing the state regulations for plugging operations in West Virginia). The existence of a special procedure before a regulatory body with exclusive authority warrants abstention.

All five factors favor abstention. Abstention is therefore the only appropriate result.

## <u>CONCLUSION</u>

Creating a $700-million federal fund based on "equity" would be an unprecedented act of judicial policymaking. Creating a new contingent right to payment in favor of surface owners would do the same. Federal courts do not legislate in diversity cases. This Court should abstain.

Respectfully submitted:

Dated: September 10, 2024

/s/ *Jennifer J. Hicks*

Jennifer J. Hicks, Esquire (WVSB #11423)
Tiffany M. Arbaugh, Esquire (WVSB #9982)
**BABST, CALLAND, CLEMENTS AND**
      **ZOMNIR, P.C.**
300 Summers Street, Suite 1000
Charleston, WV 25301
Phone: (681) 205-8888
Fax:   (681)205-8814
Email: jhicks@babstcalland.com
Email: tarbaugh@babstcalland.com

Mark K. Dausch, Esquire (WVSB #11655)
**BABST, CALLAND, CLEMENTS AND**
      **ZOMNIR, P.C.**
603 Stanwix Street
Pittsburgh, PA 15222
Phone: (412) 394-5655
Fax:   (412) 394-6579
Email: mdausch@babst.calland.com

Anna Rotman, P.C. (*pro hac vice*)
Nick Brown (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
609 Main Street
Houston, TX 77002
Phone: (713) 836-3600
Fax:   (713) 836-3601
Email: anna.rotman@kirkland.com
Email: nick.brown@kirkland.com

*Counsel for Defendants EQT Production Company, EQT Gathering, LLC, and EQT Corporation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

MARK MCEVOY, *et al.,*

                  Plaintiffs,

v.

DIVERSIFIED ENERGY COMPANY PLC,
*et al.*,

                  Defendants.

Civil Action No. 5:22-cv-00171-JPB
Judge John P. Bailey

**<u>CERTIFICATE OF SERVICE</u>**

       The undersigned, as counsel for Defendants EQT Production Company, EQT Gathering, LLC, and EQT Corporation, hereby certifies that on September 10, 2024, I electronically filed the *EQT's Memorandum in Support of Motion to Abstain* with the Court's CM/ECF system, which will send notice to all counsel of record all counsel of record as follows:

Brian R. Swiger, Esquire
Brian A. Glasser, Esquire
John W. Barrett, Esquire
Athanasios Basdekis, Esquire
J. Lincoln Wolfe, Esquire
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
bswiger@baileyglasser.com
bglasser@baileyglasser.com
jbarrett@baileyglasser.com
tbasdekis@baileyglasser.com
jwolfe@baileyglasser.com
*Counsel for Plaintiffs and Proposed Class*

Panida A. Anderson, Esquire
Stephen Sorensen, Esquire
Bailey & Glasser, LLP
1055 Thomas Jefferson St. NW
Suite 540 Washington, DC 20007

panderson@baileyglasser.com
ssorensen@baileyglasser.com
*Counsel for Plaintiffs and Proposed Class*

Joseph M. Lovett, Esquire
Benjamin A. Luckett, Esquire
J. Michael Becher, Esquire
Amanda Demmerle, Esquire
Isak Howell, Esquire
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
jlovett@appalmad.org
bluckett@appalmad.org
mbecher@appalmad.org
ademmerle@appalmad.org
ihowell@appalmad.org
*Counsel for Plaintiffs and Proposed Class*

Claire Horan, Esquire
Appalachian Mountain Advocates
250 West Main Street, Suite 201
Charlottesville, VA 22902
choran@appalmad.org
*Counsel for Plaintiffs and Proposed Class*

Howard M. Persinger, III, Esquire
Persinger & Persinger, L.C.
237 Capitol Street
Charleston, WV 25301
Hmp3@persingerlaw.com
*Counsel for Defendants Diversified Energy Company, PLC,*
*Diversified Gas & Oil, PLC, Diversified Production, LLC,*
*Diversified Gas & Oil Corporation, Diversified Oil and Gas LLC and*
*Alliance Petroleum Corporation*

Ragan Naresh, P.C.
Daniel T. Donovan, P.C.
Alexis B. Hill
Maria Kearns-Galeano
Kirkland & Ellis, LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
ragan.naresh@kirkland.com
daniel.donovan@kirkland.com
alexis.hill@kirkland.com

maria.kearnsgaleano.com
*Counsel for Defendants Diversified Energy Company, PLC,*
*Diversified Gas & Oil, PLC, Diversified Production, LLC,*
*Diversified Gas & Oil Corporation, Diversified Oil and Gas LLC and*
*Alliance Petroleum Corporation*

Kenneth Young, Esquire
Dustin Womack, Esquire
Kirkland & Ellis, LLP
609 Main Street
Houston, TX  77002
Kenneth.Young@kirkland.com
Dustin.Womack@kirkland.com
*Counsel for Defendants Diversified Energy Company, PLC,*
*Diversified Gas & Oil, PLC, Diversified Production, LLC,*
*Diversified Gas & Oil Corporation, Diversified Oil and Gas LLC and*
*Alliance Petroleum Corporation*

G. Nicholas Casey, Jr., Esquire
4401 Kanawha Avenue, SE
Charleston, WV 25304
*Counsel for Intervening Defendants, Chester C. Dodd, Jr.,*
*Kathryn M. Hunt and Linda Dodd Fluharty*

Patrick S. Casey, Esquire
Sandra M. Chapman, Esquire
Ryan P. Orth, Esquire
Casey & Chapman, PLLC
Wheeling, WV 26003
*Counsel for Intervening Defendants, Chester C. Dodd, Jr.,*
*Kathryn M. Hunt and Linda Dodd Fluharty*

C. Scott Driver, Esquire
Office of Legal Services
WV Department of Environmental Protection
601 57th Street, SE
Charleston, WV 25304
*Counsel for WV Department of Environmental Protection,*
*Office of Oil and Gas*

*/s/ Jennifer J. Hicks*
Jennifer J. Hicks (WVSB #11423)

3