**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

MARK MCEVOY, et al., individually and
on behalf of a proposed class,

        Plaintiffs,

v.

DIVERSIFIED ENERGY COMPANY PLC,
et al.,

        Defendants.

CIVIL ACTION NO. 5:22-cv-171
Honorable Judge John P. Bailey

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

I.      INTRODUCTION ............................................................................................. ii

II.     BACKGROUND ................................................................................................. 3

    A.   The Plaintiffs' commencement of the action and legal claims ......................... 3

    B.   Litigation of motions to dismiss ...................................................................... 4

    C.   Completion of discovery and discovery disputes ............................................ 8

    D.   Class certification-related rulings, and appeals ............................................. 10

III.    THE PROPOSED SETTLEMENT ................................................................... 11

    A.   The Settlement .............................................................................................. 11

        1.   The proposed Settlement Class ................................................................ 11

        2.   The Plugging Promises ............................................................................ 12

        3.   Earnest Money and Additional Consideration ......................................... 13

        4.   Notice and administration ....................................................................... 13

        5.   Opt-out and objection procedures ........................................................... 14

        6.   Release .................................................................................................... 14

IV.   ARGUMENT ..................................................................................................... 16

    A.   At final approval, it is likely the Court will conclude the settlement is fair, reasonable, and adequate ..................................................................................................... 16

        1.   Rule 23(e)(5)(A) & (B): The Class has been adequately represented, and the settlement was negotiated at arms-length. ................................................ 17

        2.   Rule 23(e)(5)(C) & (D): The relief is adequate and treats all class members equitably ................................................................................................. 19

V.      PROPOSED SETTLEMENT APPROVAL SCHEDULE ................................. 21

VI.     CONCLUSION .................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burford v. Sun Oil Co.*,
   319 U.S. 315 (1943)................................................................................................7

*Cohen v. Beneficial Indus. Loan Corp.*,
   337 U.S. 541 (1949)................................................................................................7

*Domonoske v. Bank of Am., N.A.*,
   790 F. Supp. 2d 466, 472 (W.D. Va. 2011) .........................................................21

*Hewlett v. Premier Salons, Int'l, Inc.*,
   185 F.R.D. 211 (D. Md. 1997)..............................................................................17

*In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales
   Practice*, 952 F.3d 471 (4th Cir. 2020)...........................................................18, 19

*Muhammad v. Nat'l City Mortg. Inc.*,
   2008 WL 5377783 ................................................................................................18

*In re Nissan Motor Corp. Antitrust Litig.*,
   552 F.2d 1088 (5th Cir. 1977) ..............................................................................20

*Wiggins v. Eastern Associated Coal Corp.*,
   357 S.E.2d 745, 748 (W. Va. 1987)........................................................................5

**Statutes**

Ala. Code § 8-9A-1 et seq..........................................................................................4

Ala. Code § 8-9A-7(a) ...............................................................................................4

Ala. Code § 8-9B-1 et seq..........................................................................................4

Ala. Code § 8-9B-8(a)(1)............................................................................................4

Alabama Fraudulent Transfers Act.........................................................................3, 4

Alabama Voidable Transactions Act ..........................................................................4

W. Va. Code. § 22-6-19 .............................................................................................3

W.Va. Code § 22-6-28(a)........................................................................................4, 5

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ........................................................................................6

Fed. R. Civ. P. 12(c) .........................................................................................6, 8

Fed. R. Civ. P. 19 .............................................................................................6, 7

Fed. R. Civ. P. 23 .............................................................................................16

Fed. R. Civ. P. 23(a)(4) .....................................................................................17

Fed. R. Civ. P. 23(c)(2)(B) ...........................................................................20, 21

Fed. R. Civ. P. 23(e) ..........................................................................................21

Fed. R. Civ. P. 23(e)(1)(B) ................................................................................16

Fed. R. Civ. P. 23(e)(2) .....................................................................................18

Fed. R. Civ. P. 23(e)(3) .....................................................................................17

Fed. R. Civ. P. 23(e)(5) .......................................................................................2

Fed. R. Civ. P. 23(e)(5)(A) & (B) ......................................................................17

Fed. R. Civ. P. 23(e)(5)(C) & (D) ......................................................................19

Fed. R. Civ. P. 23(f) ..........................................................................................11

Fed. R. Civ. P. 26 ...............................................................................................9

*Newberg on Class Actions* (6th ed.) .............................................................16, 18

## I.   INTRODUCTION

After more than two years of hard-fought litigation — including the completion of fact discovery, the submission of all expert reports and rebuttal reports, forty-plus depositions, multiple appeals, and an impactful class certification ruling — Plaintiffs have obtained a proposed class action settlement, and request preliminary approval.[1]

This case is and always has been about well-plugging, and the settlement's key feature — Diversified's Plugging Promises — reflects that. If approved, the settlement requires the Diversified Defendants to increase their plugging obligations in the six affected states (West Virginia, Ohio, Kentucky, Pennsylvania, Virginia, and Tennessee) from approximately 580 non-producing wells to at least 2600 such wells in the affected states.

In exchange, Class Members' well-plugging claims against Diversified will generally be subject to a ten-year covenant not to sue Diversified. Other claims are released, although claims against Diversified for personal injury or property damage will not be released; Class Members retain rights under state law to use any existing administrative procedures to have their wells plugged; and Class Members who have bona fide health, safety, or environmental concerns will have an expedited and streamlined process of applying for well-plugging (up to ten wells annually) through a court-appointed Settlement Account Administrator, with Diversified bearing the cost. With respect to EQT — who has not owned most of the class wells for more than six years, and against whom Plaintiffs alleged only voidable transfer claims arising out of its sale of the Diversified Wells to Diversified in 2018 and 2020 — the

---

[1] *See* Settlement Agreement ("SA"), attached as Exhibit 1. Capitalized terms in this brief correspond with defined terms in the Settlement Agreement. As stated in the SA, "[t]he Defendants will not oppose but do not endorse or approve the content of the motion for Preliminary Approval or the content of the Preliminary Approval Order." *Id.* ¶ V.1.

release is generally limited to claims that were or could have been brought in this action.[2]

In addition, the Defendants will pay up to $6.5 million to fund class notice, proposed incentive awards to the named Plaintiffs, and attorneys' fees and costs. The parties have made no agreements respecting incentive awards or fees and costs, and the Defendants retain their rights to oppose them.

While Plaintiffs continue to believe in the strength and viability of their claims against both Defendants, the fact is that many hurdles — including class certification challenges outlined in the Court's order striking the common law class allegations, the unprecedented and untested nature of the legal claims, Diversified's efforts to moot the Named Plaintiffs' claims by plugging their wells, and the delay in reaching final judgment — stand in the way of meaningful relief.

At this preliminary approval stage, the question for the Court is whether it is likely to finally approve the settlement, an assessment that includes whether class counsel and the representatives have adequately represented the class; whether the proposed settlement was negotiated at arms' length; whether the settlement treats class members equitably relative to each other; and whether the settlement provides adequate relief to the class considering, among other things, the cost, risks, and delay of trial. Fed. R. Civ. P. 23(e)(5).

For these reasons, and the others stated below, this settlement more than sufficiently meets that test. Plaintiffs therefore urge the Court to grant their motion so Plaintiffs can disseminate notice, and class members can opt-out or object.

---

[2] The above is a summary of the relevant portions of the Settlement Agreement. The Release and Covenant Not to Sue provisions are reprinted *supra* at pp. 14-15.

## II.   BACKGROUND

### A.   The Plaintiffs' commencement of the action and legal claims

On July 18, 2022, Plaintiffs commenced this putative class action on behalf of thousands of West Virginia landowners with Defendant Diversified's gas wells on their properties. Diversified is the largest owner of natural gas wells in the United States. In 2018 and 2020, Diversified acquired approximately 12,000 wells from Defendant EQT, the largest producer of natural gas in the United States, in exchange for nearly $700 million. Plaintiffs brought common law property claims for damages related to what they allege was Diversified's failure to plug wells that had not produced for the last 12 months, as well as statutory fraudulent transfer claims against EQT to ensure adequate funds will be available to plug the Diversified Wells in the future.

Specifically, Plaintiffs raise common law trespass and negligence claims, seeking damages sufficient to plug Diversified wells in West Virginia that have not produced in the last 12 months and remediate their surface properties. First, Plaintiffs allege that because Diversified's non-producing wells are no longer "reasonable and necessary" for mineral production and their presence is not authorized by deed or lease, Diversified has exceeded its right to occupy Plaintiffs' land. Diversified is, therefore, alleged to be trespassing. Second, Plaintiffs allege that Diversified has a statutory duty to plug a well promptly after 12 months of failing to report production, *see* W. Va. Code. § 22-6-19, and a breach of that duty constitutes a negligent act. Diversified contested these allegations on factual and legal grounds.

Plaintiffs also bring statutory claims against EQT related to the transfer of wells from EQT to Diversified under the Alabama Fraudulent Transfers Act ("AFTA") and its successor, the

Alabama Voidable Transactions Act ("AVTA") (collectively, the "Acts").[3] Those statutes protect creditors from debtors who would hinder or delay their claims by transferring assets to a third party. The Acts authorize creditors, including creditors such as Plaintiffs with both contingent and non-contingent claims to void transfers that would otherwise make it impossible for their debtors to satisfy their claims. Ala. Code § 8-9A-7(a); *id.* § 8-9B-8(a)(1). Here, Plaintiffs' claims seek to void the transfer of money from Diversified to EQT to ensure there are sufficient funds available to properly plug the thousands of wells owned by Diversified that are currently producing but that will cease production and become abandoned in the future.  EQT disagreed with these allegations and asserted both factual and legal defenses to these claims.

## B.    Litigation of motions to dismiss

Plaintiffs have overcome numerous efforts by Defendants to dismiss their claims. In support of their Motion to Dismiss Plaintiffs' Second Amended Complaint,[4] Defendants argued that Plaintiffs' tort claims must be dismissed because they impermissibly interfere with WVDEP's "exclusive" regulatory authority under West Virginia's oil and gas laws. More specifically, they argued that Plaintiffs' claims constitute an impermissible collateral attack on Diversified's Consent Order with WVDEP over which the Court lacks jurisdiction. ECF No. 105 at 7–12. Defendants also argued that the Court lacked jurisdiction because Plaintiffs did not file an ultimately unreviewable complaint with WVDEP under West Virginia Code Section 22-6-

---

[3] The AFTA, Ala. Code § 8-9A-1 et seq., applies to transfers that took place prior to January 1, 2019 — in this case, the July 2018 Transfer. The AVTA, Ala. Code § 8-9B-1 et seq., applies to transactions that took place on or after January 1, 2019 — in this case, the May 2020 Transfer.

[4] Defendants first moved to dismiss Plaintiffs' Amended Complaint. ECF No. 44. Plaintiffs then moved to file their Second Amended Complaint, ECF No. 84, which Defendants opposed on grounds of futility, ECF No. 90. The Court rejected Defendants' futility arguments, granted Plaintiffs' motion to amend, and denied Defendants' motion to dismiss Plaintiffs' First Amended Complaint as moot. ECF No. 95.

28(a), essentially claiming that Plaintiffs failed to exhaust their administrative remedies. *Id.* at 13–15. Further, Defendants argued that Plaintiffs' common law property claims and statutory fraudulent transfer claims were barred as untimely, *id.* at 15–19, 24–25, and that Plaintiffs are not creditors of Diversified under the fraudulent transfer laws, *id.* at 20–23.

The District Court denied Defendants' Motion, citing the oil and gas program's multiple savings clauses and explaining that the "West Virginia Legislature made clear that the remedies provided by the regulatory program are not exclusive and do not preclude surface owners' common law claims." ECF No. 204 at 9–10.  As to the Consent Order, the Court found that the "agreement entered into between the [WVDEP] and the well operators, without prior notice to the surface owners or lessees, without subsequent notice to the surface owners or lessees, with no right of appeal" was "simply an exercise of [WVDEP]'s prosecutorial discretion and has no effect on the plaintiffs' property rights." *Id.* at 9 (citing *Citizens for a Better Env't-Cal. v. Union Oil Co. of Cal.*, 861 F. Supp. 889, 902–03 (N.D. Cal. 1994), *aff'd*, 83 F.3d 1111, 1120 (9th Cir. 1996) (explaining that administrative orders extending compliance deadlines reflect an agency's prosecutorial discretion and do not bar actions separately authorized for private citizens)).

The court also concluded that Plaintiffs were not required to file an unreviewable complaint with WVDEP before bringing their tort claims. The court explained that the oil and gas program makes clear that its remedies are not exclusive and that the complaint process is neither designed nor adequate to afford Plaintiffs the common law relief they seek. *Id.* at 11–12 (citing Syl. Pt. 2, *Wiggins v. Eastern Associated Coal Corp.*, 357 S.E.2d 745, 748 (W. Va. 1987) (recognizing that exhaustion is not required where the administrative remedy is inadequate)). Further, the Court found that the "requirement for the [WVDEP] to issue a permit for well plugging is not an obstacle to plaintiffs' requested relief." *Id.* at 12.

5

Finally, the Court concluded that, at the pleadings stage, Plaintiffs' claims were not

barred by any applicable statute of limitations, *id.* at 13–14, 21– 23, and that Plaintiffs are

creditors of Diversified because "the fact that an oil and gas operator drilled a well on their

property . . . necessarily gives rise to an obligation on the part of the operator or its successor to

plug the well," *id.* at 20.

After denial of their Rule 12(b)(6) Motion, Defendants filed a Rule 12(c) Motion for

Judgment on the Pleadings. By that Motion, Defendants argued that, because WVDEP is an

indispensable party under Rule 19 that cannot be joined due to its sovereign immunity, Plaintiffs'

claims must be dismissed. ECF No. 275 at 1. In support of their Rule 12(c) Motion, Defendants

argued that Plaintiffs' suit interferes with WVDEP's exclusive regulatory interests — including

its interests in the Consent Order — and that WVDEP's exclusive authority to permit the

plugging of a well would create obligations inconsistent with Plaintiffs' requested relief. ECF

No. 276 at 10–16.

The Court denied that Motion as well, finding that WVDEP is neither a necessary nor

indispensable party. ECF No. 303. The Court expressly acknowledged WVDEP's sovereign

regulatory authority, but concluded once again that Plaintiffs' claims for money damages do not

implicate or infringe on that authority because "Plaintiffs are not requesting this Court to order

[WVDEP] to take any action or instruct the state agency and state officials on how to conform

their conduct to state law." *Id.* at 16.  Further, "plugging plaintiffs' abandoned and nonproducing

wells would not be inconsistent with the Consent Order . . . [because] [i]f plaintiffs are granted

their requested relief, defendants['] obligations to [WVDEP] under the Consent Order would be

satisfied." *Id.* at 17–18. Finally, the Court concluded that "it is mere speculation that [WVDEP]

would deny the permits necessary to plug and remediate abandoned, nonproducing wells on plaintiffs' properties." *Id.* at 18.

Defendants then attempted to immediately appeal the Court's order denying their Rule 19 motion to the Fourth Circuit. ECF No. 329. Plaintiffs filed a motion to dismiss that appeal as premature because this Court's non-final order did not constitute a collateral order subject to interlocutory review under *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949). The Court of Appeals deferred ruling on Plaintiffs' motion to dismiss and the parties fully briefed the merits of Defendants' appeal. Following oral argument, the Fourth Circuit granted Plaintiffs' motion to dismiss, finding that Defendants' appeal was premature. ECF No. 633.

After this Court denied Defendants' Rule 19 Motion for Judgment on the Pleadings, Plaintiffs filed the operative Third Amended Complaint. ECF No. 322. After noticing their appeal of the denial of their Rule 19 Motion, Defendants moved to dismiss the Third Amended Complaint, once again arguing that Plaintiffs' claims should be dismissed because they interfere with WVDEP's regulatory authority — this time under the abstention doctrine announced in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). ECF Nos 338, 339.

The Court again denied Defendants' Motion, explaining that, "as this Court has already held multiple times, (1) Plaintiffs lack an adequate alternate remedy to their common law tort and fraudulent transfer claims, and (2) Plaintiffs' claims are expressly preserved by West Virginia's oil and gas program and thus do not interfere with that law nor with [WVDEP]'s exercise of prosecutorial discretion embodied in the Consent Order." ECF No. 362 at 6–7. The Court thus determined that Plaintiffs' claims are not "disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Id.* (quoting *New Orleans Pub. Serv. Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989)).

Additionally, after the Fourth Circuit dismissed the Defendants' appeal of this Court's Rule 12(c) order as premature, WVDEP moved to intervene for the limited purpose of seeking dismissal. ECF No. 647. WVDEP advanced similar the same arguments to those the Defendants raised in their Rule 12(c) Motion, and this Court denied their Motion to Intervene, again holding that WVDEP is neither a necessary nor indispensable party. ECF No. 672. WVDEP immediately appealed that ruling, ECF No. 675, but has voluntarily dismissed its appeal. ECF No. 681.

However, other motions remain pending, including EQT's Motion to Abstain, ECF No. 663, and Diversified's Motion to Compel related to Plaintiffs' expert Luke Plants, ECF No. 637.

Importantly, as of the time of settlement, the Court of Appeals has not reviewed any of the Court's substantive rulings. These would come, if at all, only at final judgment, and would bring further risk and delay in obtaining any recovery for the class.

## C.   Completion of discovery and discovery disputes

Plaintiffs reached this proposed settlement having expended enormous effort in the conduct of discovery in this action, in both compelling production of discovery from Defendants and protecting their expert witness from improper subpoenas.  The parties and third parties produced over a million pages of discovery, and the parties took more than 40 depositions.

The discovery process was lengthy and hard fought.  Plaintiffs first had to oppose a motion to stay discovery filed concurrent with Defendants' first motion to dismiss. *See* ECF No. 52 (denying motion and finding that Defendants' motion to dismiss presented "no reason to put a halt on discovery"). Plaintiffs then defeated EQT's motion for a protective order based on EQT's requests that the Court disqualify Plaintiffs' counsel. *See* ECF No. 155 (denying motion to disqualify and denying as moot related motion for protective order); ECF No. 162 (granting

Plaintiffs' motion to compel discovery EQT unilaterally withheld pending the Court's ruling on its motions to disqualify); *see also* ECF No. 208 (denying EQT's motion to compel production of documents from Plaintiffs that were relevant only to EQT's motions to disqualify counsel, which the Court had already denied).

Plaintiffs then successfully moved the Court to compel Defendants to disclose a broad range of documents that they had withheld based on their assertions that the documents sought were not relevant or that their production constituted an undue burden. *See* ECF No. 180 (granting Plaintiffs' motion to compel disclosure of documents regarding wells outside of West Virginia, documents regarding producing wells, documents from July 2016 to July 2017, and numerous other classes of documents as to which Defendants raised relevance and undue burden objections). Soon after, Plaintiffs successfully moved to compel Diversified to disclose tax returns and other financial information that Plaintiffs contended were relevant to Plaintiffs' fraudulent transfer claims. *See* ECF No. 282.

Plaintiffs have also defeated two separate motions to disqualify counsel. ECF Nos. 155, 156. Plaintiffs also overcame Diversified's motion for a protective order that sought to prevent Plaintiffs' well-plugging expert, Luke Plants, from considering any documents marked confidential under the parties' agreed protective order. ECF No. 253 (rejecting Diversified's argument that Mr. Plants' status as a competitor in the well-plugging industry justified restricting his access to necessary documents). They then successfully moved the Court for a protective order halting premature, overbroad subpoenas to Mr. Plants and his company that that Plaintiffs argued were outside the scope of expert disclosures required by the Rule 26. ECF No. 283.

9

In the end, Plaintiffs litigated over thirty motions, took or defended more than 40 fact witness depositions, secured expert reports from six primary experts (two of whom also disclosed rebuttal reports) and two additional rebuttal experts, and engaged in depositions of five expert witnesses.

**D.    Class certification-related rulings, and appeals**

On June 21, 2024, Plaintiffs moved to certify two classes: a Voidable Transfer Class which "consists of all persons or entities that owned property on April 2, 2024, in West Virginia on which Diversified1 owns a well, regardless of whether the wells are currently abandoned or non-producing," and a Common Law Class, which "consists of all persons or entities who owned land in West Virginia as of April 2, 2024, containing at least one well that (1) is not producing and/or has not produced oil or gas for twelve consecutive months, (2) is currently owned or operated by Diversified, and (3) has not been plugged or properly decommissioned." ECF No. 617 at 2–3, 6–7.  Plaintiffs attached multiple expert reports in support of their motion. *Id.*, Exs. A, B.

Just two days prior to Plaintiffs' class certification motion, Intervening Defendants Chester C. Dodd, Jr., Kathryn M. Hunt, and Linda Dodd Fluharty (the "Intervenors") moved to strike Plaintiffs' Common Law Class allegations, ECF No. 612, a request that the Court had previously denied as premature when it same relief was sought in October 2023, ECF No. 428. Prior to Defendants' response to Plaintiffs' Motion for Class Certification and prior to Plaintiffs' reply, while the parties were still engaged in expert discovery relevant to class certification issues and had yet to submit rebuttal expert reports, the Court granted Intervenors' Motion to Strike. ECF No. 653. The Court found that the Common Law Class was not ascertainable because, it concluded, well production records submitted to the WVDEP could not

10

definitively determine whether a well was abandoned, tax maps could not adequately establish whether a person owned property burdened by a Diversified well, and the Court could not determine whether a particular well's presence was authorized without consulting relevant deeds or leases. *Id.*

Pursuant to Rule 23(f), Plaintiffs timely petitioned the Fourth Circuit for permission to immediately appeal the Order granting the Intervenors' motion to strike, which acted as a denial of certification of the Common Law Class. ECF No. 666. The Petition was denied on October 3, 2024. ECF No. 677.

Finally, the proposed settlement was reached after approximately a year of informal negotiations, including a formal mediation session in May 2024 with mediator Don O'Dell.

### III. THE PROPOSED SETTLEMENT

**A.     The Settlement[5]**

**1.      The proposed Settlement Class**

The proposed Settlement Class includes:

> All persons and entities that own or lease any right, title, or interest in the surface of any piece or parcel of land in West Virginia, Ohio, Kentucky, Pennsylvania, Virginia, or Tennessee that have had a Diversified Well on said piece or parcel at any time between the date of the first complaint in the Action (July 8, 2022) and the date of the signing of the Settlement Agreement (November 4, 2024), including their predecessors, executors, administrators, heirs, assigns, related parties or persons, tenants, and successors.

SA ¶ II.27. Because the Settlement Class excludes all federal, state, and local governmental entities, the proposed settlement will have no effect on Diversified's plugging obligations imposed by State regulatory agencies. *Id.*

---

[5] All summary descriptions of the Settlement Agreement in this Motion are subject to the provisions in the Settlement Agreement, which controls.

2.      **The Plugging Promises**

The key feature of the settlement is Diversified's "Plugging Promises," in which Diversified will be required to plug Diversified Wells as follows: 200 in calendar year 2025; 225 in each of 2025 and 2027; 250 in each of 2028, 2029, and 2030; 275 in 2031; 300 in each of 2032 and 2033; and 325 in 2034. SA ¶ II.4. Diversified will have a 5% cushion on the Plugging Promise for any given calendar year without causing a default, so long as it plugs 2,600 Diversified Wells (the total of the above schedule) by the end of 2034 ("Cushion Provision"). *Id.* ¶ II.4.b. However, if Diversified misses the Plugging Promises in any given year (after accounting for the cushion), then the Diversified Parties must plug an additional number of Diversified Wells that is equal to 10% of the miss. *Id.*

Because the proposed class wells are spread across six states, the wells Diversified selects for plugging must be spread roughly proportionately — within 17.5% of each state's proportional share of Diversified's non-performing wells on a five-year average. *Id.* ¶ II.6. Those Settlement Class Members with bona fide human health, safety, or environmental concerns may apply for well plugging via declaration or written submission to a court-appointed Settlement Account Administrator. *Id.* ¶ III.9. Under expedited procedures, either party may appeal the decision to a federal magistrate. *Id.*

The settlement does not affect Diversified's well-plugging obligations to any state environmental agency.  As before, all plugging must be completed and permitted in compliance with state law. *Id.* ¶ II.10.

Diversified's compliance with these Plugging Promises will be monitored by a Settlement Account Administrator, whose duties also include receiving and reviewing annual reports outlining the plugging of wells under the SA, considering applications for "extraordinary

need" plugging, and taking actions in event of default. *Id.* ¶ III.2. The parties jointly propose G. Nicholas Casey, Jr., a respected member of the Bar, to serve in this role, at a salary of $22,500, to increase by 4% annually. *Id.* III.4.

### 3.   Earnest Money and Additional Consideration

Diversified and EQT each will contribute $250,000 in Earnest Money to fund Class Notice, to be paid through the Settlement Account. SA ¶ II.1. Earnest Money funds remaining after notice will not revert to the Defendants if the Settlement is approved and becomes effective. *Id.* ¶ II.3. In addition, on the Effective Date, Diversified and EQT each will contribute up to $3 million to the Settlement Account. *Id.* ¶ II.14. Again, no funds will revert to either Defendant if the settlement is approved. *Id.* ¶ II.3.

These funds will be used to pay the cost of class notice, and any service awards and attorneys' fees and costs awarded by the Court. Both Defendants reserve all rights to contest motions seeking these awards. *Id.* ¶¶ IV.7, .8.

### 4.   Notice and administration

Plaintiffs, with the assent of Defendant, propose the settlement administration firm Kroll to serve as Class Notice Agent. A declaration from Cecily Uhlfelder outlining Kroll's experience in providing class notice and settlement administration services is attached as Exhibit 1.E.

The principal form of notice is direct mail notice, sent to persons identified by Diversified through a combination of its own records and public sources. The mailed notice is augmented by an extensive publication notice program including 21 newspapers in the six-state region and a robust digital notice campaign. As stated above, the notice cost will be paid through the $500,000 in Earnest Money. SA ¶ 11.1.

### 5.     Opt-out and objection procedures

Class members will have 60 days from the notice date to exclude themselves from the class, and 86 days from the notice date to object to the settlement. *See supra* at p. 21. Opt-out requests must be via signed writing from the class member, and include the name, address, contact telephone number, API number of the affected well, and reasonable proof of ownership. Objections must also be in writing, and include identifying information, factual and legal support for the objection, and other specified objection requirements. *Id.* ¶ 11.03.

### 6.     Release

As recounted *infra* at pp. 1-2, Plaintiffs have pursued separate theories against EQT and Diversified. Against EQT, Plaintiffs have alleged that the 2018 and 2020 transactions involving the sale of wells to Diversified were fraudulent transfers. Those claims will be extinguished in full, according to the terms of a release encompassing:

> [A]ny and all claims and causes of action of any nature whatsoever, whether based on any federal law, state law, common law, contract, rule, regulation, or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, punitive or compensatory, for any alleged claim or cause of action (whether based in tort, statute, regulation, common law, or any other law), or assertion of fraudulent transfer regarding or other challenge to (i) any transaction between or involving the EQT Defendants and/or Diversified Defendants (including but not limited to Plaintiffs' claims relating to the transactions between the Diversified Defendants and the EQT Defendants in 2018 and 2020), (ii) any transaction related to the acquisition of any Diversified Wells, (iii)  with respect to the EQT Defendants, any claims that were or could have been asserted in this case, (iv) the Diversified Parties' solvency as of July 1, 2024, as related to its asset retirement obligations, and (v) the Released Parties' actions, omissions, practices and decisions regarding the plugging and abandonment or restarting of Diversified Wells (including any allegations of trespass, negligence, nuisance, or failure to plug) that are plugged or restarted at any time prior to and through the 10 year period referenced in the following paragraph.

SA ¶ VI.2.a.

However, because Diversified may not plug all non-producing wells in the ten-year Plugging Promises period, trespass and similar common law claims alleged against Diversified will not be released, but instead are subject to a ten-year covenant not to sue.

> Covenant Not to Sue.  To covenant not to sue or bring any type of claim or action (including against any Released Party or State or other regulators) —for a period that shall not expire until 10 full years has elapsed since the occurrence of the Effective Date—regarding any and all claims and causes of action of any nature whatsoever, whether based on any federal law, state law, common law, contract, rule, regulation, or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, punitive or compensatory, that arise out of or relate to (i) the Released Parties' actions, omissions, practices, and decisions regarding the plugging and abandonment (or lack thereof) of Diversified Wells (including the timing of such plugging or lack thereof) on property owned or leased by members of the Settlement Class, or (ii) the validity or sufficiency or primacy of agreements or consent orders between any of the Diversified Parties and State well regulators that concern well plugging and abandonment.  This tolling and covenant not to sue includes all causes of action that were alleged and could have been alleged against the Released Parties in the Action.  For the avoidance of doubt, Class Representatives and Settlement Class Members covenant not to sue—for a period that shall not expire until 10 full years has elapsed since the occurrence of the Effective Date—the Released Parties for any claim or cause of action arising out of or related to trespass, negligence, nuisance, or failure to plug associated with Diversified Wells that was brought or could have been brought in this Action.  For the further avoidance of doubt, except as set forth in Article II.9, no Class Representative or Settlement Class Member may petition or seek any relief that the Diversified Parties must plug any specific well for a period that shall not expire until 10 full years has elapsed since the occurrence of the Effective Date (to be clear, no Class Representative or Settlement Class Member may ever petition or seek any relief that the EQT Defendants must plug any Diversified Wells).  To the extent the Diversified Parties plug the Diversified Wells on the property of a Settlement Class Member, all such claims that the Settlement Class Member may have against the Released Parties regarding the actions, omissions, practices, and decisions regarding the plugging and abandonment of Diversified Wells (including the timing of such plugging or lack thereof), whether such claims sound in trespass, nuisance, negligence, or otherwise, shall be automatically and immediately released for all time by the operation of this Agreement and without further action.

*Id.* ¶ VI.2.b.

Critically, the key impact of this provision is that surface owners with Diversified Wells that remain unplugged and non-producing on January 1, 2035 reserve all rights to bring an action

requiring Diversified to plug wells.

Finally, the Settlement provides that certain administrative remedies are unaffected by either the release or the covenant not to sue, as are claims for damages to person or property caused by well plugging. Specifically, as to Diversified, Settlement Class Members will not:

> waive any individual rights (1) to individually (and not as a group or class) apply to applicable State Departments of Environmental Protection to request that their wells be plugged if such a process exists under state law; and (2) to individually (and not as a group or class) assert any claims arising out of damage caused by the plugging of a well and associated work, or damage to persons or property caused by actions taken in the plugging of a well[.]

*Id.* ¶ VI.2.c.

## IV.  ARGUMENT

### THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT AND APPROVE CLASS NOTICE

**A.      At final approval, it is likely the Court will conclude the settlement is fair, reasonable, and adequate.**

Under Rule 23(e)(1)(B), a court may "grant preliminary approval of a proposed class action settlement — and hence send notice of it to the class — as long as the moving parties demonstrate that the court 'will likely be able to' grant final approval to the settlement." Rubenstein, *Newberg on Class Actions* (6th ed.) § 13:14 (quoting Fed. R. Civ. P. 23(e)(1)(B)). In 2019, Rule 23 was amended to list the specific factors a court must consider in evaluating whether to approve a class action settlement. A court may "authorize[] final approval only upon a showing that the settlement is 'fair, reasonable, and adequate,' made after a consideration of four factors." *Newberg* § 13:14 (quoting Fed. R. Civ. P. 23(e)(5)). *Id.* The four factors are whether:

> **(A)**     the class representatives and class counsel have adequately represented the class;
>
> **(B)**     the proposal was negotiated at arm's length;
>
> **(C)**     the relief provided for the class is adequate, taking into account:

(i)    the costs, risks, and delay of trial and appeal;

(ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)  the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)  any agreement required to be identified under Rule 23(e)(3); and

**(D)**    the proposal treats class members equitably relative to each other.

*Id.*[6]

Plaintiffs address these factors below.

### 1.    Rule 23(e)(5)(A) & (B): The Class has been adequately represented, and the settlement was negotiated at arms-length.

The Rule 23(e)(5)(A) and (B) factors of adequate representation and arms-length negotiation are procedural in nature, and do not look substantively at the settlement terms. Adequacy of representation "requires that 'the representative parties will fairly and adequately protect the interests of the class.' Fed. R. Civ. P. 23(a)(4). This determination requires a two-pronged inquiry: (1) the named plaintiffs must not have interests antagonistic to those of the class; and (2) the plaintiffs' attorneys must be qualified, experienced and generally able to conduct the litigation. *Hewlett v. Premier Salons, Int'l, Inc.,* 185 F.R.D. 211, 218 (D. Md. 1997).

The named Plaintiffs do not have interests antagonistic to the Class Members, and are not singled out in the Settlement Agreement for special treatment. Substantively, they are entitled to no more than that of any Settlement Class Member. Moreover, the Settlement Agreement requires that Diversified's well-plugging be carried out proportionately to the number of abandoned wells in each of the six states (subject to a 17.5% cushion), ensuring

---

[6] According to the leading treatise, these new provisions "essentially codified" the courts' prior jurisprudence governing preliminary settlement approval processes and standards, and therefore are "unlikely to generate a significant change in the settlement process or outcome." *Newberg* § 13:14.

equal treatment among the affected states. SA ¶ II.6.

The adequacy of Plaintiffs' counsel is revealed by the extraordinary lengths to which they have gone to achieve this settlement. They have devoted thousands of hours and millions of dollars to fund and pursue extensive discovery, multiple motions to compel discovery, the disclosure of six expert reports (and four rebuttal reports), and multiple appeals to bring this case to the stage where the risks and rewards of further litigation can fairly be judged.

The requirement of arms-length negotiation generally looks to the procedural posture of the case to determine if it is the subject of legitimate, informed negotiations. *Newberg* § 13:14. As the Advisory Committee's notes to the 2018 amendments state, "the nature and amount of discovery . . . may indicate whether counsel negotiating on behalf of the class had an adequate information base." Fed. R. Civ. P. 23(e)(2) Adv. Comm. note to 2018 amendment. Here, as stated above, Plaintiffs had abundant information to inform the negotiated settlement, including the benefit of a formal mediation led by a respected mediator. The Court had also issued its order striking the common law class allegations, which signaled significant certification challenges.

Similarly, the settlement was negotiated by counsel experienced in class action litigation. *See In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Practice,* 952 F.3d 471, 484 (4th Cir. 2020) (a court considering whether to approve a class action settlement should consider "the experience of counsel in the relevant area of class action litigation."); *see also Muhammad*, 2008 WL 5377783, at *4 ("When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight.") (cleaned up). Plaintiffs' counsel have many years of experience litigating class actions and

commercial cases, including in numerous matters litigated in this Court.

### 2.    Rule 23(e)(5)(C) & (D): The relief is adequate and treats all class members equitably.

The Rule 23(e)(5)(C) and (D) factors look at the substance of the settlement — the adequacy of its relief, and the equity of its distribution across the class. *Newberg* § 13:15.

Any determination of adequacy of a settlement's relief requires consideration of "the existence of any difficulties of proof or strong defenses [that] the [class members were] likely to encounter if the claims proceeded to trial." *In re Lumber Liquidators,* 952 F.3d at 485 (cleaned up). One of Plaintiffs' principal challenges was to obtain contested class certification. In its order striking the common law class allegations against Diversified, the Court found that the common law class — effectively, surface owners on whose properties Diversified Wells were located —was not ascertainable because DEP well production records could not definitively determine whether a well was abandoned, tax maps could not adequately establish whether a persons owned property on which a Diversified Well was located, and the Court could not determine whether a specified well's presence was authorized without consulting relevant deeds or leases. *See* ECF No. 653 at 8–11. While Plaintiffs contest this ruling, and in response to Plaintiffs' motion for reconsideration (ECF No. 658) the Court allowed the continued briefing of these issues (ECF No. 670), these challenges remain available to the Defendants and, if adopted either here or in the Court of Appeals, would foreclose any class remedy.

Additional barriers to class relief include the untested, unprecedented nature of the claims and a risk of an adverse judgment; the continued risk that Diversified would moot the named plaintiffs' claims by plugging wells (*see* ECF No. 545); and the extraordinary cost and delay in getting to final judgment over what would likely have been multiple Fourth Circuit appeals. The likelihood that this process would "likely drag on for years" is a significant factor

supporting the adequacy of this settlement. *In re Lumber Liquidators,* 952 F.3d at 485 (quoting *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005)).

Finally, Class Members are treated equitably. None are singled out for special treatment, and each State will benefit from plugging equitably, in proportion to its share of Diversified's nonproducing wells.

**A.      The Court should approve the proposed notice plan, which meets all Rule-based and constitutional requirements.**

Rule 23(c)(2)(B) requires "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." The Rule further requires that:

> The notice must clearly and concisely state in plain, easily understood language:
> (i)      the nature of the action;
> (ii)     the definition of the class certified;
> (iii)    the class claims, issues, or defenses;
> (iv)     that a class member may enter an appearance through an attorney if the member so desires;
> (v)      that the court will exclude from the class any member who requests exclusion;
> (vi)     the time and manner for requesting exclusion; and
> (vii)    the binding effect of a class judgment on members under Rule 23(c)(3).

*Id.*

The type of notice to which a member of a class is entitled depends upon the information available to the parties about that person, and the possible methods of identification. *See In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1098 (5th Cir. 1977) (*citing Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)). Here, Plaintiffs' counsel worked with defense counsel and Diversified employees (as well as Plaintiffs' experts) to identify the names and mailing addresses for Settlement Class Members in all six states. "[D]ue process is satisfied

'where a fully descriptive notice is sent first-class mail to each class member, with an explanation of the right to opt out.'" *Domonoske*, 790 F. Supp. 2d 466, 472 (W.D. Va. 2011) (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).

To account for the fact that mailed notice may not reach all class members, the mailed notice program is supplemented by an extensive newspaper publication and digital publication program and press release.

Plaintiffs' proposed notice plan satisfied due process. The notices (Exhibits 1.E(1)-(3)) are written in plain, easily understood language, and contain all required Rule 23(c)(2)(B) information.

## V.   PROPOSED SETTLEMENT APPROVAL SCHEDULE

The last step in the settlement approval process is a final approval hearing at which the Court may hear all evidence and argument necessary to make its settlement evaluation. Proponents of the settlement may explain the terms and conditions of the Settlement Agreement, and offer argument in support of final approval. The Court will determine after the final approval hearing whether the settlement should be approved, and whether to enter a final order and judgment under Rule 23(e).

Plaintiffs request that the Court set dates for the following proceedings according to this proposed schedule:

| ACTION | DATE |
|---|---|
| Preliminary Approval Order Entered | At the Court's Discretion |
| Class Notice Deadline | 30 days after Preliminary Approval Order Entered |
| Class Counsel's Fee Motion Submitted | 20 days after Class Notice Deadline |

| Exclusions Deadline | 60 days after Class Notice Deadline |
|---|---|
| Final Approval Motion Due | 65 days after Class Notice Deadline |
| Objections Deadline | 86 days after Class Notice Deadline |
| Supplemental Brief Responding to Objections | 95 days after Class Notice Deadline |
| Final Approval Hearing | At least 110 days after Class Notice Deadline |
| Final Approval Order Entered | At the Court's Discretion |

## VI.  CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant this Motion and enter the submitted Proposed Order, preliminarily approve the parties' proposed Settlement Agreement, and establish the schedule included in the Proposed Order.

Dated: November 6, 2024                          Respectfully submitted,

/s/ John W. Barrett
John W. Barrett, Esq. (WVSB No. 7289)
Brian A. Glasser, Esq. (WVSB No. 6597)
Brian R. Swiger (WVSB No. 5872)
Athanasios Basdekis (WVSB No. 9832)
J. Lincoln Wolfe (WVSB No. 14117)
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555 (phone)
(304) 342-1110 (fax)
bglasser@baileyglasser.com
jbarrett@baileyglasser.com
bswiger@baileyglasser.com
tbasdekis@baileyglasser.com
lwolfe@baileyglasser.com

Panida A. Anderson (admitted *pro hac vice*)
Bailey & Glasser, LLP
1055 Thomas Jefferson St. NW, Suite 540
Washington, DC 20007
PAnderson@baileyglasser.com
Telephone: (202) 463-2101
Facsimile: (202) 463-2103

J. Michael Becher (WVSB No. 10588)
Joseph M. Lovett (WVSB No. 6926)
Isak Howell (WVSB No. 11558)
Benjamin Luckett (WVSB No. 11463)
Amanda Demmerle (WVSB No. 13930)
Claire Horan (admitted *pro hac vice*)
APPALACHIAN MOUNTAIN
ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006
jlovett@appalmad.org
mbecher@appalmad.org
ihowell@appalmad.org
bluckett@appalmad.org
ademmerle@appalmad.org
choran@appalmad.org

*Attorneys for Plaintiffs and Proposed Class*

**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

MARK MCEVOY, et al., individually and
on behalf of a proposed class,

        Plaintiffs,

v.                                      CIVIL ACTION NO. 5:22-cv-171
                                      Honorable Judge John P. Bailey

DIVERSIFIED ENERGY COMPANY PLC,
et al.,

        Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of November 2024, a copy of **PLAINTIFFS'
MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT** was filed using CM/ECF, the Court's electronic notification
system, which provided notice to all counsel of record.

                                        */s/ John W. Barrett*
                                        John W. Barrett, Esq. (WVSB No. 7289)